```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
                        SOUTHERN DIVISION


UNITED STATES OF AMERICA     .      Criminal Case No. DKC-05-0393
                             .
    v.                       .
                             .      Greenbelt, Maryland
VICTOR RAMIREZ,              .
                             .
             Defendant.      .      Friday, October 24, 2008
. . . . . . . . . . . . . . .       9:15 a.m.




                      TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE DEBORAH K. CHASANOW
          UNITED STATES DISTRICT JUDGE, AND A JURY
```

APPEARANCES:

```
FOR THE GOVERNMENT:         CHAN PARK, ESQ.
                            DAVID JAFFE, ESQ.
                            ROBERT K. HUR, ESQ.
                            Office of the United States Attorney
                            Suite 400, U.S. Courthouse
                            6500 Cherrywood Lane
                            Greenbelt, Maryland 20770



FOR THE DEFENDANT:          WARREN E. GORMAN, ESQ.
                            5530 Wisconsin Avenue
                            Suite 1209
                            Chevy Chase, Maryland 20815



OFFICIAL COURT REPORTER:  GLORIA I. WILLIAMS  301-344-3228


            COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES
```

I N D E X

| GOVERNMENT'S WITNESS ON MOTION | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Wilber Garcia | 4 | 10 | 19 | 20 |

TRIAL

| GOVERNMENT'S WITNESSES | VOIR DIRE | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|---|
| Eric Garza | | 37 | 47 | | |
| Wilber Garcia | | 50 | 94 | 125 | |
| Shelley Blumberg | 133 141 | 147 | 166 | 170 | 171 |

1                     P R O C E E D I N G S

2              THE COURT:  After we recessed, late yesterday

3    afternoon, the government did e-mail, I believe, everyone

4    citations to three cases.  They were indeed the same ones that

5    we had discussed in the other trial.  Mr. Gorman, did you

6    receive that?

7              MR. GORMAN:  I did.

8              THE COURT:  Okay.  Good.  Well, are we ready to begin

9    with an evidentiary hearing on the issue?

10             MR. JAFFE:  We're ready, Your Honor.  And we're ready

11   to call the witness, Wilber Garcia-Martinez.

12             THE DEPUTY CLERK:  Please stand and raise your right

13   hand.

14             MR. JAFFE:  He would need the services of an

15   interpreter.

16             MS. GOLDSTEIN:  Good morning, Your Honor.

17             THE COURT:  All right.  Then let's swear in, please,

18   Ms. Goldstein, first.

19             (Spanish language interpreter duly sworn by the deputy

20   clerk.)

21             THE DEPUTY CLERK:  Please state your name for the

22   record and spell your first and last names.

23             THE INTERPRETER:  Marta Goldstein, M-a-r-t-a, last name

24   G-o-l-d-s-t-e-i-n, federal court certified Spanish interpreter.

25             THE COURT:  Thank you.

1          THE DEPUTY CLERK:  Mr. Garcia-Martinez, please raise

2    your right hand.

3          WILBER GARCIA, GOVERNMENT'S WITNESS, SWORN,

4          TESTIFYING THROUGH THE SPANISH LANGUAGE INTERPRETER

5          THE DEPUTY CLERK:  You may be seated.  Please speak

6    loudly and clearly into the microphone.  State your name for the

7    record and spell your first and last names.

8          THE WITNESS:  Wilber Garcia, W-i-l-b-e-r, G-a-r-c-i-a.

9          THE COURT:  Mr. Jaffe.

10                        DIRECT EXAMINATION

11   BY MR. JAFFE

12   Q   Mr. Garcia, how old are you, sir?

13   A   I just turned 23.

14   Q   Were you arrested some time in August of 2005?

15   A   Yes.

16   Q   And basically have you been in various jails since that

17   time?

18   A   Yes.

19   Q   Also, did you sign a cooperation agreement with the

20   government some time in 2006?

21   A   Yes.

22   Q   I want to focus your attention now to earlier this year in

23   2008.  Did there come a time, Mr. Garcia, that you were taken to

24   the Supermax jail?

25   A   Yes.

1   Q   Did you know ahead of time that you were going to Supermax?

2   A   Yes, I knew.  I was taken from DOC over there.

3   Q   I want to draw your attention back in time to when --

4   withdrawn.

5        Was there a time when you were in a facility in Ohio?

6   A   Yes.

7   Q   After Ohio where were you taken?

8   A   I went to DOC and then from DOC to Supermax.

9   Q   Did you know when you were in Ohio that you were going to be

10  going to DOC and then Supermax?

11  A   No.  I'm never told where I'm going.

12  Q   To make sure that's clear, did the government, the

13  prosecutors, tell you at all that that was going to be happening

14  to you?

15  A   No.

16  Q   Now, what I'd like you to do, Mr. Garcia, is tell the court

17  what happened that first day that you were brought to Supermax.

18  A   Well, the first thing that happened was that I was put into

19  a unit where Mousey and Homey were.

20  Q   Had you expected to see either of them?

21  A   No, not at all, at no time.

22  Q   Were you actually placed in a cell with one of those

23  individuals?

24  A   Yes, with Homey.

25  Q   What, if anything, happened that first day or night that you

1  were brought into the cell with Homey?

2  A   Well, the first day nothing, but the next day something.

3  Q   Could you tell us what happened that next day?

4  A   Mousey said in the morning that the first thing was that

5  when he was brought to the unit Homey was there and the first

6  thing Homey said was do you know what was going on with me.  He

7  answered that he knew that I was going crazy, but Homey said,

8  "No.  He's cooperating."

9  Q   So is this a conversation you're having with Mousey?

10  A   Yes.

11  Q   Did you approach Mousey to begin to talk to Mousey about

12  this?

13          MR. GORMAN:  Objection.

14          THE COURT:  Overruled.

15          THE WITNESS:  Well, the first day I said hello the way

16  gang members say hello to other gang members.

17  BY MR. JAFFE:

18  Q   But the second day when you had this conversation, how did

19  it begin?

20  A   Well, actually, he said it very softly to me and he started

21  the conversation with that because Homey was sleeping at the

22  time.

23          THE DEPUTY CLERK:  Mr. Jaffe, would you move that

24  microphone closer to you.

25  BY MR. JAFFE:

1   Q   Now, in the coming weeks, did you sometimes have

2   conversations with Mousey?

3   A   Yes.

4   Q   I want to direct your attention to a time that you were

5   watching television and Mousey was present.  Do you remember a

6   time when the announcer on the television used the word

7   "Riverdale" and something happened?

8   A   Yes.  Actually, it was the news that was on television and

9   when the word came out "Riverdale" on television and Mousey

10  heard that, he said that that was an area where we had gone on

11  to do some hits, what we mean to kill people, kill chavalas.

12  Q   Had you said anything to him about Riverdale before he said

13  this, the moment before he said this?

14  A   No, I didn't say anything to him at that time.  I hadn't

15  said anything to him at that time.  Or if you'd like to specify

16  a little bit better on the question, I don't know if I

17  understood it correctly.

18  Q   Okay.  Right before Mousey said these words about Riverdale,

19  had you questioned him at all to prompt him to say this?

20  A   No.  He just suddenly mentioned it when he heard it.

21  Q   I want to direct your attention to a different conversation

22  at a different point in time.  Did Mousey ever say anything to

23  you about Mousey's tattoos?

24  A   Yes.

25  Q   Could you tell the court how did this conversation start?

1          THE INTERPRETER:  Interpreter is going to request a

2     clarification, Your Honor.

3          THE WITNESS:  In the morning, he does exercises every

4     morning and he puts his bag underneath his clothes so he sweats.

5     Well, he had to take his clothes off, his shirt off, and he had

6     tattoos and he had an MS on his stomach and the MS was filled

7     in, and he said what that means is that every time they kill

8     someone, what we call a hit or to go kill someone, that that's

9     how they do it, they fill it in.  Can I specify something?

10    BY MR. JAFFE:

11    Q   Please, yes.  Please specify something.

12         THE INTERPRETER:  The interpreter is going to get a

13    clarification, Your Honor, if I may.

14         The interpreter is not understanding what the witness

15    is trying to say.  Perhaps the other interpreter might help for

16    a moment.

17         (Interpreters confer off the record.)

18         THE INTERPRETER:  May I ask the witness, Your Honor for

19    a clarification?

20         (Interpreter confers with witness.)

21         THE INTERPRETER:  The interpreter would clarify for the

22    record, Your Honor, that the gentleman was spelling out what

23    would have been the letter M in Spanish, which comes out

24    E-M-E-S-E, "eme ese," and that's why there was a confusion.

25    Thank you.

1   BY MR. JAFFE:

2   Q   Could you tell us about how -- withdrawn.

3        Did you ask him some questions about the tattoos?

4   A   I actually never asked him exactly about that.  Well, he

5   kind of likes to brag.

6   Q   But to be very specific about this conversation, did you ask

7   him anything about his tattoos to get him to say that?

8   A   At that time I don't remember asking anything about the

9   tattoos.  I just remember he mentioned it.

10  Q   Do you remember asking him about anything to get him to say

11  anything about his tattoos?

12  A   No.  Actually, I never asked him anything about the tattoos,

13  because those are normal for the gang members.

14        MR. JAFFE:  Court's indulgence.

15  BY MR. JAFFE:

16  Q   To make sure the record is clear, Mr. Garcia, what was it

17  that Mousey said about the tattoos specifically?

18  A   Each letter that's filled in, it means a hit or when someone

19  goes out to kill a chavala.

20  Q   Did you eventually leave the Supermax facility?

21  A   Well, yes.

22  Q   Did you do anything or try to do anything to make that

23  happen?

24  A   Well, at another time when there was some cooperation with

25  Homey, my lawyer, a female, came to see me and I asked her if

1   she could move me.  We asked to have me moved from that jail.

2   Q   Was that the first time you had seen your lawyer since you

3   had been at Supermax?

4   A   Yes.

5        MR. JAFFE:  Court's indulgence.

6   BY MR. JAFFE:

7   Q   How soon after you met with your lawyer did you get moved

8   out of that area with Homey?

9   A   After speaking to my lawyer, the same week, on Thursday.

10       MR. JAFFE:  Your Honor, the government has nothing

11  further on direct.

12       THE COURT:  Mr. Gorman.

13                    CROSS-EXAMINATION

14  BY MR. GORMAN:

15  Q   Prior to coming to the Supermax jail, had you ever met

16  Mousey?

17  A   I met him in Montgomery County.

18  Q   And when did you meet him?

19  A   Well, I met him when I was moved from one unit to another

20  unit at Montgomery County.  If you please could ask the question

21  more specifically.

22  Q   Where did you first meet Mousey?

23  A   Well, inside of jail.

24  Q   You never saw him before you got to jail; would that be

25  correct?

1   A    No.

2   Q    And which jail did you meet him in for the first time?

3   A    In Montgomery County.

4   Q    Do you know the name of the jail?

5   A    Clarksburg.

6   Q    What year was that?

7   A    Well, that was in -- well, I was there in 2005.

8   Q    At that point had you begun to cooperate with law

9   enforcement?

10  A    No, actually not.  And actually it was state.  It wasn't

11  federal.

12  Q    So you cooperated with the state at that point?

13  A    No.

14  Q    Had you given statements to the state about your involvement

15  in any criminal activity at that point?

16  A    Well, not a statement, not of things I had done but things

17  that I knew had been done.

18  Q    When you saw Mousey in 2005, did he make any statements to

19  you about his involvement?

20          MR. JAFFE:  Objection, Your Honor.  Relevance for this

21  hearing.

22          THE COURT:  I'll overrule it for purposes of this

23  hearing.  Go ahead.

24          THE WITNESS:  No.  He just talked a little bit about

25  the case that he had been picked up on.

1    BY MR. GORMAN:

2    Q    When you saw -- now, Mousey, is this the person sitting to

3    my right here?

4    A    Yes.

5    Q    And could you describe what he has on?

6    A    White long sleeve shirt with a white shirt underneath.

7         MR. GORMAN:  Could the record reflect the

8    identification?

9         THE COURT:  So noted.

10   BY MR. GORMAN:

11   Q    Now, when you saw him at Supermax, what year was that?

12   A    Well, at the beginning of this year.

13   Q    That would be 2008?

14   A    Right.

15   Q    Had you already begun cooperating with the prosecution at

16   the point when you saw him at Supermax?

17   A    Yes.

18   Q    And when you saw Mousey in 2008, did you tell him that you

19   were cooperating?

20   A    At no time.  That goes against the rules of the gang.

21   Q    Did he ask you if you were cooperating?

22   A    No.

23   Q    Did you tell him that you were not cooperating?

24   A    Yes.  Because of the question he was asking me, I said no.

25   Q    So you were lying to him at that point, correct?

1    A    That I was cooperating, yes, I was lying.

2    Q    How many meetings did you have with prosecutors or law

3    enforcement officers prior to the time that you talked to Mousey

4    in 2008?

5    A    I don't remember.  Several.

6    Q    More than three?

7    A    It could have been more or less.  I've never kept count.

8    Q    At a typical meeting, other than yourself and your lawyer,

9    who was there at these meetings?

10   A    Well, sometimes detectives were there.

11   Q    Were there prosecutors there?

12   A    Well, in my case the prosecutor was there at the beginning,

13   yes.

14   Q    Were the prosecutors always there?

15   A    Well, sometimes they would come and then they would leave

16   and the detectives would ask me questions.

17   Q    During the course of these meetings, did they ever tell you

18   that the more information they gave you, the better it could be

19   at your sentencing?

20        MR. JAFFE:  Objection.

21        THE COURT:  Do you want to try that one again, please.

22   BY MR. GORMAN:

23   Q    At these meetings were you ever informed by either

24   detectives or the prosecutors that the more that you told them

25   about activities of MS-13, the better it might be for you at the

1   sentencing?

2   A   They never said that to me at any time.

3   Q   Did they tell you that the more that you could help them in

4   prosecution of MS-13 members, the better sentence you might get

5   from the judge?

6   A   Well, actually, they said that with my cooperation, at the

7   end of it they would tell the judge about my cooperation and

8   then according to her, it would be her final word whether she --

9   whatever she did.

10  Q   Did either the prosecutors or the law enforcement officers

11  ever suggest to you that you should talk to members of MS-13

12  that you would meet at the jail?

13  A   No.

14  Q   Did you ever receive information from any source that if you

15  spoke to people at the MS-13 -- at the jail that it would be

16  better for you?

17          MR. JAFFE:  Objection, Your Honor.

18          THE COURT:  Overruled.

19          THE WITNESS:  No.

20  BY MR. GORMAN:

21  Q   Did you try to ask Mousey questions about his involvement in

22  order for you to get a better sentence from the judge?

23  A   I never did with that intention, no.

24  Q   Did your lawyer ever tell you to ask questions of Mousey or

25  any other MS-13 member in order to get a better sentence from

1    the judge?

2           MR. JAFFE:  Objection, Judge.

3           THE COURT:  Overruled.

4           THE WITNESS:  No.  I don't even think my lawyer knew

5    about Mousey.

6    BY MR. GORMAN:

7    Q    When you spoke to Mousey, had you already pled guilty?

8    A    Yes.

9    Q    Have you already been sentenced in this case?

10   A    No.

11   Q    Did you give any information to Mousey about your

12   involvement in the case of MS-13?

13   A    Could you please specify the question again.

14   Q    Did you give any information to Mousey about your

15   involvement in the MS-13 case?

16   A    Well, I told him more or less what had been happening to me.

17   Q    Were you given any money or any privileges prior to the time

18   that you talked to Mousey in Supermax?

19   A    I've never received any money and I've just been another

20   inmate in jail, nothing else.

21   Q    You testified that the tattoo on Mousey on his stomach was

22   filled in or part of it was filled in; is that correct?

23   A    Well, some of the letters he has.

24   Q    Were these letters on his stomach?

25   A    From what I remember and the explanation he gave me, yes.

1   Q    What part of the letters were filled in on his stomach?

2   A    The first ones from left to right.  I don't know how many.

3   Q    Would that be the letter beginning M?

4   A    What I remember and what he told me, MS-13 is not just that

5   that's on his stomach, but from what I remember, not just the

6   letters MS-13.

7   Q    What other part of his stomach was filled in?

8              MR. JAFFE:  Your Honor, object on the scope question.

9              THE COURT:  Sustained.  That may be relevant if this

10  testimony comes in later.

11             MR. GORMAN:  These were questions that were brought out

12  by the prosecution.

13             THE COURT:  Only for the area that was being discussed.

14             THE INTERPRETER:  Interpreter would like a moment, Your

15  Honor.  I believe they're doing simultaneous on the attorneys'

16  questions and I don't see any headsets on the witness.

17             THE COURT:  I'm not sure that the witness needs to hear

18  that.

19             While we're interrupted, I'd like the clerk to swear in

20  the interpreter if he's going to be assisting.

21             (Spanish language interpreter duly sworn by the deputy

22  clerk.)

23             MR. WESLEY:  Carlos Wesley, court interpreter.

24             THE DEPUTY CLERK:  If you would please spell your first

25  and last names for the record.

1        MR. WESLEY:  First name C-a-r-l-o-s.  Last name is

2   W-e-s-l-e-y.

3        THE DEPUTY CLERK:  Thank you.

4        MR. WESLEY:  Thank you.

5   BY MR. GORMAN:

6   Q   How many times did Mousey make statements to you about his

7   involvement in MS-13?

8   A   He told me about it many times without me asking.

9   Q   Were all these conversations in Spanish?

10  A   Yes.

11  Q   Other than you and Mousey, was there anybody present who

12  spoke Spanish and was in a position to overhear the

13  conversations?

14       MR. JAFFE:  Objection, Your Honor.

15       THE COURT:  Overruled.

16       THE WITNESS:  No.

17  BY MR. GORMAN:

18  Q   At what point in time after the first conversation did you

19  tell anyone that you had conversations with Mousey about MS-13?

20  A   Could you repeat the question.

21  Q   At what point in time was the first time that you told

22  anyone about your conversations with Mousey about MS-13?

23  A   That was a long time afterwards.

24  Q   Had you completed all your conversations with Mousey prior

25  to the time in which you told anyone about these conversations?

1    A    Yes.

2    Q    Do you know what date that was?

3    A    Could you specify that about Mousey?

4    Q    What date was the first time you told anyone about your

5    conversations with Mousey?

6    A    That was after I was moved from Supermax and I went to Ohio

7    and then I returned, and then I talked to the prosecutors about

8    the conversations that he had had with me.

9    Q    Do you remember the date?

10   A    No.  Speaking about dates, I don't remember dates very well.

11   Q    The first date that you had a conversation with Mousey about

12   his involvement, do you remember that date?

13   A    No.

14   Q    Did you take any notes about any of the conversations that

15   you had with Mousey?

16   A    Yes.

17   Q    What did you do with those notes?

18   A    Well, to tell you the truth, I gave them to the prosecutors.

19             MR. GORMAN:  I'd ask that those notes be turned over.

20             THE COURT:  Certainly.  We'll find out.  Continue your

21   examination of the witness.  Do you have them, Mr. Park,

22   Mr. Jaffe?

23             MR. PARK:  We're looking at each other in a puzzled

24   way.

25             THE COURT:  They're going to need to voir dire the

19

1   witness about what he's talking about.  But, yes, if there are

2   some, you would be entitled to them.

3   BY MR. GORMAN:

4   Q   Where did you keep these notes?

5            MR. JAFFE:  We object to this at this point.

6            THE COURT:  Why don't you ask some questions and find

7   out what he means.  He just said he gave you notes.  We need to

8   find out.

9                         REDIRECT EXAMINATION

10  BY MR. JAFFE:

11  Q   Mr. Garcia, did you give notes to one of the prosecutors

12  during a proffer session or to your attorney?

13  A   Well, if I remember correctly, I took some notes that were

14  short notes and I think I gave them to the prosecutor,

15  Mr. Chan, but at no time did I have intention of testifying

16  against Mousey.

17  Q   Was this before you testified in our last trial?

18  A   I don't remember very well.  I don't know if they can

19  remember.

20           MR. JAFFE:  Your Honor, we're having somebody retrieve

21  our master file to see if something is in there or not.

22           THE COURT:  Mr. Garcia, do you recall that any notes

23  concerned any conversations you had with Mousey or were they

24  about other conversations perhaps with Homey?

25           THE WITNESS:  In part they were only about Mousey,

1   things that happened in El Salvador and things about him.

2           THE COURT:  Do you have any other questions?

3           MR. GORMAN:  I have a few questions.  Thank you, Your

4   Honor.

5                       RECROSS-EXAMINATION

6   BY MR. GORMAN:

7   Q   Was Homey present in any of the conversations that you had

8   with Mousey concerning his involvement with MS-13?

9   A   Mousey didn't like to talk in front of Homey about gang-

10  related things, because Homey was very serious, especially with

11  him and with me.

12  Q   So would the answer be no?

13  A   Well, could you repeat the question because I don't have it

14  in my mind.

15  Q   Did you have any conversations with Mousey when Homey was

16  present concerning Mousey's involvement with MS-13?

17  A   Honestly, no.

18  Q   Why did you take notes about your conversations with Mousey?

19  A   Well, in fact, I did it almost without thinking.  I did that

20  because sometimes I had arguments with him.

21  Q   And why would your arguments with Mousey have anything to do

22  with you taking notes?

23  A   Well, I wanted to talk to my lawyer about that.

24  Q   Now, was the reason that you took notes about your

25  conversations with Mousey to prove that you did have the

1   conversations with him?

2   A   Well, in a way, yes.

3   Q   And was that done in order to try to get a better sentence

4   for you from the judge at the time that you were going to be

5   sentenced?

6   A   No.  In fact, I never thought I would testify against him or

7   against Homey.

8   Q   So why did you take the notes?

9        MR. JAFFE:  Objection.  Asked and answered.

10        THE COURT:  Sustained.

11   BY MR. GORMAN:

12   Q   Did you date the notes that you took with Mousey?

13   A   Yes.

14   Q   Do you have any specific recollection as to what date you

15   had any conversations with Mousey?

16   A   No.  That's the reason I wrote it down, because I have very

17   bad memory about dates.

18   Q   Did you take these notes in front of Mousey?

19   A   No.

20   Q   When you were in Supermax, did you share a cell with someone

21   else?

22   A   Yes, with Homey.

23   Q   And did you want Homey to know about the notes that you took

24   about your conversations with Mousey?

25   A   No.  And apart from that, I wrote them in English.

1    Q    How well do you speak English?

2            MR. JAFFE:  Objection, Your Honor.  Beyond the scope of

3    this hearing.

4            THE COURT:  Sustained.

5    BY MR. GORMAN:

6    Q    From the time that you took your first notes about the

7    conversation until the time that you left Supermax, about how

8    much time went by?

9    A    Well, could you specify the question better.

10   Q    Yes.  From the time that you first took notes about your

11   conversation with Mousey until the time that you were

12   transferred out of Supermax, how much time went by?

13   A    Well, I still don't understand the question well.

14   Q    There was a time that you took your first note about your

15   conversation with Mousey, correct?

16   A    Yes.

17   Q    And there was a time that you eventually left Supermax,

18   correct?

19   A    Yes.

20   Q    How much time went by between the time you took the first

21   note and the time that you left Supermax?

22   A    Well, perhaps a month, a month and something.

23   Q    About how many different times did you take these notes?

24   A    Well, three or four times.  I didn't really pay much

25   attention.

1    Q    When you took these notes, where were you physically inside

2    Supermax?

3            MR. JAFFE:  Object on relevance grounds.

4            THE COURT:  Sustained.

5    BY MR. GORMAN:

6    Q    Was Homey ever present -- did you ever write these notes

7    while you were in the cell?

8            MR. JAFFE:  Objection.

9            THE COURT:  Sustained.

10   BY MR. GORMAN:

11   Q    After you wrote these notes, where did you keep them?

12           MR. JAFFE:  Objection.

13           THE COURT:  What can you tell me about them?  Does the

14   government not have any?

15           MR. JAFFE:  We have now two people looking for our file

16   to see if we have them or not.  We don't have a recollection of

17   it, but I want to make sure by looking through the file to see

18   if there are notes in there.  We don't have an independent

19   recollection sitting here, but we're not making a proffer to the

20   court until we check the file.

21           THE COURT:  Okay.  We're going to check and see what

22   that is.  There may be more issues we need to talk about but not

23   for purposes of this hearing at the moment.

24           MR. GORMAN:  Then I'd ask the court to suspend the

25   hearing until I have a chance to take a look at those.  That's

1  the -- my line of questioning goes to these notes.

2         THE COURT:  All right.  Any redirect on this at the

3  moment?

4         MR. JAFFE:  No, Your Honor.

5         THE COURT:  Okay.  Any other witnesses?

6         MR. JAFFE:  No, Your Honor.

7         THE COURT:  Mr. Gorman?

8         MR. GORMAN:  No, Your Honor.

9         THE COURT:  Okay.  Mr. Garcia can be excused for the

10  moment.

11         Mr. Gorman, my understanding is that the notes that he

12  was referring to had to do with the conversations themselves and

13  not with conversations or directions from the government.  So,

14  while we need to follow this trail and figure out whether they

15  exist, it's not my understanding that they're directly relevant

16  to the findings that I need to make concerning whether any such

17  conversations are admissible.  So, that's why I'm somewhat

18  deferring on this, but we do need to close the loop here with

19  regard to this issue.

20         So, let me hear from counsel with regard to the Massiah

21  issue as to whether this witness should be permitted to testify

22  as to any conversations he said he had with Mr. Ramirez.

23         MR. GORMAN:  I understand what the court is saying and

24  I think it's accurate up to a certain point, but since we don't

25  know what the notes say -- suppose the notes say that "I spoke

1   with -- the police officer asked me to talk to anybody I could

2   and I talked to Mousey"?

3          THE COURT:  I haven't figured out when I'm going to

4   allow Mr. Garcia to testify if I deny your motion to suppress.

5   I need to know from the government what they're able to look

6   for, what they're able to find and where we are.  It may be that

7   they won't be calling him to the witness stand in front of the

8   jury this morning.  But I'd like to make a ruling on the record

9   as it exists after I've heard from you on argument.

10         One juror is running late, fortunately, in the sense

11  that they're not all ready to go.  So, let me hear what you have

12  to say on the Massiah issue.  If it needs to be reopened because

13  some notes are located, then that's fine, but this is all I

14  think we're going to have at the moment.  So that's what I want

15  to hear about.

16         MR. GORMAN:  I guess my argument rests on his

17  credibility and that the court shouldn't believe what he says

18  based on his testimony, and since he's not credible, we suggest

19  that he was an informant working for the prosecution and,

20  therefore, the Sixth Amendment rights of my client were

21  violated.

22         He had an attorney.  He was incarcerated.  He had an

23  attorney and he was acting -- this witness was acting as a

24  government agent and his testimony should not be believed.  If

25  it's not believed, then the court should not permit him to

1  testify since he's working as an agent.

2        THE COURT:  Mr. Jaffe.

3        MR. JAFFE:  Your Honor, I'm going to focus on the

4  second prong of Massiah, the prong whether the statements were

5  deliberately elicited, and these are classic listening post type

6  situations, in that, according to the witness, there was no --

7  there's two statements that the government is seeking to elicit,

8  the one about the hit in Riverdale and the one about tattoos.

9  The first one, the testimony was an announcer on the TV used the

10 word "Riverdale" and the defendant spontaneously said something.

11 I submit that doesn't trigger any Sixth Amendment issues at all.

12 He blurted it out.  It's a classic blurt situation and the cases

13 we cite state, "The Sixth Amendment is not violated whenever by

14 luck or happenstance the State obtains incriminating statements

15 from the accused."

16       Mr. Garcia has testified, and there's nothing to

17 contradict him, that he didn't say anything one way or another

18 about anything prior to this statement being made.

19       Similarly for the comment about tattoos.  Garcia at one

20 point said, look, you know, Mousey likes to brag.  This just

21 came out.  Again, the questions that were asked certainly by the

22 government were very broad.  First, did you ask him anything

23 about tattoos to prompt this?  No.  Did you ask him about

24 anything that prompted this?  No.  There was no conversation.

25 We're using the term "conversation," but in reality there was no

1   conversation.  It was a one-sided series of statements by the

2   defendant.  That's why we'd submit that this is not a Sixth

3   Amendment issue and one that would warrant suppression.

4           Finally, we note that -- withdrawn.

5           Court's indulgence.

6           Your Honor, that's all the government has at this time.

7   We're still trying to close the loop on the notes issue.

8           MR. GORMAN:  If the court rules in the prosecution's

9   favor, I guess -- I filed a motion in limine.  So if the court

10  rules in its favor, I'd ask that the testimony be limited as to

11  what he said.  For instance, if he's going to say that this

12  tattoo means that I beat up members of my family, there's no

13  probative value and it's highly prejudicial to him.  If he

14  testifies that this tattoo means I killed somebody in the past,

15  it's highly prejudicial, not of probative value.

16          So, if the court permits this, we'd ask the court to

17  limit it to -- and I'm trying to think of the word.  It slips my

18  mind.  But limit it, sanitize his testimony in such a way that

19  it's limited to this is a tattoo attributable to MS-13 as

20  opposed to saying this means I killed somebody, this means -- it

21  could have had something to do with something not attributable

22  to MS-13.  It could have had something -- could be attributable

23  to something that is not a period of time that's part of the

24  conspiracy.  It would be prejudicial.  He's not charged with any

25  murders in El Salvador.  He's not charged with any robberies in

1   El Salvador.  So we'd ask the court to sanitize it if the court

2   permits it.

3         MR. JAFFE:  Your Honor, the government's proffer on

4   this is Mr. Garcia has no knowledge about what any tattoo means,

5   that these statements that he's related to the court today about

6   what the defendant's tattoos mean comes solely from the mouth of

7   the defendant.  Mr. Garcia will offer no testimony that a

8   specific tattoo has some sort of significance about past crimes.

9         THE COURT:  Did we see a photograph yesterday?  Could

10  you show it to me?

11        MR. JAFFE:  Yes.  It's Ramirez 2, I believe.

12        Your Honor, I show you Ramirez 3, which has not been

13  shown yet, but it's a close-up.  Should I approach or put it on

14  the monitor?

15        THE COURT:  Put it on the screen, please.

16        What are you going to argue this means, this statement

17  about filling in the letters?

18        MR. JAFFE:  That the significance of whether or not the

19  defendant was telling the truth is irrelevant.  Rather, that the

20  defendant is making these statements that shading in tattoos of

21  MS-13 shows that you commit hits underscores the defendant's

22  knowledge that part of the purpose of MS-13 --

23        THE COURT:  So the import is not that he has some

24  shaded in letters?

25        MR. JAFFE:  He does.  If you look at the top of the M

1   and the bottom of the M and the top of the A, there is some

2   shaded in portions, but on the -- the problem is the government

3   has no knowledge as to whether it's true that if they're shaded

4   in that it's murder.

5        THE COURT:  I'm trying to assess prejudice.  As

6   Mr. Gorman is arguing here, it's at least arguable to say that

7   there aren't any.

8        I guess you can ask him what he understood that to

9   mean, but I thought he was saying that some of them were

10  completely shaded in as letters.  So, I'm not sure I see the

11  kind of prejudice, Mr. Gorman, because, frankly, looking at

12  that, I can't tell whether they are or are not, without somebody

13  explaining a little more.  I see some shading at the tops and

14  bottoms of some of the letters, but by no means are any of them

15  completely shaded in.  So, I don't see the kind of prejudice

16  that I thought you were claiming, and that is that if you put

17  together the witness's testimony and the actual photograph of

18  the tattoo that it was clear that he was boasting about several

19  murders.  I don't see that at all.

20       MR. GORMAN:  Well, I think that if the court looks at

21  this and the definition of what's shading in or not -- I mean,

22  it doesn't appear that anything -- either there was shaded --

23  almost all of them are shaded in or none of them are shaded in.

24       THE COURT:  That's my point, in the sense that if he

25  said to him when they are shaded in, it means that you have

1    participated in hits, well, then, it's not showing that the

2    defendant was saying to him I did, just that they would be if I

3    did participate.

4         MR. GORMAN:  On the definition of what's shaded in or

5    not, it looks like there may have been maybe 10 things that are

6    shaded in, which means that he's a serial killer.  So, if the

7    jury believes that shaded in on each -- if that little thing on

8    the top means shaded in, that means that he committed 10

9    murders, and I think that's pretty prejudicial.  It's either

10   there's none or 10 or close to it.

11        MR. JAFFE:  Your Honor, the government is in a strange

12   position.  I don't think we're in a position to concede that

13   they're not shaded in, especially if you compare the two R's.

14   Because of the nature of this hearing, we didn't explore with

15   the witness now what he took to mean filled in, shaded in, what

16   have you.  With these R's, I think you could make an argument

17   either way.

18        The reason why the government thought it was probative

19   in this case is, again, not to show whether or not the defendant

20   has killed the people or not, was bragging or not.  Rather, it

21   shows his knowledge of the purposes again.

22        THE COURT:  Here is where I am on this.  First of all,

23   with regard to the Massiah issue, I find that Mr. Garcia was not

24   acting as a government agent on the current record, nor were

25   these statements deliberately elicited by him, in any event.

1    Although he had signed a cooperation agreement, had pled guilty

2    and agreed to cooperate and had not been sentenced, there is no

3    evidence that he was ever instructed by or asked by the

4    government to engage any MS-13 member in conversations in order

5    to elicit evidence.  In fact, the witness said he had not been

6    told to talk with anybody to try to receive information.  He was

7    unaware that he would be back with any MS-13 member when he was

8    transferred from Ohio back to Maryland and as soon as he saw his

9    attorney, he asked to be transferred out of that situation.

10           So, there is no evidence that, although he was

11   cooperating generally, that he was acting as an agent.

12           More importantly, he did not elicit any of these

13   statements.  The first one was clearly a blurt based upon

14   overhearing or listening to a news broadcast in a room where

15   there were others, and although, frankly, the witness said he

16   didn't think there were others who spoke Spanish around, that

17   part of it I find to be an unreliable statement if it was in a

18   television room and in a unit at Supermax, because I don't know

19   that he would be in a position to know for sure who else spoke

20   Spanish or, frankly, who else might have heard that.

21           The other, the later conversation concerning the

22   tattoos, I also find that there were no questions asked that

23   were intended to elicit any such statement.  The witness very

24   clearly said tattoos are a normal -- at least were a normal part

25   of MS-13 life and he did not ask any questions about it but that

1  it was a volunteered statement.

2          As to prejudice outweighing probative value, the

3  government's position in this case is that Mr. Ramirez was sent

4  here on a mission by others in El Salvador in order to assist in

5  enhancing the conduct of the clique here in Maryland.  So, it is

6  not irrelevant for the jury to hear the defendant's statement if

7  it is interpreted to mean conduct prior to his coming to

8  Maryland.  As I talked about with counsel, it's not entirely

9  clear to me at this point that there is the kind of shading in

10 that would clearly indicate an admission to participation in

11 multiple acts of violence.  Quite frankly, I don't see the

12 unfair prejudice that the defense sees.  It is true that the

13 racketeering acts in Maryland that the government is relying on

14 involve two murders, one attempted murder and a robbery, but

15 they have to prove that the defendant participated in a

16 conspiracy involving racketeering activity that involved

17 multiple acts of murder, in any event.

18          So, I just don't see the unfair prejudice regardless of

19 how this statement is interpreted in light of the photograph of

20 the tattoos.  So, I deny the oral motion to suppress, and I also

21 will deny the motion in limine concerning the words the witness

22 says were spoken by the defendant.

23          What does the government now have?

24          MR. PARK:  Your Honor, we now have the notes, and if I

25 can explain.  I'll hand a copy to Mr. Gorman now.  Neither

1  Mr. Jaffe nor I have ever seen these.  They were apparently in

2  another file that was with another prosecutor who has been part

3  of this case.  I think what has happened is because Mr. Jaffe

4  and I have been handling the past two trials, I'm not sure at

5  what point this was turned over to the government or by whom,

6  whether it was Ms. Norman or whatever.  But we now have the

7  copies of this and we apologize to Mr. Gorman and the court.

8          THE COURT:  Take a moment to look at them and see if

9  they have any relevance to the legal issue, the portion of his

10 testimony that I've just ruled on.  Certainly they're now

11 available if he is called to testify.

12         MR. PARK:  Right.  It appears Mr. Garcia may have

13 confused me with another prosecutor in the office.

14         MR. GORMAN:  Your Honor, I'd ask that the court not

15 permit this witness to testify in violation of the Jencks Act,

16 in that I didn't get this information until after he testified.

17         THE COURT:  Is there anything in there that has to do

18 with the aspect of his testimony concerning conversations or

19 directions from the government and whether he asked any

20 questions in order to elicit the statements?

21         MR. GORMAN:  No.

22         THE COURT:  So, I don't see the harm.  You have it now

23 and he will be permitted to testify.  You have it well before he

24 even testifies, although I am not happy that the government has

25 not somehow managed to catalogue a little better all of this

1   and, frankly, you need to notify the attorneys in the prior

2   trial immediately, because these notes, I gather, have something

3   to do with the testimony or may.  Did it have anything to do

4   with Homey?

5           MR. JAFFE:  Nothing at all.  Your Honor, we're reading

6   through this and realizing that it's a little -- Mr. Garcia's

7   writing is a little hard to get through, but he actually relates

8   that the defendant provided a lot more details about the

9   Riverdale hits than he described on the stand.

10          THE COURT:  Well, you didn't ask him everything because

11  it wasn't relevant today, but it's more than he's told you in

12  preparation statements.  Okay.  I don't need to know --

13          MR. JAFFE:  I just want to let everybody know.

14          THE COURT:  I mean, at some point somebody may want me

15  to look at them.  But I don't need to know that.  I just was

16  suggesting that this witness testified already about some of the

17  encounters he had at Supermax with Homey, with Mr. Palacios, and

18  these notes were not produced or even discovered.  I know that

19  there area a lot of files.  I personally have a lot of them and

20  it's very hard to keep track, but counsel for the government

21  have a responsibility to know what's in your files.  I know

22  Agent Okray has been the one before -- but he was at the last

23  trial.  So, you need to make sure that you have a better sort of

24  catalogue system.  So, I'm not happy.  But at least the witness

25  remembered and you were able to track it down very promptly.

1   So, I don't see the harm at this point.  The notes are here.

2   They don't appear to be many pages, just a couple of pages.  So

3   why don't we -- there are just two?

4           MR. PARK:  Your Honor, there are, I think, two or three

5   other pages.  They don't mention Mr. Ramirez at all, but they

6   may have Jencks material in terms of incidents that he's going

7   to talk about.  So we're getting those copied now.

8           THE COURT:  You're getting those copied now?  Okay.  Do

9   you have anyone else to call this morning while we do that?  The

10  jurors are all here.  It's now almost 10:30.  I'm just wondering

11  if we can't start with something else and then get back to him

12  after you've gotten them and Mr. Gorman has had a chance to look

13  at them.

14          MR. JAFFE:  We have a short witness, maybe about 30, 40

15  minutes.

16          THE COURT:  Okay.

17          MR. PARK:  And then after that, actually, we can

18  rearrange.  Ms. Blumberg was going to be coming after Mr.

19  Martinez.  She had a scheduling issue this morning, but if we

20  can get her in here on time, we can take her.

21          THE COURT:  Okay.  So, we'll see if we can't delay the

22  testimony of Mr. Garcia to give everybody time to see these

23  notes and then we will proceed.

24          Is everybody all right now to do a witness for about 30

25  or 40 minutes or do you want a five-minute break?

1           MR. GORMAN:  Five-minute break.

2           THE COURT:  Okay.  Why don't we do that.  We'll take a

3   five-minute break.  Ms. Derro will tell the jurors that we're

4   going to begin in five minutes.  You're ready to do that?

5           MR. PARK:  Thank you, Your Honor.

6           THE COURT:  All right.  We'll do that and then we'll

7   proceed.

8           MR. PARK:  We'll have the witness here.  Thank you.

9           (Recess from 10:30 to 10:35 a.m.)

10          THE COURT:  Are we ready?

11          Let's bring the jury in.  I'll explain to them that it

12  took me longer to figure things out than I thought.

13          MR. PARK:  Your Honor, if I might, while we're waiting

14  for the jury, I've spoken to Mr. Gorman.  The Jencks was a total

15  of two or three pages of maybe half a page, not very much, and

16  Mr. Gorman has indicated that he's okay proceeding with

17  Mr. Garcia as the witness following Officer Garza.  So, just to

18  let the court know in terms of that.  Also, in terms of bringing

19  the witness up, I guess we should let --

20          THE COURT:  Let Ms. Derro know.

21          MR. PARK:  -- Ms. Derro know.

22          (Jury present.)

23          THE COURT:  Good morning.

24          THE JURY:  Good morning.

25          THE COURT:  Please be seated.

1          I want to thank the members of the jury for your

2     patience.  It took me a little longer than I had anticipated to

3     take care of the other matter that I had to take care of this

4     morning before we were ready to begin with the evidence, but I

5     am confident we're now ready.

6          And who is calling, Mr. Park or Mr. Hur?

7          MR. HUR:  Yes, Your Honor.  The government calls Eric

8     Garza.

9          THE COURT:  If you would stand right next to the

10    witness box.

11         THE DEPUTY CLERK:  Please raise your right hand.

12              ERIC GARZA, GOVERNMENT'S WITNESS, SWORN

13         THE DEPUTY CLERK:  Please speak loudly and clearly into

14    the microphone.  State your name for the record and spell your

15    first and last names.

16         THE WITNESS:  It's Eric Garza, E r-i-c, G-a-r-z-a.

17         THE DEPUTY CLERK:  Thank you.

18         THE COURT:  Mr. Hur.

19         MR. HUR:  Thank you, Your Honor.

20                        DIRECT EXAMINATION

21    BY MR. HUR:

22    Q    Good morning, sir.

23    A    Good morning.

24    Q    Where do you work?

25    A    I work for Prince William County Police Department.

1  Q   And that's Prince William in Virginia?

2  A   Yes, sir.

3  Q   What is your rank, sir?

4  A   I'm a sergeant.

5  Q   How long have you worked for Prince William County Police

6  Department?

7  A   Nine years.

8  Q   Over the course of those nine years, what kinds of

9  assignments have you had?

10  A   I've been involved in patrol operations, a detective in the

11  gang unit.

12  Q   Back in 2003 were you in patrol operations or part of a gang

13  unit?

14  A   I was part of the gang unit in 2003.

15  Q   I'm going to direct your attention to January 26, 2003.  Do

16  you recall that day?

17  A   I do.

18  Q   On that particular day, aside from any law enforcement

19  operations, were there any big sporting events going on that

20  day, do you remember?

21  A   Yes.  It was Superbowl.

22  Q   Did you happen to watch any of that particular Superbowl?

23  A   No.  I missed it.

24  Q   Why did you miss it?

25  A   I was called out to work.

1   Q    When you were called out to work, did you end up going to

2   Bull Run Regional Park in Virginia?

3   A    Yes, sir.

4   Q    I'm going to show you what's been previously marked as

5   Exhibit No. Bull Run 15.  Just look on the screen next to you.

6   Using the touch screen there -- well first, do you recognize the

7   area that's depicted in Exhibit 15?

8   A    Yes, I do.

9   Q    And does this map include the area to which you responded on

10  that day?

11  A    Yes, sir, it does.

12  Q    Sergeant Garza, using the touch screen on the screen in

13  front of you, could you indicate where on this particular map

14  you responded that day?  If that's not working I'm going to

15  indicate with my pen here.  Right there where it says "Bull Run

16  Regional Park" --

17  A    Yes, sir.

18  Q    -- is that the general area to which you responded?

19  A    Yes, sir.  Right there.

20  Q    Thank you.  When you responded to that location at Bull Run

21  Regional Park, was there more than one law enforcement agency

22  represented there?

23  A    Yes, there was.

24  Q    What law enforcement agencies were present?

25  A    There was Prince William County Police Department and

1   Fairfax County Police Department.

2   Q   About how many units from these two agencies was represented

3   there that day?

4   A   Maybe 15 to 20 individual officers.

5   Q   When you came out to Bull Run Regional Park, did you observe

6   some people there who were not law enforcement officers?

7   A   I did.

8   Q   About how many non-law enforcement people did you observe

9   that day at that location?

10  A   I would say 30 to 40.

11  Q   When you were called out to that location.  Sergeant Garza,

12  were police officers making efforts to identify these non-law

13  enforcement people?

14  A   Yes, sir, they were.

15  Q   Were you called to that location because your Spanish

16  language skills would help in communicating with these people?

17  A   Yes, sir.

18  Q   Is Spanish a secondary language for you or were you raised

19  with it as a primary language?

20  A   I was raised with it.

21  Q   When you were called out to Bull Run Park that day, what

22  were your responsibilities?

23  A   Basically just to help with identification.

24  Q   And did you do that?

25  A   I did.

1    Q    What kinds of information was collected that day?

2    A    I was to obtain vital information such as name, date of

3    birth, addresses.

4    Q    Were any of these 30 to 40 people who you previously

5    mentioned women?

6    A    No.

7    Q    What race were these men?

8    A    Hispanic.

9    Q    Did you collect biographical information from those people

10   that day?

11   A    I did.

12   Q    About how long did it take you to go from person to person

13   to collect their biographical information?

14   A    It took a few minutes per person.

15   Q    Did you learn where these people had come from?  And when I

16   ask that, I don't mean in terms of nationality.  I mean in terms

17   of where they'd come from in the D.C. Metro area.

18   A    I did.

19   Q    And what different jurisdictions in the D.C. Metro area were

20   represented among those 30 to 40 people you saw there that day?

21   A    As I can recall, some of them were from Virginia, Maryland

22   and the D.C. area.

23   Q    Did you end up writing a report that documented the

24   information you collected from those people that day?

25   A    I did.

1   Q   In the course of assisting in this prosecution, did there

2   come a time when you wrote down some specific names and

3   addresses of a subset of the people that you encountered that

4   day at Bull Run Park?

5   A   Yes, sir, I did.

6   Q   As you sit here today, do you remember the names and

7   addresses of every single person you encountered that day?

8   A   No, sir.

9   Q   Would it help refresh your memory if you looked at your own

10  handwritten sheet for some portion, maybe about 10 of those

11  people?

12  A   Yes.

13          MR. HUR:  Your Honor, at this point I'm going to show

14  the witness what's been previously marked as Bull Run 17.  This

15  is for identification purposes only.

16  BY MR. HUR:

17  Q   Sergeant Garza, is this exhibit written in your own

18  handwriting?

19  A   It is.

20  Q   Does the exhibit reflect some of the names and addresses

21  that you collected that day at Bull Run Park?

22  A   It does.

23  Q   I know this is only a portion of the people who you spoke to

24  that day, but could you please read down that list of names for

25  the benefit of the jury.

Case 8:05-cr-00393-DKC   Document 1398   Filed 09/08/09   Page 43 of 175

1   A    I have Jaime Guzman, Jorge Medrana Blanco, Humberto Blanco,

2   Wilbur Carcamo-Machado, Oscar Chicas, Jose Hipolito Cruz Diaz,

3   Ronaldo Diaz-Vasquez, Carlos Fernando Vasquez Martinez, and

4   Santos Mejano-Melendez.

5   Q    Did you get addresses from any of these individuals?

6   A    I did obtain some addresses, yes.

7   Q    Please run down that list that's in front of you and tell us

8   the cities and the states that these men came from.

9   A    I have Wheaton, Maryland; Columbia, Maryland; Washington,

10  D.C.; Rockville, Maryland.  I have an actual street address

11  without the city, which is 2801 Kayoke Street, apartment 106;

12  and Washington, D.C.

13  Q    Sergeant Garza, you've mentioned places in Maryland and

14  Washington, D.C. on that list.  Were there also men from places

15  in Virginia as well there that day?

16  A    I do recall there being some from Virginia, sir.

17  Q    Sergeant Garza, when you spoke to these men, did you ask

18  whether they were affiliated with any gangs?

19  A    I did.

20  Q    And did any of them tell you that they were, in fact, gang

21  members?

22  A    They did.

23  Q    What gang did they say they were members of?

24  A    MS-13.

25  Q    Did they tell you a specific clique that they belonged to?

1   A    Some of them did, yes, sir.

2   Q    Do you remember what cliques they happened to mention?

3   A    I remember a few, SLSW, CLS.  I believe one was SLS.  I'd

4   have to look at my notes to verify more of them.

5   Q    That day did you also note whether any of these men had

6   tattoos?

7   A    I did.

8   Q    Did some of these men have tattoos?

9   A    They did, yes, sir.

10  Q    Did any of these tattoos shows gang affiliations?

11          MR. GORMAN:  Objection.

12          THE COURT:  Sustained.

13  BY MR. HUR:

14  Q    Were photographs of these men taken that day?

15  A    Yes, sir, they were.

16  Q    And in the course of photographing these men, did a majority

17  of them have tattoos?

18  A    Majority of them did, yes, sir, they did.

19  Q    I'm going to show you what's been previously marked as

20  Exhibit Bull Run 16.  If you could just look at them briefly and

21  tell me if you recognize these photographs.

22  A    Yes, sir, I do recognize these photographs.

23  Q    I'd like to take them now and put them on the projector.

24  Were these photographs taken that day at Bull Run?

25  A    They were.

1    Q   I'm going to show you just a few of these photographs here.

2    Bear with me.  I'm going to need to zoom in.  Can you tell me

3    what's depicted in that photograph right there?

4    A   An M and an S.

5    Q   On the photo in the center of your screen there, what's

6    depicted in that center photo?

7    A   Also an M and S.

8             THE DEPUTY CLERK:  Mr. Hur, can you give us the exhibit

9    numbers?

10            MR. HUR:  These are all a portion of Exhibit Bull Run

11   16.

12            THE DEPUTY CLERK:  Thank you.

13   BY MR. HUR:

14   Q   Moving down still within Exhibit Bull Run 16, what's

15   depicted in that center photo?

16   A   There's an M and S in the middle and a 1 and 3 on the

17   outside.

18   Q   Moving further down, how about in the photo that's in the

19   center of your screen right there?

20   A   It's a symbol for MS.

21            MR. GORMAN:  Objection.

22            THE COURT:  Sustained.

23   BY MR. HUR:

24   Q   Without telling us what gang it's affiliated with, what just

25   physically do you see there?

1   A   Just looks like a hand with two fingers pointed up.

2   Q   How about in that photograph right there?

3   A   It says "Mara Salvatrucha."

4   Q   What do you see in the photo that's slightly left of center

5   but mostly in the center of the screen there?

6   A   I see a 1 and a 3.

7   Q   The photograph on the right of your screen there, can you

8   tell me what you see?

9   A   It is the letters S L S.

10   Q   The photo that's in the center of your screen, what do you

11   see right there where my pen is?

12   A   It's the words "Mara Salvatrucha" again.

13   Q   How about underneath the symbol right where my pen is?

14   A   I can't see far left, but I believe it's SLSW.

15   Q   How about in the center of your screen right there?

16   A   MS.

17   Q   And right there?

18   A   I can't make out the top part, but it says "Salvatrucha"

19   underneath.

20   Q   Sergeant Garza, in the course of your contact with these

21   men, did you intend to arrest them or initiate a criminal

22   prosecution at the time?

23   A   No, sir.

24           MR. GORMAN:  Objection.  Relevance.

25           THE COURT:  Sustained.

1   BY MR. HUR:

2   Q   After collecting their biographical information, is that

3   when your involvement in this case ended?

4   A   It was, sir.

5   Q   A moment ago, Sergeant Garza, you mentioned the letters SLSW

6   and SLS.  Do you know what those letters stand for?

7           MR. GORMAN:  Objection.

8           THE COURT:  Sustained.

9           MR. HUR:  No further questions on direct, Your Honor.

10          THE COURT:  Mr. Gorman.

11          MR. GORMAN:  Thank you, Your Honor.

12                          CROSS-EXAMINATION

13   BY MR. GORMAN:

14   Q   Mr. Garza, before testifying did you have a chance to look

15   at all these exhibits?

16   A   I did.

17   Q   And what date did this encounter occur on?

18   A   I can't remember the date offhand, but it was -- I remember

19   it was Superbowl Sunday.

20   Q   Do you remember what year it was?

21   A   It was 2003, yes, sir, I do remember that.

22   Q   And the person here to my right wearing the white shirt, did

23   you see him on that day?

24   A   I do not recall seeing him, no, sir.

25   Q   You can't say that you saw him on that day; would that be

1  right?

2  A    No, sir.

3          MR. GORMAN:  I'd ask the record to reflect that he's

4  indicating the --

5          THE COURT:  That's who you've asked him to look at.

6  So, sure.

7          MR. GORMAN:  -- the defendant, the accused.

8          Nothing further.

9          THE COURT:  Any redirect?

10          MR. HUR:  Nothing further, Your Honor.

11          THE COURT:  Thank you, Sergeant Garza.  That completes

12  your testimony and you are excused.

13          THE WITNESS:  Thank you.

14          MR. GORMAN:  Could we approach the bench before the

15  next witness?

16          THE COURT:  Okay.

17          (At the bench:)

18          MR. GORMAN:  I'd object to Mr. Martinez being called as

19  a witness based on the violation of the Jencks Act.

20          THE COURT:  Okay.  It's my understanding that the

21  notes, as I indicated with you before, don't have anything that

22  contradicts what he said about any contact with government

23  agents before the statements that he purports to have heard from

24  Mr. Ramirez or anything about any instructions from the

25  government or anything about whether he asked any questions.

1        Accordingly, I don't see that the Jencks issue affected

2   the evidentiary hearing or my ruling.  You have the notes now.

3   He hasn't testified on direct before the jury.  So there is no

4   Jencks problem with regard to the testimony he is about to give.

5   There may have been a violation of an agreement that you receive

6   all of that a week or five days or so before.  I'm satisfied

7   that was inadvertent on the government's part and I've urged

8   them to do a better job cataloguing in the future.  But I don't

9   see the prejudice given the limited extent of those notes.  You

10  have now had an opportunity to look at.

11       It's also my understanding that the government had

12  agreed to put another witness on before this witness but that

13  you don't believe that that would assist, that that won't help

14  the situation.  So, for all of those reasons, we'll go forward

15  now and I'll overrule the objection.

16       (In open court:)

17       THE COURT:  Mr. Jaffe, would you call your witness,

18  please.

19       MR. JAFFE:  Your Honor, the government calls Wilber

20  Garcia.

21       THE DEPUTY CLERK:  Mr. Garcia, please raise your right

22  hand.

23       WILBER GARCIA, GOVERNMENT'S WITNESS, SWORN

24       TESTIFYING THROUGH THE SPANISH LANGUAGE INTERPRETER

25       THE DEPUTY CLERK:  You may be seated.  Please speak

1   loudly and clearly into the microphone.  State your name for the

2   record and spell your first and last names.

3            THE WITNESS:  Wilber Garcia, W-i-l-b-e-r, G-a-r-c-i-a.

4            THE DEPUTY CLERK:  Thank you.

5            THE COURT:  Mr. Jaffe.

6            MR. JAFFE:  Yes, Your Honor.

7                          DIRECT EXAMINATION

8   BY MR. JAFFE:

9   Q   Mr. Garcia, how old are you?

10  A   Twenty-three.

11  Q   Where were you born?

12  A   Puerto de La Libertad, Salvador.

13  Q   How old were you when you came to the United States?

14  A   Fourteen.

15  Q   And where in the United States did you go to?

16  A   Hyattsville, Maryland.

17  Q   Did you have family members already present in the United

18  States when you came?

19  A   Yes.

20  Q   What family members?

21  A   Well, I had my father, my mother, some brothers and sisters.

22  Actually, one brother, one sister.

23  Q   Did you come to the United States legally or illegally?

24  A   Legal.

25  Q   How did you come to the United States?

1  A   Well, through my dad.

2  Q   Did you attend school when you were in Maryland?

3  A   Yes.

4  Q   Did you attend high school?

5  A   Yes.

6  Q   What was the name of the high school?

7  A   High Point High School.

8  Q   How far did you go at High Point High School?

9  A   Through the eleventh.

10 Q   When you were living in El Salvador, what language did you

11 speak?

12 A   Spanish.

13 Q   Is that your first language?

14 A   Yes.

15 Q   Since you've been in the United States, have you learned

16 some English?

17 A   Yes, more or less.

18 Q   Can you write English, too?

19 A   A little bit wrong but a little bit.

20 Q   Is it easier for you to understand and to answer questions

21 in Spanish rather than English?

22 A   Yes, it is.

23 Q   Now, I want to direct your attention to your sophomore year

24 at High Point High School, around 2002.  Around that time did

25 you join MS-13?

1   A   Well, yes.

2   Q   Did you get a gang name?

3   A   Yes.

4   Q   What was that name?

5   A   Scorpion.

6   Q   And who, if anyone, gave you the name Scorpion?

7   A   Well, Killer Bill suggested it more or less.

8   Q   Was Killer Bill in MS-13?

9   A   Yes.

10   Q   What clique did he belong to?

11   A   Killer Bill particularly was part of Sailors.

12   Q   What clique did you join?

13   A   TLS.

14   Q   What does TLS stand for, if you know?

15   A   Teclas Locos Salvatruchos.

16   Q   Could you describe for the jury what had to happen to you to

17   get into the gang?

18   A   I had to be jumped in.

19   Q   And could you just explain what does it mean when you say

20   you were jumped in?

21   A   Well, in my case, six people are actually hitting me while

22   somebody counted to 13 very slowly.

23   Q   Can you remember who it was who counted that day?

24   A   Homeboy.

25   Q   What, if any, position did Homeboy have in the TLS clique?

1   A    He was the leader.

2   Q    What, if anything, did you call the leader of the TLS

3   clique?

4   A    Could you ask that a little more specifically.

5   Q    Sure.  When you referred to the leadership position in the

6   clique, did you use a specific term?

7   A    Corredor de la clica.

8   Q    Do you remember the names of any of the people who were part

9   of the six that were beating you?

10  A    Well, I don't remember all of them, but Sombra and Killer

11  Bill were part of them.

12  Q    And what clique was Sombra part of?

13  A    TLS.

14  Q    Now, you mentioned the TLS clique and Killer Bill, the

15  Sailors clique.  Did you become familiar with the names of other

16  cliques of MS-13 in the Maryland area?

17  A    Yes.

18  Q    What were some of the other names of cliques of MS-13 in the

19  Maryland area?

20  A    The first one would be PVLS, LPS, FLS, amongst them also

21  Sailors and our clique.

22  Q    Once you became a member of the clique, did you learn who

23  founded the clique in the Maryland area, the Teclas clique?

24  A    Well, yes.

25  Q    And who was that individual?

1   A    Homeboy.

2   Q    Now, during the time that you were a member of the Teclas

3   clique of MS-13, did you learn the rules?

4   A    Yes.

5   Q    Could you tell us some of the rules of MS-13 that you

6   learned?

7   A    Well, to start with, you can't say the number 18.  You can't

8   say the number 8.  We can't use those numbers on our jerseys,

9   for example.  The first rule amongst the rules is that we can't

10  use the color red.  That's some of them.

11  Q    Were there any rules about meetings?

12  A    Well, there are amongst the members of the MS-13 the

13  principal rule would be that if you see a rival, you have to

14  either kill him or at least try to kill him.

15  Q    And what's a rival of MS-13 called?

16  A    Generally chavalas.

17  Q    Is there any rule of MS-13 about whether you are allowed to

18  cooperate with police?

19  A    No.  I mean -- well, could you repeat the question, please.

20  Q    What, if any, rule is there about cooperating with police?

21  A    Well, that goes against the rules of the gang and it really

22  means a green light, "luz verde."

23  Q    What, if any, rule exists about whether you must attend

24  meetings or not?

25  A    Could you repeat the question.

1   Q   What, if any, rule exists about whether you are required to

2   attend clique meetings?

3   A   Well, if you don't go, then you're jumped on as a

4   punishment.

5   Q   I'm now going to go through each of these rules with you and

6   have you explain them a little bit.  You said there were certain

7   colors you were not allowed to wear.  Why?

8   A   Well, the color red represents the 18.  It's the gang that's

9   our biggest rival in El Salvador as well as some areas here in

10  the United States as well.

11  Q   So, if that's their color, is there a color or colors that

12  are associated with MS-13?

13  A   Yes.

14  Q   What are they?

15  A   Blue and white.

16  Q   You said that certain numbers you can't use.

17  A   Yes.

18  Q   Why is that rule there?

19  A   Well, 18 because it's the rival gang that we have.  The

20  color because they use that red color.

21  Q   Let me talk about the rule regarding meetings.  How often

22  did the Teclas clique meet?

23  A   Well, we have meetings every two weeks or whenever something

24  had to be done.

25  Q   Could you describe some of the places where these meetings

1   took place?

2   A    Well, mainly we did it in parks.  If we could do it, we'd

3   have it in the basement of one of the homeboys or in an

4   apartment but mainly in parks.

5   Q    Now, you mentioned Homeboy had that leadership position in

6   MS-13.  During the time that you were on the street in MS-13,

7   what were the names of some of the other people who had the

8   position after him?

9   A    Are you speaking everyone in general or only the ones that

10  ever got to having just the first word?

11  Q    Tell me some of the names of the people who had first word.

12  A    Homeboy --

13              MR. GORMAN:  Objection.  Based on personal knowledge.

14              THE COURT:  Overruled.

15              THE WITNESS:  Homeboy, Little Trece, and finally

16  Striboy.

17  BY MR. JAFFE:

18  Q    Was there a second word position in the Teclas clique while

19  you were on the street with the clique?

20  A    Yes.

21  Q    Can you remember the names of any of your clique members who

22  held that position while you were a member of the clique on the

23  street?

24  A    Yes.

25  Q    Can you tell us some of those names, if you can remember?

1   A    Stomper, Casper, Dragon.  Those are the ones I remember.

2   Q    Okay.  And who had the first word at the time that you were

3   arrested and in jail?

4   A    At that point it was Striboy.

5   Q    Now, while you were a member of the clique and on the

6   street, did you attend most of the meetings?

7   A    Yes, pretty much most of the time.

8   Q    Did some members miss meetings?

9   A    Yes, there were some.

10  Q    And what, if anything, happened to them for missing the

11  meetings?

12  A    Well, if they didn't have a good reason for having missed

13  it, they were jumped.

14  Q    Did you ever participate in jumping somebody for punishment

15  for missing a meeting?

16  A    Once or twice.

17  Q    Can you remember who the person was who was getting the

18  punishment?

19  A    Well, amongst them was Snoopy, who, by the way, is my

20  cousin, Sparkey, Chicano, Metallic, amongst others.

21  Q    Are these people all that you jumped as part of the

22  punishment?

23  A    Well, yes, and the ones that I also participated.

24  Q    Okay.  Under the rules as you know them, can somebody who is

25  not jumped into the gang attend a clique meeting?

1    A    If he's not a member of the gang, he can't.

2    Q    Could you describe to the jury how one of your typical

3    Teclas meetings started?  How did it start off?

4    A    Okay.  We would start by sitting in a circle and then the

5    first word or somebody else could say we're going to start a big

6    meeting of La Mara Salvatrucha.

7    Q    And then what were some of the things that happened in the

8    meeting?

9    A    Well, we talked about problems between one gang and another

10   gang and sometimes problems within the clique itself.

11   Q    Were these punishments that you've been telling us about,

12   would they happen at some point during the meeting?

13   A    Most of the time they occurred after the meeting.

14   Q    Was it right after the meeting or some different day?

15   A    Right after -- well, you couldn't leave it some other day.

16   Q    Okay.  During the time that you were attending Teclas

17   meetings, did any MS-13 member from a different clique ever

18   attend?

19   A    Yes.

20   Q    Could you tell us either the names of some of these folks or

21   some of the cliques that they belonged to?

22   A    Well, amongst them was Killer Bill, Lil Truca, who was the

23   boyfriend of Homeboy -- the girlfriend of Homeboy, La Sombra and

24   others who came to the meetings to talk about problems.

25   Q    You mentioned Killer Bill and Lil Truca.  What clique were

1   they from, if you know?

2   A    They are SLSW, the Sailors.

3   Q    You mentioned La Sombra.  What clique was that person from?

4   A    She's in the same clique.

5   Q    You said "she."  Is La Sombra a female?

6   A    Yes, she's a woman.

7   Q    Is that somebody different from the El Sombra you mentioned

8   from the Teclas clique?

9   A    Yes.  There was a woman named Sombra and then the Sombra in

10  my clique.

11  Q    And you said there were some other people as well that were

12  from other cliques who attended your Teclas meetings?

13  A    Yes.

14  Q    Can you remember any of their cliques?

15  A    Well, the ones I most remember are the ones I've just

16  mentioned, unless you want to make it more specific.

17  Q    Okay.  That will be fine.  You mentioned that during the

18  meetings you would discuss problems that were between gangs or

19  that Teclas had with another gang.

20  A    Yes.

21  Q    What kind of problems are you talking about?

22  A    Well, they were small things.  For example, if somebody

23  wanted to fight with a member of another clique, which was

24  against the rules.  Well, on one occasion in my group it was

25  Little Man, he was going to go to a meeting.  I wasn't there at

1    that time, that there was another Little Man that hadn't done

2    anything in the neighborhood and he was in the same group.

3    Q   So was there some dispute about that?

4    A   Yes.

5    Q   In addition to discussing problems between MS-13 cliques,

6    were there any times discussions about problems that the clique

7    had with rival gangs, with chavalas?

8    A   Gangs, yes.  Not cliques but gangs.

9    Q   What were those kind of problems?

10   A   Well, let's say there was a fight between one of us and one

11   of the other ones like La Vatos Locos, things like that.

12   Q   Okay.  Now, these people who were from other MS cliques who

13   would attend your meetings, did you talk to them from time to

14   time?

15   A   Well, yes.

16   Q   In the course of those conversations, during the entire time

17   of your membership, did you become somewhat familiar with the

18   rules of, say, the Sailors or some of the other cliques?

19   A   Well, yes.  Basically they were all pretty much the same.

20   Q   Now, did you yourself ever go to a different clique's

21   meeting?

22   A   No.

23   Q   Now, besides clique meetings, did more than one clique

24   sometimes meet together?

25   A   Yes.  That's what we would call a general meeting.

1    Q    Did you ever go or try to go to one of these general

2    meetings?

3    A    Yes.  I tried when I first became part of the gang.

4    Q    Do you remember where this general meeting was supposed to

5    be taking place?

6    A    It was somewhere in Virginia, but I didn't really know the

7    area because I had recently just come here.

8    Q    Do you remember who you were going with?

9    A    Well, I was in Snoopy's car and there were other people in

10   the car, but I couldn't specifically tell you who.

11   Q    Was it just you and this -- withdrawn.

12         Was it just one car that you observed driving to this

13   place in Virginia?

14   A    No.  There was more than one.

15   Q    Did anything unusual happen on your way to this Virginia

16   place for this meeting?

17   A    Well, since there were so many cars, it kind of got to the

18   attention of the police.  So they stopped one of the first cars

19   where Stokey was.  He was from Sailors.

20   Q    Were you stopped or were you able actually to make it

21   towards Virginia?

22   A    Well, we were already in the area of Virginia.  The reason

23   that the car we were in wasn't stopped was because we were one

24   of the last cars.

25   Q    Did you ever make it to the meeting in Virginia?

1   A    No, because the police got to the place where the meeting

2   was going to be held.

3   Q    Now, did MS-13 clique leaders meet amongst themselves

4   sometimes?

5   A    Well, after that, what happened was it was decided that only

6   the members that had the first word would get together.  Not

7   everybody else could go, just the ones that had the first word.

8   Q    Okay.  Now, more on the discussion of meetings, would dues

9   be collected at meetings?

10  A    Yes.

11  Q    How much money would you have to pay as a Teclas clique

12  member in Maryland in terms of dues?

13  A    Max I would pay was a hundred dollars.

14  Q    Was it always that or did the amount change from time to

15  time?

16  A    Well, it depended on our needs, how much money we needed,

17  specifically, if we had to pay the attorney for somebody.

18  Q    Well, I guess, then, the question is during the time that

19  you were in the Teclas clique and out on the street, did the

20  clique discuss some of the different reasons why they were

21  collecting money, what they were using it for?

22  A    Yes.

23  Q    What were some of the different things that the dues money

24  was collected for?

25  A    Especially to buy weapons.

1   Q    What else, if anything?

2   A    Well, to send money to somebody who was in jail, for

3   lawyers, something like that.

4   Q    What would happen if somebody was not paying dues in the

5   clique?

6   A    He was jumped and he still had to pay the money.

7   Q    So, was it a rule that you had to pay your dues as part of

8   the clique?

9   A    Yes, it was a rule, the same as having to attend the

10  meeting.  You had to attend and also pay.

11  Q    Now, you mentioned that one of the things the money was used

12  for was to buy weapons.  What kind of weapons?

13  A    Firearms.

14  Q    Did the clique actually have firearms when you were a

15  member?

16  A    Yes.

17  Q    What were some of the firearms that the clique, this MS-13

18  clique, possessed?

19  A    Well, to be specific, I don't know much about weapons.  I

20  can recognize a revolver, and I got to have a revolver that

21  belonged to the clique at my house.

22  Q    So, my next question is did the guns always stay at one

23  person's house or did they move?

24  A    It could be anybody that could keep it in their house as

25  long as their family members would not find it or that he would

1   not lose it.

2   Q   And you kept a clique gun from time to time in your house?

3   A   Once or twice.

4   Q   Who else did you observe possessing guns that belonged to

5   the clique besides yourself?

6   A   Striboy, Strichar.  There was my cousin, he also kept a

7   weapon in his house, one of the first weapons as soon as I got

8   jumped in.

9   Q   Besides guns, did members of the clique have other types of

10  weapons as well?

11  A   Yes.

12  Q   Like what kinds?

13  A   Something comparable to the weapons that the police use,

14  like a nine like a home boy would say on the street.

15  Q   Besides guns, firearms, did MS-13 clique members have

16  machetes or knives, things like that?

17  A   Yes.

18  Q   Did you have machetes from time to time?

19  A   Well, specifically, I had two.

20  Q   Okay.  And did you have a pair of brass knuckles at one

21  point, too?

22  A   Yes.

23  Q   At times we've talked about or you've mentioned punishments

24  that somebody could receive for violating the rules.  One of

25  those was the jump-in that you mentioned?

1   A    Yes.

2   Q    What would somebody count up to for that kind of beating?

3   A    Well, regularly it was a 13, but I have witnessed occasions

4   where they counted up to 26, machine we call it.

5   Q    Why would somebody receive the machine, the 26, rather than

6   the 13-second beating?

7   A    Well, the last time somebody got one like that, it was a

8   home boy and it was because he made the mistake of bringing

9   somebody to a meeting that was not a gang member.

10  Q    So he received that extra beating for that?

11  A    Yes.  To be specific, it was Homeboy in the clique.

12  Q    Now, you also mentioned, I think, with respect to somebody

13  who's violated the rule of betraying the gang that they could

14  receive a green light.  Do you remember telling us that?

15  A    Yes.

16  Q    What is a green light?

17  A    Well, for example, what I'm doing now, if they realize --

18  well, they already know what I'm doing.  I'm testifying now.  If

19  they know I'm testifying against a home boy, they are going to

20  kill me or try to kill me at least when they have the

21  opportunity.

22  Q    Is that what it means to have a green light, that you're

23  marked for murder by the gang?

24  A    Yes.  Specifically, yes.  Yes.  You cannot remain alive.

25  Q    During the time that you were attending the clique meetings

1   for TLS of MS-13, did you witness the announcement of a green

2   light on anyone?

3   A   Well, no.  Well, no.  We just discussed about people that

4   were talking but that they had not testified yet about the

5   person that was being accused.

6   Q   Okay.  Now, during the time that you were attending clique

7   meetings, did the clique communicate with clique members in

8   El Salvador at all?

9   A   Yes.

10  Q   How often did the clique, the TLS clique here in Maryland,

11  speak with clique members in El Salvador?

12  A   I would say often.

13  Q   How would that happen?  What would they use to communicate?

14  A   Well, from what I know, in the prison in El Salvador they

15  have cell phones and they would call.  At several locations they

16  call me from a prison in El Salvador directly.

17  Q   So you personally were receiving some of these calls?

18  A   Yes.

19  Q   How was it that you were sort of chosen to receive these

20  calls?

21  A   That was the same question I asked Striboy.  I told him that

22  somehow the people in El Salvador in the prison had gotten hold

23  of my phone at home, and he told me that he had given it to

24  them.

25  Q   In attending clique meetings and talking to clique members,

1    were other members of TLS speaking to these individuals in

2    El Salvador from MS-13 by cellular telephone?

3    A    Could you repeat the question.

4    Q    Besides yourself, who were some of the other Teclas members

5    here in Maryland who were receiving calls from the people in

6    El Salvador?

7    A    Well, among them it was Homeboy, Striboy, Little Trece, and

8    some others that if they were called, I didn't know.

9    Q    Can you remember the names of some of these individuals from

10   El Salvador who were calling you?

11   A    Well, specifically, Trece and Sisco, but the one I remember

12   the conversation I had with more was Trece.

13   Q    And can you tell us what were some of the things that you

14   discussed with Trece in that conversation?

15            THE INTERPRETER:  Interpreter needs clarification.

16            (Interpreter confers with witness in Spanish.)

17   A    Well, one of the first things he told me in the first -- one

18   of the first conversations, he asked me if we were all -- if we

19   all had our heads shaved, because that was one of the rules,

20   that everybody here in the U.S. had to have their heads shaved,

21   and also if we were doing hits, if we were going out to kill

22   chavalas.  The thing about being bald or shaven head was

23   specifically for the Teclas clique.

24   Q    And can you remember anything else in any of your

25   conversations with Trece or even Sisco that they were discussing

1    with you?

2    A    Well, what I remember mostly was a conversation with Trece

3    where he asked me if we were going out to kill chavalas often,

4    but I remember I told him that here it was not the same as in

5    El Salvador.

6    Q    Now, in addition to these one-on-one conversations, during

7    the time that you were out on the street, did you ever attend a

8    meeting where everybody in the clique just spoke with Sisco or

9    Trece from El Salvador?

10            THE INTERPRETER:   Interpreter needs clarification.   You

11   said everyone in the meeting?

12   BY MR. JAFFE:

13   Q    Everybody at the meeting, yes.

14   A    Yes.   Once or twice, but on those other occasions it wasn't

15   either Trece or Sisco but other members of Teclas that were in

16   jail in El Salvador.

17   Q    And that's what you remember while you were on the street,

18   right?

19   A    Yes.

20   Q    Now, another one of the rules that you mentioned early on in

21   your testimony involved chavalas, right?

22   A    Yes.

23   Q    If a gang member, an MS-13 member, sees a chavala on the

24   street, what are they required to do under the rules?

25   A    The maximum would be to attack him or to kill him if they

1  can.

2  Q   Now, during the time that you were attending Teclas meetings

3  and on the street, did you participate in violence against

4  chavalas?

5  A   Yes, once or twice.

6  Q   Let me talk about a time in 2004.  Do you remember a time

7  there were some women you thought were part of a rival gang who

8  kept driving through the neighborhood?

9  A   Well, yes.

10  Q   Were you alone or were you with other MS-13 members?

11  A   I remember Dragon was among us.

12  Q   What happened when these women were driving through the

13  neighborhood?

14  A   Well, on the third occasion they drove in front of us, we

15  had -- well, I had stones with me and we also had bottles and we

16  threw them at the car they were driving.

17  Q   Were any of the individuals in the car struck with any of

18  these things?

19  A   No.

20  Q   Did you participate in something that happened at the

21  Hispanic Family Festival one year?

22  A   Yes.

23  Q   And what happened there?

24  A   Well, we had a fight with the 18 gang there.

25  Q   And what did you yourself physically do?

1    A    Well, apart from fighting one-on-one with one of them, I

2    grabbed a piece of cement and threw it at him.

3    Q    And what happened?

4    A    Well, it happened twice.  The first, I hit him.  On the

5    second occasion a policeman threw me to the ground.

6    Q    And did the person that you hit, did he go to the hospital

7    from what you could see?

8    A    Well, from what I know -- I don't know.  We were handcuffed.

9    They were handcuffed.  And we were taken to different places.

10   Q    Okay.  Finally, in August of 2005 did you and some other

11   gang members go to the Springbrook High School to confront

12   somebody who you thought was a rival gang member?

13   A    Yes.

14   Q    What was your understanding of what was going to happen at

15   the high school?

16   A    Well, at least I thought there was going to be a fight.

17   Q    What actually ended up happening?

18   A    Well, two persons ended up stabbed.

19   Q    Who did the stabbing?

20   A    Little Man from Sailors.

21   Q    Where were you when he was doing that?

22   A    Well, he was in the parking lot.  I was in the parking lot

23   and I could see everything.  I was at a distance like from here

24   to where the jury is.

25   Q    Okay.  And were you eventually arrested in August of 2005

1   for that?

2   A    Well, not the same day but in August, yes, because of the

3   same case.

4   Q    Now, I'm going to talk to you about some other attacks on

5   chavalas that you did not participate in, okay?

6   A    Okay.

7   Q    Did you know someone named Noel Gudiel?

8   A    In fact, I never got to meet him, but I know what happened

9   to him.

10  Q    Did you know the name?

11  A    Well, yes.

12  Q    And when you say you found out what happened to him, did you

13  ever attend a Teclas meeting where what happened to Noel Gudiel

14  was discussed?

15  A    Yes.  That was specifically at a meeting that was around the

16  park on Rick Road.  I remember that.

17  Q    Okay.  And do you remember why it was that Noel Gudiel was

18  being discussed?

19  A    Well, yes.  It was Homeboy that brought about the subject

20  about the murder because he had --

21           MR. GORMAN:  Objection.  Hearsay.

22           THE COURT:  Overruled.

23           THE WITNESS:  He said he had killed him but there was

24  somebody else from the LPS, from another clique, that was trying

25  to take credit for the death.  But he confessed there that he

1    killed him and after that he could barely sleep.

2    BY MR. JAFFE:

3    Q    Okay.  And when you say "he killed him," is that Homeboy

4    said that Homeboy killed Noel Gudiel?

5    A    Well, specifically, he said he put the weapon to his head

6    and that he asked him, "What are you," and Noel said he was

7    Vatos Locos, and that's when the weapon was fired and he killed

8    him.  That was his words.

9    Q    And you mentioned something about somebody from LPS trying

10   take credit?

11   A    Well, what I said to the translator was that the clique, the

12   LPS clique was taking credit for that.  I was going to correct

13   that but then I forgot.

14   Q    Is it the LPS clique of MS-13?

15   A    Yes, it was part of the MS-13.

16   Q    And did this meeting and the murder being discussed happen

17   around the time of April of 2003?

18   A    Well, I'm not able to tell the date, but in a way -- no, I

19   can't tell the date.

20   Q    All of this that we're discussing, did it happen early on in

21   your membership or towards the very, very end of your membership

22   in the clique before you were arrested?

23   A    Well, almost getting to the end.

24   Q    I want to focus -- withdrawn.

25          Have you ever attended clique meetings where the police

1   disrupted them?

2           THE COURT:  Mr. Jaffe, I'm going to interrupt and ask

3   counsel to come up to the bench for a moment, please.

4           (At the bench:)

5           THE COURT:  Number one, I want to take a brief break

6   even though we got started late.  But, secondly, Mr. Gorman

7   objected to the testimony about what Homeboy said at the meeting

8   and I overruled it because I think the foundation has been laid

9   that this is a co-conspirator statement during the course of and

10  in furtherance of the conspiracy.  The jury will be advised at

11  the end of the case that before they can consider any such

12  statement, they do have to find that it was made during the

13  course of and in furtherance and I wanted to ask Mr. Gorman or

14  the government to let me know -- you need to let me know if you

15  think any limiting instruction on any issue needs to be given

16  during the course of a trial.  I just wanted to alert you that

17  that was my basis for overruling it, but I recognize there is a

18  special evidentiary concern.

19          MR. GORMAN:  I guess I'd ask the court to give it.

20          THE COURT:  Okay.  What I have been doing is simply

21  telling the jury that at the end of the case I'm going to give

22  them full instructions on the law and that there will be some

23  items of evidence that have a special instruction and I'm going

24  to tell them that they need to listen to this testimony with a

25  little bit of an asterisk and that this is one of those

1    portions.  Okay.  I don't give them the full thing because I'm

2    certainly not going to give them the full co-conspirator

3    instruction right now.  Okay.

4         So, why don't I do that and we can take maybe a

5    10-minute break and then have another hour before lunch.

6         MR. JAFFE:  Yes, Your Honor.

7         THE COURT:  Okay.

8         MR. JAFFE:  Thank you very much.

9         THE COURT:  Thank you.

10        (In open court:)

11        THE COURT:  Members of the jury, we're going to take a

12   brief break, but I want to give you an instruction about a

13   certain type of evidence.

14        At the end of the case I'm going to give you lengthy

15   instructions on the law that is applicable, including

16   evidentiary issues as well as the law to be applied to the

17   charges in this case.

18        There is one type of evidence that I will tell you

19   about called statements by purported co-conspirators.  I'm not

20   going to give you all of those instructions now, but the

21   testimony we just heard from the witness concerning what he said

22   Homeboy said at a meeting is one aspect of this type of

23   evidence.  So I'm going to ask you to put a little asterisk in

24   your mind about that particular testimony, and there may be

25   times in the future during the course of this trial when I look

1  at you and say this is another point where you need to listen to

2  this with an asterisk, because there will be some limiting

3  instructions, that is, some instructions concerning preliminary

4  findings you must make before you can rely on this evidence in

5  determining whether the government has proven the case beyond a

6  reasonable doubt.

7        But I just want to alert you that this is one of those

8  times and that there may be times in the future when I also ask

9  you to listen with a little asterisk next to the testimony.

10        We are going to take a break now.  I'm going to try to

11  keep this one to about 10 minutes and then we'll come back and

12  hear some more testimony before we take our lunch recess.  Thank

13  you.

14        (Recess from 11:50 a.m. to 12:05 p.m.)

15        (Jury present.)

16        THE COURT:  Please be seated.

17        Ready to resume, Mr. Jaffe?

18        MR. JAFFE:  Yes, Your Honor.

19    WILBER GARCIA, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

20      TESTIFYING THROUGH THE SPANISH LANGUAGE INTERPRETER

21                DIRECT EXAMINATION - RESUMED

22  BY MR. JAFFE:

23  Q   Mr. Garcia, I want to focus your attention to the beginning

24  of 2004.  Have you ever attended a clique meeting that was

25  disrupted by the police?

1   A    Yes.

2   Q    I want to focus your attention actually on a meeting at a

3   park in Beltsville near some basketball courts.  Do you remember

4   being about to attend such a meeting when the police showed up?

5   A    Yes.

6   Q    Do you remember some of the TLS MS-13 members who were in

7   attendance that day?

8   A    Well, usually Criss Cross, Sombra, Metallic, Popeye,

9   Strichar, Makena, amongst others, as well as Homeboy, as I

10  recall.

11  Q    Who had the first word, if you remember, at this particular

12  meeting?

13  A    Homeboy.

14  Q    What happened when the police showed up?

15  A    Well, first of all, they had us all sit down on the

16  basketball court, on the ground.  Then they searched us

17  one-by-one, because it was a lot of us there.  They took

18  pictures of us on digital cameras, and also they took videos on

19  the cameras they had in the patrol cars.  Wait -- no, it wasn't

20  on that occasion from the patrol cars.  It was on another

21  occasion.  But they did -- they always took pictures of us.

22  Q    Now, you mentioned another occasion.  About a month later

23  was there another meeting where the police encountered you in

24  the middle of a meeting?

25  A    As I said before, I don't remember dates very well, but it

1   probably would have been about that.

2   Q   Okay.  Was this a meeting on a hill off of Powder Mill Road,

3   around that area?

4   A   All I remember is that in front of the park Rick Road was

5   there.

6   Q   Did something unusual happen in the way the police came upon

7   your meeting that day, if you remember?

8   A   Well, when they got there they -- wait.  Could you please

9   specify that a little bit.

10  Q   Sure.  I'm trying to see if you can remember if there was

11  something unusual about the way the police came upon you and the

12  other clique members in the meeting.

13  A   Well, when they got there, they tried to grab Stomper and

14  when the police tried to grab him, somebody else fell as well as

15  Stomper.

16  Q   Okay.  Now, you've mentioned a little bit about El Salvador

17  during your testimony today.  I want to direct your attention to

18  early 2005.  Did there come a time that the TLS clique decided

19  that one of their members should go to El Salvador and meet

20  with --

21            MR. GORMAN:  Objection.  Leading.

22            THE COURT:  Overruled.

23  BY MR. JAFFE:

24  Q   -- and meet with gang members there?

25  A   Well, it wasn't that the clique decided.  It's just that

1   somebody went.

2   Q   Who was that who went?

3   A   Striboy.

4   Q   Did Striboy come back and report to the clique what had

5   happened on his trip?

6   A   Yes.

7   Q   What did he report back?

8          MR. GORMAN:  Objection.  Hearsay.

9          THE COURT:  Overruled.  Do you want the same --

10         MR. GORMAN:  Yes.

11         THE COURT:  Okay.  This is another example of testimony

12  that is coming in subject to some instructions, some special

13  instructions that you will get during final jury instructions.

14  BY MR. JAFFE:

15  Q   Mr. Garcia, what did Striboy report back to the clique about

16  his trip to El Salvador?

17  A   Well, he said that instead of going to see his family while

18  he was there, he went to somewhere else to see members of

19  another clique.

20  Q   What clique did he visit?

21  A   Specifically, Teclas.

22  Q   What, if anything, did he say happened in his meetings with

23  the Teclas members in El Salvador?

24  A   Okay.  First of all, he said that anybody that came from

25  here and went to El Salvador had to do a hit but that he hadn't

1   been able to do it because he'd come back.

2   Q   To your recollection, what, if anything, did he bring to the

3   people, to the MS-13 members in El Salvador, from Maryland, if

4   you remember?

5   A   Could you be more specific?

6   Q   Did he bring anything from the clique in terms of money,

7   clothing or anything, if you remember?

8   A   Yes.  He took it to El Salvador.

9   Q   And what did he take?

10  A   No.  I'm asking you a question.  Is that what he took to

11  El Salvador?

12  Q   I'm asking you if you know or remember or you don't know or

13  don't remember.

14  A   My question was -- well, he didn't take anything or bring

15  anything back, if I recall.

16  Q   Okay.  Let me just clarify to make sure the question is

17  clear.  To your knowledge, did Striboy bring anything to

18  El Salvador, to the MS-13 members in El Salvador?

19          MR. GORMAN:  Objection.  Asked and answered.

20          THE COURT:  Overruled.

21          THE WITNESS:  Not that I know of.  Not that I remember.

22  BY MR. JAFFE:

23  Q   Okay.  Now, I want to focus your attention to the time that

24  you're arrested finally in August of 2005.  Were you first in

25  state custody?

1    A    Yes.

2    Q    When you were first arrested and in state custody, were you

3    cooperating with the authorities?

4    A    No.  At first I refused to.

5    Q    Were you still in contact with members of your clique?

6    A    Yes.

7    Q    How?

8    A    Well, I would call some of them collect.

9    Q    Who were some of the people you called collect?

10   A    Well, Striboy.

11   Q    Let me focus your attention on a conversation with Striboy

12   for a moment.  After you had been in jail for a little bit,

13   what, if any, conversations did you have with Striboy about the

14   clique collecting money for a purpose?

15           MR. GORMAN:  Same objection, Your Honor.

16           THE COURT:  Okay.  I'm going to overrule it.  Again,

17   this is another portion of testimony that will be subject to the

18   preliminary finding that you will have to make.

19           THE WITNESS:  Could you repeat the question.

20   BY MR. JAFFE:

21   Q    After you had been in jail for a period of time, what, if

22   any, conversation, did you have with Striboy about the Teclas

23   clique collecting money to pay for something?

24   A    Striboy said something about the fact that he had talked

25   about Mousey and Snoopy.

1    Q   And what about Mousey and Snoopy?

2    A   Well, that they needed money to get across the border

3    between Mexico and the United States.

4    Q   Just for one clarifying point, this Snoopy, is that your

5    cousin or a different Snoopy?

6    A   That was another Snoopy.

7    Q   This person Mousey and Snoopy that Striboy was discussing,

8    did you know who those people were at the time?

9    A   No.

10   Q   Had you ever been at any Teclas meeting where those two

11   individuals participated when you were out on the street?

12   A   No.

13   Q   Now, I want to direct your attention forward in time to

14   earlier this year, 2008.  Did there come a time that --

15   withdrawn.

16        By 2008 had you been charged federally with crimes

17   related to your participation in MS-13?

18   A   Well, I hadn't been sentenced yet.

19   Q   But had you pled guilty?

20   A   Yes.

21   Q   And had you been in various jails since your arrest back in

22   August of '05?

23   A   Yes.

24   Q   I want to direct your attention to a time that you were

25   brought to a jail called Supermax in Baltimore.  First, had you

1   known that you were being brought to this particular facility

2   from your previous facility?

3   A   No.

4   Q   And, by the way, by this point had you been cooperating with

5   federal authorities?

6   A   Yes.

7   Q   Could you tell us what happened when you were brought to

8   this Supermax facility?

9   A   Well, I was put into a unit where I met Mousey and Homey

10  from LPS.

11  Q   First of all, you mentioned the person Homey.  What clique

12  was he from?

13  A   LPS.

14  Q   And that's an MS-13 clique?

15  A   Yes.

16  Q   Now, you mentioned Mousey.  What clique was Mousey from?

17  A   TLS.

18  Q   Do you think you'd recognize Mousey if you saw him again?

19  A   After that time?

20  Q   Right now today.  If you saw him today, do you think you'd

21  recognize him?

22  A   Yes.

23  Q   Could you look in the courtroom and tell us if you see him

24  now?

25  A   Yes.

1  Q    Could you point to him and describe something he's wearing

2  right now?

3  A    He's right there.  He has a white shirt.

4  Q    Now, was that the first time you had laid eyes on the

5  defendant, Mousey?

6  A    No.  I met him in Montgomery County.

7  Q    In the jail?

8  A    Yes.

9  Q    Now, I want to focus your attention, though, on when you

10 were brought into Supermax and you saw Homey from LPS and the

11 defendant, okay?  In the days and weeks that followed once you

12 were in that jail, did the defendant sometimes speak to you?

13 A    Well, we used to talk all the time.

14 Q    I want to focus your attention on a time that you were in a

15 room, one of those -- withdrawn.

16          I want to focus your attention on a time that the

17 television set was on.  Did there come a time that while the TV

18 was on, the TV announcer said the word "Riverdale"?

19 A    Yes.

20 Q    What, if anything, happened after you heard the announcer on

21 the TV say that word "Riverdale"?

22 A    Well, Mousey, looking at it, and it was the news that was

23 being shown at the time, said that he knew that that was the

24 area where some hits had gone down.

25 Q    And, in fact, did he actually describe to you --

1           MR. GORMAN:  Objection.  Leading.

2           THE COURT:  Overruled.

3   BY MR. JAFFE:

4   Q   And, in fact, did he, in fact, describe to you a hit that he

5   participated in in Riverdale?

6   A   Well, no.

7   Q   Do you remember him providing any details about the hit --

8   withdrawn.

9           As you sit here today, can you remember some of the

10  details he provided to you, if any, about the Riverdale hits

11  that he mentioned when the TV came on?

12          MR. GORMAN:  Objection.  Asked and answered.

13          THE COURT:  Overruled.

14          THE WITNESS:  No.  He just said that that was the place

15  where they had gone.

16  BY MR. JAFFE:

17  Q   When you say "they," who is "they"?

18  A   Well, that I know of, the clique was participating in some

19  hits.  Some of the members were participating in hits.

20  Q   Now, at the time -- during the time that you were in

21  Supermax, did you sometimes later on write down some of the

22  things that the defendant Mousey had said to you?

23  A   Yes, just a few things here and there.

24  Q   Was that done sort of close in time to when Mousey had

25  actually said them, give or take?

1   A    I don't know if I had already started writing some things

2   down when he said what had happened.

3   Q    When you were writing them down, would it be fair to say

4   they were fresher in your mind than they are today?

5   A    Yes.

6   Q    Do you think that those notes would assist you in trying to

7   remember the names of the people that were participating in the

8   hits in Riverdale that you're trying to tell us about now?

9   A    Well, I didn't write anything down on those notes on

10  Riverdale, but I do remember some of the things of Riverdale.

11  Q    Okay.  Can you tell us about what you remember about the

12  things the defendant told you about Riverdale?

13          MR. GORMAN:  Objection.  Asked and answered.

14          THE COURT:  Overruled.

15          THE WITNESS:  He said some question, actually.  I asked

16  about why -- how come Sombra knew so much about all these things

17  that were going on, and he said Sombra had taken him actually in

18  his own car to that place.

19  BY MR. JAFFE:

20  Q    And that place being Riverdale?

21  A    He didn't specify Riverdale, but he did specify the hit.

22  Q    And tell us what he specified about the hit.

23  A    No.  What I meant to say is that for the hits, Sombra would

24  take him.

25  Q    Okay.  Can you tell us the hits that Sombra took him to, who

1    was the receiving end of the hits?  Who was the victim, if you

2    will?

3    A   At one point he mentioned they were Surenos Trece.

4         MR. JAFFE:  Court's indulgence.

5    BY MR. JAFFE:

6    Q   And some of what you're telling us about that rival gang,

7    was that some of the things that you had later kept some notes

8    about?

9    A   I never took notes of that.  I took notes specifically about

10   things from El Salvador and other things.

11   Q   Earlier I asked you about the fact that you had pled guilty.

12   When you pled guilty, was that pursuant to an agreement that you

13   had with the government?

14   A   Well, yes, in a certain form, yes.

15   Q   And just to make sure it's clear, what you pled guilty to,

16   was that to participating in the racketeering enterprise MS-13?

17   A   Yes.

18   Q   And this agreement, was it in writing?

19   A   Yes.

20   Q   I'm going to show you what's been marked Plea 1.  I'll

21   provide it to counsel.

22        Mr. Garcia, I want you to take a look at the first page

23   of Plea 1.  Tell us if you recognize the first page of the

24   document.

25   A   Yes.

1   Q    What do you recognize this document to be?

2   A    Well, what we understood, what we agreed to, that I had to

3   say the truth and only the truth.

4   Q    So this is your cooperation agreement, your plea agreement

5   with the government?

6   A    Yes.

7   Q    And just to confirm, do you recognize this signature on the

8   page where I'm pointing?

9   A    Yes.

10  Q    Whose signature is that?

11  A    That is my signature.

12  Q    And is that your lawyer's signature underneath?

13  A    From what I recognize, yes.

14  Q    Now, as part of your agreement, did you admit to

15  participating in the incident that led to the stabbing in

16  Springbrook?

17  A    Yes.

18  Q    Did you admit to participating in other acts like the

19  incident with the women who were driving around in the car three

20  times?

21  A    Yes.

22  Q    And you admit to participating as a member of MS-13?

23  A    Yes.

24  Q    Now, you've already mentioned it, but I want to make sure

25  it's clear.  What is your understanding of what you've agreed to

1    do under the terms of the agreement Plea 1?

2    A    As part of my cooperation, I have to tell the truth, nothing

3    but the truth, and not get into problems.

4    Q    Now, if you live up to your end of the agreement, what is

5    the government required to do for you?

6    A    Well, the judge will be informed of my cooperation, and the

7    date she sets my sentence, she can take that into account or not

8    take that into account.

9    Q    So, who is the one who decides what your sentence is going

10   to be?

11   A    The judge.

12   Q    Has anybody made any promises to you about what sentence the

13   judge will give you?

14   A    No.

15   Q    What is your understanding of what happens to your agreement

16   if you lie in this courtroom?

17   A    They will bring charges against me.

18   Q    And what happens to your agreement if you lie under this

19   agreement?

20   A    It's over.  It's finished.

21        MR. JAFFE:  Court's indulgence.

22   BY MR. JAFFE:

23   Q    Mr. Garcia, I want to direct your attention back to when you

24   were telling us about conversations you had with the defendant

25   at Supermax.  You mentioned to us that he told you about some

1   things that happened in El Salvador.

2   A    Yes.

3   Q    What, if anything, did he say to you about a position of

4   leadership he had in the Teclas clique in El Salvador?

5   A    Well, as somebody who had the word, he had no more than four

6   days to -- 13 days to kill four -- no less than four chavalas.

7   Q    What I want to make clear here is what, if anything, did he

8   say about whether or not he was the first word or second word?

9   A    Well, he told me he was the first word.  That was one of the

10  things I wrote down.

11           MR. JAFFE:  Court's indulgence.

12           The government has nothing further on direct, Your

13  Honor.

14           MR. GORMAN:  Could we approach the bench?

15           THE COURT:  Sure.

16           (At the bench:)

17           MR. GORMAN:  I'd like a few minutes to talk over the

18  situation with my client before I begin cross-examination.

19           THE COURT:  We can take our lunch break now for an hour

20  and we'll begin again at quarter of two.

21           MR. GORMAN:  Thank you.

22           THE COURT:  Okay.

23           (In open court:)

24           THE COURT:  We're going to take our lunch recess before

25  Mr. Gorman questions the witness.  We'll begin again at quarter

1    of two.

2          But, counsel, before you leave, could I talk with you a

3    few minutes about scheduling?  But members of the jury and the

4    witness can be excused.

5          (Jury excused for the luncheon recess.)

6          THE COURT:  Please be seated just a moment.

7          The jurors are inquiring of the clerk as to the

8    schedule and before I allow Ms. Derro to tell them about it, I

9    wanted to talk with you.

10         Obviously we will not sit in this case on Monday,

11   October 27th.  We'll still be in evidence and we'll meet Tuesday

12   through Friday next week.  The following week I anticipate we

13   will also still be in the evidentiary presentation for Tuesday

14   the 4th through the 7th.

15         I propose to let the jurors know, as I think I told

16   them during voir dire, that we can either begin a little later

17   or perhaps recess a little earlier if everyone would appreciate

18   more time to vote, and I might ask them to let us know which

19   makes more sense.  But I wanted to check with counsel to see if

20   you had any thoughts about that day.

21         MR. JAFFE:  Your Honor, from the government's

22   perspective about what Your Honor just suggested would be great,

23   if you actually inquired of the jury as to whether they would

24   like to come in late or leave early on Election Day.

25         THE COURT:  And I would be thinking about what, an hour

1    to two hours?  So, perhaps beginning 10:30 or 11 if they want

2    more time in the morning or recessing at three or 3:30 if they

3    want more time in the afternoon.

4            MR. JAFFE:  That sounds right.

5            MR. GORMAN:  My suggestion is to come in a little

6    later, because that way if they want to vote, they can, and if

7    there's a slip-up, they can call the court, whereas if you let

8    them go early and there's a long line or something, they're not

9    going to be able to vote.

10           THE COURT:  Well, no.  Everybody in line by 8 p.m. is

11   permitted to vote at any polling place.  And that's why if we

12   leave -- and I'll let them tell me.  I guess I have sort of the

13   opposite, is that if we say in the morning that we'll start late

14   but somebody is still in line and can't get here, I don't want

15   them to leave voting, thinking they need to come here.  I might

16   prefer leaving early.  But I think that's why I want to ask

17   them.  And we'll see.  If there's no consensus, then I'll have

18   to make a decision.  We'll see how they do.

19           Now, the following week, Monday is a workday, the 10th.

20   Tuesday is Veterans' Day, the 11th.  Is there any way counsel

21   anticipate that this case will be in deliberations by Friday,

22   the 7th?  And let me ask it this way.  Even if it is, shall I

23   tell the jury that they will not be required to come in on the

24   10th?

25           MR. PARK:  It's possible, Your Honor, that it could be

1    in deliberations by the 7th.  It's not -- at least by our

2    schedule it's not likely.  Right now, the way we've kind of

3    plotted things out and shifted things around, it looks like we

4    could have our case in chief into evidence by the 7th, but

5    that --

6            THE COURT:  But then we still have jury instructions,

7    closing, arguments and deliberations.

8            MR. PARK:  Right.

9            THE COURT:  The real question is if for any reason we

10   manage to get it to the jury by the afternoon of the 7th, is

11   there any problem if I simply tell them now that even if that

12   happens, you won't have to come in again until the 12th?  I just

13   want to know do I tell them now that they won't be required to

14   come on the 10th of November, that Monday.

15           MR. JAFFE:  That's fine by the government, Your Honor,

16   just with the asterisk that if some reason -- if they're

17   deliberating and they really want to come in on the 10th that we

18   give them that permission.

19           THE COURT:  It's just that if I tell them now they

20   don't have to, they're likely to make plans.  I'm clearly going

21   to tell them that by the 17th they may well be required to come

22   in on a Monday, the 17th of November.

23           MR. GORMAN:  Your Honor, I kind of jammed things up on

24   Mondays for other jurisdictions.  I know I've got a couple of

25   things on the 10th that I've continued once because I was ill

1  and once because of this case.  So --

2          THE COURT:  So, telling you that you're fine on the

3  10th now is a good thing as well.

4          MR. GORMAN:  I'd just as soon not come in on the 10th.

5          THE COURT:  Then we will tell the jurors as of now that

6  they will not be required to come in on the 10th or 11th, but I

7  will let them know that depending on how the proceedings have

8  gone, they may need to come in on the 17th and that week, and

9  expecting that we won't carry over to the week of Thanksgiving,

10 but we won't say anything about that at this point.

11         All right.  Ms. Derro, we can tell the jury that they

12 won't need to come in this coming Monday, the 27th, the

13 following Monday, the 3rd, or the following Monday, the 10th or

14 Tuesday, the 11th.  As to Election Day, tell them that it is

15 possible that we can either start late, such as at about 10:30

16 or 11, or leave early, at about three or 3:30 but I'd like them

17 to let me know if they have a preference for one or the other on

18 Election Day and let me know what their logistical situations

19 might be.  If they get consensus, great.  If not, I'll have to

20 figure things out.  All right.  Do you need any other

21 information concerning the schedule?

22         THE DEPUTY CLERK:  No, Your Honor.  That's it.

23         THE COURT:  All right.  Then we'll take our lunch

24 recess.  Resume at quarter of two.

25         (Luncheon recess at 12:45 p.m.)

1          AFTERNOON SESSION          (1:50 p.m.)

2          (Jury present.)

3          THE COURT:  Please be seated.

4          Before we resume with the testimony, I'd ask the clerk

5     please to swear in our new interpreter who has joined us.

6          THE DEPUTY CLERK:  Please raise your right hand.

7          (Spanish language interpreter duly sworn by the deputy

8     clerk.)

9          THE DEPUTY CLERK:  Please state your name for the

10    record and spell your first and last names.

11         MR. ORTIZ:  Ezequiel, E-z-e-q-u-i-e-l, last name

12    O-r-t-i-z.

13         THE DEPUTY CLERK:  Thank you.

14         MR. ORTIZ:  Thank you.

15         THE DEPUTY CLERK:  You're welcome.

16         THE COURT:  Mr. Gorman.

17         MR. GORMAN:  Thank you.

18    WILBER GARCIA, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

19       TESTIFYING THROUGH THE SPANISH LANGUAGE INTERPRETER

20                    CROSS-EXAMINATION

21    BY MR. GORMAN:

22    Q   Mr. Martinez, how old were you when you came over from

23    El Salvador?

24    A   I had just turned 14.

25    Q   And how old are you now?

1  A    I just turned 23.

2  Q    And have you been to El Salvador since you've come to the

3  United States?

4  A    Just once.

5  Q    And when was that?

6  A    If I recall, somewhere around 2002.

7  Q    And how long were you in El Salvador then?

8  A    About a month.

9  Q    And who did you see when you were in El Salvador then?

10  A    Well, my grandmother and some other family members.

11  Q    Anyone else?

12  A    No.

13  Q    Did you go to any MS-13 meetings there?

14  A    When I went to El Salvador, I wasn't part of the gang.

15  Q    I see.  And when did you become a member of the gang?

16  A    It was some time in the autumn of 2002 after I came back

17  from El Salvador.

18  Q    Did you try to learn the rules of MS-13?

19  A    I never really did.  I would write the rules down on my

20  book, but I really didn't know anything about the rules.

21        THE INTERPRETER:  Interpreter is being corrected, I

22  believe.  One moment please.

23        Interpreter corrects, Your Honor.  "I wrote MS-13 on my

24  books."

25  BY MR. GORMAN:

1  Q   Did you try to learn how MS-13 operated?

2  A   Well, since I didn't know anyone that belonged to them,

3  there was really no way for me to learn the rules.

4  Q   Well, once you became a member, did you try to learn the

5  rules?

6  A   Well, it wasn't that I tried.  It's that I had to.  They

7  told me the rules the first day that I joined them and I had to

8  learn them.

9  Q   So you contend now that you know the rules, correct?

10           MR. JAFFE:  Objection to the form.

11           THE COURT:  Overruled.

12           THE WITNESS:  I know most of them.

13  BY MR. GORMAN:

14  Q   And do you know how MS-13 operates?

15  A   Yes.

16  Q   Do you know the history of MS-13?

17  A   Well, more or less.

18  Q   Do you know a number of the members of MS-13?

19  A   Could you be more specific as to what you mean, please.

20  Q   Well, do you know people who are in MS-13?

21  A   Yes.  I was part of MS.

22  Q   And do you know about the cliques in MS-13?

23  A   Yes.

24  Q   Do you know if there are any cliques of MS-13 in Arizona?

25  A   Well, yes, because I know that we received some people that

1    came from Arizona into our clique.

2    Q    Do you know the names of any of the cliques?

3    A    One of them was Arsis.  But there were four other people in

4    other cliques and I don't know those.

5    Q    Do you know where any of the cliques are located physically

6    in Arizona?

7    A    No.

8    Q    How about in New Mexico, do you know if MS-13 operates in

9    New Mexico?

10   A    Well, I really don't know.  MS operates in different areas

11   and they communicate with Salvador, with L.A.  It depends on if

12   you have the telephone numbers.

13   Q    How about New Mexico?

14   A    I wouldn't be able to say.

15   Q    How about in New Hampshire?

16   A    I wouldn't know how to tell you that either.  I did not have

17   the word in the clique.

18   Q    How about in Mexico?

19   A    Yes.  We all know that there are gang members in Mexico.

20   Q    Do you know the name of the cliques from Mexico?

21   A    Well, we know that there are a lot of people in gangs and

22   cliques down there, but they go and they come back.  They've

23   been deported and then they stay at the border between U.S. and

24   Mexico and they do robberies and do drugs.

25   Q    Has anyone ever contacted you about crimes that are about to

1    take place in Arizona by members of MS-13?

2    A    Well, I don't know where you're going to with this thing

3    with Arizona, because it's a very big gang and there are people

4    in Arizona.  Whatever goes on there stays there, and sometimes

5    we go from here to Arizona and they're always treated well.

6    Q    Have you ever gone to Arizona?

7    A    I'm correcting the interpreter, though.  What I said was

8    that people that go to Arizona are treated well because they're

9    part of the gang.

10   Q    My question to you is have you ever gone to Arizona?

11   A    I've never been in Arizona.

12   Q    Have you participated in any criminal activity on behalf of

13   MS-13 in Arizona?

14   A    As I said, I've never been in Arizona.

15   Q    So would the answer be no?

16   A    No.

17   Q    Have you ever participated in any MS-13 gang activity in New

18   Hampshire?

19   A    I've never been in New Hampshire either.

20   Q    Do you know of any specific criminal activity that was done

21   by MS-13 in Mexico?

22   A    The only thing I know about that is that other home boys

23   have told me about things because they've come into the country

24   illegally and they've come across the border.  So they've had

25   contact with those that are there at the border.

1    Q    Do you feel responsible for any criminal activity done by

2    MS-13 in Mexico?

3              MR. JAFFE:  Objection.

4              THE COURT:  Sustained.

5    BY MR. GORMAN:

6    Q    Have you participated in any MS-13 gang activity in

7    El Salvador?

8    A    As I said before, I wasn't a gang member when I went to

9    El Salvador nor was I when I first came to this country.

10   Q    Well, once you became a gang member or you contend that you

11   became a gang member in MS-13 in Maryland, did you participate

12   in any gang activity in El Salvador?

13   A    No.

14   Q    So you're not responsible for any gang activity in

15   El Salvador on behalf of MS-13 after you became a gang member,

16   correct?

17             MR. JAFFE:  Objection.

18             THE COURT:  Sustained.

19   BY MR. GORMAN:

20   Q    Did anybody ask you about planning any gang activity on

21   behalf of MS-13 in El Salvador once you became a member?

22             THE INTERPRETER:  Interpreter asks or a repetition of

23   the beginning of the question, sir.  Did you say "did anybody"

24   or "has anybody"?

25             MR. GORMAN:  Yes.

1          THE WITNESS:  No.

2    BY MR. GORMAN:

3    Q    When you were in the jail in Maryland known as Supermax, do

4    you remember what unit you were in?

5    A    No.  I've already forgotten that.  I've been in a lot of

6    jails, in a lot of units.  So that's not in my mind.

7    Q    When you were in the jail at Supermax, was your ability to

8    move around the jail limited by the guards?

9    A    Well, most of the time we're inside of a unit that was

10   smaller than the inside here of the courtroom.

11   Q    And did you have a particular cell?

12   A    Yes.

13   Q    And were there times during the day that you were required

14   to be in the cell?

15   A    When they did a count.

16   Q    And other than those times, were you allowed to be in a

17   particular area other than the cell?

18   A    Well, there was a TV/living room where the TV was on the

19   unit, and other times they let us go out to the yard.

20   Q    Well, when you were in Supermax jail, was Mr. Ramirez in the

21   same cellblock as you were?

22   A    Not in the same cell.

23   Q    But in the same unit?

24   A    Yes, separated by just one cell.

25   Q    And were all the people in that unit Spanish?

1   A    No.

2   Q    The area where the TV was, was that a popular area where

3   people would congregate?

4   A    Well, actually, the TV was there in the room but no one paid

5   much attention to it because it was not very good.  They didn't

6   have cable.  So it wasn't a good TV.

7   Q    There weren't any Spanish channels, were there?

8   A    No.

9   Q    You went to high school in this country; is that correct?

10  A    Yes.

11  Q    And did you take English courses?  Did you take courses that

12  were taught in English when you were in high school?

13  A    Well, yes, one class.

14  Q    And you're able to speak English, correct?

15  A    I understand more than I can speak.

16  Q    Without the interpreter, you can understand my words; would

17  that be accurate?

18  A    Yes, depending on what you're asking.

19  Q    And when you met Mr. Ramirez, did you primarily speak to him

20  in Spanish?

21  A    Always.  We never spoke in English.

22  Q    Now, when you said you listened to this TV about Riverdale,

23  was there anybody else sitting with you other than yourself and

24  Mr. Ramirez?

25  A    Not that I remember.  I just remembered he was there.

1  Q   And after speaking with him on a number of occasions, you

2  agree that his ability to speak English is not as good as yours;

3  would that be correct?

4  A   Could you repeat the question.

5  Q   You would agree that Mr. Ramirez's ability to speak English

6  is far less than yours, would you not?

7  A   Yes.

8  Q   And this television show that you said that mentioned

9  Riverdale was an English news program, correct?

10 A   Yes.

11 Q   And is it your testimony that just from hearing the word

12 "Riverdale," that caused him to talk to you about something to

13 do with MS-13?

14 A   He said in that area things had happened.

15 Q   But the television show was in English, correct?

16 A   Yes.

17 Q   And you told him in Spanish that you were a defendant in the

18 MS-13 cases, did you not?

19 A   Yes.

20 Q   And did you talk to him about the subject of people who were

21 cooperating with the police?

22 A   Once in a while, yes.

23 Q   So, during your conversation, he was aware that some of the

24 members -- some members of MS-13 were cooperating with the

25 police, correct?

1   A    Yes.

2   Q    And it's your testimony without you asking him any

3   questions, he told you something about Riverdale, correct?

4   A    Yes.

5   Q    What does the "first word" mean?

6   A    He's the head leader.

7   Q    So the first word is the person who tells other people in a

8   particular clique what to do, correct?

9   A    Yes.  To some degree he is responsible for the clique.

10  Q    And he told you that someone told him to go from El Salvador

11  to Maryland, correct?

12        THE INTERPRETER:  Interpreter requests a repetition,

13  please.

14  BY MR. GORMAN:

15  Q    He told you that someone told him to go from El Salvador to

16  Maryland?

17  A    Can you repeat the question.

18  Q    Did he tell you that someone told him to go from El Salvador

19  to Maryland?

20  A    Well, of what I know, that he was coming from El Salvador to

21  here to Maryland was through Striboy.

22  Q    So, he never told you that he was coming -- he never told

23  you in your conversations at the jail that he came from

24  El Salvador to Maryland, did he?

25  A    Not directly.

1   Q   And is it your testimony that he told you he was first word

2   in El Salvador?

3   A   Well, he told me.

4   Q   Now, if he was the first word in El Salvador, that means he

5   would have had to leave El Salvador and somebody would have had

6   to take up the first word in El Salvador in his clique; isn't

7   that correct?

8           MR. JAFFE:  Objection, Your Honor.

9           THE COURT:  Sustained.

10           MR. GORMAN:  Could we approach?

11           THE COURT:  Come up.

12           (At the bench:)

13           MR. GORMAN:  I thought I laid a foundation for that.  I

14   don't see why that's an objectionable question.

15           MR. JAFFE:  I didn't see a foundation for this

16   question.

17           THE COURT:  It's an argument.

18           MR. GORMAN:  I don't think it's argument.

19           THE COURT:  How would he know what had to happen in

20   El Salvador?

21           MR. GORMAN:  Because he supposedly knows what the first

22   word is.

23           THE COURT:  And somebody has already told this jury

24   what it is and if he's not there, there needs to be somebody

25   else.  You're arguing.  It's not a fact.  It's an assumption.

1  It's a conclusion.

2          MR. GORMAN:  What I'd like to do, then, is lay a

3  foundation for what the first word is and then ask the question.

4          THE COURT:  Of what happens when the first word is not

5  available?  But then whether somebody had to be or not, it's not

6  a fact.  He wasn't there.  He doesn't have any firsthand

7  knowledge of what did or didn't happen in El Salvador.

8          MR. GORMAN:  Well, I'll ask it another way.  Thank you.

9          (In open court:)

10 BY MR. GORMAN:

11 Q   What is the function of the first word in a clique for

12 MS-13?

13 A   Well, in a way he's responsible for what the clique does.

14 If the clique makes a mistake, then he's responsible.  The one

15 that has the first word is responsible.

16 Q   What happens if the first word in a clique for MS-13 dies or

17 leaves the clique?

18 A   Then somebody else is chosen, somebody that fulfills the

19 requirements in a way.

20 Q   So, if Mr. Ramirez was the first clique -- the first word in

21 El Salvador and he left that clique to go to Maryland, what

22 would the clique in -- what would the MS-13 clique in

23 El Salvador have to do?

24         MR. JAFFE:  Objection.

25         THE COURT:  Sustained.

1  BY MR. GORMAN:

2  Q    Is there always a first word in a clique for MS-13?

3         MR. JAFFE:  Objection, Your Honor.

4         THE COURT:  Overruled.

5         THE WITNESS:  All the time.

6  BY MR. GORMAN:

7  Q    And if someone leaves a clique as the first word, what would

8  that clique have to do concerning who the leader would be?

9         MR. JAFFE:  Objection, Your Honor.

10        THE COURT:  Sustained.

11 BY MR. GORMAN:

12 Q    When you were a member of the MS-13 clique in Maryland, who

13 was the first word?

14 A    Can you specify what clique, my clique or another clique?

15 Q    Your clique.

16 A    In the beginning, Homeboy.

17 Q    Then who?

18 A    After Homeboy was Little Trece.

19 Q    Little Trece.  And what happened when Homeboy left the

20 clique?

21 A    Well, there was somebody who had second word, but for a

22 while Homeboy continued being the first word from jail.

23 Q    And then what happened?

24 A    Well, he wanted somebody else to take the first word because

25 when I went to see him in jail, he said that he wanted somebody

1    else to take the first word because he couldn't have the first

2    word from jail, there had to be somebody else.

3    Q    Now, I want to switch gears a little bit.  You heard from

4    someone that someone named Mousey was coming up from Mexico; is

5    that correct?

6    A    Well, Striboy told me that Mousey was coming to the United

7    States.

8    Q    You didn't know who Mousey was; is that correct?

9    A    I didn't know him.

10   Q    Were there people in your clique that had the same name?

11   A    Not the same name.

12   Q    Did you ever become aware of people who -- what would happen

13   if two people had the same name in a clique?

14   A    Well, they would have to fight one-on-one.  Like it happened

15   to my cousin.  There was another Snoopy, my cousin Snoopy and

16   the Snoopy that came from El Salvador.  So, my cousin lost and

17   he had to take the name Little Snoopy only.

18   Q    Now, you mentioned the name Little Trece, right?

19   A    Yes.

20   Q    Is that the same name as Trece that you spoke about earlier?

21   A    No.

22   Q    But other than the word "Little" it's the same name,

23   correct?

24   A    Well, the word "Little Trece" is one word together, "Little

25   Trece," and Trece is just the Trece from El Salvador only.

1  Q   You said you spoke to a couple of people from El Salvador,

2  is that right, who were in the gang?

3  A   Yes.

4  Q   And what were their names?

5  A   As I said before, I only remember the conversations with

6  Trece.

7  Q   So that's the only person whose conversations you can

8  remember, correct?

9  A   Yes, apart from Sisco.  I talked once with him.

10 Q   Did you ever meet Trece in person?

11 A   No.

12 Q   Did you ever meet Sisco in person?

13 A   No.

14 Q   And you never had a face-to-face conversation with either of

15 them; is that correct?

16 A   No.

17 Q   And they called you on the phone, correct?

18 A   Yes.

19 Q   And you took their word that they were a member of MS-13

20 from El Salvador; is that right?

21 A   Yes.  All my clique knew that they were part of the Teclas.

22        MR. GORMAN:  Move to strike, Your Honor, not

23 responsive.

24        THE COURT:  Overruled.

25 BY MR. GORMAN:

1   Q    Is it your testimony that there were phone conversations

2   with Trece on the telephone at meetings?

3   A    Yes.  Motorola cell phones were used like the ones that have

4   speakers.

5   Q    Did the person who said his name was Trece call up someone

6   at the meeting?

7   A    Well, the time I remember we talked to Trece, I remember the

8   call was generated from here to El Salvador, because we were in

9   a meeting.

10  Q    And who made the call?

11  A    Well, the last one I remember was Silence.  That member of

12  the gang was deported.

13  Q    Did you see him dial the phone?

14  A    He did it in front of all of us.

15  Q    And what number did he dial?

16  A    Well, I don't know the number.

17  Q    So you don't know who he called on the telephone, correct?

18  A    Yes, I know, because all of us spoke to that person.

19  One-by-one we introduced ourselves by name.

20  Q    When you say you introduced yourselves by name, did

21  anyone -- you don't know if anyone who was -- strike that.

22          You introduced yourself by name but Trece wasn't there

23  in person, correct?

24  A    Not in person.  As I said, it was a telephone conversation.

25  Q    And you didn't see the telephone number that was called?

1        MR. JAFFE:  Objection.  Asked and answered.

2        THE COURT:  Sustained.

3   BY MR. GORMAN:

4   Q   For all you know, Silence could have called a number in

5   Maryland; isn't that correct?

6        MR. JAFFE:  Objection, Your Honor.

7        THE COURT:  Overruled.

8        THE WITNESS:  That's not possible because we all knew

9   where he was calling and there was no reason for him to lie to

10  us.

11  BY MR. GORMAN:

12  Q   But you didn't see the number he dialed, correct?

13       MR. JAFFE:  Objection, Your Honor.

14       THE COURT:  Overruled.

15       THE WITNESS:  No.

16  BY MR. GORMAN:

17  Q   And you had never met Trece before?

18  A   No.

19  Q   You had a number of conversations with prosecutors and law

20  enforcement officers prior to the time that you testified here

21  in court concerning the MS-13 case; is that correct?

22  A   Yes.

23  Q   And who are your best friends in the MS-13 group?

24  A   Among them Striboy, Little Loco, Popeye, and including Criss

25  Cross, and including Dragon.  Those are the people with whom I

1  hung out the most.

2  Q   About how many different sessions did you have with

3  prosecutors and investigators prior to the time that you

4  testified here?

5  A   You mean in this case?

6  Q   Since you've been arrested.

7  A   Well, I lost count, but a few.

8  Q   More than five?

9  A   Well, could you specify the question better so I know how to

10  answer?

11  Q   Did you have more than five meetings with prosecutors and

12  law enforcement officers concerning the MS-13 case?

13          THE COURT:  Between his arrest and today?

14          MR. GORMAN:  Yes.  Thank you, Your Honor.

15          THE WITNESS:  I could say yes.

16  BY MR. GORMAN:

17  Q   Was your attorney there?

18  A   Most of the times, no.

19  Q   How many times was she there?

20  A   Well, the first time when I got out, they gave me house

21  arrest, all the time.  Then when I was in the street, most of

22  the times.  But when I came back in, once or twice.  I don't

23  remember very well.

24  Q   Did they tell you -- did any of the law enforcement officers

25  or prosecutors tell you that you should tell them everything you

1  know about the case?

2  A    Well, they didn't tell me what I had to say, but they asked

3  me what I knew about the gang and about my participation.

4  Q    During your course of conversations with the prosecutor and

5  the law enforcement officers, did they ever tell you that they

6  thought what you told them was not true?

7          MR. JAFFE:  Objection, Your Honor.

8          THE COURT:  Sustained.

9  BY MR. GORMAN:

10 Q    Did you ever leave out parts of your participation in your

11 conversations with the law enforcement officers and the

12 prosecutors?

13         MR. JAFFE:  Objection.

14         THE COURT:  Come on up to the bench, please.

15         (At the bench:)

16         THE COURT:  Is there something you have a proffer about

17 that he left out?

18         MR. GORMAN:  I think it goes to impeachment.

19         THE COURT:  No.  What's your basis for asking that

20 question?  Do you have a report that indicates that he didn't

21 tell them something that he should have?

22         MR. GORMAN:  I guess my basis is going through a number

23 of proffers in this and other cases.

24         THE COURT:  What is it that you think he didn't tell

25 them?

1          MR. GORMAN:  I'm not sure.

2          THE COURT:  Well, then, I can't let ask you that

3     question that way because, number one, it's unfair to the

4     witness because I'm not sure anyway -- but if it's not an

5     impeachment by a prior inconsistent omission with a good faith

6     basis for asking it, then I don't think it's appropriate.

7          MR. JAFFE:  Since we're here, I noticed for Plea 1, the

8     plea agreement for Mr. Garcia, we inadvertently included the

9     statement of facts in that exhibit, which we've pulled out,

10    because I know that's inappropriate, and I wanted to flag that.

11         THE COURT:  It doesn't matter to me.  It's depending

12    on -- they propose only to use the substance of the plea

13    agreement and not the attached statement of facts.

14         MR. GORMAN:  Well, I'd like to ask him a question about

15    the attached statement.

16         THE COURT:  It can go in if you want it, I think.

17         MR. JAFFE:  Your Honor, just for the record, if we go

18    down that road where the statement of facts is going to be the

19    basis of questions, we're going to be offering the entire

20    statement of facts into evidence.

21         THE COURT:  That's what I mean.  You can't question him

22    about it if it's not an exhibit.

23         MR. GORMAN:  Can I look it over again?

24         THE COURT:  Sure.  I just want you to know that in

25    these cases we have not been including the statement of facts as

1  part of the exhibit.  The exhibit is coming in as bias type

2  information and not anything else.  So we have been taking out

3  the facts.  If you want to question him about it, then the

4  government is going to ask that the statement of facts be

5  included.

6          MR. GORMAN:  Well, right now, I don't know if they've

7  included this.

8          THE COURT:  Plea 1.

9          MR. GORMAN:  Plea 1 has already come in?

10          THE COURT:  Yes.

11          MR. GORMAN:  Well, I'd like to go over it if you give

12  me a minute.

13          THE COURT:  Unless you ask him about the facts, they

14  will not come in.  That will be your choice.

15          MR. GORMAN:  The plea agreement won't come in?

16          THE COURT:  The plea agreement will come in.  It's in.

17  The substance of it, Exhibit A, which is the statement of facts,

18  ordinarily has not been attached to the exhibit in court.

19          MR. GORMAN:  I understand.

20          THE COURT:  If you want to ask him about something

21  that's in there, it probably is going to result in the

22  government asking to have the facts in evidence, the factual

23  statement in evidence.

24          MR. GORMAN:  I'd like to read it over.

25          THE COURT:  So you need to look it over and decide.

1            MR. GORMAN:  Can I have a moment to do that?

2            THE COURT:  Sure.

3            (In open court:)

4    BY MR. GORMAN:

5    Q    Mr. Martinez, you state that you paid dues; is that right?

6    A    Yes.

7    Q    Where did you get the money to pay dues?

8    A    Well, I worked from time to time.

9    Q    And is that the total source of the funds where you got the

10   money?

11   A    No.  No.  I always had my mother's support, and every time I

12   asked her for money, although she didn't know it was for the

13   gang, she always helped me.

14   Q    You never saw Mr. Ramirez before you met him in jail,

15   correct?

16   A    As I said before, I didn't know him from the street.

17   Q    You never saw him in Maryland other than in jail, correct?

18   A    Yes.

19   Q    You never talked to him on the telephone prior to the time

20   that you were in jail, correct?

21   A    No.

22   Q    He never told you to participate in any MS-13 activities

23   prior to the time that you saw him in jail, correct?

24            THE INTERPRETER:  I'm sorry.  Interpreter needs

25   clarification.  Could you please restate the question.

1   BY MR. GORMAN:

2   Q    He never told you to participate in MS-13 activities prior

3   to the time that you got into jail, correct?

4   A    No.

5   Q    You never collaborated with him on any MS-13 activities

6   prior to the time that you got into jail, correct?

7   A    No.

8   Q    You never saw him commit any illegal acts prior to the time

9   you got into jail; is that correct?

10  A    No.

11  Q    Are you still a member of MS-13?

12  A    Due to what I'm doing I'm not.

13  Q    Are you familiar on how people stop being members of MS-13?

14  A    Yes.

15  Q    What are the ways people stop being members in MS-13?

16  A    Among them is to become a Christian but a true Christian

17  from the heart, because if there's something we respect, it's

18  the word of God.

19  Q    So, is it your testimony that if a gang member says "I am

20  now a true Christian" that he no longer has to participate in

21  MS-13 activities?

22  A    Well, if in fact he shows that he is a true Christian, then

23  the other gang members are not going to say anything to him any

24  more.

25  Q    What other ways do people get out of being MS-13 gang

1  members?

2  A    As we say in the gang, somebody who has a good record.  That

3  means that has many murders.

4  Q    So, if someone has committed a lot of murders, they're

5  permitted to leave the gang?

6  A    In a way, yes.

7  Q    How about if someone becomes much older, would that permit

8  them to not be a member of the gang?

9       MR. JAFFE:  Your Honor, we're going to object.  I'd

10  like to approach, please, and make a record.

11       THE COURT:  Come on up.

12       (At the bench:)

13       MR. JAFFE:  Your Honor, we feel compelled by the

14  court's admonition at the beginning of the case to make a record

15  and we feel that counsel has come close, if not crossed the

16  line, on the proffer agreement.  When Detective Frank Flores on

17  the first day was questioned by the defense about ways to get

18  out of the gang, we made the objection, stating that we didn't

19  think it had crossed the line yet but that in connection with

20  other evidence, it would be getting very close.

21       The court might have mentioned that while questioning

22  an expert about the withdrawal may not do it, questioning fact

23  witnesses like gang members might.  And here counsel is asking a

24  gang member, a fact witness, about the ways to get out of the

25  gang and focusing him on a particular way regarding age.  It's

1   not clear to the government what possible relevance these

2   questions could be if not to support a defense of withdrawal.

3   If we have not crossed the line, we are now getting just right

4   up to the line on violating the agreement, and we wanted to make

5   our record now consistent with the court's admonition.

6          MR. GORMAN:  I totally disagree.  The expert witness

7   should not be the only one who can testify what constitutes

8   being a member of the gang and not being a member of the gang.

9          He's being called as a witness mainly to testify about

10  what the gang does, how they get into the gang and, we'd

11  suggest, how to get out of the gang.  Now, this guy Flores is

12  not a member of the gang.

13         THE COURT:  Okay.  I guess what he's asking is the

14  relevance of how one gets out and what relevance that has.

15         MR. GORMAN:  It has to do with his knowledge as to, A,

16  whether or not he's a member of the gang, because if he is a

17  member of the gang, he should know this stuff.  We don't know if

18  he's a member of the gang.  He claims he's a member of the gang.

19  And I should be permitted to ask questions.

20         THE COURT:  Okay.  I don't really hear -- first of all,

21  I don't agree that it's irrelevant except as it might relate to

22  some proffer of the defendant.  I don't know that yet.  And it's

23  my understanding Mr. Jaffe is coming to the bench because he

24  wanted to alert you that they think you may be getting close to

25  some line, but I'm not getting involved in that because I'm not

1    in a position to rule on that at this juncture.

2           MR. GORMAN:  Well, I'm also going to ask him if there

3    are any other ways, including moving out of an area, if that's a

4    way to get out of the gang.

5           THE COURT:  Okay.  You'll have to live with what

6    position they may take, and then I'll have a hearing.  But I

7    don't have a problem because I don't see it as irrelevant as it

8    relates to the defendant.  There are going to be other witnesses

9    as well and the whole thing about what this gang is and whether

10   it's an enterprise and all of that is fair game.

11          MR. JAFFE:  Your Honor, the way this is playing out, I

12   guess we should alert the court and counsel to the fact that if

13   counsel is asking all of these questions of all of these

14   witnesses without tying them to the defendant until his closing,

15   we're going to be making a motion to reopen the case at closing.

16   I'm not suggesting that the only possible reason that counsel --

17   or the sole reason is to suggest a defense for Mr. Ramirez of

18   withdrawal, but even if a portion of his purpose is to suggest

19   this defense that at some point we're going to be making the

20   motion to ask the --

21          THE COURT:  It's not the government's position that --

22   isn't it that -- am I going to hear some evidence about things

23   he did here in Maryland?

24          MR. JAFFE:  Absolutely.

25          THE COURT:  Well, if the purported withdrawal was the

1   move from El Salvador here, I don't understand.  At what point

2   do you think he's going to try to say he withdrew?

3          MR. JAFFE:  My understanding from the opening statement

4   is he's going to deny doing any of the things that we allege,

5   that he wasn't part or there or present and then say withdrawal.

6          THE COURT:  Then you'll have a different factual issue

7   altogether.  It's not simply the withdrawal by moving.  I think

8   we'll just go ahead.

9          MR. JAFFE:  Okay.

10          (In open court:)

11   BY MR. GORMAN:

12   Q   Are you aware of people who have gone out of the MS-13 gang

13   because of their age?

14   A   I have not met anyone that has left due to age.

15   Q   What's the oldest member of the MS-13 gang that you have

16   met?

17          MR. JAFFE:  Objection, Your Honor.

18          THE COURT:  Overruled.

19          THE WITNESS:  Personally, the oldest member I've met,

20   34, 35.

21   BY MR. GORMAN:

22   Q   So you've never met any -- okay.  Have you known of any

23   member of MS-13 gang who has withdrawn from the gang by moving

24   away?

25   A   Well, in this country, yes, people who have not even told

1  the clique that they're moving.

2  Q    And when they don't tell the clique that they're moving,

3  does the clique allow them to no longer be a member of the gang?

4  A    It's not that the clique allows it.  It's just that those

5  people are hiding.

6  Q    Have you ever known of people who have withdrawn from the

7  gang due to serious illness?

8  A    No.

9  Q    Have you ever met people who have tattoos associated with

10  MS-13 who are not part of the Teclas clique?

11  A    Some.

12  Q    When you have met them, did you ever insist that they come

13  to a meeting?

14  A    You mean to the meetings of -- the Teclas meetings?

15  Q    Yes.

16  A    At the meetings for Teclas, the majority of the time always,

17  most of them are going to belong to the Teclas clique.

18  Q    What would happen to a person who had MS-13 tattoos and

19  lived in your area and didn't come to the meetings?

20         MR. JAFFE:  Objection, Your Honor.

21         THE COURT:  Sustained.  I'm not sure I understand what

22  meeting you're talking about.

23         MR. GORMAN:  To the Teclas meetings, MS-13 Teclas

24  meetings.

25         THE COURT:  Well, why don't ask you this question

1    again.  You mean somebody with an MS-13 tattoo who's not a

2    member of the Teclas?

3              MR. GORMAN:  Yes.

4              THE COURT:  But is a member of some other clique?

5    BY MR. GORMAN:

6    Q    Who had the tattoo, what happen to them if they were seen on

7    the street and didn't come to the meetings?

8              THE COURT:  Try asking a complete question, please.

9              MR. GORMAN:  Thank you, Your Honor.

10   BY MR. GORMAN:

11   Q    What would happen to a person who had MS-13 tattoos and

12   lived in the area and consistently did not go to Teclas

13   meetings?

14             THE COURT:  Come up here for a second so I can discuss

15   this.

16             (At the bench:)

17             THE COURT:  If he's a member of some other clique, why

18   does he have to go to Teclas meetings?

19             MR. GORMAN:  This is a question asked to determine

20   whether or not he is a member of the MS-13.

21             THE COURT:  If who is?

22             MR. GORMAN:  Mr. Martinez, his knowledge of the MS-13,

23   whether or not --

24             THE COURT:  I don't understand your question.  Why

25   should anybody, just because they have an MS-13 tattoo, have to

1    go to a Teclas clique meeting?  Can't they go to a PBLS?  Can't

2    they go to SLSW?  Can't they go to a Harvey?  Can't they go to

3    Fulton?  That's my problem.  You're saying MS-13 tattoo and

4    Teclas meeting.

5              MR. GORMAN:  Well, then, maybe I'll ask it in such a

6    way if they're in the area and they don't go to any meetings as

7    to what would happen to them.

8              MR. JAFFE:  I think that question is so confusing.

9    There's so many cliques in the neighborhood.

10             THE COURT:  How would you know?

11             MR. GORMAN:  All right.  I'm going to withdraw the

12   question.

13             THE COURT:  That's my problem --

14             MR. GORMAN:  I understand.  I'm going to --

15             THE COURT:  -- is the clique versus the gang.  Okay.

16             (In open court:)

17   BY MR. GORMAN:

18   Q   Have you gone to any Teclas meetings in which after -- and

19   after the meeting there's a party?

20   A   That happened sometimes.

21   Q   And at the party are there women?

22   A   Well, at the meetings most of the times it was just home

23   boys and sometimes a woman but it was a member of the gang.

24   Q   So, if there's a party after the meeting, are the women who

25   go to the party allowed to go to the Teclas meeting?

1   A   Well, what I mean to say, to be specific, for example, when

2   there was Little Truca, who was Homeboy's girlfriend, Sombra,

3   who was Stomper's girlfriend, they were there already at the

4   party.  They weren't coming from somewhere else.

5   Q   So were they allowed to listen to what was going on at the

6   meeting?

7   A   Sometimes, because they were the girlfriends of some of the

8   home boys belonging to Teclas.  Plus, they were at the same time

9   members of MS-13, which is the same thing.  In a way, we're all

10  the same.

11  Q   So, are you saying that there are a number of women who were

12  members of MS-13, of your clique, while you were out on the

13  street?

14          MR. JAFFE:  Objection to the phrase "a number of."

15          THE COURT:  Overruled.

16          THE INTERPRETER:  Could you ask the question again,

17  please.

18  BY MR. GORMAN:

19  Q   Is it your testimony that there were a number of women who

20  were MS-13 members who were part of your clique?

21  A   Not Teclas.  The two that were there belonged to Sailors, MS

22  Sailors.

23  Q   Other than those two women, were other women permitted to go

24  to the meetings who were going to attend the party?

25  A   Never, not while I was present, never.

1          MR. GORMAN:  Can I have a moment, Your Honor?

2          Thank you, Your Honor.  Nothing further.

3          THE COURT:  Any redirect?

4          MR. JAFFE:  Yes, Your Honor.  Court's indulgence.

5                      REDIRECT EXAMINATION

6   BY MR. JAFFE:

7   Q   Mr. Garcia, I want to focus your attention first on

8   Mr. Gorman's question about Silence initiating the call to

9   El Salvador.  Can you remember whether or not Silence used one

10  of those calling cards to help call the number?

11  A   Well, I don't recall a hundred percent, but that is the way

12  that I recall that he did it.

13  Q   Now, you were asked a question about what unit you were in

14  in Supermax.  Do you remember that?

15  A   Yes.

16  Q   Now, you've told us that you couldn't remember as you sit

17  here today what the number of the unit was.

18  A   Yes.

19  Q   You've also told us that while you were in Supermax, you

20  sometimes took notes of what Mousey had said.

21          MR. GORMAN:  Objection.

22          THE COURT:  Overruled.

23          MR. GORMAN:  May we approach, Your Honor?

24          THE COURT:  Come on up.

25          (At the bench:)

1          MR. GORMAN:  There were absolutely no questions about

2    the notes that he took in my cross-examination, none.  So, this

3    is definitely far outside the scope.  They're trying to revise

4    his testimony after he testified a certain way, and we'd ask the

5    court not to permit it.

6          THE COURT:  No, no, no, no, no.  Let's calm down.

7    They're, first of all, entitled to impeach their own witness,

8    but if he's going to refresh -- he did say something about

9    notes.  And that was during the direct?

10         MR. JAFFE:  Yes.  I mentioned the notes because he says

11   he can't remember the cell number.  On his notes I was going to

12   refresh his recollection to see if he can remember the cell

13   number, see if the notes jog his memory.

14         THE COURT:  But there were notes mentioned during

15   direct?

16         MR. GORMAN:  Direct, not on cross.

17         THE COURT:  Okay.  Well, he's going to try and refresh

18   his recollection about the cell number.  That's all.  And he

19   could do that whether it was mentioned -- I guess you don't need

20   to have him tell us what it is.  The jury doesn't need to know

21   what would refresh his --

22         MR. JAFFE:  I was just going to say --

23         THE COURT:  You can just say I'm just going to show you

24   a document -- and we'll know what it is because you'll see it --

25   to see if it refreshes your recall as to what cell it is.  Okay.

1   But you don't have to talk about the notes.  They don't need to

2   know the basis for it.

3           MR. JAFFE:  Okay.

4           (In open court:)

5   BY MR. JAFFE:

6   Q   Mr. Garcia, I'm going to approach with a document, which, I

7   guess, ask it be deemed Garcia 1 for identification purposes

8   only.  What I want you to do is just look at this document.

9   Just look at it.  Don't say anything.  Look at it.  Read it to

10  yourself without saying anything.  You don't have to say

11  anything.  Just read it.  I'm going to turn it over now.  Does

12  that help your memory as to the unit that you were in in

13  Supermax?

14  A   Yes.

15  Q   Do you remember what unit you were in?

16  A   C2.

17  Q   When you were in Supermax with Mousey, did you ever tell him

18  that you were cooperating with the government?

19          MR. GORMAN:  Objection.  Leading.

20          THE COURT:  Overruled.

21          THE WITNESS:  Never.

22  BY MR. JAFFE:

23  Q   When Mousey told you in Supermax that he was the first word

24  of Teclas in El Salvador, what part of El Salvador was the

25  clique, the Teclas clique, that he was first word of?

1      MR. GORMAN:  Objection to the form.

2      THE COURT:  Overruled.

3      THE INTERPRETER:  Could you ask again.

4   BY MR. JAFFE:

5   Q   When Mousey told you that he was first word of the Teclas

6   clique in El Salvador, which part of El Salvador was this

7   particular Teclas clique in, according to Mousey?

8   A   Santa Teclas.

9   Q   Did he ever claim to have leadership in the Quezaltepeque

10  Prison in El Salvador?

11      MR. GORMAN:  Objection.  Outside the scope.

12      THE COURT:  Overruled.

13      THE WITNESS:  Could you repeat the question.

14  BY MR. JAFFE:

15  Q   Did he ever make any claims to you about having the

16  leadership position inside the Quezaltepeque Prison in

17  El Salvador, as far as you can remember?

18  A   He never mentioned that word Quezaltepeque that I could

19  recall.

20      MR. JAFFE:  Court's indulgence.

21      Nothing further from the government on redirect, Your

22  Honor.  Thank you.

23      THE COURT:  Any recross?

24      MR. GORMAN:  No, Your Honor.

25      THE COURT:  Thank you, Mr. Garcia.  That completes your

1   testimony and you are excused.

2          Should we take a break at this point?  Does that make

3   sense?

4          MR. PARK:  That's fine, Your Honor.

5          THE COURT:  All right.  We'll take our afternoon break

6   and we'll resume.

7          (Recess from 2:55 to 3:15 p.m.)

8          THE COURT:  I just wanted to report that the jury

9   agreed they would prefer to leave early on Election Day rather

10  than come in late.  So, we'll plan on three or 3:30 or 3:15.

11  We'll go up to a break, I guess, after lunch.  And you'll let me

12  know as we get closer whether we want to try to start earlier.

13  If we're in trouble in terms of presentation, we can ask

14  everyone to be here by nine.

15         MR. PARK:  That's fine, Your Honor.

16         THE COURT:  If we're on schedule, then --

17         MR. PARK:  We are on schedule.  Just to let the court

18  know, the next witness is Ms. Blumberg.  I've already warned

19  Ms. Derro and I guess I'm warning the court reporter as well

20  that there will be a series of exhibits I'm going to rattle off.

21  These are where we're, again, putting in all the certified

22  translations.  So there's going to be a long list of Cronin and

23  14th Avenue exhibits as well as some 8320 14th Avenue, Willow

24  and Erie exhibits that we're going to rattle off.

25         I've also advised Mr. Gorman of the various prefixes, I

1  guess, of the exhibits.

2         THE COURT:  Okay.

3         MR. GORMAN:  Your Honor, I'd ask that the court reserve

4  ruling on the admission of these.  I can't say I'm familiar with

5  every single one of these and I don't know for sure if there's

6  going to be something in there that's very prejudicial that

7  might --

8         THE COURT:  As long as you agree that it won't be

9  anything dealing with Ms. Blumberg's translation of the

10 document.  The government is calling her now and this is the

11 opportunity to talk with her about them.  If you're suggesting

12 that there may be some that you may have other issues with or

13 portions of them, I don't have a problem with that, frankly,

14 because they're not going to go to the jury at this particular

15 point.  But if it's an issue concerning what she says she reads

16 in them, that needs to be raised now.

17        MR. PARK:  Particularly, Your Honor, because I was

18 planning to have Ms. Blumberg read from some of the

19 translations.

20        THE COURT:  Some of them.  So those that you want her

21 to read from, obviously now is the time.  Can you identify which

22 of those they are?

23        MR. PARK:  I believe Cronin 9 was one of them, Your

24 Honor, and then there were the exhibits from portions of the

25 translations from the 14th Avenue and 8320 14th Avenue exhibits,

1   and Willow.  So that would be 14th Avenue 17, 23, 24, 24a, 79,

2   80, 81 and 82.

3           MR. GORMAN:  What book is that?

4           MR. PARK:  It would probably be in the first book.

5           THE COURT:  It's not alphabetized under F, but it's a

6   number.  So it comes first.

7           MR. PARK:  Right.

8           THE COURT:  You have to learn the system.

9           MR. GORMAN:  Can I ask for those numbers again?

10          MR. PARK:  I can hand them to Mr. Gorman.

11          THE COURT:  You can look at them.

12          MR. PARK:  While I go through the Cronin exhibits,

13  Mr. Gorman is welcome to look at those as well as the 8320 14th

14  Avenue.

15          THE COURT:  The beginning of her testimony, Mr. Gorman,

16  I'm sure will be the process she went through and all of that

17  before we get to any specific ones.

18          MR. PARK:  Right.

19          THE COURT:  Okay.  We'll bring the jury in.

20          MR. PARK:  Was Your Honor planning to go to 4:30 today?

21          THE COURT:  4:30 or wherever thereafter there's a

22  natural break.  You anticipate not finishing her testimony,

23  then, today?

24          MR. PARK:  I'll just be getting through Ms. Blumberg's

25  testimony.  After her is Kim Drielak, who is the agent who did

1 | the Cronin Drive search and, as the court is aware, there's

2 | quite a number of exhibits from there.  That may be something

3 | we'll have to hold over, I guess, Tuesday.  I mean, start now

4 | but then finish up on Tuesday.

5 | THE COURT:  Okay.  Yes.  Sure.  No problem.  I'm sure

6 | on a Friday afternoon 4:30 is fine.

7 | MR. PARK:  We're fine to go later, Your Honor.  It's

8 | more that we didn't want to run afoul of the court or the jury.

9 | THE COURT:  It's the first week.  The jurors are still

10 | getting used to the rhythm of what we're doing.

11 | MR. PARK:  Right.

12 | (Jury present.)

13 | THE COURT:  Please be seated.

14 | Ready to resume, Mr. Park?

15 | MR. PARK:  Yes, Your Honor.  Thank you.  The government

16 | calls Shelley Blumberg.

17 | THE DEPUTY CLERK:  Ms. Blumberg, if you would please

18 | walk down this aisle.  Be careful of your step on the ramp.

19 | Turn and face me.  Please raise your right hand.

20 | SHELLEY BLUMBERG, GOVERNMENT'S WITNESS, SWORN

21 | THE DEPUTY CLERK:  Please be seated.  Please speak

22 | loudly and clearly into the microphone.  State your name for the

23 | record and spell your first and last names.

24 | THE WITNESS:  Shelley Blumberg, S-h-e-l-l-e-y,

25 | B-l-u-m-b-e-r-g.

1          THE DEPUTY CLERK:  Thank you.

2          THE COURT:  Mr. Park.

3          MR. PARK:  Thank you.

4                    VOIR DIRE EXAMINATION

5    BY MR. PARK:

6    Q   Good afternoon, Ms. Blumberg.

7    A   Good afternoon.

8    Q   Where are you currently employed or how are you currently

9    employed?

10   A   I'm a freelance translator/interpreter in the Metropolitan

11   area, D.C. and Maryland and Virginia.

12   Q   How long have you been so employed, I guess, as a freelance

13   translator and interpreter?

14   A   I began work as a freelancer in Los Angeles in 1975.

15   Q   And which language have you primarily focused on in terms of

16   your translation and interpretation services?

17   A   Spanish and English.

18   Q   Have you been working both in, I guess, translating and

19   interpreting from Spanish to English and then also English to

20   Spanish?

21   A   I interpret from Spanish to English and English to Spanish

22   and I principally translate from Spanish to English, though I do

23   some translation into Spanish as well.

24          MR. PARK:  Court's indulgence.

25   BY MR. PARK:

1    Q    Are you a native English speaker?

2    A    Yes.

3    Q    And in terms of your background in the Spanish language, can

4    you give the jury some idea of how that came about?

5    A    Well, I grew up in southern California.  So, I've been

6    exposed to Spanish since I was a child.  I had a very informal

7    class in elementary school.  And then after studying French for

8    three years in junior high -- we called it junior high then -- I

9    started studying Spanish in twelfth grade and then continued on

10   from there to receive a B.A. in Spanish and to work in a

11   bilingual capacity in several places and then received a

12   master's degree as well involving language.

13   Q    I'm sorry.  In what?

14   A    The master's also had to do with the language.

15   Q    Okay.  I want to show you on the screen Resume 2.  Just for

16   a quick moment, just glance at that.  Do you recognize that

17   document?  It's again Government's Exhibit Resume 2.

18   A    Yes.

19   Q    And is that a document that you prepared and provided to the

20   government as a synopsis of sorts of your educational background

21   and your work experience?

22   A    Yes.

23   Q    In particular, does this capture accurately your experience

24   not only professionally but also some of your certifications as

25   well as some of the study that you've done both in the United

1   States as well as abroad?

2   A    Yes.

3   Q    Just to summarize a little bit, in terms of the study abroad

4   that you have conducted, which countries have you gone to?

5   A    Mexico and Chile for studying specifically.

6   Q    And what were you studying specifically?

7   A    Oh, and France also.  I was studying language.

8   Q    Fair to say you were studying Spanish?

9   A    Well, except in France I was working on my French.

10  Q    Backing up a little bit, we're using a couple of different

11  terms here, translation as well as interpretation.  For, I

12  guess, making sure we're using the right terms, can you describe

13  for the ladies and gentlemen of the jury what the difference, if

14  any, there is between translation and interpretation?

15  A    Yes.  Translation is the written word and interpretation is

16  oral.

17  Q    So, in terms of your work as a translator, typically what

18  does that involve?  We'll go through the process of the

19  documents that you translated for this case in much more detail

20  later.  But generally what does that involve when you're

21  translating a document?

22  A    Translation involves taking the original language and

23  putting it accurately into the target language.

24  Q    And interpretation?

25  A    Would be speaking, spoken word, listening to the original

1   language and speaking it in the other language.

2   Q    Are there various types of interpretation?

3   A    Yes.

4   Q    And can you describe, for example, simultaneous

5   interpretation, what that might be?

6   A    Simultaneous interpretation is what you're observing my

7   colleagues doing, which is when you speak slightly behind the

8   original speaker because you have to change the word order, but

9   you pretty much simultaneously repeat in the other language

10  what's being said.  And then consecutive would be the type of

11  interpreting we do at the stand or in an interview, for example,

12  where one person speaks and the interpreter would take notes and

13  then speak after they stop in the other language.

14  Q    Are you familiar with the phrase "sight translation"?

15  A    Sight translation is a combination of the two.  That would

16  be, for example, if someone were to hand one of us a written

17  document and, let's say, it would be in Spanish, we would read

18  the document and convey the same document but verbally in the

19  other target language.

20  Q    I referenced earlier when I was showing Resume 2, your CV,

21  some certifications.  Are you federally certified in any way?

22  A    Yes.  I'm a federally certified court interpreter.

23  Q    And can you describe for the ladies and gentlemen of the

24  jury what the process is for becoming federally certified as a

25  court interpreter?

1  A    Yes.  In order for us to work in the federal system and also

2  in D.C. Superior Court, we have to take a written exam to

3  determine our capabilities in both languages, and once we pass

4  the written exam, two years later we take an oral exam and

5  that's to determine that we're at a level where we can begin to

6  work in the federal court, and then it's an ongoing learning

7  process.

8  Q    And how long have you been federally certified as a

9  courtroom interpreter?

10 A    In 1991 I was certified to work in federal court.

11 Q    And since 1991 have you been working on a regular basis in

12 the courts, particularly the federal courts, as a Spanish

13 language interpreter?

14 A    Yes, and D.C. Superior Court as well.

15 Q    That goes to my next question.  Can you just give a quick

16 summary of the various jurisdictions or courts that you may have

17 worked in as a Spanish interpreter?

18 A    On the federal level?

19 Q    On the federal level.

20 A    I've worked in Baltimore and here in Greenbelt, in

21 Washington, D.C. at D.C. Superior Court and the U.S. Attorney's

22 Office, also for the Federal Public Defender Services of

23 Maryland, Virginia, Washington, D.C., and in Virginia and

24 Alexandria in the federal court, and I've traveled to Tennessee

25 on occasion, and sometimes they send us to Fort Detrick and some

1    of the outlying areas.  We interpret in the jails and many

2    different venues.

3    Q    In the course of your work as a Spanish language

4    interpreter, have you ever worked with or for defense attorneys?

5    A    Oh, yes.

6    Q    And in the course of your work, have you ever been certified

7    or in any way qualified by the Department of State?

8    A    Yes.  When I first came to Washington, D.C., I had already

9    passed the federal -- excuse me -- the U.S. Department of State

10   exam for interpreting.  And that's a whole different realm, I

11   guess you could say.  But, yes, I did take the exam and I did

12   pass that exam and worked for many years and still work for the

13   U.S. Department of State as an interpreter.

14   Q    During the course of your career have you had occasion to

15   train other individuals in either translating documents or

16   interpreting for individuals?

17   A    Yes.  I worked at the Los Angeles Olympic Coordinating

18   Committee for the Olympics in 1984 and part of my job as a

19   manager in language services was to design and carry out the

20   training program for the volunteer interpreters that were going

21   to work at the pregame events and villages and the games.

22   Q    Approximately how many different individuals did you train

23   or were you responsible for training?

24   A    You know, I don't remember the exact number.  I know we had

25   several groups of 200 and I remember mentioning before 200, but

1   I think it was actually more than 200.  Maybe 400 or 600.

2   Q    And specifically with regard to translating documents, do

3   you have any professional experience translating large numbers

4   of Spanish language correspondence?

5   A    Besides this?

6   Q    Besides this.

7   A    This has been a big job.  Well, I began doing some

8   translating and interpreting in Los Angeles at a law firm.  I

9   worked at a law firm for almost two years and my job was

10  bilingual legal assistant.  And so, I did a lot of translations

11  there, and one of the -- I've done freelance work since I came

12  to D.C. as well for the international organizations and for the

13  courts, different letters and what not.

14          One of the bigger assignments was the Mariel Boatlift

15  project, which was for an agency that contracted with the

16  government, CACI, and we translated all the documents, legal

17  documents and letters that had to do with the Marielitos who

18  came from Cuba.

19  Q    And if you can just quickly, again, for background purposes

20  give a sense as to how many different pieces of correspondence

21  or documents or legal documents, ballpark, that you had to

22  translate?

23  A    Well, it was a three-year assignment that was freelance.  It

24  was not full-time, but it was close to full-time.  I would have

25  a hard time estimating the numbers, but hundreds, I guess, would

1  be safe.

2  Q   You had mentioned traveling to Mexico and Chile as part of

3  your educational or education process.  Have there been other

4  countries, Spanish language countries, that you've gone to,

5  again, to further your abilities in the Spanish language?

6  A   Yes.  I worked in Puerto Rico on a State Department

7  assignment.  I've traveled to Venezuela, Panama, Guatemala,

8  El Salvador, Spain, Argentina, Brazil, but that's Portuguese.

9  That's what I can remember right now.

10  Q   Are you familiar with the term, Ms. Blumberg, of what's

11  called a "regionalism"?

12  A   Yes.

13  Q   Can you describe, again, very briefly, just what a

14  regionalism is and how it affects your work as an interpreter or

15  a translator?

16  A   Yes.  In a way it's similar to English.  The Spanish

17  language is spoken in 22 countries.  And so, there's a structure

18  of the language that's similar throughout the Spanish-speaking

19  world, but then according to the country or a portion or a

20  region of a country or a continent people speak a different way

21  and use different terms.  If I use the example in English, it's

22  like Australian, New Zealand, American English, and maybe the

23  difference between the southern and the western and the eastern

24  United States.

25  Q   Do the regionalisms within the Spanish language that's used

1   by people from these various countries sometimes differ

2   according to which country those individuals might be natives of

3   or have come from?

4   A    It can be the country but also the region of the country

5   that they're from.

6            MR. PARK:  Your Honor, at this time we would offer

7   Ms. Blumberg as an expert in the area of Spanish language

8   interpretation and translation.

9            THE COURT:  Do you wish to inquire?

10           MR. GORMAN:  I do, Your Honor.

11           THE COURT:  Go ahead.

12                    VOIR DIRE EXAMINATION

13   BY MR. GORMAN:

14   Q    Other than working on this case, have you translated or

15   interpreted documents that come from El Salvador?

16   A    Other than this case?  Yes.

17   Q    How much of that work have you done?

18   A    I would say not a huge amount, but at times I'm asked to

19   translate personal identification documents for the Department

20   of Motor Vehicles.  Individuals who are getting licenses will

21   ask us to translate their documents.  And on occasion I've

22   worked for the Inter-American Dialogue and within the Inter-

23   American Dialogue there's an organization called PREAL, and they

24   do a lot of work in Central America in education and I did

25   several large translations having to do with long distance

1   education and some of them had writers who were from

2   El Salvador.

3   Q   So, would it be fair to say that the bulk of your work has

4   been work done other than for El Salvador?  Would that be

5   accurate, other than this case?

6   A   Could you repeat the question for me.

7   Q   Other than this case, would it be fair to say that your

8   translations have primarily been for countries other than

9   El Salvador?

10  A   As far as written translation, I would say it's a fair mix

11  of the different countries.

12  Q   Is there anything different about interpreting letters from

13  El Salvador than from other countries?

14  A   Yes, definitely.  Translating I think can be.

15  Q   From written word, translating?

16  A   Yes.

17  Q   What would those differences be?

18  A   If the letters are formal, then it would be more similar

19  than different.  But if the letters are informal and

20  conversational, then there would be terms that are specific to

21  El Salvador.

22  Q   And would the documents that you translated concerning this

23  case be formal or informal?

24  A   Most of them are informal, but there have been formal

25  documents as well.

1   Q    And were there slang words used?

2   A    Yes.

3   Q    And were you familiar with all the slang words?

4   A    Some of the slang words are actually more Mexican or words

5   that I'm familiar with because of being from California and my

6   exposure to Mexican Spanish.  Some of the words I was not aware

7   of when I first saw them.

8   Q    Now, the words that you weren't aware of, how were you able

9   to figure out what they meant?

10  A    That's part of the challenge and the art of being a

11  translator/interpreter.  I have a lot of resources that I use.

12  As far as specifically Salvadorian language, I have a book

13  called "Puro Guanaco," which is Spanish terms and it has a lot

14  of terms that are specific to El Salvador and it shows the

15  meaning in standard Spanish and the meaning in El Salvador for

16  the words.

17        And I have a couple of other books, one from the

18  Ministry of Education of El Salvador, "La Lengua Salvadorina,"

19  which has a lot of terms as well showing the influence from

20  Nawat and the other Indian languages in El Salvador that have

21  come into the Spanish and make their language unique.

22        I have several other books that are specifically

23  Salvadorian Spanish as well as literature and individuals.  I

24  have a lot of contacts who are from El Salvador and I consult

25  with them as well.

1   Q    Were there words that you came into contact with in these

2   letters that were scripted in such a way that they were

3   illegible?

4   A    On occasion, but oftentimes with repeated viewing of the

5   terms, I began to notice that there sometimes the syllables were

6   reversed in the words and when you switched them around, then

7   the word has meaning when it didn't before.  Most of the words

8   were eventually legible, but there were some that were not

9   legible.

10  Q    Did you consult with any members of the prosecution, either

11  attorneys or agents or other interpreters who worked for the

12  prosecution in order to determine what particular words meant?

13  A    In my research I did not consult with any of the attorneys

14  in the U.S. Attorney's Office.  They don't really know Spanish,

15  to be honest.  As far as the agents, there were a couple of

16  police officers that I asked who had a lot of street experience

17  and I would request information from them about terms.

18        But I have to explain that when I do research, I don't

19  automatically accept the opinion of the person that I get the

20  information from.  I usually have three sources minimum.

21  Q    So, it's your testimony that at least on some of the words,

22  you relied on something that police officers said in order to

23  make a determination as to what the word is?

24  A    No.  I could ask their opinion, but I would usually consult

25  at least two other people.  And you asked also about other

1    interpreters.  And I have consulted with other translators and

2    interpreters on terminology.

3    Q    Out of all the interpretation you did concerning this

4    particular case, were there any words at all that you couldn't

5    determine what they meant?

6    A    You mean interpreting or translating or both?

7    Q    Translating, the written word.  Were there any words you

8    looked at and said, you know, I don't know what this is either

9    because it's illegible or I don't know the words?  Were there

10   any words such as those?

11   A    There are a few words that I have not yet been able to

12   resolve.

13   Q    And when you did your interpretation, when you came to those

14   words, what did you do?

15   A    Interpretation?

16   Q    Translation.  Excuse me.

17   A    In translation I would put a note that the word is illegible

18   or unintelligible.

19   Q    And how long have you been working on the MS-13 case?

20   A    Well, I began -- my first exposure to MS-13 cases was at

21   D.C. Superior Court and I don't know the exact year but in the

22   eighties.  And then in Virginia I worked on a couple of cases

23   also.

24   Q    And has your work in the last year been primarily on MS-13

25   cases?

1   A   I would say it's a mix of other cases as well, and also I

2   don't only work in court.

3   Q   How much money were you paid for these, for the MS-13 cases?

4        MR. PARK:  Your Honor, I'll object.  This is going

5   beyond the scope of the voir dire in terms of qualifications.

6        THE COURT:  Well, come up here to the bench for a

7   second.

8        (At the bench:)

9        THE COURT:  Are you going to object to her

10  qualifications?

11       MR. GORMAN:  I don't think so.  No.  That was going to

12  be my last question.

13       THE COURT:  I'm not sure it is.  I mean, if she's so

14  biased because she made this -- I mean, it could be --

15       MR. GORMAN:  That's fine.  That's my last question.

16       MR. PARK:  As long as he's not going into the substance

17  of cross, which I thought we were going into.

18       THE COURT:  Well --

19       MR. PARK:  That's fine, Your Honor.

20       THE COURT:  Some of it got more into --

21       MR. PARK:  Right.

22       THE COURT:  But this I think is more general.  Go

23  ahead.

24       (In open court:)

25  BY MR. GORMAN:

1  Q   How much money were you paid for the MS-13 interpretation in

2  the cases in Greenbelt?

3  A   As far as dividing it up between translating and

4  interpreting, I really --

5  Q   I'm not as familiar with these terms as you are.  I meant

6  just translating the written word.

7  A   Most people mix them up all the time.  I'm just being a

8  stickler.  I really can't tell you exactly how much.  This began

9  in 2004 and I've been working on these cases and other cases

10  throughout the area as well as some of the international

11  organizations that I work for.

12  Q   Do you think it was more than a hundred thousand dollars?

13  A   Since 2004?  Probably.

14          MR. GORMAN:  I have nothing further, Your Honor.

15          THE COURT:  Do you object?

16          MR. GORMAN:  I'd submit.

17          THE COURT:  Okay.  You may go ahead, Mr. Park.

18          MR. PARK:  Thank you, Your Honor.

19                    DIRECT EXAMINATION

20  BY MR. PARK:

21  Q   Ms. Blumberg, let's kind of pick up where counsel left off

22  there.  In terms of the money that you were paid, I guess, by

23  the United States Attorney's Office, was that for just

24  translation services?

25  A   No.  It's a combination of interpreting and translating.

1    Q    Have there been times when you've been asked to assist with

2    interviewing witnesses or interviewing -- well, interviewing

3    witnesses?

4    A    Many times.

5    Q    Okay.  And can you give an estimate as to the number of

6    hours you've spent either translating or being there for

7    interpretation services when witnesses are interviewed?

8    A    I'm sorry, but I didn't think about this.  I didn't really

9    estimate the time, but it's not uncommon for me to make maybe

10   5,000 in a month doing a combination of translating and

11   interpreting on these cases.

12   Q    I was asking more about the hours, though, the number of

13   hours.

14   A    Well, then divide that by 62.50.  I'm making 62.50 an hour.

15   Q    Okay.  Would it be fair to say it's been hundreds of hours

16   that you've spent on this?

17   A    Definitely.

18   Q    Okay.  And in terms of the process -- let me back up.  Can

19   you give us a sense as to the number of documents that you have

20   looked at or have been asked to look at by the United States

21   Attorney's Office in the course of this whole process?

22   A    It's been hundreds of documents.

23   Q    And typically are these documents typewritten or

24   handwritten?

25   A    The majority of them are handwritten.  There are also

1   typewritten documents.

2   Q   Are there times when you have to look at a document more

3   than once in order to determine even what is written there and

4   then beyond that how to translate it?

5   A   Definitely.

6   Q   Can you give a sense as to, in the process of translating a

7   document, particularly a handwritten document, how many times

8   you have to kind of go through the review of a document?

9   A   I think it's safe to say that any translation requires many

10  reviews.  We usually -- we do have a process that we follow and

11  it would be a minimum of three or four revisions.  But with the

12  handwritten documents, since sometimes they don't have

13  punctuation and many times the spelling is nonstandard, it's

14  kind of a conversational flow and you almost have to read it out

15  loud sometimes to really understand the letter, it does take

16  more time and sometimes requires a magnifying glass or enlarging

17  the document to be able to see some of the words.

18  Q   Let me show you an example.  I'm going to show you Willow

19  2e.  Just look on the screen there, Ms. Blumberg.  First let me

20  show you the original document here, part of Willow 2e.  Is

21  this, I guess, an example of the type of document that you were

22  asked to look at?

23  A   Yes.  This is a well-written one, an easy to read one.

24  Q   Okay.  And showing you the translation that's attached as

25  part of this exhibit, again, Willow 2e, first let me ask you do

1  you recognize this format that's shown here on the screen?

2  A    Yes.

3  Q    The format of the document?

4  A    Yes.

5  Q    Is this the format of the documents typically that you

6  prepared as the translations for these Spanish language original

7  documents?

8  A    Yes.

9  Q    Going towards the end or the last page of this particular

10 document, do you see what's listed there as a translation

11 certification?

12 A    Yes.

13 Q    Beyond just reading what's written there, can you describe

14 what it is that you're communicating through this translation

15 certification?

16 A    What I'm saying is that to the best of my ability, I'm

17 providing a true and correct translation from Spanish to English

18 of the original document, and I'm also reserving the right to

19 make corrections, because it could be that in time and I've

20 learned so much over these years just on this specific case,

21 that there are times when I did a letter early on and I read it

22 later, I realize that something is not correct and I want to be

23 able to make the corrections, if necessary.

24 Q    Ms. Blumberg, is that your signature there on this

25 particular exhibit?

1    A    Yes.

2    Q    For each of the translations that you provided to the United

3    States Attorney's Office, did you provide a document that would

4    have attached to it a similar translation certification?

5    A    Yes.

6    Q    And for each of those documents did you sign the document,

7    again, certifying with your own signature that these, in fact,

8    were your best attempts to translate the document?

9    A    Yes.

10   Q    And did you date each of those documents?

11   A    Yes.

12   Q    Going back to the first page, again, just to go over the

13   format generally, at the top of each of these translations did

14   you have a standard, I guess, format for noting what the

15   document was and where it may have come from?

16   A    This would be an example of one of the original header

17   formats.  I modified it later and made it, I think, more clear,

18   but this is how it looked from the start to identify the

19   documents, to keep track because of the volume especially.

20   Q    Going to, I guess, just one of the notations here in the

21   header while we have it up here, it says, "Words in quotation

22   marks were in English in original."  What do you mean by that?

23   A    I wanted to show that in some cases people would use English

24   in the middle of the Spanish.  And so, I wanted that to be clear

25   to the reader who couldn't read the Spanish that this person had

1   used this particular word in quotes in English in the original.

2   Q   And there's also a notation "Brackets indicate translator

3   additions for clarity."  Were there times when you added, I

4   guess, into the written translation document or the translation

5   comments or notations or punctuation to help with the clarity of

6   the document?

7   A   Yes.  I kept that to a minimum because I wanted to retain

8   the tone and style of the original, but from time to time I

9   would put a period or a comma or something that would clarify

10  for the reader.

11  Q   Further down on this first page of the translation, again,

12  part of Willow 2e, there is a bracketed insertion here.  It says

13  "El" in front of "Sombra."

14  A   Yes.

15  Q   What was the intent in putting that insertion there, for

16  example?

17  A   Well, the nickname "Sombra" is used by a male and a female.

18  And so "El" indicates that it's a male and "La" indicates that

19  it's a female.  And there were two of them.  So I wanted to make

20  it clear.  Now, later on as I polished my work, in other

21  translations I would try to indicate without the brackets that

22  it was a he or a she in the rest of the sentence, if I could.

23  Q   If I might ask, in the process of doing translations, does

24  it involve pretty much just taking a word that's written in

25  Spanish and word-for-word putting the English word on a

1  translation in the same exact order?

2  A    No.  What we have to do is transform from one language to

3  the other and make it natural and use chunks of meaning, not

4  word-for-word.  Though it is a true and accurate translation,

5  it's not literally word-for-word because that would be

6  nonsensical.

7  Q    Does that also apply to when you're interpreting as well?

8  A    Yes.  That's one of the reasons we shadow.  We keep a little

9  bit of delay, because we have to change the word order.  In

10 Spanish and English the word order is not the same.

11 Q    The process that you already talked about, going over and

12 reviewing some of the documents, the original documents, a

13 number of times, after you've done, I guess, an initial draft of

14 the translation, do you go back to it at all after consulting

15 with other colleagues or other individuals?

16 A    Well, the professional approach, even without consulting

17 anyone, would be to read over the document first and maybe make

18 notes about any terms that are troublesome that we need to work

19 on or I need to work on, and also make notes of things that come

20 to mind right away, because sometimes intuition kicks in and you

21 want to capture that first thought.  Then after reading the

22 document I would do a rough draft on the computer, and then the

23 next step would be to take the original document and the draft

24 and compare the two to make sure that nothing is missing and

25 there are no changes of meaning, because sometimes when you work

1    fast, you can switch things around or miss a word or miss a

2    line.  And after that I would -- I mean, I don't know how much

3    detail, but I make sure that all of the changes that I've

4    indicated -- so you go and put the changes in the computer, but

5    then you have to make sure you didn't miss any of the notes you

6    made by hand.  And after that, read it again to see how the

7    English sounds if it's into English, to make sure that it's

8    natural, that it's not too wordy, and also then sometimes to

9    pick up more slang words or to try to tone it to the original.

10   It may take some polishing, a lot of polishing.  And usually

11   I'll indicate words that I need to research and I start doing

12   Internet research.  I look in all my resources, my documents, my

13   books, and if I'm really stuck, then I start asking people.

14   Q   You had mentioned slang words.  Have you done any research

15   on either academic or just a professional level into slang

16   words?

17   A   Extensive, constant research.

18   Q   And, in particular, in the, I guess, context of gangs, are

19   you familiar with or have you had experience working with slang

20   words in the gang context?

21   A   Extensive experience.

22   Q   And I'm using the word "context," but is context important

23   to you in your job as you're looking through the various words

24   that are written down in the original document and the end

25   result that you come up with?

1    A    Yes, context is essential.  Most all of us have had

2    experience with reading and writing in our own language and a

3    word can mean something totally different in a different

4    context.  So, it's important to take into consideration the

5    context that the word is found in.

6    Q    Mr. Gorman asked you whether or not you had been asked by

7    any of the prosecutors in this case or any other law enforcement

8    individuals to somehow -- let me rephrase it.

9         Have you ever been asked by anybody with the

10   government, either prosecutors or law enforcement, to put a

11   particular perspective or spin on a translation?

12   A    No.

13   Q    Have you ever been asked by a law enforcement official or

14   prosecutor or anybody with the government to put a document in a

15   particular context?

16   A    I feel that I've been treated as a professional.  I know my

17   job and I don't feel I've been guided or directed in any way.

18   And if someone had told me that I should put a spin on anything,

19   I wouldn't do it.  That's unethical.

20   Q    And I think you've already commented on the Spanish language

21   abilities of the prosecutors, but beyond that, in --

22   A    Without being insulting.

23   Q    Well, we're big boys.  We'll handle it.  But in terms of

24   even specific words that are used, and I want to focus on slang

25   words, specifically with respect to slang words or other words

1   that you've found in these letters, have you been asked by

2   anybody associated with the government to put that down in an

3   English translation as some particular word?

4   A    No.

5   Q    I'd like to ask you about some particular words, though,

6   that you may have run across.  Let's me ask you first have you

7   run across these words and, secondly, in the context of these

8   letters what definitions or meaning have you translated them

9   into in English, and I guess the first ward would be "corredor."

10  A    "Corredor."

11  Q    Thank you.  What's the literal meaning of that particular

12  word in Spanish?

13  A    A "corredor" is literally a runner, and my previous

14  experience taught me that it was used for a drug runner.

15  Q    And in the context of these letters, what have you found it

16  to mean?

17  A    I found it to mean someone who runs a meeting or runs a

18  clique.

19  Q    The word "misa," m-i-s-a, what is the literal translation of

20  that particular word?

21  A    "Misa" is a mass.  It's like a Catholic mass, but in

22  these --

23  Q    In the context of these letters, have you seen it being used

24  in the context of a Catholic mass being attended by people?

25  A    No.

1  Q   The word "chavala," have you run across that word in these

2  translations that you've done?

3  A   Yes.  "Chavala" is a -- let's see.  "Chavala" has a feminine

4  ending and it's used in this group with a masculine article,

5  "los chavalas," which is one of the first things that made us

6  know that it was being used differently than usual, because

7  "chavala" means a girl, just a girl.  But in this context "los

8  chavalas" is a reference to a rival gang member.

9  Q   And "misa," going back to that, in the context of these

10 letters, what was the meaning that you determined?

11 A   A meeting.

12 Q   "Leva," l-e-v-a, have you run across that word?

13 A   Yes.  "Leva" is a word that in El Salvador means like a

14 loser or a dummy, and in this context it's used as a reference

15 to a rival gang, which is 18, but to avoid using the number 8

16 because they're rivals and they're hated, so they use "leva"

17 instead of 8.

18 Q   And, finally, and this is perhaps not a slang, but showing

19 you "Para" and "Del."

20 A   In the letter it's "to" and "from."

21 Q   So, "para" would be "to"?

22 A   "To."

23 Q   "Del" is "from"?

24 A   Yes.

25 Q   Have you ever seen letters where it's just "De" colon?

1   A    Yes.

2   Q    In the course of your work were you provided not only with

3   the original correspondence but were you also asked to sometimes

4   translate writings that were on drawings or writings that were

5   on envelopes or other pieces of paper?

6   A    Yes.

7   Q    So, it wasn't just restricted to correspondence and letters

8   like the one I just showed you, correct?

9   A    Correct.

10  Q    Were there times when you would insert footnotes to somehow

11  clarify the source, I guess, of your definition, whether it be a

12  reference material or interviews with other individuals as to

13  how you came up with that particular translation?

14  A    Yes.

15  Q    And is that again noted in the written document that's

16  provided as the certified translation typically?

17  A    Yes.

18  Q    Finally, if I could ask you -- well, not finally, but

19  looking at this document again, Willow 2e, on the first page at

20  the bottom there's a series of dashes.  What does that indicate?

21  A    When I was typing the letters I would end the letter on the

22  same page as the original so that it would be easy to find

23  sections of letters or refer back to letters.  So that means

24  that that's where the page ended even though the letter didn't

25  necessarily end there.

1   Q   So, even though, for example, you have more space on this

2   particular page, you didn't continue the translation on this

3   page.  You went to the next page to show, I guess, the

4   correspondence with the original document?

5   A   Correct.  So that it would be easier to find things and be

6   able to see the correlation of page to page.

7   Q   When you have "back" in brackets there, what does that mean?

8   A   That's because some of the letters are written on a front

9   page and the back of the page and I was just trying to help the

10  reader know more or less what the original looked like.

11  Q   Ms. Blumberg, what I'm going to ask you to -- well, I'm

12  going to show you a series of exhibits now, and let me ask prior

13  to coming and testifying here this afternoon, did you have a

14  chance to look at a number of original documents, original

15  exhibits, and verify that your signature was, in fact, on the

16  translations and the translation certifications attached to

17  those particular exhibits?

18  A   Yes.

19  Q   And in doing so, did you also verify that it was your

20  original signature and that those translations did correspond

21  with the original document that was included in the plastic

22  sleeve?

23  A   Yes.

24          MR. PARK:  If I might approach, Your Honor, just

25  briefly.

1    BY MR. PARK:

2    Q   Ms. Blumberg, I'm not going to have you go through all of

3    them right now.  This is something you did prior to testifying

4    today, correct?

5    A   Correct.

6    Q   But just scanning through, are these the documents that you

7    looked at prior to coming in and verifying again that your

8    signature was on the translation certifications?

9    A   Yes.

10   Q   And with the court's permission, I'm going to run through

11   the list of these various exhibits, starting again with Willow

12   2e that we had mentioned.  The next series will be 14th Avenue

13   exhibits.  Again, Ms. Blumberg, you can see --

14   A   You want me to verify my signature?

15   Q   No.  You can see it there, though?

16   A   Yes.

17   Q   14th Avenue 17, 23, 24, 24a, 79, 80, 81, and 82.  The next

18   series of documents come from the 8320 14th Avenue set and just

19   two would be 8320 14th Avenue 19 and 20.  There's one exhibit

20   from the Chapman series.  It's Chapman 8.  And then a long

21   series of exhibits from the Cronin Drive exhibits.  There's

22   Cronin 2, 2b, 4, 9, 16, 17, 20a, 20b, 20c, 20d, 20e, 20f, 20g,

23   20h.

24        Still in the Cronin series, 23, 24, 31, 34, 36, 39a,

25   39b and 39d, 39f, Cronin 40, 41, 42, 43, 44, 44b and 45, 46, 47,

1    48, 49, 50, 51, 53, 61, 62, and 63, 64 and 65.  That's all from

2    the Cronin series.

3         The next would be from Erie Street.  It's Erie 11 and

4    Erie 22 -- I'm sorry.  Not Erie 22.  Just Erie 11.

5         The next are from Otis Street.  Otis 5, Otis 9, Otis

6    12, Otis 43.

7         I'm sorry.  I left one out from the 8320 series.  It's

8    8320 14th Avenue 22, which I think had been previously admitted?

9         What I'd like to do now, Ms. Blumberg, is just read

10   from some of these exhibits.

11   A   Okay.

12   Q   Let me pull one up for you.  Showing you 8320 14th Avenue

13   19.  The ones I'll be reading from are 8320 14th Avenue 19 and

14   20 and then Willow 2e.

15        Ms. Blumberg, first of all, let me show you the

16   original.  Was this the original envelope that you were asked to

17   look at?

18   A   It appears to be.

19   Q   And your translation right there has that information

20   recorded, correct?

21   A   Yes.

22   Q   On the inside of that can you just indicate here what that

23   reads?

24   A   "The Prince William Manassas Regional," and then there was

25   an illegible section.

1   Q   So, this is an example, I think, as you were telling

2   Mr. Gorman about instances where there would be something

3   illegible and you'd just leave it as that?

4   A   Yes.  This one I believe was a stamp of some sort and it

5   wasn't fully recorded on the -- I believe it's the back of the

6   envelope.

7   Q   If I could turn to the second -- I'm sorry -- the fourth

8   page of the translation document.  If I could ask you to start

9   reading from where it says, "You know, I've realized."

10  A   Can you make it --

11  Q   Yes, I will in a second.  Between the different highlighted

12  marks rights there, if you could read that for the ladies and

13  gentlemen of the jury.

14  A   "You know, I've realized that Luis hasn't wanted to or

15  hasn't been able to help out the other friend that was in New

16  York.  I think that no one realizes how much this friend is

17  worth there in El Salvador and, in reality, I don't know how

18  Luis will be doing things."

19  Q   And the letter is coming from or at least -- I'm sorry.  The

20  individual listed on the return address portion of that

21  particular envelope is who?

22  A   Henry Zelaya.

23  Q   And the individual listed in the addressee portion?

24  A   Eris Rivas-Marchante.

25  Q   Showing you now the translation from 8320 14th No. 20, first

1    of all, I show you the original up top here and then the last

2    page or the back page, rather.  The individual or, rather, the

3    words listed at the top of that particular page, the first page,

4    what did you have there?

5    A    HB and Strayboy.

6    Q    On the second page, if you could read from the highlighted

7    mark down to the bottom.

8    A    "Well, yo, I hope everything's cool there on the outside and

9    try to always go out to walk with homeboys from the clique.

10   Well, homie, also collaborate with the other homies so that

11   you'll be in contact with everyone.  Well, brother, also help

12   the other homies that are in inactive.  Well, dude, now with

13   this I say good-by to you, brother, and I'll write soon again.

14   Your brother and yours truly, Home Boy says good-by."

15   Q    "Home boy" here you've got listed as two separate words.  Is

16   that something that is different from "homeboy" that's not

17   capitalized and just one word?

18   A    Yes.  This is a nickname of a particular individual, not a

19   general homeboy.

20   Q    Is that something you saw just in this letter or did you see

21   it in other letters?

22   A    I saw it in other letters, the distinction made.

23   Q    Showing you Willow 2e, the original documents here, I think

24   I showed four.  The date on this particular letter is what?

25   A    1-23-05.

1    Q    And who is this letter addressed to?

2    A    This is to "Homeboy Lil 13."

3    Q    And from?

4    A    "The Smokey."

5    Q    This one actually I will ask you to read the entire letter.

6    So, starting from "Dear and remembered brother."

7    A    "Dear and remembered brother, I greet you with the same

8    affection as always, hoping you are well along with all of the

9    homeboys.

10         "What's up with Lil 13?  How are you?  I hope you're

11   solid as always.

12         "Well, first of all, I write you to tell you that last

13   week El Sombra came to see me.  Sombra told me that it's

14   terrible out there, but that, yeah, everyone is with it.  And

15   tell me what's the deal with Homeboy?  I don't write to him

16   because, one, I don't have his address and, two, because I don't

17   want them to give him trouble.  Also, Sombra told me that the

18   home boy Stomper got locked up.  What's the deal?  How is that

19   homie?  Really, how is the problem?  Really, home boy?  I was

20   told that that homie is snitching.  How is it home boy?  Really,

21   how is the shit, home boy."

22         Back, "And tell me how are the homies are doing out

23   there.  Well, Sombra told me that you hold first for us.  Check

24   it out, home boy.  Well, I tattooed my chest with the number 13

25   and in letters La Mara Salvatrucha, and on my fingers mi clica

1    TLS [my clique TLS].  But Sombra told me that in order to get

2    tattooed we have to ask permission.  Check it out home boy.  I

3    got tattooed a few months ago and I didn't know what the deal

4    was.  So, take this problem for me.  Also, home boy, I write to

5    you so you can tell me where I can write to you and I would also

6    like to write to the homies, but I don't have anyone's address.

7    No problem.

8         "Also, tell Casper that by mid-February I'm going to

9    put him on my list so he can come see me.  I don't know who else

10   can come to see me.  I would like you to come, but I don't know

11   if you can.  But I can only put two more on my list because I've

12   got Dragon on my list because home boy gave me his name because

13   they were going to come to see me, but unfortunately home boy

14   got locked up.  Sombra told me that Casper wants to come see me.

15   So I'm going to put that homie on my list.

16        "And what's going on with home boy Killer.  Send the

17   claw for me to all the homies of the big Mara Salvatrucha X3.

18   Little homey Chatos says hi to all the homies.  This homie is

19   LGFS La Gran Familia Salvatrucha [the big Salvatrucha family].

20   This homie is from Georgia and, yeah, he's with it.  Maybe in

21   the next few days I'm going to try to pull Spooky of FLS over

22   here to have reinforcement.  You know the deal.  Check it out.

23   I'm sending you this tag just this big and bad is how I tattooed

24   chest here.  Also, I'm sending you these two photos.  One is

25   from Chato because he wants to know if you know this homie.  The

1    tag is Masiso.  The clique is LGFS.  And he says that he was

2    hanging out in Langley Park in the '90s.  Sailor homies might

3    know him.  Also, I tell you that in the photo I'm sending you I

4    flash the claw concealed, because if you don't, they won't give

5    them to you.  You already know the two who are beside me, Sparky

6    and Catracho.  Check it out, homeboy.  I'd like to have pictures

7    of all the homies and of the new guys who are in the

8    neighborhood.  But when you send them to me, send them regular

9    because if they're flashing gang signs, they won't give them to

10   me.  These cops are really faggots.  Okay.

11           "Write to me when you can, home boy, and tell me how

12   things are running.  Keep me informed of what's going on because

13   when I get to El Salvador, I don't want to mess up because I

14   don't know what's up.  So be alert with all the homies and give

15   the claw to all the homies for me.

16           "And long live the big Mara Salvatrucha X3, TLS, Smokey

17   for the neighborhood, till death."

18           MR. PARK:  Your Honor, that's all I have on direct.

19   Thank you.

20           Thank you, Ms. Blumberg.

21           THE WITNESS:  You're welcome.

22           THE COURT:  Mr. Gorman.

23                         CROSS-EXAMINATION

24   BY MR. GORMAN:

25   Q   When you were reviewing these documents, were you asked to

1   determine names of the persons who were sending the documents

2   and the persons who were receiving them?

3   A    I wasn't asked to do that specifically, no.

4   Q    Did you do that?

5   A    What I did was write down what was on the envelope and write

6   down what was in the letter and that's all.

7   Q    Do you recall ever seeing a letter from someone named

8   Mousey?

9   A    No.

10  Q    Do you remember seeing a letter from someone named Victor

11  Ramirez?

12  A    I'm not positive about that.  I don't remember one

13  specifically.

14  Q    Did you ever see a letter to someone named Mousey?

15  A    I'm not sure if there was one, but I can't say for sure.

16  Q    Do you remember ever seeing a letter written to a Victor

17  Ramirez?

18  A    I would have to verify it.  I'd have to double-check that.

19  It wasn't a high volume.

20  Q    Do you ever remember the name Mousey or Victor Ramirez being

21  mentioned in any of the letters?

22  A    The name Mousey has come up.

23  Q    Do you recall when and where?

24  A    No, not specifically.

25  Q    Now, you have no way to know as to whether or not any of the

1  contents in any of the letters are true?  Would that be

2  accurate?

3  A   I guess my purpose -- my role is not to verify them, just

4  relaying the message.

5  Q   And, for instance, if the letter is -- if the letter comes

6  from someone -- if the letter is sent by someone -- let me

7  rephrase that.

8       If there is a return address on the letter, you have no

9  idea if that's really the person who wrote the letter, do you?

10 A   It depends on if the same person says to and from and signs

11 it or not.

12 Q   Well, let's say the name on the letter is Joe, Joe Schmoe,

13 and the letter is signed Joe Schmoe.  You would have no idea if

14 that really came from Joe Schmoe, would you?

15 A   If on the envelope it was from Joe Schmoe and on the letter

16 it was also --

17 Q   Yes.

18 A   -- to Joe Schmoe?

19 Q   No.  Signed by Joe Schmoe.

20 A   It would be likely if that -- that would be a bizarre

21 coincidence.

22 Q   But, for instance, someone named Sam could have written that

23 letter and he could have signed it Joe Schmoe and it could have

24 been on the envelope from Joe Schmoe; isn't that correct?

25 A   I suppose anything is possible.

1   Q   Were you able to ascertain when the letters -- well, did you

2   notice as to the dates on the letters?

3   A   Yes.

4   Q   And when did the first letter that you looked at start from?

5   I mean, the first date on any of the letters?

6   A   I could not tell you accurately that at this point.

7   Q   Well, can you approximate?

8   A   It seems to me there were letters in 2002 on.

9   Q   And when was the last letter?

10  A   I know there were a lot in 2005, but I couldn't tell you the

11  last letter.

12  Q   And did you look at the postmarks on the letters?

13  A   Yes, I did.

14  Q   And what part of 2005 was the last letter from?

15  A   Sir, I'm sorry.  I can't tell you that.  I don't know.

16  Q   And were any of the letters -- were the return addresses on

17  any of the letters from El Salvador?

18  A   Yes.

19  Q   How many?

20  A   I can't tell you exactly but at least three.

21  Q   And what years were those letters written in?

22  A   I don't have that in my memory.

23          MR. GORMAN:  I have no further questions.

24          THE COURT:  Any redirect?

25          MR. PARK:  Just briefly, Your Honor.

1                      REDIRECT EXAMINATION

2   BY MR. PARK:

3   Q   Ms. Blumberg, the letters that you're speaking of, I guess,

4   when you were answering questions from defense counsel about

5   where they're from or the dates of those letters --

6   A   Yes.

7   Q   -- are you referring solely to the letters and exhibits I

8   showed you or are you referring to the whole universe of

9   documents that you looked at in the course of your work with our

10   office?

11   A   I was trying to dredge up a memory of the whole universe,

12   very, very large universe.

13   Q   In terms of the documents that you've looked at, both

14   letters and other pieces of paper, are we talking just about

15   this stack of paper and documents that I showed you just a few

16   moments ago?

17   A   No.  It's a huge volume.

18   Q   So, in terms of, I guess, your involvement with our office,

19   the Office of the United States Attorney, has that involved

20   other prosecutions or other cases that have nothing -- well,

21   that are not dealing with this particular case here at trial?

22   A   I have worked in this area since 1985, in the Washington

23   Metropolitan area, and I have worked on every level of many

24   cases of all sorts with the prosecution, with the defense, with

25   the courts, with all aspects of all kinds of cases.

1          MR. PARK:  Thank you, Ms. Blumberg.  Nothing further.

2          MR. GORMAN:  May I ask a few questions?

3          THE COURT:  Okay.

4                      RECROSS-EXAMINATION

5    BY MR. GORMAN:

6    Q    The stacks of letters that were shown to you by the

7    prosecutor today, were any of those letters written from someone

8    named Mousey?

9    A    I don't think so.

10   Q    Were they written from anybody by the name of Victor

11   Ramirez?

12   A    That I'm not sure of.  I would have to go back and check.

13   Q    Were any of the letters addressed to someone named Mousey?

14   A    I don't think to Mousey.

15   Q    Were any of them addressed to someone name Victor Ramirez?

16   A    That I'm not positive of.

17   Q    Were any of the letters shown to you today by the

18   prosecutor, did any of them mention someone named Mousey?

19   A    Of the portions that we read and reflected on, no.

20   Q    How about the other letters that were shown to you today,

21   stack of letters?

22   A    Right.  We didn't -- I didn't re-read all of the letters to

23   double-check about that.

24   Q    How about the name Victor Ramirez?

25   A    I would have to go through them all to verify, but it

1    doesn't stand out in my mind.

2    Q   How do you know that if a -- do you know if anyone else

3    other than yourself was translating letters in the MS-13 case?

4          MR. PARK:  Objection, Your Honor.

5          THE COURT:  Sustained.

6    BY MR. GORMAN:

7    Q   How do you know that you were the one that did the

8    translation on the stack of letters that were shown to you by

9    the prosecutor?

10         MR. PARK:  Objection, Your Honor.

11         THE COURT:  Overruled.

12         THE WITNESS:  Because they were certified by me and

13   it's my work product.

14   BY MR. GORMAN:

15   Q   But you can't remember the answers -- well, I don't have any

16   further questions.

17         Thank you, Your Honor.

18         THE COURT:  Any other questions?

19         MR. PARK:  No, Your Honor.

20         THE COURT:  Thank you, Ms. Blumberg.  That completes

21   your testimony and you are excused.

22         MR. PARK:  May we approach, Your Honor?

23         THE COURT:  Sure.

24         (At the bench:)

25         MR. PARK:  We'll do the court's bidding.  We have a

1   witness here.  I don't know that the jury looks up to going

2   forward with the search warrant at this point.

3          THE COURT:  No, not when we're talking about physical

4   evidence.

5          MR. PARK:  Right.

6          THE COURT:  And she's going to have to come back on

7   Tuesday anyway.

8          MR. PARK:  And she'll be reading a lot of letters, too.

9          THE COURT:  Okay.  We'll call it a week.  Do you

10  object?

11         MR. GORMAN:  No, I don't.

12         MR. PARK:  Thank you, Your Honor.

13         (In open court:)

14         THE COURT:  Okay.  Members of the jury, although there

15  is another witness here, we would certainly not complete the

16  testimony if we began it today and I think everyone agrees for a

17  Friday afternoon, we'll just call it a week.

18         Leave your notes here in those folders.  They'll be

19  waiting for you on Tuesday morning.  If you'll be back a minute

20  or so before 9:30, we'll be ready to resume.

21         I'm not going to repeat all the admonitions that I gave

22  you at the beginning, but, please, you are not to talk about

23  this case.  You're not to make any investigation, do any

24  research.  Just kind of set it aside in your minds but come back

25  refreshed on Tuesday.

1          Ms. Derro is giving you an overview of the calendar so

2    that you can do some planning, and it's my understanding that

3    you prefer to leave a little early on election day rather than

4    coming in late.  So that's what we'll plan on.  So you can plan

5    your lives around that kind of schedule.

6          Have a good weekend, safe weekend, safe trip home and

7    back, and we'll see you on Tuesday morning.

8          The jury will be excused.  Thank you.

9          (Jury excused.)

10         THE COURT:  Please be seated just for a minute.  I just

11   want to check whether there's anything we anticipate for next

12   week that you want to bring to my attention at this point.

13         MR. PARK:  Not that we can think of, Your Honor.

14         THE COURT:  Anything, Mr. Gorman?

15         MR. GORMAN:  Just the names of the witnesses who are

16   going to be here on Tuesday.

17         THE COURT:  On Tuesday?

18         MR. PARK:  We know Agent Drielak.  We're going to have

19   to kind of refigure and figure out where we are.

20         THE COURT:  Right.  You know it's Kim Drielak.  When

21   will you be able to tell Mr. Gorman?

22         MR. PARK:  Either Saturday or Sunday we can probably

23   send an e-mail to Mr. Gorman.

24         THE COURT:  Before Monday they'll tell you the rest.

25   But she'll be quite a while, I gather?

1    MR. PARK:  She will be.

2    THE COURT:  And if you know which exhibits are --

3    MR. PARK:  If there are, for example -- I'll look.  If

4  there are going to be, for example, cooperators and such, I can

5  let Mr. Gorman know in terms of the exhibits that he may need to

6  take home with him and stuff like that and we'll work with him.

7    THE COURT:  As much as you can let him know but without

8  prejudice to adjusting that schedule --

9    MR. PARK:  Absolutely.

10    THE COURT:  -- I'd appreciate it.  Give him the

11  opportunity.  I know there's an awful lot of documents and other

12  preparation that we need to do.

13    Okay.  Have a good weekend.  We'll see you on Tuesday

14  morning.

15    MR. PARK:  Thank you, Your Honor.

16    (Proceedings adjourned at 4:30 p.m.)

17                    CERTIFICATE OF REPORTER

18    I hereby certify that the foregoing is a true and

19  accurate transcript of proceedings in the above-entitled matter,

20  to the best of my knowledge and ability.

21

22

23              _____/s/_____
                 Gloria I. Williams
24               Official Court Reporter

25