1                      UNITED STATES DISTRICT COURT
                          DISTRICT OF MARYLAND
2                          SOUTHERN DIVISION

3    UNITED STATES OF AMERICA     .
                                  .
4         vs.                     .   DKC-05-0393
                                  .
5    VICTOR RAMIREZ               .   GREENBELT, MARYLAND
     DEFENDANT                    .
6                                 .   NOVEMBER 6, 2008

7

8                          TRANSCRIPT OF TRIAL
             BEFORE THE HONORABLE DEBORAH K. CHASANOW,
9             UNITED STATES DISTRICT JUDGE, AND A JURY

10

11   A P P E A R A N C E S:

12   FOR THE GOVERNMENT:        CHAN PARK, ESQ.
                                DAVID JAFFE, ESQ.
13                              ROB HUR, ESQ.
                                ASSISTANT U.S. ATTORNEYS
14

15   FOR THE DEFENDANT:         WARREN E. GORMAN, ESQ.

16

17

18

     Court Reporter:           Sharon O'Neill, RMR
19                             Official Court Reporter
                               United States District Court
20                             6500 Cherrywood Lane - RM 200
                               Greenbelt, Maryland 20770
21                             301-344-3227

22

23

24

25

1                         I N D E X

2    GOVERNMENT'S WITNESSES     DIRECT   VOIR DIRE   CROSS   RED   REC

3    Sonia Portela                4                   21

4    SA Shawn Morrow             23                   46

5    Juan Diaz                   48      58         108    113   115
6                                67

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.

2          VOICES:  Good morning, Your Honor.

3          THE COURT:  Please be seated.

4          We are joined this morning with a new

5    interpreter.  I would ask the clerk to swear her in,

6    please.

7          (The oath was administered.)

8          THE INTERPRETER:  For the record, my name is Eva

9    Desrosiers, federally certified Spanish interpreter.

10         THE CLERK:  Ms. Desrosiers, would you please

11   spell your first and last names.

12         THE INTERPRETER:  E-V-A, D-E-S-R-O-S-I-E-R-S.

13         THE CLERK:  Thank you.

14         THE COURT:  Are we ready?

15         MR. JAFFE:  Yes, Your Honor.

16         THE COURT:  Bring in the jury, please.

17         (Jury present.)

18         THE COURT:  Good morning.  Please be seated.

19         MR. JAFFE:  Yes, Your Honor.  The Government

20   calls Sonia Portela.

21         (The oath was administered.)

22         THE CLERK:  Please be seated.

23         Please speak loudly and clearly into the

24   microphone.  State your name for the record and spell your

25   first and last names.

 1              THE WITNESS:  Sonia E. Portela.  S-O-N-I-A, last

 2     name P-O-R-T-E-L-A.

 3              THE CLERK:  Thank you.

 4              THE COURT:  Mr. Jaffe.

 5              MR. JAFFE:  Yes, Your Honor.

 6                          DIRECT EXAMINATION

 7     BY MR. JAFFE:

 8     Q.   Good morning, Ms. Portela.

 9     A.   Hi.

10     Q.   When you testify, if you can try and speak into the

11     microphone as much as possible so we can all hear you in

12     the back.

13              What do you do for a living?

14     A.   I'm a community manager.

15     Q.   And how long have you been a community manager over

16     the course of your employment work?

17     A.   For about eight and a half years.

18     Q.   Have you always worked for the same company?

19     A.   No.

20     Q.   What's the name of one of the companies that you've

21     worked for over the course of your employment career?

22     A.   Sawyer Realty Holdings.

23     Q.   And can you give us an idea of some of the time period

24     that you worked at Sawyer Holding Realty?

25     A.   Beginning of -- almost end of 1999 up to 2007.

1    Q.    Okay.  And where is Sawyer Realty Holdings located?

2    A.    They have two different locations:  The main office in

3    College Park, and the head office in Needham,

4    Massachusetts.

5    Q.    And that's -- the name of the town is Needham in

6    Massachusetts?

7    A.    Yes.

8    Q.    Okay.  Could you tell us a little bit about what does

9    it mean to be a community manager?

10   A.    Well, you're responsible for the day-to-day operations

11   of the community, collecting rents, going to the bank,

12   renting apartments, yearly budgets, walking apartments,

13   move-ins, move-out inspections, etc.

14   Q.    When you say inspections, you mean inspecting the

15   apartment, the units themselves?

16   A.    Yes.  Before they move in and after they move out.

17   Q.    When you were working with Sawyer Realty, did you have

18   communications with the home office in Needham,

19   Massachusetts from time to time?

20   A.    Pretty much on a daily basis by email.

21   Q.    Okay.  And what were the names of some of the

22   apartment complexes that you were a community manager for

23   while you were working for Sawyer Realty Holdings?

24   A.    Terrace Green, Newbury Square, Bedford Station and The

25   Villas at Langley.

1    Q.    Okay.  And The Villas is in Langley Park?

2    A.    Yes.

3    Q.    Bedford Station is where generally?

4    A.    Langley Park.  Right on University Boulevard and 14th.

5    Q.    Okay.  For The Villas, how many apartments, how many

6    building are involved?

7    A.    586 apartments, 31 buildings.

8    Q.    How old were those buildings?

9    A.    1970s.

10   Q.    I'm going to focus your attention on the Bedford --

11   the time you were at Bedford Station before that.  How big

12   was that complex?

13   A.    487 units, 91 buildings.

14   Q.    During the time that you were working at Bedford

15   Station, did you begin to have contact with individuals

16   that caused you some concern?

17   A.    Yes, I did.

18   Q.    Could you tell us how those contacts began to develop?

19   A.    I remember walking towards a couple of my buildings,

20   especially 1420 Kanawha.  I saw a couple of writings on the

21   walls that caught my attention.

22   Q.    Can you remember what those writings on the walls

23   looked like or said or anything like that?

24   A.    Well, they were pretty big, so it was MS one three.

25   Q.    Okay.  What did you do when you saw that?

1    A.   One of the first things, which it was policy, is you

2    have to take a picture and then contact one of the police

3    officers.

4    Q.   And did you do that in this case?

5    A.   Yes.

6    Q.   Okay.  After that, did you begin to have more contacts

7    and more observations in -- at Bedford Station?

8    A.   Well, I did, but when I really got interested on it is

9    when they stole my car.  Well, my car was stolen, and when

10   it was found, it was burned and it had MS-13 on it.

11   Q.   You mean somebody had spray painted it on the car?

12   A.   Um hum.

13   Q.   Okay.  So after that happened, did you become more

14   sensitive to MS-13 as it appeared around your work

15   environment?

16   A.   I did.  I went into the internet and I looked it up,

17   and then I started noticing things like the bandannas and

18   the gatherings and things like that.

19   Q.   Okay.  When you say the bandannas, what is it that you

20   observed related to bandannas?

21   A.   Well, whenever I will see them by the steps, they will

22   have a bandanna on their head, either gray or blue.

23   Q.   What, if anything, did you notice about tattoos at

24   all?

25   A.   One of them had a 13 on their stomach and another one

1    on their arm, so I did see the number a lot.

2    Q.   How often did you come in contact with individuals on

3    your properties with the bandannas, the tattoos, the

4    gatherings?

5               MR. GORMAN:  Objection.  Relevance.

6               THE COURT:  Overruled.

7    A.   A lot.

8    Q.   Okay.  Are you familiar with an event called National

9    Night Out?

10   A.   Yes, I am.

11   Q.   What is that.

12   A.   That's a group of individuals that they come together,

13   usually on -- in August, and it's a fight against crime

14   where they try to educate a lot of the residents or the

15   community about crime and how to be safe.  The police

16   comes, the fire department comes, many businesses come, and

17   it's a night that we all get together.

18   Q.   Is it something that you participated in as your role

19   as community manager for Bedford Station or The Villas?

20   A.   I did when I was a manager at The Villas at Langley.

21   Q.   Um hum.

22   A.   Both years I participated.

23   Q.   Okay.  Did something unusual happen with respect to

24   MS-13 during one of these National Nights Out that you

25   worked on?

1    A.   Yes.

2              MR. GORMAN:  Objection to the form of the

3    question.

4              THE COURT:  Sustained.

5    Q.   Focusing your attention on the National Nights Out at

6    The Villas that you helped participate in, what, if

7    anything unusual, happened?

8    A.   Well, one of the -- the second night that we got

9    together -- the second year, excuse me, we have across from

10   where we were meeting to our community, which is right next

11   to the boys and girls club, and a couple of guys with

12   jerseys on it, they wouldn't let some of my residents get

13   through.  They will bother them, and they even tried to

14   charge them to let them walk through the gate.

15   Q.   When you say jerseys, what, if anything, did you

16   observe about the jerseys?

17   A.   They had a number 13 on it.

18   Q.   Okay.  Now, as part of your responsibilities and

19   duties as a community manager, was it your job to receive

20   complaints from tenants about their units?

21   A.   Yes.

22   Q.   Okay.  Did you receive those complaints related to

23   MS-13?

24             MR. GORMAN:  Objection.

25   A.   Yes, I did.

1          THE COURT:  Sustained.

2    Q.    Okay.  Well, after receiving complaints, did you go --

3          MR. GORMAN:  Objection.

4          MR. PARK:  Okay.  With --

5          THE COURT:  Any complaints.

6    Q.    -- any complaints, did you make observations of the

7    areas that were the focus of the complaints' attention?

8    A.    Yes.  Most of the complaints -- well, the complaints

9    increased during the summer, and --

10   Q.    Okay.  Let me stop you right there.  So those summer

11   complaints, where are some of the places that you went to

12   to look at what was going on in the buildings?

13   A.    Apartments.  Laundry rooms.  Just common areas,

14   everywhere.

15   Q.    And when you went to like the common areas, let's

16   focus on those, and the laundry rooms, what did you see?

17   A.    MS-13 graffiti in pretty big letters.

18   Q.    Okay.  Did you actually go into some apartments

19   sometimes based on complaints, too?

20   A.    Yes, and it's pretty much policy that if we get three

21   or more complaints, we do have to go to an apartment and

22   inspect.

23   Q.    And when you did those inspections of these

24   apartments, tell us some of the things you observed.

25   A.    Well, from housekeeping to, you know, writing on the

1    walls.

2    Q.   And just to be clear for the jury, what were some of

3    the writings on the walls that you saw?

4    A.   MS-13 or X one three.

5    Q.   At any times that you did these inspections, did you

6    sometimes observe items on the floors that caused you to

7    focus on them?

8    A.   Well, some of the items was a knife, and the other one

9    was a gun that was found at 1438.

10   Q.   Okay.

11   A.   I'm sorry, 8138.

12   Q.   Okay.  And was that at the Villas or at Bedford

13   Station we're talking about?

14   A.   Villas at Langley.

15   Q.   Okay.  Now, focusing on graffiti that you've been

16   telling us about, during those times that you observed the

17   graffiti at the buildings that you were a manager for,

18   what, if anything, did you do to get it cleaned up?

19   A.   Well, again --

20          MR. GORMAN:  Objection.  Relevance.

21          THE COURT:  Overruled.

22   A.   Again, policy is that once we found the graffiti, we

23   had to take a picture of it.  If it was small, we could do

24   it in-house, clean it up in-house, but most of them were

25   pretty big so we had to call a company or order the

1   supplies to clean it up.

2   Q.   What were the companies -- the primary companies that

3   you used to have them cleaned up?

4   A.   Basuto Landscaping and Precise Chemicals when we did

5   it in-house.

6   Q.   Is Basuto the company that has the name ABM, or is

7   that something different?

8   A.   No, ABM, that's our cleaning company.

9   Q.   Okay.  Let's -- let me just focus on the ABM one for a

10  moment.  How do you get like ABM to -- how did you get ABM

11  to clean up graffiti?

12  A.   Well, we have a porter, who once everything had been

13  done, they will go in and they will use the chemicals from

14  Precise Chemical and clean it up.

15  Q.   How would they get paid?

16  A.   Check.

17  Q.   Okay.  And how would the check get issued?

18  A.   From Needham.

19  Q.   So -- I'm sorry.  Just to --

20  A.   I'm sorry.  I will create a PO.  It will go to

21  Needham.  Once a -- once a month, ABM will be paid their

22  monthly contract.

23  Q.   Okay.  So when you say you do a PO, is that a purchase

24  order?

25  A.   Right.

1    Q.   And the purchase order goes to where?

2    A.   Needham.

3    Q.   And that's Needham, Massachusetts, right?

4    A.   Right.

5    Q.   And then what does Needham, Massachusetts do with the

6    purchase order that you send them?

7    A.   Once I complete the purchase order with the invoice,

8    it's sent to Needham.  Needham approves it.  They cut a

9    check, and it can either be mailed or deposit directly into

10   their -- their account.

11   Q.   Into ABM's account?

12   A.   Right.

13   Q.   And that's for them to clean up the MS graffiti?

14   A.   Correct.

15   Q.   Okay.

16        MR. GORMAN:  Objection.

17        THE COURT:  Overruled.

18   Q.   Now, was the process -- we mentioned Basuto as one of

19   the companies as well that did cleaning.  The process for

20   paying them, was that similar to what you just described?

21   A.   Yes.

22   Q.   In addition to the graffiti we've been talking about,

23   have you ever noticed broken windows or other damage next

24   to such graffiti?

25   A.   Yes.

1    Q.   How would you get broken windows fixed?

2    A.   Well, we have a company that is based in Florida.

3    They will be called again with a purchase order, and they

4    will give us the glass, send someone to come and replace

5    it.

6    Q.   Okay.  Do you remember the name of the Florida company

7    off the top of your head?

8    A.   Honeycut Glass.

9    Q.   Okay.  In addition, did you have apartments at The

10   Villas that were rented under the Section 8 guidelines of

11   the Housing and Urban Development to the Federal

12   Government?

13   A.   Yes.

14   Q.   Could you tell the jury a little bit about what is

15   that program?

16   A.   Well, it's a program that will help either low-income

17   or people who cannot afford to pay the rent through a

18   voucher.  They will come in and inspect the apartment,

19   approve the voucher and the apartment, and then they will

20   move in.  And we'll get monthly payments from Section 8.

21   Q.   Okay.  I think -- did you mention that somebody from

22   the Federal Government inspects the apartments beforehand?

23   A.   Yes.  Yes.  It has to be approved by them before they

24   can actually move in.

25   Q.   After they're moved in and approved, how does -- how

1    do you get rent from these particular individuals?  How

2    does that rent come in?

3    A.   It comes through the mail.  We post it, and then we

4    take it to the bank.

5    Q.   Does the rent just come from the renter, or does the

6    Federal Government send some portion of the rent?

7    A.   It all depends because we have both.

8    Q.   Did you have Section 8 renters at The Villas from --

9    or Bedford Station from roughly 2002 to 2006 or '7?

10   A.   Yes.

11   Q.   Okay.  Focusing on The Villas, the people who would

12   come to rent at The Villas, where did they come from?

13   A.   Different places, most of them Maryland, but we did

14   have prospects or tenants who came in from North Carolina,

15   Virginia, D.C., New Jersey.

16   Q.   Okay.  When you collected rent from the people who

17   were renting apartments, what did you do with the rent

18   money?

19   A.   It will be posted, stamped, copied and taken to the

20   bank.

21   Q.   Okay.  And eventually, once -- the purpose --

22   withdrawn.

23        What, if anything, did Needham get with respect

24   to the rent money?

25   A.   Well, the money, the deposits.

1    Q.   Okay.  So they eventually went to Needham,

2    Massachusetts?

3    A.   Right.

4    Q.   Okay.  What advertising did The Villas use?

5    A.   El Pregonero, Washington Hispanic, Apartment Showcase

6    and For Rent.

7    Q.   Were these newspapers all just Maryland newspapers?

8    A.   No.

9    Q.   Where else -- where were some of these newspapers

10   based?

11   A.   Well, the Washington Hispanic, it's a D.C. newspaper,

12   and the Apartment Showcase is throughout.

13   Q.   Okay.  Throughout what?

14   A.   D.C., Maryland, Virginia.

15   Q.   Okay.  You've mentioned during the course of your

16   testimony this morning that you were required to take

17   photographs of graffiti as you observed it.

18   A.   Correct.

19   Q.   Have you provided some of those photographs to the

20   Government?

21   A.   Yes.

22   Q.   I'm going to -- there's a TV screen right there on

23   your left.  If you can bring the microphone along with you

24   as you turn over there, I'm going to show you some things

25   on the screen.  I'm just going to ask if you recognize the

1    photographs and also what's in them.

2    A.    Okay.

3    Q.    Let me start with Villas 1.  Just bear with me.

4    There's a little glare here.

5          Do you recognize the photograph up there on the

6    screen?

7    A.    Yes.

8    Q.    What are we looking at in that Villas 1, that

9    photograph?

10   A.    That's our laundry room at 8113, and I see a one and a

11   three on the wall.

12   Q.    Okay.  And when you say -- for that building address,

13   is that the Villas or is that Bedford Station?

14   A.    No, the Villas.

15   Q.    Okay.  And you say you see a one three on the wall, is

16   that what you were -- one of the main things you're

17   photographing in this picture?

18   A.    Yes.

19   Q.    And let me just focus things.  That's where I'm

20   zooming in there, on the back wall of the photograph?

21   A.    Yes.

22   Q.    Starting from another photograph, Villas 2, I guess is

23   this one of the photographs you provided to us as well?

24   A.    Yes.

25   Q.    And what did you have photographed here?

1    A.    See an M.

2    Q.    Okay.  And is this the same location or a different

3    location?

4    A.    I'm not sure.

5    Q.    Um hum.

6    A.    I believe it's 8113.  They -- both the graffitis look

7    the same in both laundry rooms.

8    Q.    Okay.  And Villas 3, did you take this photograph --

9    did you provide this photograph for us as well?

10   A.    Yes.

11   Q.    And this, again, laundry room and part of The Villas?

12   A.    Yes.

13   Q.    And what, if anything, caught your attention that

14   caused you to photograph this particular area?

15   A.    The M, the S and the one and the three.

16   Q.    Okay.  Thank you.  Showing you Villas 4, is this,

17   again, further documentation of what you saw in one of your

18   laundry rooms in The Villas?

19   A.    Right.  8113, that's an M, three dots.

20   Q.    Okay.  I'm sorry.  The M and the S, is that in the --

21   over here in the corner?

22   A.    Right.

23   Q.    Okay.  And just a couple more of the laundry room

24   pictures.  Villas 5 is another picture of some of the

25   different graffiti, not just on the back wall, but on some

1    of the other walls in that same laundry room?

2    A.    Yes.

3    Q.    And finally in the laundry rooms, Villas 6, what

4    caught your attention in this photograph?

5    A.    The writing, Mara Salvatrucha one three, which mara,

6    it's a gang.

7    Q.    And was this some of the graffiti that is the type of

8    stuff that you would have to have cleaned through some of

9    the process you've been telling us about today?

10   A.    Yes.

11   Q.    In addition to see graffiti on the insides of rooms,

12   like apartments and laundry rooms, did you find it on the

13   outsides of the structures as well?

14   A.    Yes.

15   Q.    Let me show you Villas 7.  Do you recognize what's

16   photographed there?

17   A.    Yes.

18   Q.    What's the location?

19   A.    That's Newbury Square.

20   Q.    And that -- was that also one of the locations that

21   you were a community manager for?

22   A.    Correct.

23   Q.    And what caught your attention that caused you to take

24   this photograph?

25   A.    The M and the S and the one and the three.

1    Q.    Showing you Villas 8, do you recognize this location?

2    A.    Yes, 6813 at Newbury.

3    Q.    Okay.  And what did you have photographed here that

4    caught your attention?

5    A.    MS one three and Mara Salva -- Salvatrucha.  That's

6    all I can see.  Salvatrucha.

7    Q.    Okay.  Villas 9, is that the same location?

8    A.    Yes, Newbury Square.

9    Q.    Okay.  And there's different graffiti here on this

10   particular corner?

11   A.    Yes.

12   Q.    And, again, is it the MS and the 13 and the other

13   writing?

14   A.    Yes.  La Mara Salvatrucha.

15   Q.    And finally on the outside shots, Villas 10, is this,

16   again, the same location where the other photographs you

17   provided to us?

18   A.    Yes, Newbury Square.  Different building.  MS one

19   three.

20   Q.    This is a different building in the same complex?

21   A.    Right.

22   Q.    With more MS graffiti?

23   A.    Correct.

24   Q.    Okay.  In addition, did you provide us with a

25   photograph concerning some graffiti you saw inside an

 1    apartment housing unit itself?

 2    A.   Yes.

 3    Q.   Let me show you Villas 11.  Is that inside an

 4    apartment unit that you had photographed?

 5    A.   Yes, 8138D3.

 6    Q.   And is this some of the graffiti that has the X that

 7    you were mentioning to us before?

 8    A.   Yes.

 9    Q.   As well as the MS and the 13?

10    A.   Right.

11    Q.   Okay.  And finally, even for the interior shots and

12    the exterior graffiti, when you needed to have this

13    cleaned, did you go through the same purchase order process

14    and the payment through Needham, Massachusetts that you

15    described to us?

16    A.   Yes.  Policy is you have to create a PO for

17    everything.

18    Q.   Okay.  And does Needham, Massachusetts cut checks for

19    this material?

20    A.   Yes.

21           MR. JAFFE:  Court's indulgence.

22           That's all the Government has on correct, Your

23    Honor.  Thank you.

24           THE COURT:  Mr. Gorman.

25                        CROSS-EXAMINATION

BY MR. GORMAN:

Q.   Have you gone to any MS-13 meetings?

A.   No.

Q.   Did anyone ask you to take these pictures?

A.   No.

Q.   Other than the graffiti that you were shown, were
there other graffiti that you've seen in the complexes?

A.   Yes.

Q.   And other than the graffiti that was inside the
apartments, were there times when it was necessary to clean
up walls with markings on it other than MS-13?

A.   No.

Q.   Other than the graffiti that you saw, was it necessary
for your company as part of their business to make repairs
inside the apartments?

A.   Yes.

Q.   Do you remember any dates when these graffitis -- the
graffiti were cleaned up?

A.   It was done immediately, but it was during the summer.
Mostly during the summer.

Q.   So you can't remember any specific dates, is that
correct?

A.   2004, 2005.

Q.   Did you bring any checks with you to show the cost of
cleaning the items?

1   A.   I'm sorry?

2   Q.   Did you bring any checks with you to show the costs --

3   A.   No.

4   Q.   -- of cleaning the items?

5   A.   No.

6            MR. GORMAN:  Nothing further.

7            THE COURT:  Any further questions?

8            MR. JAFFE:  No, Your Honor.  Thank you.

9            THE COURT:  Thank you, Ms. Portela.  That

10  completes your testimony, and you are excused.

11           MR. HUR:  Your Honor, the Government calls Shawn

12  Morrow.

13           (The oath was administered.)

14           THE CLERK:  Please be seated.

15           Please speak loudly and clearly into the

16  microphone.  State your name for the record and spell your

17  first and last names.

18           THE WITNESS:  Shawn, S-H-A-W-N, Morrow,

19  M-O-R-R-O-W.

20           THE CLERK:  Thank you.

21           THE COURT:  Mr. Hur.

22           MR. HUR:  Thank you, Your Honor.

23                    DIRECT EXAMINATION

24  BY MR. HUR:

25  Q.   Good morning, sir.

1    A.   Good morning.

2    Q.   Where do you work?

3    A.   I'm currently employed as a special agent with the

4    Bureau of Alcohol, Tobacco, Firearms and Explosives, the

5    ATF.

6    Q.   How long have you been a special agent with ATF?

7    A.   I began my employment with ATF in March of 2005.

8    Q.   What did you do before joining ATF?

9    A.   Prior to that, I was employed as a police officer in

10   the State of Tennessee beginning in 1997, and I came to

11   ATF -- I was a special agent with the Tennessee Bureau of

12   Investigation as a state police agency there.

13   Q.   Are you currently assigned to the RAGE Task Force?

14   A.   Yes, sir, I am.

15   Q.   Have you attended various training events and

16   conferences related to the investigation of gangs,

17   specifically MS-13?

18   A.   Yes, multiple trainings.

19   Q.   Okay.  Was one of these conferences actually held in

20   El Salvador?

21   A.   Yes, sir.

22   Q.   Which countries' governments were represented at this

23   conference?

24   A.   All the countries in Central America, Mexico, the

25   United States.  Spain had Government representatives there,

1   as well as Canada.

2   Q.   Are you one of the case agents for this investigation?

3   A.   Yes, sir, I am.

4   Q.   Special Agent Morrow, I'm going to draw your attention

5   to November 2005.  In that time period, did you assist in

6   conducting a search warrant at 1900 Erie Street, Apartment

7   201, in Adelphi, Maryland?

8   A.   Yes, sir.

9   Q.   Okay.  Who were the individuals that were associated

10  with this residence?

11  A.   There was -- we believe the individuals there, one TLS

12  gang member named Snoopy.  His name is Juan Carlos Angel.

13       MR. GORMAN:  Objection to the characterization.

14       THE COURT:  Sustained.

15  Q.   Simply the names.

16  A.   Snoopy.  Another individual named Splinter.  And at

17  the time of our entry, we encountered a female named Rosa

18  Hernandez.

19  Q.   Now, during the conducting of the search warrant, what

20  was your specific role that day?

21  A.   First I was assigned to participate in the entry of

22  the residence.  I was on the entry team.  Upon securing the

23  residence, making sure that individuals were secured, I was

24  assigned as the evidence technician.

25  Q.   Okay.  Now, I want to talk some more about your role

1    as evidence technician.  In terms of process in conducting

2    the search warrant, what did that mean for you to be

3    evidence technician?

4    A.    Essentially, it -- the role of an evidence technician

5    is to locate property that is potential evidence or

6    something that you may want to seize, to record that

7    evidence, to take it into custody for the agency.

8    Q.    And when other agents that are conducting that search

9    warrant with you find pieces of evidence, do they have you

10   come to that location and actually handle seizing the

11   evidence?

12   A.    That's correct.  The participating agents in the

13   search warrant may be assigned as a searcher, an evidence

14   technician, maybe a photographer.  Other agents will be

15   dispersed throughout the residence.  As they find items

16   that may be seized, they'll bring the evidence technician

17   to that location and show them the property.

18   Q.    Was a sketch of the layout of the residence made that

19   day during the conducting of the search warrant?

20   A.    Yes, sir.

21   Q.    Okay.  I'm going to show you Exhibit Erie 12.  Just

22   look to the screen on your left.

23         Do you recognize this exhibit?

24   A.    Yes, sir.  That's the sketch from 1900 Erie Street.

25   Q.    Does this sketch fairly and accurately set out the

1    layout of the residence that you searched that day?

2    A.   Yes, sir, it does.

3    Q.   I want to draw your attention to a specific room in

4    this residence on the sketch, and that's Bedroom Number 2,

5    where my pen is.  Was that one of the rooms that you

6    searched?

7    A.   Yes, sir.

8    Q.   Okay.  Showing you Exhibit Erie 2, or at least one

9    portion of Erie 2, do you recognize this exhibit?

10   A.   Yes, sir.  That's one of the items we seized from the

11   residence.

12   Q.   Okay.  I want to show you just a few pages in this

13   exhibit.

14             Is that one of the pages in this exhibit?

15   A.   Yes, sir.

16   Q.   What letters do you see in the background?

17   A.   I see an M and an S.

18   Q.   How about on this page?

19   A.   Specifically in the top left-hand corner, I see the

20   letters E-M-E-S, or eme ese.

21   Q.   How about where my pen is right here?

22   A.   Teclas Locos.

23   Q.   Okay.  And these large letters here?

24   A.   Large MS with a Mara Salvatrucha written on the top.

25   Q.   Okay.  Fair to say that there are other drawings in

1    this notebook that are of a similar nature?

2    A.   Yes, sir.

3    Q.   I'm going to show you now back to Erie 12, the sketch

4    here, Closet Number 7 in Bedroom 2.  Did you also search

5    that closet?

6    A.   Yes, sir.

7    Q.   Okay.  Showing you Exhibit Erie 21, is that a

8    photograph of one of the items that you encountered in

9    Closet Number 7?

10   A.   Yes, sir, it is.

11   Q.   Okay.  Now showing you Exhibit Erie 9, is that the

12   actual item that was depicted in the photograph you just

13   saw?

14   A.   Yes, sir.  It's a Western Union customer receipt.

15   Q.   Okay.  I'm going to zoom in on certain portions of

16   this.

17        Can you tell me who the sender is on this Western

18   Union receipt?

19   A.   Yes, sir.  It's displayed Osmin Leiva.

20   Q.   And who's the recipient?

21   A.   Claudia Maria Mejia.

22   Q.   Okay.  And what does it indicate that the funds are

23   available in?

24   A.   It says that they're available in El Salvador.

25   Q.   Okay.  Moving over to the right of the exhibit, what

1  are the amounts that you see here?

2  A.   Seems the amount transferred was $1,000.  There was a

3  service charge of $50, so the total expended was $1,050.

4  Q.   Okay.  Showing you now Exhibit Erie 20, do you

5  recognize what's depicted in this photograph?

6  A.   Yes, sir.  It's a photograph of a homemade tattoo gun

7  that was seized from the residence.

8  Q.   Is that a photograph of it in place where you saw it?

9  A.   Yes, sir.

10  Q.   I'm going to approach you with Exhibit Erie 5.  Do you

11  recognize this exhibit?

12  A.   Yes, sir.  That's the same item, the tattoo gun.

13  Q.   Okay.  Can you open that bag and publish the contents

14  of it to the jury.

15  A.   It's a box of latex disposable gloves or plastic

16  gloves.

17  Q.   Be careful when you're handling ing that.

18  A.   First is a bottle of dark-colored ink.  Looks like two

19  adapters used to plug in to -- for electricity.  Various

20  wiring.  And there's a mechanism that's attached to a --

21  what looks like a Bic ink pen.  Then various wiring.

22  Q.   Thank you.

23          MR. HUR:  Your Honor, may I publish briefly to

24  the jury?

25          THE COURT:  Okay.

1    Q.   Agent Morrow, showing you now Exhibit Erie 8, do you

2    recognize Erie 8?

3    A.   Yes, sir.

4    Q.   What is it?

5    A.   It's a blue composition book seized from the

6    residence.

7    Q.   Okay.  Show you a few pages within this composition

8    book.

9              What do you see on this page?

10   A.   I see various drawings.  The first thing is a drawing

11   of possibly a skull with a hole in the center of the

12   forehead.

13   Q.   Is that where my pen is right now?

14   A.   Yes, sir, it is.

15   Q.   And what does this writing say up here?

16   A.   It says Fulton Locos.

17   Q.   Okay.

18   A.   And then just to the side, FLS.

19   Q.   Okay.  One more page from this exhibit.

20   A.   Yes, sir.

21   Q.   Can you tell me what you see here.

22   A.   Yes, sir.  On the top I see an L and an A or La Mara

23   Salvatrucha.  I see a Northside, MS, one three, Fulton

24   Locotes and a female holding a handgun.

25   Q.   Showing you now Exhibit Erie 10, do you recognize this

1   exhibit?

2   A.   Yes, sir.  It's another item seized from the

3   residence.

4   Q.   Okay.  Showing you just a couple of items from within

5   this exhibit.  This first page?

6   A.   Sir, on the top, in block letters, I see Teclas Locos.

7   I see a one, an MS and a three.  And in the bottom right of

8   the S, I see a 301 and the word Maryland written at the

9   bottom of the page.

10  Q.   How about on this page?

11  A.   Top left-hand corner, I see a cemetery with a

12  headstone that reads RIP.  Writing, La Mara Salvatrucha, a

13  large one, MS and then a three.  And at the very bottom of

14  the page, I see Teclas Locos.

15  Q.   Showing you now Exhibit Erie 11, and I'll zoom in on a

16  portion of that exhibit.  Do you recognize Exhibit Erie 11?

17  A.   Yes, sir.  It's another item from the residence.

18  Q.   I'm going to show you first the originals of just a

19  couple pages in this exhibit, then I'll focus your

20  attention on a certified translation.

21       Zoom in here, and if you could just read the

22  writing that's in italics from where my pen is all the way

23  down.

24  A.   Before you do a thing, you have to have gloves.  Go in

25  black shirts.  When you're going to call or talk, either

1    you advise something the day said.  It's not going to be

2    other than the next or before.  To go on a mission, no more

3    than four can go.  Check it out always.  Do it with

4    schooling or experience and wait for them and afuedo or be

5    on their heels.

6    Q.   Show you the original of another page, and I'll show

7    you the certified translation of that page.

8             Again, could you just read the writing in

9    italics, starting from where my finger is.

10   A.   A homeboy always goes who is responsible so everything

11   turns out fine.  Don't joke a lot.  Act serious.  And don't

12   rough up a lot.  Do a favor when deserved or when shows

13   dedication.

14   Q.   Taking you back to the sketch, Erie 12, did you also

15   search Closet 9, which is where my pen is, off the dining

16   area?

17   A.   Yes, sir.

18   Q.   Did you seize certain items from that closet?

19   A.   Yes, sir.

20   Q.   Showing you Exhibit Erie 14, put it this way.  What do

21   you see in that photograph?

22   A.   See a -- like a style of fishing hat, light colored,

23   with a handwritten drawing on it.

24   Q.   Okay.  I'll approach you with Exhibit Erie 3.  Tell me

25   if you recognize this exhibit.

1   A.   Yes, sir.  That's the item.

2   Q.   What else was in this bag with the exhibit?

3   A.   It's a key chain of a Hispanic male displaying hand

4   signs.

5   Q.   Take that back from you and I'll put it on the

6   projector.

7        Focusing just on the hat in that exhibit -- try

8   to lay it as flat as I can.  Can you tell me what we see

9   there?

10  A.   Yes, sir.  Looks like a handwritten drawing of a

11  tombstone, the letters LPS written in the center of the

12  tombstone.  The letters A-R-A-N-A one three, or Araña.

13       MR. HUR:  Special Agent, let me stop you there.

14       If I could ask the court interpreter to provide

15  an English translation of the word Araña?

16       THE INTERPRETER:  Spider.

17       MR. HUR:  Thank you.

18  Q.   Please continue, Agent Morrow.

19  A.   I see a -- if you could focus in a little on the

20  right, right-hand side of the brim.  I see handwritten

21  forever and what appears to be a head or a skull with X and

22  one, one, one.

23  Q.   Is that right where my pen is pointing on the screen?

24  A.   Yes, sir.

25  Q.   Okay.  Back to Exhibit Erie 12, did you also search

1    Closet Number 6 that's off Bedroom Number 1 in this sketch?

2    A.   Yes, sir, we did.

3    Q.   Did you seize items of evidence from that closet?

4    A.   Yes.

5    Q.   Showing you Exhibit Erie 15, do you recognize what's

6    in this photograph?

7    A.   Yes, sir.  It's a photograph of ammunition that was

8    seized from the residence.

9    Q.   Approaching you with Exhibit Erie 6.  Do you recognize

10   this exhibit?

11   A.   Yes, sir.  It's the item taken from the residence.

12   Q.   Put it up on the projector.

13        Can you tell the jury what we see there?

14   A.   Yes, sir.  It's a red box of ammunition displaying

15   American Eagle by Federal Cartridge Company, and it reads

16   50 pistol cartridges.

17   Q.   I'm going to turn it on its side.  Can you tell us

18   what information is on that side of the exhibit?

19   A.   Yes, sir.  Again we see displayed American Eagle .38

20   Super Automatic plus P, 130 grain full metal jacket.

21   Q.   Thank you.

22        Let me approach you again, Agent Morrow, with

23   this exhibit.

24        Can you open up the box briefly and confirm that

25   there are actual rounds inside that box?

1   A.   Yes, sir.  It's a full box containing 50 rounds.

2   Q.   I'll put that briefly up on the screen.

3        Agent Morrow, turning to a separate topic now,

4   you've heard testimony during this trial regarding

5   shootings and homicides on Quintana Street in Riverdale,

6   Maryland, is that correct?

7   A.   Yes, sir.

8   Q.   Are you investigating a separate homicide in Riverdale

9   that has nothing to do with the defendant in this case,

10  Mr. Victor Ramirez?

11  A.   That's correct.

12  Q.   Have you and other members of the RAGE Task Force also

13  investigated another homicide involving a victim named

14  Nancy Diaz?

15  A.   Yes, we have.

16  Q.   Agent Morrow, as part of your work on the MS-13

17  investigation, have you personally traveled to Nashville,

18  Tennessee?

19  A.   Yes, sir.  Multiple times.

20  Q.   Have you, during your travels to Nashville, ever

21  observed MS-13 graffiti in Nashville, Tennessee?

22  A.   Yes, sir.  Multiple times.

23  Q.   Okay.  And what were the dates of these multiple times

24  that you observed MS-13 graffiti in Nashville?

25  A.   Beginning in the summer of 2006 to this year.

1    Q.   When you were in Nashville, did you come into

2    face-to-face contact with a number of individuals there?

3    A.   Yes, sir.

4    Q.   I'm going to put up Exhibit Photo Book 10.

5            Did you come into face-to-face contact with this

6    individual in Nashville?

7    A.   Yes, sir, I did.  I personally interviewed him.

8    Q.   Do you recognize who he is?

9    A.   Yes, sir.  It's Rigoberto Del Transito Mejia Regaldo.

10   He's also known as Ski.

11   Q.   Agent Morrow, when you were in Nashville, did you

12   locate in Nashville an individual in connection with the

13   MS-13 investigation named --

14           MR. GORMAN:  Objection.

15           THE COURT:  Sustained.

16   Q.   Did you come into contact with other individuals in

17   Nashville when you were there on MS-13 investigation

18   business?

19   A.   Yes, sir, I did.

20   Q.   Do you recall the names of certain of those

21   individuals that you came into contact there?

22   A.   Yes, sir.  Oscar Serrano, Escolastico Serrano, Ronald

23   Fuentes, a number of individuals.

24   Q.   Okay.  As part of your investigation, did you then

25   return to Maryland from Tennessee?

1    A.    Yes, I did.

2    Q.    Did you then go to a particular hotel in Maryland?

3    A.    Yes, sir.  I traveled to Days Inn located on Route 1

4    in College Park.

5    Q.    What did you do when you arrived at the Days Inn?

6    A.    Upon consulting with the management at Days Inn, I was

7    given access to some manual -- or, I'm sorry, some physical

8    hotel records, old receipts.  I hand searched those.

9    Q.    How far back do those receipts that you hand searched

10   date?

11   A.    Specifically 2005 and 2006.

12   Q.    Okay.  And when you conducted that manual search of

13   hotel records, did you see a name that you recognized?

14   A.    Yes, sir.  I saw a hotel receipt and credit card

15   statement or credit card receipt in the name of Escolastico

16   Serrano.

17              MR. GORMAN:  Objection.

18              THE COURT:  Come up on here, please.

19              (Counsel approached the bench.)

20              THE COURT:  Where is this document?

21              MR. HUR:  The document is available.  We can have

22   that produced.

23              THE COURT:  What's your objection.

24              MR. GORMAN:  What's the relevance?

25              THE COURT:  They're going to show interstate

1    travel because it's somebody he saw in Tennessee whose name

2    shows up on the record having stayed at a hotel in

3    Maryland --

4              MR. GORMAN:  So what does that have to do with --

5              THE COURT:  They have to prove the effect upon

6    interstate commerce, and I guess they weren't happy just

7    with all the other stuff they had on that topic, is that

8    correct?

9              MR. HUR:  Yes, Your Honor.  And adding a bit

10   more, we find that this testimony is particularly relevant

11   because it involves someone who traveled from Nashville,

12   Tennessee, which is a location that Mr. Gorman has been

13   referencing repeatedly in his cross-examination of various

14   Government witnesses, so we thought it particularly

15   relevant.

16             THE COURT:  It's not just the interstate nexus

17   for financial impact but the enterprise activity to show

18   that people travel.

19             MR. GORMAN:  My objection goes to the fact that

20   unless they show that it's MS-13 business, the fact that a

21   person goes from one place to another doesn't prove

22   anything.

23             THE COURT:  Were these people with Ski?  You're

24   saying MS-13, but how does he know?

25             MR. HUR:  Well, Your Honor, he was -- what the

1   witness is able to testify to is that he traveled to

2   Nashville as part of his work on the MS-13 investigation.

3          THE COURT:  No, no, no, no, no.  That's not

4   enough to say that the people he saw were MS-13.

5          MR. HUR:  And he will --

6          THE COURT:  The question is this person whose

7   credit card receipt -- and I'm not sure best evidence rule

8   wouldn't be violated by him telling us what's on it, but

9   that's another problem.  Why is it relevant that he saw

10  somebody?  It could have been a police officer --

11         MR. HUR:  Certainly.

12         THE COURT:  -- he saw in Tennessee who stayed at

13  the Days Inn when he came here, and that would not have any

14  relevance to this case.

15         MR. HUR:  Certainly, Your Honor.  I'm not

16  certain, I believe it may be that Agent Morrow has had

17  personal contacts with this individual and this individual

18  let him know that he was an MS-13 member.  I had not

19  planned to elicit that particular piece of testimony.

20         MR. PARK:  If I might jump in, Your Honor, just

21  to clear things up.  Agent Morrow has traveled down to

22  Tennessee on a number of occasions and has coordinated

23  extensively with the ATF down there.  This individual who

24  he just mentioned who was up here in Maryland was, I

25  believe, spotted with and seen with and investigated in

1    connection --

2            THE COURT:  Not by this officer.  He's not here

3    as an expert --

4            MR. PARK:  No, no, no, I understand, which is why

5    we're staying away from all of his investigation into that,

6    and I'm just kind of clarifying in terms of what the

7    Court's -- which is why we're intentionally staying away

8    from it.  But this officer, I believe, has, in fact, had

9    contact with that individual and interviewed him.  We can

10   clarify that.  I can actually talk to Mr. Jaffe just to

11   make sure.

12           But this individual, I believe -- if I might just

13   confer with Mr. Jaffe -- Mr. Jaffe actually has gone down

14   to Tennessee as well -- just to make sure so we're not

15   running afoul of the Court and counsel here as well and --

16           THE COURT:  I'm not going to allow him,

17   certainly, to reveal hearsay information that this is an

18   MS-13 member unless he's had personal contact --

19           MR. PARK:  Right.  And unless, for example, this

20   individual may have said it to him himself.

21           THE COURT:  Yeah.  I mean Ski, I don't have a

22   problem.  He's got the tattoo --

23           MR. PARK:  Right.  Right, right.

24           THE COURT:  -- and you @ can show that, but

25   unless there's something so clear, then if this is not an

1    MS-13 member that he can say it's irrelevant.

2             MR. PARK:  I understand.  If I might just check

3    with Mr. Jaffe.  Thank you, Your Honor.

4             THE COURT:  Um hum.

5             (Counsel returned to the trial tables.)

6             (Pause.)

7    BY MR. HUR:

8    Q.   Agent Morrow, moving on, I'm going to show you

9    portions of what's been previously marked as Exhibit AV 3,

10   which has already been shown in part to the Court.  Have

11   you had a chance to review portions of this exhibit?

12   A.   Yes, I've reviewed the entire video.

13   Q.   As these clips come onto the screen in front of you,

14   please view them and tell me and the jury who comes onto

15   the screen.

16   A.   Yes, sir.

17            MR. HUR:  And for the record, the first clip will

18   come at 3 minutes and 50 seconds in the exhibit.

19            (Pause)

20            MR. GORMAN:  I'm going to object.  Could we

21   approach the bench?

22            THE COURT:  Sure.

23            (Counsel approached the bench.)

24            MR. GORMAN:  I'm going to object on the basis

25   this is redundant.  These people have already been

1    identified by another witness on multiple occasions.  To

2    show this tape again, I think would be prejudicial.

3         They've already been identified.  They

4    self-identified themselves on the tape.  And for the jury

5    to see this again, I think, has very little probative value

6    but prejudicial value to play this over and over again to

7    show them their tattoos, to show them in El Salvador in a

8    prison, and we'd ask the Court not to permit it.

9         MR. HUR:  Your Honor, a number of points in

10   response.  First, Agent Morrow is not going to identify any

11   person on this video except for a person the Government

12   submits is Victor Ramirez, the defendant.

13        Moreover, there are certain portions that we plan

14   to show Agent Morrow where the defendant is pictured in the

15   video that have actually not been published to the jury

16   before or to any witness.

17        Finally, Your Honor, this is testimony that we

18   had thought about previously introducing into evidence

19   through the next witness, Mr. Juan Diaz.

20        THE COURT:  Which we're not going to allow.

21        MR. HUR:  Exactly, Your Honor.  So for various

22   reasons --

23        THE COURT:  So it's not the speaking part.

24        MR. HUR:  Correct, Your Honor.  It's simply still

25   shots.

1          THE COURT:  It's simply to show where the

2   defendant appears --

3          MR. HUR:  That's correct, Your Honor.

4          THE COURT:  -- visually, without speaking.

5          MR. HUR:  Correct, Your Honor.

6          THE COURT:  Okay.  And how many are they and how

7   brief?

8          MR. HUR:  I believe there are six, and the sixth

9   one is, I believe, ten seconds long.

10         THE COURT:  And the others are shorter.

11         MR. HUR:  The others are simply still shots or

12  freeze frames.

13         THE COURT:  So I understand your objection, but

14  it's not redundant.  It's not going to be cumulative to the

15  other.  In fact, they haven't been identified yet by

16  anybody.  They're in the transcript, but it's the next

17  witness who's going to testify that he was the one who

18  affixed the names to the transcript.

19         So I'll overrule that objection.

20         MR. HUR:  Thank you, Your Honor.

21         (Counsel returned to the trial tables.)

22         MR. HUR:  May we continue, Your Honor?

23         THE COURT:  Um hum.

24         MR. HUR:  Again, for the record, the shot at 3

25  minutes and 50 seconds in the exhibit.

1    BY MR. HUR:

2    Q.   Agent Morrow, can you see the image on your screen

3    there to your left?

4    A.   Yes, sir.

5    Q.   Who is the individual that's standing in the center of

6    the frame?

7    A.   Victor Ramirez, Mousy.

8    Q.   And do you see that individual in the courtroom today?

9    A.   Yes, sir, I do.

10   Q.   Can you identify him by what he's wearing and where

11   he's sitting.

12   A.   Yes, sir.  He's sitting at the defense table beside --

13   to the left of the gentleman in the gray suit, wearing a

14   white polo shirt with a white long underwear shirt.  Dark

15   hair.

16          MR. HUR:  Your Honor, requesting in-court

17   identification?

18          THE COURT:  So noted.

19          MR. HUR:  Thank you.

20   Q.   Agent Morrow, I'm next going to show you the shot at 5

21   minutes and 50 seconds.  Same exhibit.

22          Agent Morrow, do you see the individual in the

23   center of the frame there?

24   A.   Yes, sir.

25   Q.   Who is that individual?

1    A.    That's another video shot of Victor Ramirez, Mousy.

2    Q.    Next showing you a portion of the video at 26 minutes

3    and 56 seconds.

4              Agent Morrow, looking at the screen in front of

5    you, do you recognize any of the individuals on that

6    screen?

7    A.    Yes, sir.

8    Q.    Do you see Mr. Ramirez, the defendant, on the screen

9    there?

10   A.    Yes, sir.

11   Q.    Using your touch screen -- I believe it works.

12             MR. HUR:   Court's indulgence.

13   Q.    Have you placed that red dot there on the screen?

14   A.    Yes, sir.

15   Q.    Could you, using your touch screen, circle the face of

16   that individual.

17             Next going to the shot at 28 minutes and 12

18   seconds.

19             THE COURT:   Let's delete the marking.

20             Thank you.

21   Q.    Agent Morrow, looking to the right of the frame that's

22   on your screen right now, do you see the defendant in that

23   shot?

24   A.    Yes, I do.

25   Q.    Okay.  And using your touch screen again, could you

1    circle the face that you see and identify as the defendant.

2    A.   Okay.

3    Q.   The next and final segment of the video is at 30

4    minutes and 4 seconds through 30 minutes and 9 seconds.

5              And freezing that shot at 30 minutes and 8

6    seconds, do you see the face of the defendant in that shot?

7    A.   Yes, sir, I do.

8    Q.   Can you circle it, please, on your screen.

9    A.   Okay.

10             MR. HUR:  Court's indulgence.

11             No further questions on direct, Your Honor.

12             THE COURT:  Mr. Gorman.

13                      CROSS-EXAMINATION

14   BY MR. GORMAN:

15   Q.   All these recent video shots that you see -- that you

16   saw on the screen, were they all taken in the same country?

17   A.   I can't say.

18   Q.   Do you know what country they were taken in?

19   A.   I have no -- I can't say that either.

20   Q.   And you sat here through the whole trial, right?

21   A.   Yes, sir.

22             MR. GORMAN:  Nothing further.

23             THE COURT:  Any redirect?

24                     REDIRECT EXAMINATION

25

1    BY MR. HUR:

2    Q.   Agent Morrow, do you have any idea of where this video

3    was shot?

4    A.   Yes, absolutely.

5            MR. GORMAN:  Objection.

6            THE COURT:  Okay.  Why didn't you object to the

7    question when Mr. Gorman asked it?  I don't think we're

8    going to go there.  We'll just leave it where we are.

9            MR. HUR:  Very well, Your Honor.  Nothing

10   further.

11           THE COURT:  Thank you, Agent Morrow.  That

12   completes your testimony, and you can return to counsel

13   table.

14           THE WITNESS:  Thank you.

15           MR. PARK:  Your Honor, the Government's next

16   witness is Juan Diaz.

17           (The oath was administered.)

18           THE CLERK:  Please be seated.

19           Speak loudly and clearly into the microphone.

20   State your name for the record and spell your first and

21   last names.

22           THE WITNESS:  Good morning, Your Honor, members

23   of the jury, members of the prosecution, members of the

24   defense.  My name is Juan Diaz.

25           THE CLERK:  Would you please spell your name,

 1    your first and last names.

 2                THE WITNESS:  J-U-A-N.  D-I-A-Z.

 3                THE CLERK:  Thank you.

 4                THE COURT:  Mr. Park.

 5                MR. PARK:  Thank you, Your Honor.

 6                          DIRECT EXAMINATION

 7    BY MR. PARK:

 8    Q.   Good morning, Mr. Diaz.

 9    A.   Good morning.

10    Q.   Which country are you from?

11    A.   From El Salvador.

12    Q.   Were you born in El Salvador?

13    A.   Yes.

14    Q.   Do you currently live in El Salvador?

15    A.   Yes.

16    Q.   Have you been subpoenaed to come here to testify --

17    have you been asked to come here to testify on behalf of

18    the United States Government?

19    A.   Yes.

20    Q.   By whom are you employed?

21    A.   In the National Civil Police of El Salvador.

22    Q.   Does that go by an acronym or by the initials PNC?

23    A.   Yes.

24    Q.   And how long have you been with the PNC?

25    A.   Over 12 years.

1   Q.   During that time, have you served in the capacity at

2   some point as a police officer?

3   A.   Yes.

4   Q.   During your time with the PNC, have you also worked

5   not only -- well, have you also worked as an investigator?

6   A.   Yes.

7   Q.   Is there a National Academy in El Salvador?

8   A.   Of course.

9   Q.   Did you attend that Academy?

10   A.   Yes.

11   Q.   And did you graduate from that Academy?

12   A.   Yes.

13   Q.   As part of your work with the PNC, have you

14   investigated gangs in El Salvador?

15   A.   Yes.

16   Q.   Has that included or has your work included the

17   investigation of the MS-13 gang or La Mara Salvatrucha?

18   A.   Yes.

19   Q.   Could you -- well, let me ask you.  Have you also

20   investigated other gangs in El Salvador?

21   A.   Yes.

22   Q.   Is it fair to say, though, that the primary focus of

23   your work with the PNC has been the investigation of MS-13?

24   A.   Yes.

25   Q.   Over the course of the year -- strike that.

1          How many years have you been working as an

2    investigator focusing on MS-13 or La Mara Salvatrucha?

3    A.   Approximately since 1998 I've been in the

4    investigation.

5    Q.   During the time since 1998, have you became familiar

6    with the rules, the organization, the structure and the

7    activities of MS-13 in El Salvador?

8    A.   I didn't know very much about them.  It was not until

9    1998.

10    Q.   And after 1998, from that point onwards, up until now,

11    have you learned and come to know about the rules,

12    structure, organization and activities of MS-13?

13    A.   Yes.

14    Q.   Have you yourself participated in actual

15    investigations of MS-13 members?

16    A.   Yes.

17    Q.   Have you also worked with other individuals with the

18    PNC who have also conducted investigations of MS-13

19    members?

20    A.   Yes.

21    Q.   Have you over the years participated in search

22    warrants that were conducted by the PNC related to the

23    activities of MS-13 members?

24    A.   Yes.

25    Q.   Can you give a rough general estimate as to the number

1  of search warrants that you've been involved in?  Is it

2  just a few?  Is it dozens?  Is it more than that?

3  A.   Many more.

4  Q.   Many more than dozens?

5  A.   Maybe 50, 60 times or more.

6  Q.   During the course of your time with the PNC and

7  looking specifically into MS-13, have you had occasion to

8  speak with witnesses to various crimes that MS-13 is

9  alleged to have committed?

10 A.   Yes.

11 Q.   And during those times that you've spoken with these

12 individuals, have you learned about the activities of MS-13

13 as well as other information that they may have gleaned

14 about MS-13?

15 A.   Yes.

16 Q.   Have you also -- have you, during the course of your

17 time working with the PNC, reviewed records associated with

18 either MS-13 or investigations into MS-13?

19 A.   Yes.

20 Q.   I asked you about witnesses to certain activities or

21 crimes involving MS-13.  Have you, in addition to that,

22 spoken with victims of crimes connected with MS-13?

23 A.   Yes.

24 Q.   And just to clarify in terms of not only that last

25 question but the earlier questions, we're talking about

1    your contact with individuals and interviews with

2    individuals in El Salvador, correct?

3    A.    Yes.

4    Q.    Have you also had occasion during the time that you've

5    worked with the PNC to interview family members of victims

6    of crimes related to MS-13?

7    A.    Yes.

8    Q.    Have you ever had a chance to speak directly with an

9    individual who has identified himself as a member of MS-13?

10   A.    Yes.

11   Q.    Are these individuals who are cooperating with the PNC

12   or are they individuals who are not cooperating with the

13   PNC?

14   A.    Both.

15   Q.    Can you give -- we've gone through a list of various

16   types of individuals who you've had contact with.  Can you

17   give us a rough -- again, a rough estimate as to the number

18   of individuals you've spoken with over the course of your

19   work on MS-13 since 1998?

20          And let me clarify the question.  The people

21   you've spoken with who are -- who fall into these various

22   categories, those types of people.

23   A.    Maybe a hundred more or less.

24   Q.    Have you had occasion to read literature about MS-13

25   in El Salvador?

1   A.    Yes.

2   Q.    Have you had occasion to attend courses concerning

3   MS-13 in El Salvador?

4   A.    Yes.

5   Q.    And these are courses in El Salvador that are

6   organized by the PNC as well as other entities, correct?

7   A.    Yes.

8   Q.    Can you describe some of the other entities that may

9   have been involved in organizing or sponsoring these

10  courses in El Salvador?

11  A.    Institutions of the European Union, the American

12  Embassy and other U.S. organizations.

13  Q.    And I think we talked about before the National

14  Academy of El Salvador?

15  A.    Yes.

16  Q.    Was that also one of the sponsors?

17  A.    Of course.

18  Q.    Have you had occasion during the course of your work

19  on MS-13 to consult with or work with intelligence analysts

20  from various law enforcement agencies regarding the

21  activities of MS-13?

22  A.    Yes.

23  Q.    And during the course of your work, has this become

24  kind of a routine element of the work that you do,

25  consulting not only with your fellow officers but other

1    intelligence analysts?

2    A.   Yes.

3    Q.   We spoke earlier about search warrants that may have

4    been conducted during the course of investigations into

5    MS-13, and I want to ask, have you yourself had occasion to

6    review evidence that has been seized during the course of

7    these search warrants?

8    A.   Yes.

9    Q.   And from your review of these items of evidence that

10   may have been seized, have you also gleaned knowledge or

11   gathered information regarding the activities, the

12   structure, the rules, the organization of MS-13 in El

13   Salvador?

14   A.   Yes.

15   Q.   Do you know what a wila is?

16   A.   Yes.

17   Q.   Can you spell that?

18          MR. PARK:  Or, Madam Interpreter, if you could

19   spell it, I guess, as well.

20          THE INTERPRETER:  The interpreter would spell it

21   as W-I-L-A.

22   Q.   And, Mr. Diaz, what is a wila?

23   A.   It's a document, a letter.  It's the means by which

24   gang members communicate in writing.

25   Q.   Have you had occasion during the course of your work

1    on MS-13 with the PNC to review phone records or any other

2    documentation associated with either the use or obtaining

3    of phones, cell phones by gang members?

4    A.    Yes.

5    Q.    From these various sources of information that you've

6    spoken of, have you become familiar with the structure and

7    leadership and organization of MS-13 in El Salvador?

8    A.    Yes.

9    Q.    In addition, have you become familiar with the rules

10   and activities and terminology used by MS-13 members in El

11   Salvador?

12   A.    Yes.

13   Q.    And, in fact, have you, on occasion, personally

14   participated in the interviews of leaders of MS-13 in El

15   Salvador, either directly or along with other individuals?

16   A.    Yes.

17   Q.    Have you ever had occasion to share the information

18   that you've learned about MS-13 in El Salvador with

19   agencies or organizations from outside El Salvador?

20   A.    Yes.

21   Q.    Can you share with us some of the countries from which

22   these individuals or organizations came from?

23   A.    Guatemala, Honduras, United States and Mexico.

24   Q.    Have you had occasion to -- well, during the course of

25   your time working with the PNC on MS-13 in El Salvador,

1    have you had occasion to learn about communications by

2    MS-13 members in El Salvador with MS-13 members in other

3    countries?

4    A.    Yes.

5    Q.    Have you been to the United States before on at least

6    three prior occasions, or on three prior occasions, to

7    testify in court as an expert on MS-13 in El Salvador?

8    A.    Yes.

9    Q.    And, again, were those occasions when you were asked

10   by the U.S. Government to come here to -- to come to the

11   United States to testify regarding your knowledge of MS-13

12   in El Salvador?

13   A.    Yes.

14   Q.    And was it to this actual courthouse that you came on

15   those three prior occasions and was offered as an expert on

16   MS-13 in El Salvador?

17   A.    Yes.

18   Q.    And did you, in fact, testify on those three prior

19   occasions in that capacity?

20   A.    Yes.

21         MR. PARK:  Your Honor, at this time the

22   Government would offer up Mr. Diaz as an expert on MS-13 in

23   El Salvador, including, but not limited to, its rules,

24   organization, structure, leadership and activities.

25         THE COURT:  Do you wish to inquire?

1      MR. GORMAN:  Could we approach?

2      THE COURT:  Um hum.

3      (Counsel approached the bench.)

4      MR. GORMAN:  Could we take our midmorning break

5  before I voir dire him?  I've got some notes, and I

6  inadvertently put it in this box and didn't want to go

7  rifling through it while he was examining.

8      THE COURT:  We've reached just about the right

9  time.

10      MR. PARK:  That's fine.

11      MR. GORMAN:  Thank you, Your Honor.

12      MR. PARK:  If I might, just to let the Court

13  know, we are going to obviously very clearly delineate

14  between the expert nature -- assuming he's accepted and

15  similarly testifies -- delineate very clearly, so we'll

16  approach the bench at that point maybe to let the Court

17  know if the Court or counsel want any sort of instruction,

18  but just want to let the Court know that we're going to be

19  very mindful of that delineation.

20      MR. GORMAN:  Is the Court going to inquire as to

21  which one they're doing first, the factual or the --

22      THE COURT:  I'm assuming he's doing the expert

23  first since he's gone ahead and qualified him.

24      MR. PARK:  Right.

25      THE COURT:  Okay?

1            MR. PARK:  Thank you.

2            (Counsel returned to the trial tables.)

3            THE COURT:  All right.  We'll take our morning

4    recess.  We'll resume in 15 minutes.

5            (Recess.)

6            THE COURT:  Please be seated.

7            Mr. Gorman, are you ready?

8            MR. GORMAN:  Yes.

9            THE COURT:  Bring in the jury, please.

10           (Jury present.)

11           THE COURT:  Please be seated.

12           Okay.  Mr. Gorman.

13                    VOIR DIRE EXAMINATION

14    BY MR. GORMAN:

15    Q.   Mr. Diaz, are you familiar with how MS-13 gang

16    conducts its business inside the prison?

17    A.   Yes.

18    Q.   Are you familiar with the way other gangs conduct

19    their business inside the prison?

20    A.   Yes.

21    Q.   Are you familiar with how prisoners in the prison who

22    are not affiliated with gangs conduct their business inside

23    the prison?

24           MR. PARK:  Objection, Your Honor.

25           THE COURT:  Come up on here, please.

1        (Counsel approached the bench.)

2            MR. PARK:  I just ask in terms of the relevance

3    of asking about other gangs and other communications and

4    the way that -- how that would go to voir dire as to --

5            THE COURT:  Credentials?

6            MR. PARK:  -- qualifications or credentials.

7            MR. GORMAN:  I think it goes -- he's going to

8    testify about this video.  I think I can -- I assume it's

9    going to be put on the screen for him.  I think this --

10           THE COURT:  Right now this is voir dire on his --

11           MR. GORMAN:  I understand.

12           THE COURT:  -- qualifications to express any

13   opinion as to the rules, organization, structure,

14   leadership and some, maybe, activities in El Salvador of

15   MS-13.  That's what we're talking about in terms of his

16   credentials, so that's all that's relevant right now.

17           MR. GORMAN:  I think the way the gang conducts

18   its business inside the prison in respect to other gangs

19   and other people who are not members of gangs and his

20   ability to testify to that goes to his overall credentials.

21           THE COURT:  I'm not sure I understand that, but

22   you said is he familiar with how people who are not in

23   gangs conduct their business in prison?

24           MR. GORMAN:  Yes.

25           THE COURT:  What does that mean?

1          MR. GORMAN:  How they act in prison.  He says

2     he's going to testify about --

3          THE COURT:  Let's focus on his credentials.  It's

4     limited to MS-13 in El Salvador.  The questions about

5     prisons, I think, are so far fine, but I don't know how

6     asking him whether he's familiar with non-gang members'

7     activities in prisons would be relevant to whether he

8     should be allowed to express opinions about gang members.

9          MR. GORMAN:  All right.

10         THE COURT:  Thank you.

11         (Counsel returned to the trial tables.)

12    BY MR. GORMAN:

13    Q.   Are you familiar with how MS-13 -- the MS-13 gang

14    receives funds in El Salvador?

15    A.   Yes.

16    Q.   And did you receive that information from speaking to

17    MS-13 gang members?

18    A.   On some occasions.

19    Q.   Have you also received that kind of information from

20    reading newspaper articles?

21    A.   I've read them also.

22    Q.   And have you received any information about MS-13 gang

23    members from the internet?

24    A.   I've seen some web pages related to MS-13.

25    Q.   Have you seen some information about how MS-13, the

 1   MS-13 gang, conducts its business from going to

 2   conferences?

 3   A.   When I have attended the courses, that subject is

 4   discussed also.

 5   Q.   How are you able to differentiate how you've received

 6   information from the various sources, such as talking to

 7   MS-13 gang members, the internet and the newspapers?

 8          MR. PARK:   Objection.

 9          THE COURT:   I don't understand your question.

10          MR. GORMAN:   I'll rephrase it.

11   Q.   Can you recall specifically what information you

12   received from talking to prisoners as compared to what

13   information you received from looking on the internet?

14   A.   Well, it's -- the information that has been obtained

15   and confirmed has been through investigations and talking

16   with witnesses about the business of how MS collects money.

17   Q.   And is some of that gotten from the internet also?

18   A.   No, we're talking about the witnesses.

19   Q.   Some of the information, not -- well, I'm going to go

20   on to another topic now.

21          Some of the information you received generally

22   about MS-13 comes from newspaper articles, correct?

23   A.   Well, yes.   Sometimes I read them, and it is related

24   to information that is known.

25   Q.   And some of the information generally about MS-13 is

1   from talking to people, is that right?

2   A.   Yes.

3   Q.   And some of it is from reading newspaper articles?

4   A.   Information is not obtained from that, but it's good

5   to read them to see what else is out there.

6   Q.   Do you recall what specific information you received

7   from the various sources, such as newspaper, talking to

8   people or internet?

9            MR. PARK:  Objection.

10           THE COURT:  Again, I don't understand.

11  Q.   When you receive all this information from these

12  various sources, can you remember specifically which source

13  which information came from?

14           MR. PARK:  Same objection, Your Honor.

15           THE COURT:  Come up here to the bench, please.

16           (Counsel approached the bench.)

17           THE COURT:  Part of my problem is that Mr. Park

18  did outline a lot of different potential sources of

19  information, but nobody has asked him, in his profession or

20  in his job or in his expertise, what he relies on.  And I

21  think he's trying to tell you that -- that while he talks

22  to people, he reads things, he attends conferences and some

23  of it is MS-13 related, what he's trying to say when he

24  said the word confirmed is that that doesn't mean he's

25  going to rely on it.  And that's why, when you're talking

1   about information he has obtained, he gets -- he gets

2   reports from a lot of sources, but that doesn't mean that

3   he, as an investigator for the PNC, accepts it as true

4   without question.  And that's why, I guess, I think the

5   witness is having some difficulty, and that's why I'm not

6   sure I understand what you're asking him.

7          Yes, he may read newspapers.  That's what he

8   said.  It's good to know what's out there.  But that

9   doesn't mean they rely on it.

10          So if you want to focus on in forming conclusions

11  or opinions, you know, that's why -- yes, he may read

12  something, somebody may tell him something, he may agree

13  it's true, he may not, but that's what's important to focus

14  on, not --

15          MR. GORMAN:  I understand.

16          THE COURT:  Okay?  So if you could perhaps focus

17  the questions differently.  Thank you.

18          (Counsel returned to the trial tables.)

19  BY MR. GORMAN:

20  Q.    Concerning the MS-13 gang, do you rely on any of the

21  information that you've received by interviewing witnesses?

22  A.    Yes, that's done also.

23  Q.    Do you rely on any information that you receive from

24  reading newspapers?

25  A.    No.

1    Q.   Do you rely on any information you receive from

2    looking at the internet?

3    A.   No.

4    Q.   Is there any other source of information that you rely

5    on to form your opinions other than speaking to MS-13

6    members?

7    A.   Well, yes.  When you examine evidence and compare it

8    with what the witnesses have said, that gives you a

9    certainty.

10   Q.   What kind of evidence are you talking about?

11   A.   Well, it could be, for example, an examination of

12   phone records of different phone numbers that have been

13   called, or money that has been found from extortions, that

14   type thing.

15   Q.   If you don't rely on any information that you've

16   received from newspapers, why do you read the newspapers

17   about MS-13?

18   A.   Most of us do that, read them.

19   Q.   If you don't rely on any information that you read

20   about MS-13 on the internet, why do you look on the

21   internet?

22   A.   I not only look at MS-13 information, I look up other

23   subjects.  It's good to be informed.

24   Q.   What is your rank in the police department in El

25   Salvador?

1          MR. PARK:  Your Honor, I'll object.

2          THE COURT:  Sustained.

3          MR. GORMAN:  I have no further questions on voir

4     dire.

5          THE COURT:  Any redirect on voir dire?

6          MR. PARK:  No, Your Honor, not on voir dire.

7          THE COURT:  Do you object?

8          MR. GORMAN:  Yes.

9          THE COURT:  Okay.  Come to the bench then for a

10    moment, please.

11         (Counsel approached the bench.)

12         MR. GORMAN:  I object on the grounds that he's

13    not given his true identity.  I object on the grounds that

14    he's going to be testifying about things that are not

15    outside the ken of jurors.  And I object on the grounds --

16         THE COURT:  Like what?

17         MR. GORMAN:  Whatever -- well, I'm going to just

18    say that generally about what he's going to say about the

19    MS-13.  I don't -- I don't know that right now, but I'm

20    going to suggest that what he's -- what I think he's going

21    to testify about are about things that are not outside what

22    a juror would know.

23         I'm also going to testify on the grounds that he

24    doesn't qualify as an expert witness.

25         THE COURT:  Why is that?

1          MR. GORMAN:  I don't think that speaking to MS-13

2    members about their incidents, about what's occurred,

3    qualifies him as an expert to testify in a Maryland court

4    about what's happened in Maryland.  The fact that he's

5    in --

6          THE COURT:  Okay.  He's not going to say anything

7    about what happens in Maryland.  He is being offered as an

8    expert in MS-13 rules, regulations, leadership, structure,

9    organization and activities in El Salvador, period.

10   Absolutely he's not going to be asked about Maryland.

11         MR. GORMAN:  Well, I'd still -- it's still our

12   position that he doesn't qualify.

13         THE COURT:  He's been investigating MS-13 for

14   over ten years as a member of the National Police in El

15   Salvador.  He's spoken with self-identified members,

16   witnesses, victims family members, participated and viewed

17   evidence from search warrants.  He's attended courses,

18   exchanged information, both within and without El Salvador,

19   as it relates to MS-13 in El Salvador, and he's personally

20   participated in the investigations of MS-13 members.

21         He has made clear a lot through the

22   cross-examination that in his work he is discerning about

23   what information he would rely on, and although he's

24   consulted a lot of sources, he does his investigative

25   conclusions based upon a view of the reliability of it.

1          So he's not going to be merely repeating what's

2    in newspaper articles or on the internet, but these will be

3    his opinions.  It's to be limited to the structure, rules,

4    regulations, organization -- I don't know what you mean in

5    terms of activities, but I do not want him to be reporting

6    any incident --

7          MR. PARK:  No.

8          THE COURT:  -- for which he has only hearsay

9    information.

10         MR. PARK:  No, Your Honor, let me just, I guess,

11   proffer it's just going to be asking very general

12   questions.  In your experience or is it your opinion that

13   MS-13 in El Salvador engages sometimes in acts of violence,

14   to include homicide or robbery or other crimes, such as

15   extortion.  And it's going to be very general, and he's not

16   going into any specifics as to what he may have seen or

17   heard in that regard.

18         THE COURT:  Okay.  I'm going to overrule the

19   objection.  You may inquire.

20             (Counsel returned to the trial tables.)

21         THE COURT:  Go ahead, Mr. Park.

22         MR. PARK:  Thank you, Your Honor.

23                 DIRECT EXAMINATION (Resumed)

24   BY MR. PARK:

25   Q.  Mr. Diaz, let me ask you, circling back to the earlier

1    part of your testimony, is La Mara Salvatrucha the same as

2    MS-13?  Are they one and the same?

3    A.   Yes.

4    Q.   And is it a gang that has members who are either

5    initiated or jumped in into the gang?

6    A.   Yes.

7    Q.   Is it an -- well, is it a gang that has some type of

8    organizational structure?

9    A.   Yes.

10   Q.   And, again, just to be clear, we're talking about

11   MS-13 in El Salvador, correct?

12   A.   Yes.

13   Q.   And with regard to MS-13 in El Salvador, in your

14   opinion, is there a component of the organization called a

15   clique?

16   A.   Yes.

17   Q.   Are there different cliques in El Salvador?

18   A.   Of course.

19   Q.   And these cliques of MS-13, do they have identifying

20   names that distinguish one clique from another?

21   A.   Of course.

22   Q.   Could you give us some examples of some of the names

23   of cliques in El Salvador?

24   A.   Yes.  There's a Hollywood clique, Normandy, Sailor,

25   TLS, Guanacos, Villa Marionas, Fulton, Parkview, plenty

1    more.

2    Q.    You mentioned the initials TLS.  Could you tell us,

3    does that stand for anything?

4    A.    Yes.

5    Q.    What does it stand for?

6    A.    It's the name of a clique.  The name is Teclas Locos

7    Salvatruchos.

8    Q.    These various cliques that you've mentioned, are the

9    cliques every associated in any way with a particular

10   region or city or area of El Salvador?

11   A.    Yes.

12   Q.    Okay.  For example, TLS, the Teclas clique, is that

13   associated in any way with any region or city or area of El

14   Salvador?

15   A.    It is located at the city.  The name of the city is

16   Santa Tecla.

17   Q.    You also mentioned a clique, I think, with the name

18   Hollywood?

19   A.    Yes.

20   Q.    To your understanding, is that name of the clique or

21   that clique itself in any way associated with a region or

22   area of El Salvador?

23   A.    No.

24   Q.    Where did that clique get its name?

25   A.    According to what it is known, a place in the United

1    States.

2              MR. GORMAN:  Objection.

3              THE COURT:  Overruled.

4    Q.   Within a particular clique, for example, the Teclas

5    clique in El Salvador, are all the clique members in one

6    particular area or one particular region, or are there

7    sometimes different subsets of the cliques in other parts

8    of El Salvador?

9    A.   They are in a place, in an area in San Salvador, Santa

10   Tecla, but they also move around to other places.

11   Q.   Are there -- within a clique, are there leaders who

12   are designated to run or operate or organize the activities

13   of that particular clique within MS-13?

14   A.   Yes.

15   Q.   What are they called, if anything?  Do they have a

16   particular name or a particular title?

17   A.   They are called clique leaders or clique runners.

18   Q.   Beyond the leadership of a particular clique, within

19   MS-13 in El Salvador, is there any sort of leadership

20   structure, I guess, above the clique level in terms of a

21   hierarchy?

22   A.   Within the MS-13 structure, there are two other

23   levels.

24   Q.   What are those levels?

25   A.   There's a second level.  It's called the program

1    runner.  And there's another level called the ranfleros,

2    which are the leaders of the MS-13.

3    Q.    Have you ever heard the term La Ranfla?

4    A.    The leaders -- the first level leaders are called La

5    Ranflas.

6    Q.    And I think you mentioned a term just now, ranfleros.

7    Are those ranfleros the individuals who comprise or make up

8    La Ranfla?

9    A.    Yes.

10   Q.    And I think you also used the phrase it's the first

11   level.  Would it be fair to say it's, I guess, if it's a

12   top down hierarchy, that the La Ranfla or ranfleros are at

13   the top of that hierarchy?

14   A.    Yes.

15   Q.    Are the members of La Ranfla, are they all from one

16   particular clique of MS-13 in El Salvador?

17   A.    No, from different cliques.  They are leaders from

18   cliques in El Salvador as well as in the United States.

19   Q.    The second level, I think you said, was the level

20   which involved the program runners?

21   A.    Yes.

22   Q.    Can you describe what their role or function is within

23   MS-13?

24   A.    The ranfleros cover all El Salvador, including in the

25   United States.

1          MR. GORMAN:  Objection.

2          THE COURT:  Sustained.  The question is about the

3     program runners.

4     Q.   Mr. Diaz, then explain -- I think you've talked about

5     the ranfleros, but in terms of the program runners, what is

6     their role and function?

7     A.   Well, that's why I gave you the first question -- no,

8     I'm sorry, the first answer.  Because the program runners

9     are limited to a particular region in El Salvador.  They

10    lead certain cliques with the help or the coordination of

11    the national ranfleros, although in El Salvador, according

12    to what our sources or witnesses say, there are people who

13    hold or are in all three levels.

14    Q.   The program runners, you indicated, are restricted to

15    certain areas or regions of El Salvador, correct?

16    A.   They're limited to certain areas, yes, but that could

17    change.

18    Q.   And can you give us an estimate as to the range or

19    number of program runners that there might be in El

20    Salvador within MS-13?

21    A.   Could be 30, 24 to 30 runners, but they have other

22    people who collaborate with them.

23    Q.   The ranfleros who are part of La Ranfla, I think you

24    indicated, at the top of the hierarchy, how many ranfleros

25    are there?

1    A.   At first they kept saying that there were 13 of them,

2    the national as well as the international leaders.

3    However, some gang members arrive to El Salvador from the

4    United States and from the United States --

5              MR. GORMAN:  Objection.

6              THE COURT:  Overruled.

7    A.   -- and from the United States to El Salvador, and it

8    depends on whether they're out of prison or in prison.

9    Q.   Within the leadership structure of MS-13 in El

10   Salvador, are there certain individuals who have been

11   designated to keep in contact with MS-13 in other

12   countries?

13   A.   Yes.  There are others named coordinators.

14   Q.   And these coordinators, what is their role or function

15   within MS-13 in El Salvador?

16   A.   They carry out certain missions or they coordinate

17   certain activities that will be taking place within the

18   gang.

19   Q.   Are there communication -- well, strike that.

20           Is part of the function of these international

21   coordinators the receipt or transmission of information

22   from MS-13 in El Salvador?

23   A.   Yes.

24   Q.   Are there certain cliques within MS-13 that are either

25   larger or stronger than other cliques within MS-13?

 1   A.   Yes.

 2   Q.   Are there certain cliques within MS-13 that have more

 3   authority or weight, if you will, within MS-13?

 4   A.   Yes.

 5   Q.   Are there certain cliques within MS-13 that are older

 6   or more established than other cliques within MS-13?

 7   A.   Yes.

 8   Q.   Within MS-13 in El Salvador, can you give us an

 9   opinion as to where Teclas Locos Salvatruchos, or the TLS

10   clique, falls within that spectrum of cliques in terms of

11   their authority, their -- how old they are and how much

12   influence they might -- that clique might have within MS-13

13   in El Salvador?

14             MR. GORMAN:  Objection.  Relevance.

15             THE COURT:  Overruled.

16             THE INTERPRETER:  Counsel, I have to ask you to

17   ask the question again.

18             MR. PARK:  Let me see if I can try.

19   Q.   Could you give us an opinion as to where TLS or Teclas

20   Locos Salvatruchos falls within that spectrum of various

21   cliques in terms of its ages, in terms of its authority or

22   influence vis-a-vis other cliques of MS-13 in El Salvador?

23   A.   It's one of the most recognized cliques within the

24   gang.  They say they carry the most weight based on the

25   actions or the activities that they have taken on behalf of

1    the gang, if you will.

2    Q.   Do you know or do you have an opinion as to whether or

3    not TLS leaders have any role within La Ranfla?

4    A.   Yes.

5    Q.   And is TLS represented among the ranfleros?

6    A.   Yes.

7    Q.   Are all the cliques within MS-13 represented among the

8    ranfleros?

9    A.   No.

10   Q.   In your opinion, or based on your experience and your

11   understanding, how many different cliques are there within

12   MS-13 in El Salvador?

13   A.   About 300, including some from the United States that

14   are over there.

15   Q.   Over there meaning in El Salvador?

16   A.   Yes.   The ones who have immigrated from here to there.

17   Q.   And, again, just to be clear, immigrated from the

18   United States to El Salvador, correct?

19   A.   Yes.  Yes.

20   Q.   In your opinion, does imprisonment, the incarceration

21   of an MS-13 leader, stop or somehow inhibit the leadership

22   structure of -- or the operations of MS-13?

23   A.   It does not limit it, no.

24   Q.   Are there MS-13 members who have, in fact, been

25   incarcerated in El Salvador and who still function within

1    the gang?

2    A.   Yes.

3    Q.   Is there any sort of organization among MS-13

4    members -- strike that.  Withdrawn.

5             MS-13 members who are in prisons in El Salvador,

6    is there any sort -- any degree of organization among these

7    MS-13 members in prison?

8    A.   Yes.

9    Q.   Within the prisons in El Salvador, have there been any

10   issues or concerns regarding possible escapes of MS-13

11   members from these prisons?

12   A.   Yes.

13   Q.   Have there been -- within prisons in El Salvador that

14   house MS-13 members, have there been organized attempts by

15   MS-13 members to smuggle in communication methods or

16   weapons?

17             MR. GORMAN:  Objection.  Relevance.

18             THE COURT:  Sustained.

19   Q.   Going to communication, you spoke earlier about cell

20   phones, I think, or records that you've reviewed.  To your

21   understanding, is there communication among MS-13 members

22   both who are within prison and not in prison?

23   A.   Yes.

24   Q.   You had indicated, I think, earlier that wilas is one

25   method of communication?

1    A.    Yes.

2    Q.    Is that a method of communication that has been used

3    frequently by MS-13 members to communicate among and to

4    members in prison?

5    A.    Yes, they communicate through wilas or cell phones or

6    through the people who go visit them.  They carry some type

7    of message.

8    Q.    MS-13 cliques in El Salvador, do they hold regular

9    meetings?

10   A.    Yes, they do meet.

11   Q.    The program runners, do they have any sort of regular

12   meeting among themselves, the program runners?

13   A.    They do that, too.

14   Q.    The ranfleros or the members of La Ranfla, do they

15   have regular meetings among themselves, among the

16   ranfleros?

17   A.    Yes.

18   Q.    Are -- the meetings of the ranfleros, are they all in

19   person, face to face, with each member of the ranflero

20   there in one location?

21   A.    Generally, no.  It's through the phone.

22   Q.    At the meetings that are conducted by MS-13 members,

23   whether at the level of La Ranfla or program runners or the

24   cliques, is there ever any discussion regarding the rules

25   of MS-13 and the activities of MS-13?

1   A.   Yes.

2   Q.   You'd indicated earlier that MS-13 is a gang which has

3   a membership structure or membership.  Are members required

4   to go through any sort of initiation process in El Salvador

5   prior to joining the gang?

6   A.   Well, when they're initiated, we all know the method

7   of the 13 seconds.  But the person will climb up to

8   different levels, upward, according to the kind of crimes

9   that he commits and according also to the organization.

10  Q.   You indicated I think we all know or you said we all

11  know what happens with the 13 seconds.  Can you just be

12  clear as to what -- what exactly happens during a member's

13  initiation process?

14  A.   Thirteen seconds.

15          THE INTERPRETER:  I believe the interpreter said

16  30.  Corrected.  Thirteen seconds.

17  Q.   What happens during that 13 seconds?

18  A.   The person who is being jumped into the gang, they

19  beat him up for 13 seconds, plus other tests that they make

20  him go through.

21  Q.   Like what?

22          MR. GORMAN:  Objection.  Relevance.

23          THE COURT:  Overruled.

24  A.   When a person is initiated, they don't only apply the

25  13-second method.  He has to fulfill certain missions, such

1   as robbery, and also you have to go kill somebody.  That's

2   another -- that's another method that they use to be able

3   to join the gang.

4   Q.   Are dues --

5            MR. GORMAN:  Objection.  Move to strike.

6            THE COURT:  Overruled.

7   Q.   Are dues paid by MS-13 members at any of these types

8   of meetings?

9   A.   They collect money.  Sometimes they have to give a

10  certain amount of money.  Sometimes it is required.

11  Q.   What is this money used for in MS-13 in El Salvador?

12  A.   With that -- with that money, they buy food for those

13  who are in prison or detained.  Or they -- they buy

14  weapons.  They pay for lawyers, vehicles.

15  Q.   Have you ever heard the term greenlight?

16  A.   Yes.

17  Q.   What, if any, significance does that term have, the

18  term greenlight have, within MS-13 in El Salvador?

19           MR. GORMAN:  Objection.

20           THE COURT:  Overruled.

21  A.   When it is said that someone has been greenlighted,

22  means that they have coordinated to kill that person in any

23  form that they can.

24  Q.   To be clear, is it they meaning the gang, MS-13 has

25  coordinated or decided to kill the person who has been

1  greenlighted?

2  A.    Yes.

3  Q.    Have you ever heard the term chavala used in the

4  context of MS-13?

5  A.    Yes.

6  Q.    How have you heard that term used within MS-13 in El

7  Salvador?

8  A.    They refer to chavalas when they're talking about the

9  18th, the 18th Gang.

10  Q.    And what is the 18th Gang?  Is that the same as MS-13?

11  A.    It's the same.  It's their number one enemy out there

12  on the streets of El Salvador.

13  Q.    Is there any rule within MS-13 in El Salvador

14  regarding what MS-13 members are required to do if they

15  encounter a chavala?

16  A.    The rule of each gang is if they find each other, they

17  have to kill each other.

18  Q.    Are there any rules within MS-13 in El Salvador

19  regarding whether or not it's permissible to cooperate with

20  law enforcement?

21  A.    No.

22  Q.    Is it permitted within MS-13 for a member to cooperate

23  with law enforcement?

24  A.    No.

25  Q.    What would happen to a member of MS-13 in El Salvador

1    if he or she were to be found to have cooperated with law

2    enforcement?

3    A.    They would be killed.

4    Q.    Do MS-13 members in El Salvador utilize graffiti?

5    A.    Yes.

6    Q.    What is the purpose of putting graffiti on walls or

7    other locations?

8    A.    To mark their territory of operations or to show a

9    certain area.

10   Q.    What role, if any, does intimidation play within the

11   MS-13 gang in El Salvador?

12   A.    Excuse me?

13   Q.    What role does intimidation play within the gang in El

14   Salvador, within MS-13 in El Salvador?

15   A.    Very well.  It's used very often in El Salvador at

16   present, you know, through threats or other things they do.

17   Q.    Are tattoos a component of MS-13 culture or the way --

18   strike that.

19              Do MS-13 members get tattoos signifying their

20   membership in the gang?

21   A.    Yes.

22   Q.    Can you describe the types of tattoos that MS-13

23   members put on their bodies to signify their membership in

24   MS-13.

25   A.    Yes.  Some tattoos are MS, 13, Mara Salvatrucha.

1    These are some of the ones that indicate affiliation to the

2    MS in El Salvador.

3    Q.    Are people who have not been jumped into the gang, are

4    they allowed to put an MS-13 or Mara Salvatrucha or other

5    tattoo related to MS-13 on their bodies?

6    A.    No.

7    Q.    Do MS-13 members in El Salvador use any hand signs or

8    hand gestures to signify their affiliation with or

9    membership in MS-13?

10   A.    Yes.

11   Q.    Can you describe what that hand gesture -- or describe

12   what types of hand gestures they use.

13   A.    They do what they refer to as the claw with the hand.

14   Q.    Do they sometimes -- do MS-13 members in El Salvador

15   sometimes gesture with their fingers or their hands or

16   their bodies to form the letters M or S or a one -- or the

17   numbers one and three?

18   A.    Yes.

19   Q.    Are individuals in El Salvador who are not members of

20   MS-13 permitted to flash or show or display these types of

21   hand gestures that you've just described?

22   A.    No.

23   Q.    What would happen to an individual in El Salvador if

24   that person were to either have a tattoo related to MS-13

25   or show a hand gesture related to MS-13 without permission

1    of the gang?

2              MR. GORMAN:  Objection.  Speculation.

3              THE COURT:  Overruled.

4    A.   Well, they say that if someone has -- puts on a tattoo

5    like that, well, the person, first of all, runs the risk

6    that a rival gang will see that person, or if the MS-13

7    sees, he could be killed.

8    Q.   I had asked you earlier about what role intimidation

9    plays within MS-13 in El Salvador.  I guess my next

10   question is what role, if any, does violence play within

11   MS-13 in El Salvador?

12   A.   It's the same as intimidation.

13   Q.   Is violence a component or part of the -- strike that.

14              Within MS-13 in El Salvador, what role, if any,

15   does controlling or marking your territory in a

16   neighborhood have for the gang?

17   A.   It's a very large one.  Well, at present, they're not

18   using graffiti very much.  Well, now it's the violence, the

19   acts they commit.  For example, in a case of extortion, if

20   someone doesn't pay the amount they're asking for, that

21   person is killed.  That's the type of violence that is

22   occurring.

23              MR. PARK:  Court's indulgence, please.

24   Q.   Last question to you, at least on this particular

25   section.

1          Mr. Diaz, you talked about extortion.  Have you

2  ever heard the term, within the context of MS-13 in El

3  Salvador, the term paying rent to the gang?

4  A.   Yes.

5  Q.   And what is that?  What's the significance of that

6  phrase within the context of MS-13 in El Salvador?

7  A.   Well, they refer it to us the rent, but actually it's

8  the crime of extortion that is being committed.

9  Q.   What types of individuals or businesses -- or who is

10  being charged rent, I guess, is the question?

11  A.   Different types of businesses, people, the victims

12  they target.

13  Q.   Within the context of MS-13 in El Salvador, have you

14  ever heard or seen or somehow encountered the phrase mata,

15  viola, controla, or viola, mata, controla?

16  A.   Yes.

17  Q.   And have you heard -- or, rather, is this phrase a

18  phrase that you, again, have either seen in graffiti or

19  seen in correspondence or somehow seen or heard said in the

20  context of MS-13?

21  A.   Yeah.  This is sort of like a slogan that they use and

22  shout out, and I've seen it in graffiti and in letters and

23  I've even seen -- heard them saying it.

24          MR. PARK:  Your Honor, may we approach briefly?

25          THE COURT:  Um hum.

1            (Counsel approached the bench.)

2            MR. PARK:  Your Honor, that's all I was intending

3    to ask the witness in terms of his expert testimony or that

4    component of his testimony.  I'm now intending to go into,

5    I guess, a factual component, and I just want to proffer to

6    the Court and counsel, I guess, what I'm intending to do is

7    to start showing the video, Otis Street 1, I think, the

8    Otis Street video, and just have him identify the

9    location -- some locations that he sees in that video.

10            For example, he's been personally to

11   Quezaltepeque prison.  I'll show him the diagram of that

12   prison, ask him about what his knowledge is in terms of

13   whether or not prisoners are allowed to have street clothes

14   in prison, that type of thing.  And then I'll also ask him

15   questions about that one particular day when they're

16   playing soccer, if they're -- he knows of, for example, an

17   inmates day where family and friends were allowed to come

18   and they played soccer.

19            And then ask him about whether he recognizes

20   certain portions of the video -- after what's in the

21   prison, whether he recognizes portions of El Salvador,

22   specifically San Salvador, and the neighborhoods in that

23   location.

24            MR. JAFFE:  Court's indulgence.

25            THE COURT:  Um hum.

1          MR. PARK:  Mr. Jaffe actually raised a very good

2     point.  I wanted to flag for counsel as well we do not

3     intend and have no interest in asking the witness about

4     whether or not he has encountered the defendant, Victor

5     Ramirez, in El Salvador in prison.  I just wanted to flag

6     for counsel in terms of him asking about that because the

7     witness has told us that he has encountered the defendant

8     in prison.  He has seen him in prison.  He has seen him

9     there.  But obviously we're just flagging that because --

10    at Quezaltepeque prison.  He knows that he's been charged

11    with crimes in El Salvador, was incarcerated for certain

12    crimes.  We're not asking about that.  We're not going

13    anywhere near that.  I just wanted to flag that in terms of

14    what the witness knows so that counsel is aware of that.

15         THE COURT:  Are you going to have him do anything

16    with regard to the transcript?

17         MR. PARK:  Yes.  Yes.  That's the other thing,

18    too.  We're talking about --

19         THE COURT:  But you're going to make it clear

20    that it's based upon the self-identification?

21         MR. PARK:  Yes.  Absolutely.

22         THE COURT:  And not voice identification?

23         MR. PARK:  Well, only voice identification to the

24    extent that someone's already self-identified themselves

25    and that same voice is then being heard.  For example,

1    Cisco is, you know, using the camera on a number of

2    occasions.

3             THE COURT:  But not the defendant.

4             MR. PARK:  No.  No.

5             THE COURT:  Do you want me to tell the jury that

6    we're moving from one phase of the witness's testimony to

7    another?  It's going to be evaluated under different

8    standards and I will explain?  Do you want me to do that

9    now?

10            MR. GORMAN:  Yes.

11            MR. PARK:  Thank you.

12            (Counsel returned to the trial tables.)

13            THE COURT:  Members of the jury, I apologize for

14   that interlude.

15            During the closing instructions, I'm going to

16   tell you about evaluating credibility of witnesses.  Some

17   witnesses have been permitted to testify based upon their

18   training and experience, and we call them experts.  I will

19   give you some particular instructions about evaluating that

20   kind of testimony.  This witness has just been testifying

21   in that capacity, as I'm sure you understand.

22            He's going to switch hats, though, and move to a

23   different type of testimony now, that which is based on

24   what he says is his personal experience and knowledge and

25   no longer based upon his experience and training, and

1    Mr. Park is now going to switch to that phase of the

2    witness's testimony.  Go ahead.

3              MR. PARK:  Thank you, Your Honor.

4    BY MR. PARK:

5    Q.   Mr. Diaz, I'd like to first draw your attention to

6    Government's Exhibit AV 2.  I'm not sure if you have a copy

7    of that up there with you.  Do you have a copy of this,

8    sir?

9    A.   Yes.

10             THE COURT:  Are you asking the -- are we supposed

11   to take ours out or not?

12             MR. PARK:  I was going to in a second, but that's

13   fine if the jury would like to do that now.

14             THE COURT:  Okay.  But don't look at any

15   particular page again unless somebody directs your

16   attention to it.

17             MR. PARK:  Thank you, Your Honor.

18             THE COURT:  We don't have it on if that's -- do

19   you want the --

20             MR. PARK:  No, no.  Just for the interpreters.

21   We will not be going through and reading through portions

22   of the transcript, so just so the interpreters are okay

23   with that.

24   Q.   Mr. Diaz, first of all, do you recognize this

25   document, AV -- Governments Exhibit AV 2, not only the

1    cover, but then also what's inside, just flipping through

2    the various pages of this particular document?

3    A.    Yes.

4    Q.    And do you also know or have you spoken with an

5    individual named Gladys Segal?

6    A.    Yes.

7    Q.    And have you spoken with her about a transcription and

8    translation that she prepared of a videotape?

9    A.    Yes.

10   Q.    Okay.  And have you discussed with her also -- strike

11   that.

12          During the course of your conversations, did you

13   have discussions with her about what individuals had -- or

14   how individuals had identified themselves in the video?

15   A.    Yes.

16   Q.    I want to draw your attention to page 1 and ask if the

17   jury could turn to page 1 of the video -- or of the

18   transcript, excuse me, AV 2.

19          And, first of all, I guess, the question is,

20   Mr. Diaz, that particular video, that we're speaking of,

21   have you actually viewed that video?

22   A.    Yes.

23   Q.    And, in fact, have you viewed it on a number of

24   occasions?

25   A.    Yes.

1    Q.    In viewing the video, did you watch the video and

2    listen to the audio and see and hear individuals identify

3    themselves by certain names?

4    A.    Yes.

5    Q.    And then after viewing the video, did you provide

6    Ms. Segal with the names of those individuals who had

7    identified themselves on the video.  For example, on page

8    1, where it says Cisco on the far left-hand side?

9    A.    Yes.

10   Q.    Did you assist -- strike that.

11         Did you have any role in preparing this document

12   aside from that very far left column where it has the names

13   of certain individuals or the letters MV?

14   A.    Yes.

15   Q.    Let me ask it this way.  Did you participate in the

16   transcription and translation of this particular document?

17   A.    Some portions, yes.  Not in the transcription.

18   Q.    Okay.  Did you -- strike that.

19         Have you ever met Ms. Segal?

20   A.    No.

21   Q.    Have you spoken with her about, I guess, the

22   identifying information rather, who is speaking and what

23   names should be put on the left-hand column of this

24   particular transcript?

25   A.    Yes.

 1   Q.   In providing information to Ms. Segal about what names

 2   should be put on the far left-hand column of each page of

 3   this transcript translation, did you base that upon the

 4   words spoken by an individual in the video and how they

 5   identified themselves?

 6   A.   Yes.

 7            MR. GORMAN:  Objection.  Could we approach?

 8            THE COURT:  Come on up.

 9            MR. GORMAN:  Move to strike the answer.

10            THE COURT:  Let me hear the issue before I

11   decide.

12            (Counsel approached the bench.)

13            MR. GORMAN:  I guess my objection goes to the

14   lack of foundation and maybe impossibility of what he's

15   testifying about.  He testified that he never met

16   Ms. Segal, so how could he have shown her what -- who was

17   on the video if they weren't in the room together?

18            MR. PARK:  I'll proffer they had a lengthy

19   conference call where they had the video and time markers

20   and were going through it, but what I'm trying to focus the

21   witness on, and this may be by a lack of phrasing or a lack

22   of ability to clearly articulate it, but his role in this

23   was because we wanted to separate out Ms. Segal's

24   transcription translation from identification of the people

25   speaking, as we've done in previous occasions with other

1    exhibits.  Obviously that was a little bit different where

2    we had, you know, for example, Mr. Cruz, Noe Cruz --

3                THE COURT:  Don't muddy things up here.

4                He doesn't know these people?  He honestly put

5    the names on here only because he heard them self-identify?

6                MR. PARK:  He knows some of them but not all of

7    them.

8                THE COURT:  Where in this transcript does Cisco

9    identify himself?  Do you want to show it to me?  Where on

10   here does Trece identify himself?  Where does he identify

11   himself?  Where does Trece identify himself?

12               MR. PARK:  Trece identifies himself, Your Honor,

13   and Cisco does, too.  I'll find it, Your Honor.  And there

14   was one occasion where Cisco has the camera and then turns

15   it to himself after, for example, he videotapes --

16               THE COURT:  That's the only basis on which he's

17   doing this?

18               MR. PARK:  No, Your Honor.  He also bases it

19   on --

20               THE COURT:  You see, that's where I have a

21   problem.  I don't have a problem with the impossibility.

22   He can look at the same tape at the same time and the same

23   transcript that she's already done and say the person

24   saying this is Cisco and write down Cisco.  I don't have a

25   problem with that.

1          MR. PARK:  Right.

2          THE COURT:  But I am very concerned about your

3    telling me and this jury that -- why did you have him do

4    it?  Why can't any Spanish speaker listen to it and say

5    this person identified himself as Cisco and that's the same

6    person every other place?  You didn't use him for that

7    reason.  You used him because he knows some of these folks.

8          MR. PARK:  He knows some of the people.  I mean

9    part of the reason was obviously he knows some of the slang

10   and was listening to it and watching it and just, you know,

11   in terms of his ability to go through and listen to what

12   these people are saying and pars through whatever slang or

13   whatever --

14         THE COURT:  It might have been easier for him --

15         MR. PARK:  It definitely was easier for him to do

16   it.

17         THE COURT:  -- than it has been for others, but

18   there could have been even more people who have not

19   personally --

20         MR. PARK:  There could have.  I don't know it

21   poses a problem in terms of -- what I'm trying to avoid is

22   any sort of factual testimony by this individual as to his

23   knowledge of these individuals in El Salvador.  That's

24   what -- I could go and ask him about have you met Cisco?

25   Have you met Trece?  Have you seen -- or at least have you

1    seen these individuals --

2              THE COURT:  I think Mr. Gorman needs to know.

3              MR. PARK:  -- in prison?

4              THE COURT:  I, frankly, just suggest that you

5    just say did you supply the names to put in that column

6    based upon the names you heard them use on this tape.

7              MR. PARK:  That's fine.

8              THE COURT:  And if he says yes, if he understands

9    it, that's fine.  If he doesn't, you've got a problem.

10             But, Mr. Gorman, you know that he also knows some

11   of these folks, so --

12             MR. GORMAN:  I know it now.

13             THE COURT:  -- you may end up opening the door if

14   you challenge him on that.

15             MR. GORMAN:  I understand.

16             MR. PARK:  And that's what I -- and I apologize

17   if we were not clear on this, but we tried to -- in talking

18   with the witness before testifying, I wanted to make clear,

19   and I did make clear with him, can you testify that these

20   names come from individuals speaking and self-identifying

21   or are you using any information that you have from your

22   investigations --

23             THE COURT:  Well, just ask him that question

24   straightforward because he's getting very confused.

25             But in terms of the fact that they were not in

1    the same room at the same time, I don't think is a problem.

2            MR. GORMAN:  Well, I'm going to also object on

3    the point that the Court brought up.

4            THE COURT:  Right.  I -- you need to make it very

5    clear what he's basing this speaker identification on.

6            (Counsel returned to the trial tables.)

7    BY MR. PARK:

8    Q.   Mr. Diaz, let me try this and ask you, the names

9    listed on the far left column of this particular

10   transcript, when you provided that to Ms. Segal, or

11   provided that information to Ms. Segal, was that based on

12   the information or the self-identification of these

13   individuals within the video when you watched it?

14   A.   Yes.

15   Q.   I asked you earlier, Mr. Diaz, whether or not you'd

16   had a chance to review the video?

17   A.   Yes.

18   Q.   And I'm going to --

19           MR. PARK:  Actually, Your Honor, we're not going

20   to be using the transcript any longer, so I'm not sure if

21   the jurors will need to ...

22           THE COURT:  Okay.

23           MR. PARK:  Ms. Derro, just a heads up that I'm

24   not going to do the video just yet, but we will be

25   switching over shortly from the document camera to, I

1    guess, the AV input on the Government's counsel's desk.

2              THE CLERK:  Okay.  We'll attempt it again.

3              MR. PARK:  Thank you, Ms. Derro.

4    Q.   Before we get to that, Mr. Diaz, let me ask you this.

5    Are you familiar with a place called Centro Penal de

6    Quezaltepeque?

7    A.   Yes.

8              MR. PARK:  And if I could actually just get the

9    interpreter to translate that, if possible, or interpret

10   that?

11             THE INTERPRETER:  It's -- what is it, penal

12   central?

13             MR. PARK:  Right.

14             THE INTERPRETER:  It's centro penal.  Penal

15   center or prison of Quezaltepeque.

16   Q.   And have you been there yourself, sir?

17   A.   Yes.

18   Q.   Is that a prison that's located in El Salvador?

19   A.   Yes.

20   Q.   When you reviewed the videotape that we were speaking

21   of earlier, did you see any images that depicted the

22   prison -- Quezaltepeque prison in El Salvador?

23   A.   Yes.

24   Q.   Have you been there on a number of occasions?

25   A.   Yes.

1    Q.    From 1998 up until now, can you give us an estimate as

2    to how many times you've been to that location?

3    A.    Probably some 15, 10 times.

4    Q.    It's fair to say that was in your capacity as a law

5    enforcement officer, correct?

6    A.    Yes.

7    Q.    Showing you Government's Exhibit ES 2.

8              MR. PARK:  And, Ms. Derro, if we could get the

9    document camera up.  Sorry.

10             THE COURT:  Are the jury monitors on?

11             THE CLERK:  No, not yet.  I have to -- well, they

12   might be.  Are they on yet?

13             JUROR:  No.

14             THE COURT:  Okay.

15   Q.    At the top there, Mr. Diaz, do you see -- is that how

16   you spell Centro Penal de Quezaltepeque?

17   A.    Yes.

18   Q.    Do you recognize this diagram as a diagram that

19   depicts the general layout of the prison?

20   A.    Yes.

21   Q.    Does this diagram accurately reflect or depict the

22   layout of the prison in 2004, 2005 and even today?

23   A.    Yes.

24   Q.    Sir, on this particular screen, you can look on the

25   touch screen and you can actually touch it and make a

1   diagram.  Can you -- could you circle, just generally

2   speaking, what portion of this diagram shows the area where

3   they've got the jail cells or the locations where prisoners

4   are housed?

5   A.   The section where it says Sector Uno, Sector Dos --

6   Sector 1, Sector 2, Sector 3, Sector 4.

7   Q.   All right.  So if I'm drawing here on the screen, it's

8   maybe not exactly right, but that general area that I've

9   drawn with the red outline, is that the area in which jail

10  cells are located?

11  A.   Yes.

12  Q.   What's located where I'm, again, putting a red box

13  around?  What's located at that location?

14  A.   It's the area where the school is located, where they

15  give some classes, some rehabilitation training to the

16  prisoners.

17  Q.   I'm going to circle or outline an area in red on the

18  lower right-hand portion of the screen.  Do you see that,

19  sir?

20  A.   Yes.

21  Q.   What is located there?

22  A.   The soccer field of the prison or penal center in

23  Quezaltepeque.

24  Q.   Just to be clear, is that a grassy area where they

25  play soccer?

1   A.   Yes.

2   Q.   Have you yourself seen, physically been to this

3   particular area where they play soccer?

4   A.   Yes.

5   Q.   In this Quezaltepeque prison in El Salvador, are

6   prison uniforms issued?

7   A.   No.

8   Q.   Do prisoners just wear street clothes that have been

9   provided to them by family members or other people?

10  A.   Yes.

11  Q.   Are you familiar with a day or event or holiday called

12  the inmates day or day of the prisoner?

13  A.   Yes.

14  Q.   What happens on that particular day?

15  A.   That is a day that has been set aside called inmate

16  day where they can perform certain types of activities.

17  Q.   Does that include playing soccer?

18  A.   Yes.

19  Q.   Are friends and family permitted to go within the

20  prison walls on that particular day?

21  A.   Yes.  As a matter of fact, it's a free day.  It's

22  called a free day or an off day, where all kinds of people

23  can come in.

24        MR. PARK:  Sir, if I could just ask Mr. Diaz to

25  make sure you get the microphone up close to you.  Thank

1    you.

2            And, Ms. Derro, I would like to put up the video

3    at this point, or at least the screen.

4            MR. GORMAN:  Your Honor, I'm going to have a

5    continuing objection to the identifications.

6            THE COURT:  Okay.  We're not --

7            MR. PARK:  We're not doing it yet.

8            THE COURT:  Understood.

9    Q.   Sir, I'm going to put on the screen a portion of the

10   video and ask you if you recognize the location where this

11   particular video is shot.

12           I'm going to play a portion of the video starting

13   at I, guess, 1:40.  I'm not going to put the sound on.

14   Just more if you can just visually look at what's being

15   shown on the screen, and then I'm going to ask you if you

16   recognize what's shown there.

17           Let me also jump, I guess, to 3:20.  And I've

18   frozen the screen there, sir, at the 3 minute and 20 second

19   mark.  Do you recognize that location?

20   A.   Yes.

21   Q.   And where is that, sir?

22   A.   This is Quezaltepeque penal center or prison.

23   Q.   Sir, I'm circling in red here a portion of the screen

24   on the upper left-hand corner.  Can you tell us what's

25   shown there in the red circle?

1    A.    It's a watchtower.  That's where the people that

2    are -- the security on the prison, they have a personnel

3    from security there.

4    Q.    I want to go now to the 6 minute and 21 second mark.

5              Actually, I'll just do this.  The six minute

6    mark, do you recognize that as also being within the

7    Quezaltepeque prison within El Salvador?

8    A.    Yes.

9    Q.    Now, have you had occasion to again review the

10   entirety of this video, in particular the first portion of

11   this video?

12   A.    Yes.

13   Q.    And did you see and then also hear people saying

14   certain things or identifying themselves during the course

15   of that first part of the video?

16   A.    Yes.

17   Q.    I'll play a portion of it just as we're scrolling

18   through, but did you recognize this early section as all

19   occurring within the Quezaltepeque prison in El Salvador?

20   A.    Yes.

21   Q.    In listening to or watching the video, did you hear a

22   reference to Maryland?

23   A.    Yes.

24   Q.    To your understanding and knowledge, is there any

25   region in El Salvador called Maryland?

 1   A.   No.

 2   Q.   During this video, did you hear any reference to the

 3   word "los" used by people speaking here?

 4   A.   Yes.

 5   Q.   And when you heard that in certain contexts, what were

 6   the -- what were they referring to?

 7   A.   Well, they were greeting other members, other gang

 8   members that were in the United States.

 9   Q.   There was also a reference, I think, in the transcript

10   and in the video -- strike that.

11        Did you hear the word Sivar used during this

12   video?

13   A.   Yes.

14   Q.   What did that refer to?

15   A.   San Salvador.

16   Q.   I'm going to scroll now to the 49 minute mark, 49:21,

17   and I'm going to play a portion of this, again, from about

18   49:21 through about 49:49.

19        I'll actually speed it up just a little bit, too.

20   I'm going to ask you if you recognize any of these

21   locations that are depicted in the video.  Do you recognize

22   that location?

23   A.   Yes.

24   Q.   Where is the video being taken in that segment?

25   A.   San José El Pino community in Santa Tecla.

1   Q.   Is Santa Tecla a city or town in El Salvador?

2   A.   It's a city in El Salvador.

3   Q.   And I think you said the community of San José El Pino

4   or Pino?

5   A.   San José El Pino.

6   Q.   Is that still part of Santa Tecla?

7   A.   Yes, it's an area in Santa Tecla.

8   Q.   And which department or state is Santa Tecla located

9   in?

10  A.   La Libertad state.

11  Q.   La Libertad?

12  A.   Yes.

13  Q.   I want to now scroll to the 50 minute and 27 second

14  mark.

15          Actually, starting from around 50:25 and

16  scrolling through.  Sir, do you recognize this as also

17  being taken in San José El Pino of Santa Tecla?

18  A.   Yes.

19  Q.   And have you yourself seen graffiti like this in Santa

20  Tecla?

21  A.   Yes.

22  Q.   Going to the one hour and five minute and nine second

23  mark.  Or ten seconds, I guess.  Do you see that, sir?

24  A.   Yes.

25  Q.   First of all, do you recognize that graffiti as

 1   being -- well, have you ever seen that type of graffiti

 2   before?

 3   A.   Yes.

 4   Q.   Have you ever seen individuals flashing a hand sign

 5   similar to what's shown in the graffiti here?

 6   A.   Yes.

 7   Q.   Have you ever seen or been to this particular building

 8   before?

 9   A.   Yes.

10   Q.   Where is this building located?

11   A.   In San José El Pino community.

12   Q.   What type of building is this?

13   A.   It's a community house.  That's what it's called.

14   Q.   What happens at the community house?

15   A.   It's a house for community events, and it is managed

16   or administered by the mayor's office, in this case the

17   mayor in Santa Tecla.

18   Q.   Which is part of the government, correct?

19   A.   Yes.

20        MR. PARK:  Just for the record, too, during the

21   witness's last portion of testimony, I was showing on the

22   screen a portion of the video from the minute five -- one

23   hour, five minute, nine or ten second mark up to the one

24   hour, five minute and 45 second mark.

25   Q.   Sir, jumping ahead to the one hour, six minute mark

1    and letting it play just for a little bit, do you

2    recognize, first of all, where this video is shot?

3    A.    Yes.

4    Q.    Where is that?

5    A.    Still the El Pino community, near the community house.

6    Q.    And are these, I guess, a series of steps that are

7    near the community house?

8    A.    Yes.

9    Q.    What is the significance of the paint and the colors

10   of paint that are used there on those steps?

11   A.    They are the colors of a political party that uses a

12   political party in El Salvador.

13   Q.    And painted over this second step right here, did you

14   recognize any graffiti that's associated with MS-13?

15   A.    Yes.

16   Q.    Going ahead to the one hour, 20 minute and 10 second

17   mark.  Let me play a little bit here.

18           Do you recognize what's being shown in this

19   particular part of the video?

20   A.    Yes.

21   Q.    Where is that?

22   A.    It's still in the El Pino community, but right next or

23   adjacent to it there's a community called San Rafael.  It's

24   where the clique Teclas resides.

25   Q.    Do you see on the screen there -- this is at the one

1    hour, 20 minute and 35 second mark where it says class de

2    coslo (phonetic).  Do you see that, sir?

3    A.   Yes.

4    Q.   Have you ever seen graffiti like that in parts of

5    Santa Tecla or San Salvador?

6    A.   Yes.

7              MR. PARK:  Court's indulgence.

8              Your Honor, may we approach briefly?

9              THE COURT:  Sure.

10             (Counsel approached the bench.)

11             MR. PARK:  I think that's all I have, Your Honor,

12   on direct, but I -- we're close to the lunch hour.  If I

13   could just keep direct open just to check my notes to be

14   sure I didn't miss anything.  I was paring down things just

15   to kind of make sure we --

16             THE COURT:  I'm sure your cross is going to be

17   more than five minutes or not?

18             MR. GORMAN:  It's going to be more than five

19   minutes.  Not significantly more.

20             THE COURT:  So we wouldn't finish before lunch.

21             MR. PARK:  And he is the last witness, Your

22   Honor.

23             THE COURT:  I understand that.  I was thinking we

24   could try to finish, but I don't think we can, so we'll

25   come back at 2:00.  It's okay.  It's fine.

1          MR. PARK:  Okay.  Thank you.

2          (Counsel returned to the trial tables.)

3          THE COURT:  Okay.  We've reached an appropriate

4    time for us to take our lunch recess.  I'll let you know,

5    members of the jury, it won't be a long day today.  We do

6    have more evidence, though, when we come back at 2.  Okay?

7          Take a lunch recess.  We'll resume at 2:00.

8          MR. PARK:  Thank you, Your Honor.

9          (Luncheon recess.)

10          THE COURT:  Have we completed the direct?

11          MR. PARK:  We have, Your Honor.

12          THE COURT:  Bring in the witness and the jury,

13    please.

14          (Jury present.)

15          THE COURT:  Please be seated.

16          Mr. Park, do I understand you've completed your

17    direct?

18          MR. PARK:  Yes, Your Honor.  Thank you.

19          THE COURT:  Okay.  Mr. Gorman.

20          MR. GORMAN:  Your Honor, I'd ask the interpreter

21    to define the word -- the Spanish word "los" before I begin

22    my cross-examination.

23          THE COURT:  The word?

24          MR. GORMAN:  Los.

25          THE COURT:  L-O-S?

1          THE INTERPRETER:  You wish the interpreter to

2     translate it?

3          MR. GORMAN:  Yes.

4          THE INTERPRETER:  The.

5                    CROSS-EXAMINATION

6     BY MR. GORMAN:

7     Q.   Mr. Diaz, you said that the rules of MLS are different

8     in prison, is that correct?

9          THE COURT:  Which rules?

10          MR. GORMAN:  MS.

11     A.   No.

12     Q.   Well, are any of the rules different?

13     A.   I don't know what you're referring to.  Could you be

14     more specific in your question?

15     Q.   Yes.  Are any of the rules concerning MS-13 membership

16     or the way it operates different in prison than outside

17     prison?

18     A.   It's a gang whether it's outside the prison or inside.

19     It's MS.

20     Q.   No rules are different?

21     A.   No, not as far as any specific rule, but it is said

22     that when the gangs are inside the prison, maybe they come

23     to some agreement so that there are no problems within the

24     prison, but that hasn't been seen in El Salvador.

25     Q.   In this prison where you saw MS-13 members, were there

1    also chavalas?

2    A.    No.

3    Q.    Were there any other gang members?

4    A.    All MS.

5    Q.    How many different prisons have you seen?

6    A.    There are 19 prisons in El Salvador.

7    Q.    How is it that the only gang members that are in this

8    particular prison are MS?

9    A.    Those are decisions made by the correctional

10   authorities.  For example, at a time in Quezaltepeque,

11   there are only MS members.  At one time in the penitentiary

12   at Chalatenango, only 18th Street.  In Mariona, there were

13   no gang members.

14   Q.    Is there any violence that occurs in any of the

15   prisons?

16   A.    Yes, there have been.

17   Q.    Do prisoners often -- do prisoners ever associate with

18   other prisoners in order to avoid the violence?

19               MR. PARK:  Objection.

20               THE COURT:  Would you come up here so I

21   understand what this is about.

22               (Counsel approached the bench.)

23               THE COURT:  What are you getting at here?

24               MR. GORMAN:  I'm going to criminal enterprise

25   questions.  These are preliminary questions as to why

1    someone might join MS for reasons other than being part of

2    the gang.

3             THE COURT:  I don't know that he expressed any

4    opinion as to why people would join, so I don't know

5    why he --

6             MR. GORMAN:  He expressed opinions about MS

7    being -- how MS operates within the prison and outside the

8    prison.

9             THE COURT:  Just in terms of structure.

10            MR. GORMAN:  In terms of what?

11            THE COURT:  Structure, organization.

12            MR. GORMAN:  Well, I think I should be permitted

13   to ask a question if anybody joins MS in order to protect

14   themselves in prison.

15            THE COURT:  The reasons people join MS was not --

16   he was not asked about that.

17            MR. GORMAN:  So the Court's not permitting me to

18   go into this area?

19            THE COURT:  He's not being offered as an expert

20   as to motivations of individual gang members.

21            MR. GORMAN:  All right.

22            THE COURT:  It's not proper cross.  It's beyond

23   the scope.  He wasn't asked that.  I don't think we're

24   going to get into it.  I don't even know if he has any

25   expertise in that, but it's not what the Government -- it's

 1    not proper cross.  It's beyond the scope.

 2                (Counsel returned to the trial tables.)

 3    BY MR. GORMAN:

 4    Q.    When you have spoken to MS-13 members, have they ever

 5    lied to you?

 6                MR. PARK:  Objection.

 7                THE COURT:  Overruled.

 8    A.    It's possible.

 9    Q.    Have you ever found out that they lied to you based

10    upon information that you received after you spoke to them?

11    A.    Active MS members sometimes don't say the truth.  They

12    lie.

13    Q.    And is it correct that once they speak to an MS --

14    once they speak to a law enforcement officer, they're no

15    longer members of MS-13?

16    A.    Not necessarily.  They continue being.

17    Q.    So sometimes after they speak to you, they still are

18    members of MS-13, is that correct?

19    A.    They don't only talk to me.  They talk to other

20    people.

21                But it depends on the situation.  Sometimes they

22    ask to talk, and maybe they want to tell lies to confuse an

23    investigation.

24    Q.    Isn't it correct that one of the rules of MS-13 is

25    that they're not supposed to talk to law enforcement

1    officers about crimes that other people in the organization

2    have committed?

3    A.   It's a rule, but it's a strategy used sometimes by the

4    leaders, members of La Ranfla to confuse an investigation.

5    It's a mission.

6    Q.   So is it your testimony that people stay members of

7    MS-13 after they tell about other -- criminal activities of

8    other members within MS-13?

9              MR. PARK:  Objection.

10             THE COURT:  Overruled.

11             THE INTERPRETER:  Can counsel repeat the

12   question.

13   Q.   Is it your testimony that when a member of MS-13 tells

14   a law enforcement officer about criminal activity of other

15   members of MS-13, the person who tells the police officer

16   remains a member of MS-13?

17   A.   Well, when they try to confuse investigations and give

18   other facts, they normally don't mention the other MS --

19   other MS-13.  Normally they would say -- they say, well,

20   that crime was not committed by MS.  That crime was

21   committed by the 18th.

22   Q.   When they talk about crimes that other MS-13 members

23   have done, do those members remain members of MS-13?

24   A.   Can you repeat the question?

25   Q.   When members of MS-13 tell law enforcement officers

1    about crimes other members committed, do they remain

2    members of MS-13?

3              THE COURT:  Do you mean if it's true?

4    Q.   If it's true.

5    A.   Well, when a gang member wants to talk about crime, be

6    it an MS member or an 18th Street, and that person is in a

7    prison, he's taken out of that prison because his life

8    might be at risk.  Or the correctional facilities may -- or

9    the authorities may put him in some witness protection

10   program.

11   Q.   Telling a law enforcement officer truthful crimes that

12   another MS-13 member committed are grounds for the person

13   not to be a member of MS-13 any longer, wouldn't that be

14   correct?

15   A.   I didn't understand your question.

16   Q.   I am going to go to another area.

17             The video that you watched here in court today,

18   were all the scenes from that video in El Salvador?

19   A.   Yes.

20             MR. GORMAN:  I have nothing further, Your Honor.

21             THE COURT:  Any redirect?

22             MR. PARK:  Court's indulgence, Your Honor.

23             Very briefly, Your Honor.  Thank you.

24                       REDIRECT EXAMINATION

25

1   BY MR. PARK:

2   Q.   Mr. Diaz, counsel asked you questions earlier about

3   whether or not the rules of MS-13 are different outside of

4   prison versus inside of prison.  Do you remember that?

5   A.   Yes.

6   Q.   Does the MS-13 gang operate differently in prison

7   versus the way it operates out of prison?

8   A.   The operations are always criminal.

9   Q.   Let me ask it this way.  Does the fact that an MS-13

10  member is in prison, does that somehow inhibit or alter the

11  way that they might go about MS-13 business as opposed to

12  the way they might operate out on the streets?

13  A.   Well, no.  It doesn't inhibit.  Well, if they are

14  in -- outside on the street, well, they organize and commit

15  crimes directly, but if they're in prison, they do it

16  through the communication and the organization they have.

17  Q.   Regardless of whether an MS-13 member is out of prison

18  or in prison, are the overarching rules and is the

19  overarching leadership structure of the organization still

20  the same throughout the gang?

21            MR. GORMAN:  Objection.

22            THE COURT:  Overruled.

23  A.   Yes.

24            MR. PARK:  Thank you, Your Honor.  No further

25  questions.

1          THE COURT:  Mr. Gorman.

2          MR. GORMAN:  Thank you, Your Honor.

3                      RECROSS-EXAMINATION

4    Q.  Can you be jumped in as a member in the prison?

5          MR. PARK:  Objection.  Beyond the scope of

6    redirect.

7          THE COURT:  Overruled.

8    A.  It is possible, but I don't know of any cases.

9    Q.  Have you ever gone to any MS-13 meetings?

10         MR. PARK:  Objection.

11         THE COURT:  Sustained.

12         MR. GORMAN:  That's all I have.

13         MR. PARK:  Nothing further.

14         THE COURT:  Thank you, Mr. Diaz.  That completes

15   your testimony, and you are excused.

16         MR. PARK:  Your Honor, subject to conferring with

17   counsel and Ms. Derro just to make sure all the exhibits

18   have been marked and are in, the Government would rest its

19   case at this point.

20         THE COURT:  Would you come up to the bench then

21   for a minute, please.

22             (Counsel approached the bench.)

23         MR. GORMAN:  Can I make my points outside the

24   jury?

25         THE COURT:  I was going to ask -- you mean a

1    motion?

2              MR. GORMAN:  Yes.

3              THE COURT:  Do you have evidence?

4              MR. GORMAN:  I'm not going to put on any

5    evidence.

6              THE COURT:  Okay.  Then what I would request that

7    you do is say that, and I'll let you then make a motion

8    after I let the jury go.

9              MR. GORMAN:  Well, I wanted to make a -- I wanted

10   to move for judgment of acquittal.  I wanted to renew

11   my motions --

12             THE COURT:  Absolutely.  I don't have a question.

13   You may do that.  But even if I deny the motion, if you're

14   not going to put on evidence, you can tell that to the

15   jury, I can let them go, and then we can have full

16   explanation of the positions.

17             MR. GORMAN:  Okay.  I just don't want to lose my

18   rights as far as the --

19             THE COURT:  That's exactly what I'm telling you

20   is that --

21             MR. GORMAN:  That I won't?

22             THE COURT:  -- you don't have any problem.

23             MR. PARK:  No, not at all.

24             THE COURT:  As long as you would not put on

25   evidence anyway, let them go, and then we'll back ourselves

1    up to the end of the Government's case.

2                MR. PARK:  That's fine.

3                THE COURT:  Okay?

4                (Counsel returned to the trial tables.)

5                MR. GORMAN:  Could I just have a moment with my

6    client?

7                THE COURT:  Certainly.

8                (Pause.)

9                MR. GORMAN:  Thank you, Your Honor.

10               Your Honor, we are not going to put on any

11   evidence.  We're going to rest our case.

12               THE COURT:  Okay.  Members of the jury, with

13   those announcements, it means that we have heard all of the

14   evidence that will be presented in this case.  At this

15   stage of the proceedings, there are many things I need to

16   take up with the attorneys before we're ready to move into

17   the next stage of the trial, which is for me to give you

18   instructions on the law.

19               So we're not going to do it today, and we

20   conferred earlier, and it's going to take the better part

21   of a day for me to give you the instructions and for us to

22   hear the closing arguments from the attorneys, and it's not

23   a good idea to do that on a Friday when the weekend is

24   coming, when Monday we don't normally sit in this case, and

25   Tuesday is a legal holiday and we're closed.

1          So we're going to release you now until Wednesday

2     of next week, which is the 12th, I believe, when we will

3     convene again at 9:30.  I will give you the instructions on

4     the law, and we will then hear the closing arguments from

5     the attorneys, and some time later that day the jury will

6     begin deliberating on the verdict.

7          It's just because of the weekend and the coming

8     holiday that we're going to have this kind of a break.

9     It's better than starting tomorrow and then having a break,

10    we decided, so that's what we're going to do.

11         Even though you have heard all of the evidence,

12    it is not time to do anything other than sort of set this

13    case aside in your minds, go about your normal very busy

14    lives and come back ready to listen on Wednesday morning at

15    9:30.

16         Again, just leave everything here, and it will be

17    waiting for you.

18         Counsel, is there anything else I should tell the

19    jurors before I excuse them until Wednesday?

20         MR. PARK:  Not from the Government.  Thank you,

21    Your Honor.

22         THE COURT:  Anything?

23         MR. GORMAN:  No.

24         THE COURT:  Okay.  Members of the jury, I will

25    see you then not quite a week, Wednesday, the 12th, at

1    9:30.  Thank you.

2                    (Jury not present.)

3                    THE COURT:  Please be seated.

4                    We are now going to hear from Mr. Gorman as if he

5    had been making this motion before announcing that the

6    defense would not put on any evidence.

7                    MR. GORMAN:  I'd like to review all my motions

8    for a mistrial, including the motion that I was not

9    permitted to effectively cross-examine witnesses because of

10   the interpretation that if I asked the question that drew a

11   response that was different from what my client said, that

12   they would be able to offer in those statements as

13   evidence.

14                   THE COURT:  I'm sorry.  I don't know what you're

15   referring to.

16                   MR. GORMAN:  Well, we had --

17                   THE COURT:  I don't know that I sustained any

18   objection to any question on that basis.  It was not -- it

19   would not have been proper.  The question you could ask and

20   do what you needed.  The Government was merely identifying

21   places where it said that if you did something, they might

22   ask me to conclude that you had opened the door to some use

23   of the statements.  I did not prohibit you from asking any

24   questions.

25                   MR. GORMAN:  It wasn't a question of the Court

1   prohibiting.  It was a question of when this matter came

2   before the Court, the Court didn't say that -- well, when

3   this matter was brought up, I understand that the Court

4   didn't make a complete ruling, but the Court let it be

5   known that the Court interpreted the agreement in such a

6   manner that if I asked a question and if there was a

7   response different than what my client said in the proffer,

8   then the prosecution would have been able to use that.

9          For instance, if I would have asked the question

10  to a witness, isn't it correct that Victor Ramirez was

11  never a member -- never attended any MS-13 meetings, now,

12  if I had asked that question based on what I thought was

13  the Court's general ruling, then the prosecutor would have

14  been able to bring that statement in that he did attend the

15  meetings.  That's my basis.

16         THE COURT:  Mr. Gorman, I do not recall you

17  proffering to me that at any time you wanted to ask any

18  witness any such direct question about the defendant's own

19  participation.  I made no ruling.  The Government filed a

20  motion in limine to alert me and you that, in their view,

21  there was a proffer agreement that was a waiver of certain

22  otherwise applicable rights that any statement made during

23  the course of a guilty plea negotiation could not be used.

24         We had some discussions.  I understood your

25  position to be that there was a certain understanding

1    between you and your client as to what that document meant,

2    that if it meant something else, it might not have been a

3    voluntary waiver.  There was some disagreement between you

4    and the Government as to what that document really meant,

5    and there was a big disagreement over what might

6    constitute a -- and I don't have it in front of me -- a

7    presentation of evidence or argument that contradicted

8    statements the Government says your client made during

9    those proffer sessions.

10           At several times during the trial, the Government

11   asked to approach the bench to alert me and you to the fact

12   that they thought you were close to the line.  I think on a

13   couple of occasions I said I said I didn't agree with them.

14   I do not remember ever saying that asking or persisting in

15   a line of questioning would be found to me to have crossed

16   a line and to open the door to the Government's use.  I

17   certainly never made any finding with regard to the

18   validity of any such proffer agreement or the scope of any

19   waiver that might have been in there.

20           I also do not remember you proffering during

21   trial at all any questions that you were not asking because

22   you were afraid of running afoul of that document or any

23   proffers as to any responses that you had expected to get

24   from any witness, and I certainly don't remember any

25   mistrial request based upon that problem.  I could well be

1    wrong.  It's been a long trial and I didn't catalog all of

2    the mistrial requests specifically so I cannot sit here and

3    agree that I've -- there's anything to renew in terms of a

4    mistrial request.

5              MR. GORMAN:  I'm reasonably sure that I made this

6    motion.

7              THE COURT:  A motion for what?

8              MR. GORMAN:  For a mistrial based upon the

9    inability to ask questions because of the Government's

10   position in the interpretation of the proffer agreement.

11   So --

12             THE COURT:  What witness was being --

13             MR. GORMAN:  I think this was before -- I think

14   it was right at the beginning of the trial.

15             THE COURT:  Oh, you mean when this first came up?

16             MR. PARK:  Your Honor, if I might interject, I

17   believe that's the Government's recollection as well, that

18   after the jury was selected but prior to the presentation

19   of any evidence, when the issue was, I guess, flagged by

20   the Government, Mr. Gorman made a motion for a mistrial --

21   I think it was an oral motion for a mistrial -- around --

22   on these grounds, but I don't believe, and my recollection,

23   I believe, is the same as the Court's, that during the

24   course of the presentation of evidence, there was never,

25   number one, any sort of proffer from Mr. Gorman as to the

 1    fact that he believed he was being somehow restrained from

 2    asking questions and that there were certain questions that

 3    he wanted to ask that he was not being permitted to ask.

 4             Indeed, our recollection is the same as the

 5    Court's in that the Court has never made any sort of

 6    determination, legal or otherwise, regarding this

 7    particular aspect of the proceedings in terms of the

 8    Government's motion in limine.  In fact, the Court, I

 9    think, sent the message, and the message was received very

10    clearly by the Government, that on a number of occasions,

11    even though the Government was flagging this as potentially

12    getting near the line, the Court, number one, disagreed

13    with us, and, number two, on a couple of occasions, said

14    that the threshold had not been crossed or reached because

15    the Court had sustained the Government's objections to

16    certain questions, and we never even got to the point of

17    worrying about whether or not any facts had been elicited

18    that would somehow trigger this.

19             THE COURT:  Okay.  Well, the -- and let me

20    clarify that any sustaining of any such objection was not

21    based on the existence of --

22             MR. PARK:  Right.

23             THE COURT:  -- a proffer agreement.  It was based

24    on other evidentiary rules.

25             MR. PARK:  Exactly.  And that's the message that

1    we got, is that this whole analysis was something that was

2    being set aside, and if and when the Government

3    re-initiated this at a point later on where it believed

4    that it wanted to ask the Court to reach some sort of

5    ruling, we would.  But we don't understand that the Court

6    has ever made a determination, number one, that the

7    agreement was valid or that there was a waiver, and beyond

8    that, whether or not there was any sort of interpretation

9    of the agreement, even if it were to be -- have been deemed

10   valid, that would have somehow constrained

11   cross-examination by Mr. Gorman.

12           THE COURT:  Okay.  Well, if I understand that

13   you're renewing the motion made after the jury was sworn

14   but before we even got started, that's one thing, but I do

15   not remember it coming from you during the -- once we got

16   started with the opening statements.

17           MR. GORMAN:  It's our position that the Court's

18   failure to rule -- that by asking a question that elicited

19   a response, by the Court's failing to rule that the

20   Government could not use that response as a way of opening

21   the door based upon what my client said, denied my client a

22   fair trial, and that was the basis of the motion for

23   mistrial.

24           THE COURT:  The Government filed a motion in

25   limine, which I did not grant.

1        MR. GORMAN:  Well, the Court didn't grant it, but

2   the Court didn't deny it either.  And based on that and

3   based on the Court's comments, the defense was under the

4   impression that if I asked a certain question or if a

5   certain question was asked that elicited a response from a

6   witness that was different from what my client said in his

7   proffer statements, that those statements would be

8   introduced into evidence or could be introduced into

9   evidence.  That's our position.

10       THE COURT:  Do you want to tell me which witness

11  you would have asked which question of and what the

12  response you expected it to be?

13       MR. GORMAN:  Well, there were a lot of witnesses,

14  but I -- in my cross-examination, I tried to make sure on

15  many, many occasions that I did not mention my client's

16  name as to whether or not he participated in one thing or

17  another.  Not on each and every occasion, but on all the

18  occasions I believed that that might elicit a response that

19  was different from what he told the prosecutor in the

20  proffer, and that's how the defense was limited in its

21  ability to question certain witnesses.

22       THE COURT:  Mr. Park.

23       MR. PARK:  Your Honor, if I might just add the

24  one thing that was clear to the Government, at least in

25  terms of the Court's assessment of where we were prior to

1    starting trial, is that the Court, I think, clearly said

2    that you were not going to rule on the Government's motion

3    in limine, that it's something where we would see how it

4    went in terms of questioning, but I think the Court made

5    very clear that the one thing that the Court was aware of

6    and made clear to everybody here at counsel tables was the

7    fact that counsel has an ethical obligation under the

8    Professional Rules of Responsibility not to ask questions

9    unless there's a good faith basis for it, and I think

10   that's the one thing that -- right.  And that if we were to

11   get to that point, that an evidentiary hearing would be

12   necessary even where -- or possibly necessary in terms of

13   even getting to the point of whether or not an agreement

14   was valid and was reached between the parties that would

15   then be interpreted by the Court.

16           THE COURT:  Right.  I was satisfied, and I remain

17   satisfied, that there should have been nothing in that

18   proffer agreement that significantly affected counsel's

19   approach, given normal ethical considerations, that

20   prohibit an attorney from putting on evidence he knows to

21   be false.  So unless you are taking the position that

22   things that the Government thinks your client said during a

23   proffer session were untrue, I didn't really see a conflict

24   for you.

25           And unless you are in a position and willing to

specify particular witnesses, particular questions and

proffer to me what you feel you were constrained from

doing, this is not the form for me to reconsider that

decision.  I did not believe at the beginning of the trial

that the Government's motion should have had an improper

effect on you, and I haven't now heard anything to change

that at this point.  So this may not be the forum for me to

hear any such presentation, but that's your choice.

So I again deny a motion for mistrial based on

the Government's raising of the existence of the proffer

agreement, which is really all that they have done.

MR. GORMAN:  I can't recall each and every

instance at this moment where I would have asked a

question, but I know that there were many, and I know that

when I -- there were times when we approached the bench and

the prosecutor said we think that he has gone over the

line, we're warning him that -- and on a couple of

occasions I remember the Court saying that you're very

close to that line.  I think it had to do with some

questions about the prison early on.

So it was my understanding that I was limited, I

felt limited in my ability to cross based upon what I feel

was the Court's -- the Court not exactly ruling on the

issue, but I was under the impression that if I asked the

question that had a response that was something different

1    than he said in the proffer session, that the prosecution

2    on that point would be able to bring in the proffer

3    session.

4              I understand the Court's ruling.  I just wanted

5    to bring that up.

6              THE COURT:  Okay.

7              MR. GORMAN:  I also want to -- I think there was

8    a couple other instances where I asked for a mistrial, and

9    I want to renew those.

10             As far as the judgment of acquittal is concerned,

11   we'd suggest to the Court on a number of bases that the

12   Court should grant a motion for judgment of acquittal.

13   We'd suggest to the Court that the prosecution hasn't

14   proved that MS-13 is a RICO enterprise.  If they have

15   proved it's a RICO enterprise, we'd suggest that they

16   haven't proven that my client took part in it.

17             We'd also move -- suggest to the Court that

18   there's a variance in the indictment itself.  The

19   indictment suggests that it's an international conspiracy.

20   They didn't prove it was an international conspiracy.  They

21   didn't prove that my client was part of it.  They didn't

22   prove that he participated in any two acts as part of any

23   kind of conspiracy.  So on all those bases, we move for

24   judgment of acquittal.

25             Specifically, on page 19KKK of the indictment, he

1   is charged together as robbery and rape.  We'd suggest to

2   the Court that since rape is not a crime in Federal Court,

3   that that should not be part of the charging document that

4   goes back to the jury.

5                THE COURT:  It won't be.

6                MR. GORMAN:  What?

7                THE COURT:  It won't be.

8                MR. GORMAN:  Okay.  We also suggest to the

9   Court --

10               THE COURT:  I mean none of the overt acts.

11               MR. GORMAN:  I didn't hear.

12               THE COURT:  None of the overt acts go back.  Only

13  the charging language.

14               MR. GORMAN:  We'd also suggest to the Court that

15  they have not proven premeditation and first degree murder

16  or second degree murder or attempted murder.  That there's

17  insufficient proof for robbery.  There was -- this has to

18  do with the verdict sheet, that there was no proof of

19  obstruction of justice or witness tampering.

20               We'd also move for a general motion for judgment

21  of acquittal on Count 29, that they haven't shown

22  interfering with interstate commerce by robbery and they

23  haven't proven robbery, and for Count 30, they haven't

24  shown that he used a firearm to commit a crime of violence.

25               We'd ask for judgment of acquittal on all counts.

1             THE COURT:  Mr. Park.

2             MR. PARK:  Thank you, Your Honor.

3             The Government would oppose the motion for

4    motion -- or the motions for judgment of acquittal under

5    Rule 29 on all three counts.

6             As to Count 1, the RICO conspiracy, the

7    Government contends that all four elements of that

8    particular charge under Section 1962(c) -- or (d), rather,

9    I'm sorry, of --

10            THE COURT:  What section?

11            MR. PARK:  1962(d)?

12            THE COURT:  62.  Okay.

13            MR. PARK:  Right.  1962(d), first of all, that

14   the -- the fact that the enterprise existed as charged in

15   the indictment, we believe that the evidence is

16   overwhelming, quite frankly, in terms of the existence of

17   this particular enterprise.  It is an organization, I

18   think, both from the expert testimony -- well, the expert

19   testimony of Frank Flores, but also the testimony of the

20   cooperating witnesses, the search warrant evidence itself,

21   the letters.  All the evidence, we believe, do show the

22   fact that there is an organization, albeit, perhaps, a bit

23   more informal, yet still with some formal attributes.

24            There is an organization.  There is structure to

25   it.  There is a common purpose.  There is, in fact, a set

1   of rules and set of meetings and leadership structure that

2   all tend to or, in fact, do suggest and prove that there is

3   an enterprise and that the defendant himself associated

4   with this enterprise by his own membership in the

5   enterprise.

6          I would note that there is no requirement that

7   the defendant himself have committed any of the acts of

8   violence or any predicate acts that are alleged, although

9   we believe the evidence itself at trial has shown that he

10  did participate in the acts of violence and that he was

11  present, for example, for the double homicide and the

12  shooting of another victim at Quintana Street in Riverdale

13  on October 9th of 2005, and that he was there at Four Stops

14  in Langley Park on October 23rd of 2005 when Alejandro Rubi

15  Hernandez was shot and killed, or Rubi Martinez, and that

16  the defendant was there at 2302 Blueridge Avenue in

17  Wheaton, Maryland when the robbery of the prostitution

18  house took place and the victim prostitute was raped in the

19  back room, and that there was a gun back there in that

20  apartment, brandished and used -- or brandished and

21  displayed in connection with the robbery and in connection

22  with the rape.

23         And all these, again, go back to Count 1 in terms

24  of his participation in the conspiracy, showing that he was

25  not only aware of what the enterprise was all about, aware

1   of the existence of the enterprise, but, in fact, die

2   associate with and take part in the activities of the

3   enterprise.

4           The interstate and foreign commerce aspect of

5   this, in terms of the nexus between the enterprise and

6   interstate and foreign commerce, we believe has been

7   established.  The Court's instructions, at least the draft

8   instructions, and we believe the case law itself, also

9   clearly show that the only requirement, especially at this

10  stage in the proceedings, is that the Government have

11  established that there is some minimal or de minimis effect

12  on interstate or foreign commerce.

13          We believe, quite frankly, it's beyond that in

14  terms of the evidence showing that the travel of

15  individuals across state lines, which falls within the

16  definition of effect on interstate or foreign commerce, the

17  travel of goods or items across state lines, which is

18  established by the fact that firearms and ammunition were

19  found here in Maryland that were manufactured elsewhere,

20  the use of Western Union and other methods to transfer

21  money, the use of the Postal Service to send mail to

22  prisoners, all those, again, we feel, establish that second

23  element in terms of interstate and foreign commerce and the

24  nexus there.

25          And finally, going back again to the knowing and

1    willful membership of the defendant in the conspiracy, the

2    evidence establishes that the defendant was an MS-13 member

3    in El Salvador.  We have the video of him in the

4    Quezaltepeque prison prior to him coming up to the United

5    States.  We have testimony from cooperating witnesses

6    talking about him being here in Maryland present at MS-13

7    meetings where not only were the rules discussed, but, in

8    fact, Mr. Ramirez participated in the jumping in of one of

9    the cooperating witnesses in terms of being there and

10   advising him of the rules.

11           And then beyond that, of course, his actual

12   physical presence, the defendant's presence, at the scene

13   of three separate incidents where people were either

14   killed, robbed or raped.

15           And all those, we believe, establish that --

16   particularly at this stage of the proceedings on a Rule 29

17   motion, that the Government has met its burden.

18           As to Counts 29 and 30, which obviously are

19   linked together, the Government also believes that we have

20   met our burden at this stage of the proceeding.

21           As to the Hobbs Act count under 1951, the

22   evidence has shown clearly that the defendant, either aided

23   and abetted in or did himself take personal property of

24   another and that a robbery did, in fact, take place.  There

25   was testimony from the victim who was raped about the fact

1   that she identified certain items of jewelry.  That jewelry

2   was then found -- the testimony of the witness, I believe

3   it was Officer Green who testified that that bag of jewelry

4   was found on the person of Victor Ramirez after -- at the

5   time that he was arrested, and so we believe that the

6   evidence has established that a robbery was, in fact --

7   did, in fact, occur.

8          The testimony also of Santos Mejia, the

9   individual who testified that he went there to be a

10  customer of the prostitution place, but then also testified

11  that after being pulled into the brothel he was robbed and

12  money -- his wallet, which had money in it, as well as his

13  cell phone, were taken from him, and so that element, we

14  believe, has been satisfied.

15         And that it was taken against his will.  There

16  was actual force in terms of either throwing the man on the

17  ground or brandishing a weapon and pointing the weapon at

18  the victim who was in the apartment, either the female

19  prostitute or this individual.

20         And then finally, in terms of the third element

21  that the defendant's actions resulted in effect on

22  interstate commerce or somehow delayed, obstructed or

23  affected it in any way or degree, we believe has been

24  established by the fact that it was a prostitution business

25  and the fact that the individual, the victim, testified

1    that she traveled from Virginia to this location to

2    participate in the prostitution activities and that her

3    travel as well established the fact that it involved

4    interstate commerce.

5              And I believe she testified regarding -- I might

6    be wrong here -- in terms of her activities in prostitution

7    elsewhere.  Let me make sure I don't get that wrong.

8              THE COURT:  You need to talk to me a whole lot

9    more about Count 29.  I had understood, I thought, that

10   this count was the extortion, the robbery, the attempt to

11   get the rent.

12             MR. PARK:  That's also the case, Your Honor.

13   That's -- there's that and -- it's all combined in one act.

14   There is a robbery attempt.  The program -- the program

15   that MS-13 had in terms of going and robbing places and

16   then extorting them and saying that they had to pay rent,

17   this is, again, part of that.

18             What happened here was that they actually did rob

19   the individuals and actually did take property from the

20   individuals, but then this was also part of their ongoing

21   program where they would then also extort the owner and

22   extort the people, the owners of that particular

23   prostitution place, on an ongoing basis.

24             THE COURT:  You mean the Government's theory is

25   that this was interrupted before they got that far on this

1    occasion?

2              MR. PARK:  Yes.  For this particular --

3              THE COURT:  Right.

4              MR. PARK:  Yes.

5              THE COURT:  And who were they going to extort

6    from?

7              MR. PARK:  From the --

8              THE COURT:  The doorman?

9              MR. PARK:  The doorman.  Yes, Your Honor.

10             Your Honor, at the time the robbery takes place,

11   or at the time the individuals go into the apartment, the

12   intent, as we've heard from Jovet Medina, Travieso, the

13   intent was to go in there and to rob the place, and the

14   intent -- obviously what the intent was, to have this be

15   part of their ongoing program of extorting places.  In

16   fact, Travieso, or Jovet Medina, testified that earlier

17   that same day he and the defendant had gone to a separate

18   apartment in Gaithersburg and done the exact same thing,

19   where they'd gone in, they had robbed the place and they

20   had advised the doorman that they would be collecting rent.

21             And this is also, again, consistent with

22   Mr. Medina's testimony that this had happened on a number

23   of occasions where he had accompanied the defendant on at

24   least three or four occasions, separate occasions, in the

25   Langley Park area, to go rob places and then also extort

1    individuals on an ongoing basis based on, again, part of

2    the MS-13 enterprise.

3              On this particular occasion, I think there are

4    two ways to look at it in terms of the Hobbs Act -- well,

5    there are ways in which the elements have been met.  Number

6    one, there was an actual robbery, and it did affect

7    interstate commerce in the sense that the individuals who

8    are there in the apartment, their property was taken by

9    force or by threat of force, and it affected interstate

10   commerce to the extent that there was an individual -- one

11   of the victims had, in fact, traveled from another state

12   and was part of a prostitution business that had interstate

13   reach.  And since -- or interstate impact to the extent

14   that it brought in clients, to the extent that it had -- I

15   think there was a -- there is that element of it, Your

16   Honor, and then beyond that, in terms of, obviously, the

17   interstate impact of the enterprise itself, we believe all

18   establish for these -- at least, again, at this stage of

19   the proceeding, that the Government has met its burden to

20   establish these three elements.

21             And then obviously going to the 924(c) count

22   under Count 30, whether or not the defendant himself

23   committed or did aid and abet in the commission of a crime

24   of violence, which might be prosecuted in a court of the

25   United States, that has been established, again, by the

1    testimony of the cooperating witness Jovet Medina and,

2    quite frankly, the circumstantial evidence of the officers

3    going in and finding that Mr. Ramirez is there, one of the

4    four individual who is not tied up or is not in the back

5    room having just been raped, and he is there at the door

6    and is the one who tries to grab Detective Cobo.  So in

7    terms of his presence there and his participation in this

8    act of violence, or crime of violence, we believe that has

9    been established.

10          And it also has been established in terms of the

11   defendant knowingly using or carrying or aiding and

12   abetting or being there -- knowingly using or carrying a

13   firearm.  The testimony of Mr. Medina also speaks to him,

14   Mr. Ramirez, having the firearm in hand during the robbery

15   and knowing of the firearm.  In fact, he's the one who

16   brought the firearm along with him for the robbery to be

17   committed.

18          For those reasons, we believe the motions by the

19   defendant should be denied.

20          MR. GORMAN:  Could I be heard a little further?

21          THE COURT:  Certainly.

22          MR. GORMAN:  There's absolutely no evidence that

23   on this particular date, November 14th, that anyone was

24   extorted for money at this house of prostitution.  None.

25   There was a proffer about it maybe in the opening

1   statement, but no one came -- you didn't hear from the

2   doorman.  You didn't hear from any of the cooperating

3   witnesses that they asked the doorman for money for rent.

4   That was not done.

5         Now, all these other supposed acts at other

6   brothels, that's part of the continuing enterprise.  There

7   is a specific count about this particular place, and there

8   was absolutely no evidence about any extortion, so I don't

9   see how the prosecution has met its burden.

10        The fact that, oh, well, they did it other

11   places, that doesn't prove beyond a reasonable doubt that

12   they did it at this place.  They put on no evidence of any

13   extortion, and without that, they haven't made their case

14   on that count.

15        As far as Count 30 is concerned, if that concerns

16   the robbery and there was no robbery, then it wasn't a

17   crime of violence.  So we think that both those counts

18   should be thrown out.

19        I don't know if I made myself clear on this -- I

20   don't know -- if the Court doesn't agree with me on that

21   and the Court lets those in, I don't know if I made myself

22   clear on the rape and robbery issue.  I don't know if it's

23   going to -- KKK charges both rape and robbery as part of

24   the enterprise.  If that somehow goes in, we wouldn't be

25   able to understand whether or not they convicted him of the

1    rape as a predicate act or the robbery, but --

2              THE COURT:  You have the -- you have the proposed

3    jury instructions.  It shows the only portion of the

4    charging document that the jury will see is what's

5    contained in that jury instruction, which is Count 1,

6    paragraph 15 only.  That is the operative charging language

7    in Count 1.  The jury will not see any other portion of the

8    indictment concerning Count 1.

9              You do not have to find any of the overt acts as

10   alleged.  That's information in the indictment that is of

11   assistance to the defendants in understanding a little bit

12   more about the Government's claim here.

13             The question the jury will be asked on the

14   verdict sheet is whether the enterprise the defendant

15   conspired to participate in contemplated the commission of

16   two or more of these offenses, and if so, which ones.

17   There will not be, with the exception of Counts 29 and 30,

18   any question for the jury as to whether the defendant

19   actually participated in any crime other than the

20   conspiracy to participate in the racketeering enterprise.

21             So I do understand, but they will not see the

22   allegations in sub little paragraph KKK or any of the

23   others.

24             I will deny the defendant's motion with regard to

25   Count 1 and reserve on Counts 29 and 30.  For Count 1, I

1    think the evidence is overwhelming that the Government's

2    evidence, if believed, establishes the existence of the

3    RICO enterprise, the defendant's participation.  As I've

4    said, they don't have to prove that he personally

5    participated in two of the predicate racketeering acts,

6    only that two or more were contemplated.

7            The interstate nexus, I think, is adequate on

8    this record.

9            With regard to the specific aspects of murder,

10   robbery, obstruction of justice or witness tampering, I

11   think there is evidence from which the jury could conclude

12   that two or more acts of all of those were contemplated,

13   and I won't detail it.

14           I want to review all of my notes, as well as,

15   perhaps, some case law on the interstate commerce aspect of

16   Count 29 and, therefore, Count 30 as to -- because I

17   just -- I want to satisfy myself as to what that aspect

18   must be in terms of the interstate commerce.

19           MR. PARK:  Can I -- I understand the Court's

20   ruling on that.  We did look at this before, and if I might

21   suggest to the Court a couple cases that we've looked at.

22           THE COURT:  It would be helpful.

23           MR. PARK:  There is U.S. vs. Ware.  It's an

24   unpublished decision, but it's at 230 F.App. 249.  It's a

25   2007 Fourth Circuit case.

1           THE COURT:  Is that W-A-R-E?

2           MR. PARK:  W-A-R-E, yes.  I'm sorry, Your Honor.

3    It goes to, again, the interstate commerce nexus aspect of

4    this particular Hobbs Act charge.

5           There's another case from the Third Circuit.

6    It's a Pennsylvania -- well, a Third Circuit case of 2003.

7    It's U.S. vs. Clausen, C-L-A-U-S-E-N, found at 328 F.3d

8    708.

9           And obviously the jury instructions, we were

10   looking at the Sand and Siffert as well, when we were not

11   only crafting the draft that we submitted to the Court but

12   also in framing our presentation of evidence.

13          THE COURT:  Okay.  All right.  We're going to go

14   forward on the counts.  I'm going to continue to do

15   research and thinking, and if I have questions or conclude

16   one way or the other --

17          MR. GORMAN:  I don't know if I made myself

18   particularly clear on the first degree murder count.  I

19   guess it's our position that they haven't charged him with

20   the requisite language in the indictment for first degree

21   murder.

22          MR. PARK:  Your Honor, I'm not sure if I

23   understand.  I don't believe the defendant has been charged

24   with first degree murder.  I know that in terms of the

25   language, or, rather, the state statutory sites regarding

1    first degree murder, we have language in there regarding

2    the predicate acts, and I know in the jury instructions as

3    well, we discuss first degree murder and levels of

4    premeditation in that.  But with regards to Count 1 and the

5    conspiracy, as the Court has indicated, the defendant

6    himself is not charged with first degree murder.  It's

7    whether or not the enterprise itself had it as one of its

8    objects of the conspiracy.

9           THE COURT:  The indictment alleges that the

10   racketeering activity includes some for which the maximum

11   penalty can be life in prison, including multiple acts

12   involving intentional and premeditated murder in violation

13   of Maryland Code, two sections in the common law.

14           He is not charged with murder.  If the Government

15   thought they could prove that he personally or directly

16   aided and abetted, he would have been charged with it.

17   They have not.  But they do believe that he participated in

18   a conspiracy to participate in a racketeering enterprise

19   which contemplated the commissions of premeditated murder,

20   and for that I think they have sufficient evidence.

21           All right.  It's about 10 or so after 3.

22   Counsel, we need to meet to talk about these jury

23   instructions so I understand what the issues are so that I

24   can prepare them for next Wednesday.  Half an hour or so in

25   chambers?

1              MR. PARK:  That's fine, Your Honor.  We're ready

2      to go whenever.

3              MR. GORMAN:  I'm ready now.

4              THE COURT:  Ready now?  All right.  Let's just

5      take then a -- let's meet at 3:30?

6              MR. PARK:  That's fine, Your Honor.

7              THE COURT:  Okay.  You have a few more exhibits,

8      but I don't know -- there weren't too many more today that

9      hadn't been discussed.

10             You want me to go over them with you now, the

11     ones that you had some issues about?  Are you ready to show

12     me the redactions?

13             MR. JAFFE:  Yes.  Your Honor, just a full

14     disclosure, we didn't have a chance to show them to

15     Mr. Gorman, but I can go very quickly with them.  I don't

16     think there's --

17             THE COURT:  I want to try to do everything we can

18     before Wednesday morning.  I don't want to delay --

19             MR. PARK:  Oh, yes.

20             THE COURT:  -- at that point.

21             MR. PARK:  I think we're pretty much there, Your

22     Honor.

23             MR. JAFFE:  Your Honor, I'm going to start, if I

24     may, with some of the exhibits that we have a challenge on.

25     Starting with 14th Avenue Number 3, there's a question

1    about redaction.  Let me just use the screen here.

2           The challenged document was -- I'll put it on the

3    screen -- this large multipage document, a charging

4    document.  We wanted to just include the top of it.

5           Here's the proposed redaction.  It just has the

6    title and the name of the individual and doesn't address or

7    reveal exactly what charges or what's involved beyond that.

8    That's our proposed redaction for 14th Avenue 3.

9           THE COURT:  Okay.  Any problem, Mr. Gorman?

10          MR. GORMAN:  No.

11          THE COURT:  Okay.

12          MR. JAFFE:  I apologize.  This is a little out of

13   order.  Next one, I believe, is Chapman 7, which was a

14   large packet of materials found that appear to be printed

15   off the internet.  The unredacted document appears on the

16   screen with a banner on the top.  The proposed redaction we

17   have includes the banner on the top only and a couple of

18   words on the top and at the very bottom just reveals that

19   it's from the internet, has an internet site, but there's

20   no text at all as to what this is all about.

21          THE COURT:  Any problem?

22          MR. GORMAN:  No.

23          MR. JAFFE:  Next is -- I'm skipping over the

24   Cronin exhibits for a moment.

25          Otis 1I, which was a large document found in the

 1   search warrant that appeared to be from the Phoenix Police

 2   Department detailing various charges, our proposed

 3   redaction is just to include one page that only has a --

 4   two lines at the top, the one being a date and some random

 5   numbers, and GIB, court liaison, at top, and the next line

 6   saying Phoenix Police Department Report.  Everything else

 7   redacted.  No additional pages.

 8              THE COURT:  Looks all right to me.  That's what

 9   my notes show.  Only the top line comes in, and that's what

10   you read, the Phoenix Police Department.

11              MR. PARK:  Okay.  We can redact that business at

12   the top.

13              THE COURT:  I don't see a problem with that, but.

14              MR. JAFFE:  If that's okay, we'd just rather --

15   if we can just leave it --

16              THE COURT:  Okay.

17              MR. JAFFE:  -- if there's no objection from the

18   Court or defense, it would just be easier.

19              THE COURT:  Okay.

20              MR. JAFFE:  That would leave the Cronin exhibits.

21   Starting, I believe, with Cronin 5A, which, I think, is

22   another charge -- or a document regarding a motion for a

23   new trial.

24              THE COURT:  The Henry Zelaya charging documents?

25              MR. JAFFE:  Yes.  As the agents are pulling that

1    out -- actually, Agent, it's got a yellow tag on it way in

2    the back here.

3            Again, Your Honor, this is a multipage document.

4    We propose that the exhibit only have one page.  Again,

5    showing the front -- I'll just show the redacted page.

6            It just has the caption.  Mentioned it's a

7    Circuit of Prince George's County.  It says State of

8    Maryland vs. Henry Zelaya.  And my -- I couldn't redact

9    the -- with my limited arts and crafts skills, I couldn't

10   get out the case number, but I don't think that adds any

11   prejudice to anybody.  With no text underneath.

12           THE COURT:  Is that all right?

13           MR. GORMAN:  Yes.

14           MR. JAFFE:  Okay.  The remaining exhibits are

15   Cronin exhibits.

16           Court's indulgence.

17           THE COURT:  It's 39B and F.

18           MR. JAFFE:  Your Honor, 39B and F are two

19   newspaper articles in Spanish.  39B is on the screen now.

20   Has some photographs and some sort of text in Spanish.  39F

21   now I'm placing on the screen similarly.  They include --

22   the exhibits include certified translations.

23           The Government does not have a proposed redaction

24   for we don't believe one is necessary given the Court's

25   limiting instructions in court, the ones included in the

1    proposed jury instructions and the nature of the text,

2    which makes no mention of violence in any way, shape or

3    form.

4            We believe that these exhibits as is are

5    important proof for the Government to underscore and prove

6    communication and that newspaper articles were used as a

7    means of communication to be -- as members are updated on

8    each other's activities.

9            There's nothing, we submit, prejudicial in the

10   text themselves, even if the -- even if some juror were to

11   ignore the Court's instructions, and they're presumed not

12   to have, in any way, shape or form.  To give an example of

13   what the text is like, I've got 39B on the screen, and it

14   mentioned, after a headline that says Prosecutor's Office

15   Studies Cases of 40 Gang Members, Mano Dura, Tough Hand,

16   Against 247 Gang Members, the next text line is minor

17   crimes, and it talks about, in two pages, about minor

18   crimes and people being just arrested for illegal

19   association and disturbing the peace and threats.

20           Similarly, the other document language involves

21   another discussion of this -- I'm putting 39F on the

22   screen, zooming in, and again just mentions that people are

23   being arrested.

24           I think the only crime mentioned is illegal

25   association.  There's no mention of violence or people

 1     doing anything graphic in any way, shape or form.

 2            What we think is important in the text is that

 3     it's related to MS -- or actually, I believe, I'm sorry,

 4     that the portion I just had says three MS people are

 5     detained because of having tattoos.  That's the nature of

 6     the crimes discussed in the articles.

 7            The nature of the crimes isn't significant.  It's

 8     the fact that these are MS-13 people and law enforcement is

 9     intercepting them and that that is -- that these were found

10     in possession of people who used the residence in question.

11     This is Cronin, so it's Lisbeth Delcid and at a point in

12     time, perhaps, Henry Zelaya.

13            We believe that, and what we would argue is that

14     this is just another example of the fact that this is a

15     gang that actually does communicate and uses communications

16     from, not just within Maryland, but places outside of

17     Maryland, and the text is important for that purpose and

18     that purpose alone, not for the -- and that they possessed

19     this material, not that actually -- that there's any truth

20     in the articles, that the people actually were detained for

21     having tattoos or anything like that, but just that the

22     stuff is being collected and maintained by MS people in

23     Maryland has a significance for the purposes of

24     communication.

25            So we'd ask that it go in as is with the limiting

1    instruction that we believe is proposed in the Court's jury

2    instructions.

3            MR. GORMAN:  I'd ask the Court to not -- not to

4    let that in.  We don't object to the newspaper to show that

5    it comes from another country, but as far as some of these

6    articles, they're prejudicial.  I mean the jury's going to

7    take the -- be under the impression that MS-13 must really

8    be bad because just from having a tattoo, you can be put in

9    jail.  I mean how -- it's prejudicial to my client.  It

10   buttresses the idea that in El Salvador, if you're a

11   member, that's illegal.  If you have a tattoo, that's

12   illegal.

13           It's different than the laws in this country,

14   gives the jurors the wrong idea.  It doesn't necessarily

15   aid the prosecution's case as to what's communicated and

16   what's read, but it makes the jurors believe that MS-13 is

17   bad, tattoos are illegal, and they're thrown in jail for

18   them.

19           So we'd ask the Court not to let that in.

20           THE COURT:  I'd like to see and be able to read

21   myself the translations of these exhibits.

22           MR. JAFFE:  Yes, Your Honor.  I'm approaching

23   with 39B and F.

24           (Pause.)

25           THE COURT:  On 39B, why are these two pages in

1   the back?

2           MR. JAFFE:  Your Honor, those are probably the

3   interpreter -- not the interpreter, Ms. Blumberg's

4   photocopying materials.  I'm not sure if it's from the same

5   article or not.

6           THE COURT:  It's redactions.  It's redacted copy.

7           (Pause.)

8           THE COURT:  On that one, on 39B, at the very

9   least there's the section about fear.  That's to be

10  redacted.  It's the neighbors or the community fearing that

11  they'd be released and come back and intimidate.

12          MR. JAFFE:  Yes, Your Honor.

13          THE COURT:  It appears to me, counsel, that your

14  translations are of redacted articles.  It is not the full

15  article that is translated.

16          MR. JAFFE:  Okay.

17          THE COURT:  And that the copies that are in each

18  package are what are translated.  And there has been a

19  great deal of material not translated.

20          MR. JAFFE:  That's my mistake, Your Honor.  We

21  would only offer the redacted articles and not seek

22  anything more than what was translated and what is

23  redacted.

24          THE COURT:  And it does not say, Mr. Gorman, that

25  having a tattoo is a crime.  It says that they identify as

1  MS-13 members by the tattoos and that's what they're using

2  to base their detention decision on.  Does not say that

3  it's the crime itself.  So ...

4        MR. GORMAN:  I think just being detained because

5  you have a tattoo --

6        THE COURT:  Well, that's how they're identifying

7  them as MS-13 members.  But the real point, the real

8  relevance of these articles is the presence in the

9  purported MS-13 member's apartment here in Maryland, I

10  think two years after the date of the article or

11  thereabouts, because I believe they probably were found in

12  2005, although I honestly don't remember all the dates, and

13  it's dated in July of 2003.

14        And it is a mechanism for people here to know

15  what's going on with police actions vis-a-vis MS-13 in El

16  Salvador, so they are relevant for that purpose.  I am

17  certainly telling the jurors that any article is not to be

18  read for the truth of anything asserted in it but for the

19  fact that they exist and were found where the evidence

20  might show they were found.

21        But I point out that these have been redacted.

22  It is not the entire article that has been translated.  But

23  I direct that with 39B, there is an additional section that

24  I think should come out, which is the expressed fear of the

25  community that some of these will be released because the

1   crimes are so minor and that they will come back and

2   intimidate in the neighborhood.  So that part comes out.

3           MR. JAFFE:  Yes, Your Honor.

4           THE COURT:  39F is okay as is.

5           Okay.  I think that takes care of the exhibits,

6   at least the ones that I was notified about.

7           MR. JAFFE:  Yes.

8           THE COURT:  All right.  Is --

9           MR. JAFFE:  I apologize, Your Honor.  Before we

10  leave the exhibits, for 39B and F, there's these

11  photocopies that have the redacted articles.  Is it the

12  Court's instruction to remove the original of the articles

13  and just have the photocopies underneath of the articles?

14  The articles, both photocopy and original, are in Spanish,

15  which the jurors aren't going to be reading anyway, but

16  whatever the Court's preference is will be fine with the

17  Government on that.

18          THE COURT:  You may use during argument the

19  fact -- you may show them, if you want -- I mean I don't

20  know if you're going to -- the originals, but I direct

21  those not go back.

22          MR. JAFFE:  Yes.

23          THE COURT:  There are some jurors who speak some

24  Spanish, and I don't want them tempted -- I don't want a

25  problem with it, frankly, so only the photocopy of the

1    redacted article is to go back.

2         But as a demonstrative tool during closing, if

3    anybody wants to show it, they may.

4         MR. JAFFE:  Yes, Your Honor.  Thank you.

5         MR. GORMAN:  Your Honor, as far as the Otis

6    Street video, where my client is on the video, I'd ask that

7    that not go back for the same reason.  If they have

8    something to play it, they're going to hear the words in

9    Spanish.  I know the Court said that that's not the

10   evidence, the evidence is what's on the written

11   translation, so we'd ask the Court either not to let it

12   come back, because no matter what the Court says, they

13   could still try to put the audio on, or, in the

14   alternative, instruct them not to turn the audio on at all.

15   But I'd ask the Court --

16        THE COURT:  Let me find out.  We don't have

17   equipment to send back.  Does the Government have one or

18   not?

19        MR. PARK:  I believe we can find something

20   because the actual disk itself is a DVD, so it's not going

21   to require a computer.  You can just stick it into a

22   regular DVD player, and it can be viewed that way.  So

23   we've --

24        THE COURT:  And that we do have, right?

25        MR. PARK:  We put it into a format where it's

1    actually playable now by -- in a DVD format.

2              THE CLERK:  We have combination DVD/VCR units

3    that we can wheel back --

4              MR. PARK:  And I've tested it on actually this --

5    at least this DVD in the podium here, so it should work.

6              THE COURT:  Okay.  Mr. Gorman, we will talk about

7    the jury instructions, and I do tell them some limiting

8    instructions as to that.  Typically we do send recordings,

9    even those in different languages and ones that there are

10   transcripts for.  The jury may well need to satisfy itself

11   in connection with Ms. Segal's testimony, that they think

12   she got what's on there, so it's -- it may be part of their

13   deliberation process to listen to at least some of it,

14   audio as well as the visual.

15             But I will work with you as we talk about the

16   actual jury instructions in terms of how to emphasize to

17   them that they are not to try to make any translation or

18   interpretation of any of the Spanish language materials

19   because there is a lot of it that they will see.  But,

20   instead, they must rely on the English as it has been

21   provided to them.

22             I, frankly, feel the same way about the letters,

23   which I think have more significant messages, that they

24   might read.  And I want to -- they're going back.  I

25   can't -- they are the exhibits.  Some of them have drawings

1   on them as well, so it's just not possible for me not to

2   send the originals back.

3         So we'll work on what additional or changed

4   language would be appropriate in the jury instructions, but

5   I am not going to refuse to send that exhibit back.

6         The jurors will not be getting any of the

7   firearm, ammunition -- what about the clothing?  I mean ...

8         MR. PARK:  In past, the clothing has gone back,

9   Your Honor.

10        THE COURT:  It's all in bags?

11        MR. PARK:  They're all in bags.  The only thing,

12  I guess, I would also suggest maybe we don't send back

13  would be -- there's, I think, a tattoo machine which has

14  some sharp edges on it.

15        THE COURT:  Right.  Well, I'll tell them that

16  they will get the documentary exhibits, the electronic

17  exhibit, but not any weapons, or any sharp -- well, just

18  some of the physical exhibits won't be going back.  If they

19  think there is anything they wish to examine, they should

20  notify me, and they'll be brought back into the courtroom

21  for appropriate opportunity to look at anything else.

22        MR. PARK:  Your Honor, just to clarify, we

23  obviously have no intention of and have not in the past

24  sent back live ammunition.  As to casings and spent

25  bullets, though, we would suggest that that would be

1    appropriate to send back.

2                THE COURT:  That's okay?

3                MR. PARK:  They're all bagged up.  There's no

4    gunpowder or any sort of ability to discharge or fire those

5    off.

6                THE COURT:  Okay.

7                All right.  We've now reached 3:30.  Let's take a

8    15-minute break.  I'll meet you back in my office at 3:45.

9                MR. PARK:  Thank you, Your Honor.

10               (Proceedings adjourned.)

11

12                    COURT REPORTER'S CERTIFICATE

13                            -oOo-

14               I certify that the foregoing is a correct

15   transcript from the record of proceedings in the above

16   matter.

17

18   Date:

19                            /s/

20                            Sharon O'Neill

21

22

23

24

25