1               UNITED STATES DISTRICT COURT
                 DISTRICT OF MARYLAND
2                   SOUTHERN DIVISION

3

UNITED STATES OF AMERICA    .
4                           .
       vs.             .  DKC-05-0393
5                           .
VICTOR RAMIREZ          .  GREENBELT, MARYLAND
6 DEFENDANT              .
                          .  NOVEMBER 12, 2008
7

8                  TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE DEBORAH K. CHASANOW,
9         UNITED STATES DISTRICT JUDGE, AND A JURY

10

11 A P P E A R A N C E S:

12 FOR THE GOVERNMENT:        CHAN PARK, ESQ.
                         DAVID JAFFE, ESQ.
13                        ROB HUR, ESQ.
                          ASSISTANT U.S. ATTORNEYS
14

15 FOR THE DEFENDANT:         WARREN E. GORMAN, ESQ.

16

17

18

Court Reporter:         Sharon O'Neill, RMR
19                        Official Court Reporter
                       United States District Court
20                        6500 Cherrywood Lane - RM 200
                       Greenbelt, Maryland 20770
21                        301-344-3227

22

23

24

25

I  N  D  E  X

                                                          PAGE

JURY INSTRUCTIONS                                          23


CLOSING ARGUMENTS

Mr. Jaffe                                                   76
Mr. Gorman                                                 134
Mr. Park                                                   154

1          THE COURT:  Good morning.

2          VOICES:  Good morning, Your Honor.

3          THE COURT:  Please be seated.

4          I met with counsel on Thursday afternoon to talk

5     about jury instructions, and I then sent out a revised

6     draft that I hope everyone received.  I received a

7     submission by email from the Government, not necessarily

8     concerning jury instructions but concerning the interstate

9     commerce aspect of Count 29.

10         This morning Mr. Gorman indicated that he wanted

11    to discuss some of the issues raised in the former

12    codefendant's submission to the Court concerning jury

13    instructions, so I suggested, for all of those reasons, we

14    needed to meet before we began this morning.

15         I'll point out that in rereading the draft I sent

16    to you, when I had moved the aiding and abetting

17    instruction around, I inadvertently also moved a portion of

18    Count 30.  I don't know which draft you have in front of

19    you, but I believe if -- let's see.

20         On page 42 of the draft that I emailed to you, it

21    then says, "The second element the Government must

22    prove" -- I think that's it -- just before Count 30.  Is

23    that not there?

24         MR. PARK:  I have it on page 40 of our draft.

25         THE COURT:  Okay.  But it's just before the

1    beginning of Count 30 --

2                MR. PARK:  Right.

3                THE COURT:  -- is the second element that doesn't

4    belong there.  That, instead, needs to go -- on my page 45,

5    for some reason, I have the fourth element, and -- anyway

6    I've moved that one paragraph and put it in place of that

7    erroneous reference to the fourth element.

8                MR. PARK:  Yes, Your Honor.  We see that.

9                THE COURT:  I think that's the only change I've

10   made in the draft that I sent to you.

11               Did anyone find anything other than what

12   Mr. Gorman wants to talk about?

13               MR. GORMAN:  There was one other thing I don't

14   know -- I asked about, but I --

15               THE COURT:  Um hum.

16               MR. GORMAN:  -- they put on a lot of evidence

17   about rape, and I -- I know I brought this up, and I want

18   just, perhaps, a line in there saying that the defendant is

19   not charged with rape or something to that effect.

20               THE COURT:  There is a sentence -- I don't know

21   how your pages come out.  It's on my page 27.  The term

22   racketeering activity as charged in the indictment means,

23   A, murder and attempted murder, robbery and/or obstruction

24   of justice or witness tampering.  I will define those

25   crimes a little later.  The crime of rape is not included

1    in the definition of racketeering activity.

2            So I did put in that sentence as we had discussed

3    at the conference.

4            Okay, Mr. Gorman, the issues you wanted to raise?

5            MR. GORMAN:  Including the issues that we brought

6    up at the --

7            THE COURT:  Anything you wish to put on the

8    record at this point, but you did call this morning and

9    said the multiple conspiracy instruction should be

10   considered.

11           MR. GORMAN:  I think -- I think it should.  I

12   mean the Government is coming up -- its theory is that

13   anybody who was part of the MS-13 gang is part of an

14   international conspiracy, and they brought in evidence of

15   different countries and different states, and in my

16   cross-examination I brought up these points on a lot of

17   time -- a lot of different times.  It's my theory that

18   there is not an international conspiracy, that each gang is

19   autonomous -- or each group of individuals is autonomous.

20   There was testimony from a number of the witnesses that

21   they were not in contact with other cliques in other

22   states.  They didn't know about their rules.  They didn't

23   know if their rules were the same.

24           I think that there is more than enough evidence

25   to suggest that there is not an international conspiracy

1    but multiple conspiracies.

2              There is evidence that was put forward that my

3    client was in El Salvador.  There's no evidence that my

4    client was actually even in this country when a number of

5    the alleged acts took place.  If it's not an international

6    conspiracy but each conspiracy is different, then these

7    murders could not be attributed to him because he did not

8    join that clique, at least according to the Government's

9    evidence, until either the summer or September of 2005.  A

10   number of the matters that were brought up by the

11   prosecution occurred in 2003, such as, I think, the Gudiel

12   murder, and perhaps another murder, so he wasn't even in

13   the country then.

14             So if there is not an international conspiracy

15   but just individual conspiracies, he could not be

16   responsible for those since he didn't join the clique in

17   Maryland, at least according to their evidence, until 2005.

18             So we feel that, based on all of that, that there

19   should be a proposed instruction about multiple

20   conspiracies.

21             Also, some of the other matters that I brought up

22   which I want to put on the record, as far as the elements

23   of conspiracy, there's nothing in the instructions or not

24   specific elements of proof of racketeering activity or a

25   pattern of racketeering activity.  There's nothing in there

1    to show that the prosecution must show that the defendant

2    had not drawn from the racketeering activity.  There's no

3    specific language stating that the defendant should have

4    known about and agreed to facilitate two or more acts or he

5    committed or participated in two or more racketeering acts.

6    There's nothing in the instructions specifically that says

7    that the jury must agree which racketeering acts were

8    committed.  For instance, they could agree that, at least

9    based upon the instructions and based upon the verdict

10   form, that seven of the jurors could, for instance, agree

11   that my client participated in the October 9th murder as

12   opposed to the -- and five would think that they didn't,

13   whereas the other five might think he participated in the

14   October 18th murder, and that way they'd be unanimous, but

15   you don't know which act they'd be unanimous for.

16          So they could make a determination that he

17   committed some murder or participated in some murder, and

18   they all 12 might agree, but they may not agree as to which

19   particular murder or robbery.

20          For instance, one of the cooperators said that

21   they participated in about seven robberies, and they didn't

22   give a particular date, but they could come to the

23   determination that yes, he must have participated in one of

24   those seven robberies and perhaps the robbery on

25   November 14th, and they might not be unanimous on which

1    one.

2         So I don't think it's clear that they have to

3    agree specifically unanimously that he participated in or

4    was part of the group when two of these acts were

5    committed.

6         There's no -- I know we went over this, but we

7    still take the position that there's nothing about -- no

8    malice aforethought in the instructions.  There's nothing

9    on interstate commerce concerning robbery.  In the

10   obstruction of justice instruction, it does not eliminate

11   statements to a State Grand Jury, and we think that it

12   should.

13        The witness tampering instruction does not limit

14   the cases to pending cases.  For instance, he could have

15   tampered with a witness where there's no case pending, and

16   we'd suggest to the Court that that would not be witness

17   tampering.

18        We'd ask the Court to consider the reasonable

19   doubt instruction that I put in as opposed to the one that

20   the Court's given.

21        They haven't put on any specific proof that he

22   had not withdrawn or left the conspiracy.  I think I've

23   already said that.

24        And I also mentioned proof about mere association

25   or mere presence.

1          So those are my objections.

2          THE COURT:  Does the Government wish to be heard?

3          MR. PARK:  Your Honor, I lost track a little bit

4   in terms of all the different concerns or objections that

5   the defense counsel wanted to put on the record.  I guess

6   we don't believe that these various instructions or

7   proposals are well-founded.  I'm not sure if --

8   particularly on the multiple conspiracy one, I guess that's

9   the one new issue that has been raised that was not

10  discussed in chambers during our charging conference.

11         On that particular proposed instruction -- and I

12  guess I haven't studied the proposal from Mr. Gorman at

13  all, but presuming it's based on 19-5 -- 19-5 from Sand and

14  Siffert or something close to that, and we don't believe

15  that there is any grounds or reason for a multiple

16  conspiracy charge or instruction in this particular case.

17         It is not something where any evidence has seemed

18  to indicate that there are multiple conspiracies.  This is

19  a case where there's a single defendant.  There's not a

20  danger or a concern about a variance from the indictment in

21  any way.  It is a single defendant charged here with a

22  conspiracy.  There's obviously been discussion about the

23  different cliques, but it's all been under the umbrella of

24  a single conspiracy, a single RICO conspiracy, and a single

25  enterprise known as MS-13.

1       This is not -- again, just looking briefly -- and

2   I know -- I apologize.  We've briefed this previously in

3   other cases.  I don't have the paperwork in front of me or

4   the case law to cite, but I know, looking even at the

5   commentary following the Sand and Siffert instruction in

6   19-5, it talks about the fact that this is only

7   appropriate -- or it's not appropriate, rather, in cases

8   where there is a single defendant on trial.  It's something

9   where the charge need not be submitted to the jury if there

10  has been substantial evidence demonstrated to the jury that

11  there is an ongoing conspiracy, there's an ongoing single

12  conspiracy here, and the factors are whether there's a

13  common goal.  This is all going, again, to the same type of

14  framework that we've presented with the RICO conspiracy.

15  There is a common goal, the nature of the scheme is very

16  consistent and similar throughout, and there are

17  overlapping participants.

18       And there's nothing clearer in term of the

19  overlapping participants than the fact that Mr. Ramirez is

20  in a video taken in El Salvador in a prison there -- in

21  Quezaltepeque with Cisco and Trece, who are the same ones

22  who call up to the clique here in Maryland and talk about

23  not only Mr. Ramirez's role up here in Maryland but then

24  also talk about what the clique should be doing here in

25  Maryland, which is, in fact, what they go out and do in

1    terms of the murders and the robberies and the continuance

2    of their criminal acts.

3            I'm not sure what more the Court wants to hear on

4    that particular issue, but we're happy to brief it or go

5    find case law if the Court desires.

6            THE COURT:  I do not find it appropriate to give

7    a multiple conspiracy instruction here.  The charge here is

8    conspiracy to participate in MS-13 that the Government

9    contends is a racketeering enterprise.  It is somewhat of a

10   two-step process in the jury's consideration, but the facts

11   here and the evidence do not generate a multiple conspiracy

12   instruction.

13           The defense had argued in its papers for a

14   slightly different formulation of the racketeering

15   enterprise elements by citation to some other cases,

16   including United States v. Smith, a 2005 decision from the

17   Tenth Circuit.  I looked at that after our conference to

18   see how that formulation fit in with the draft I had before

19   everyone, and I think, frankly, they're not inconsistent.

20           The focus the jury will be told is that the

21   defendant has to have agreed to participate in the

22   objective of the enterprise to engage in that pattern of

23   racketeering activity, so I think the current jury

24   instructions do incorporate the elements as suggested.

25   They may not track in terms of the exact numbering or the

1    order of them, but I think the concept is in there.

2              I don't think it appropriate to give any

3    withdrawal instruction.  The jury has to find that the

4    Government has proven beyond a reasonable doubt the

5    defendant's participation in this conspiracy, and I saw no

6    evidence or heard none of any withdrawal.

7              The malice aforethought, I don't think is

8    necessary.  I think the components of state law murder and

9    attempted murder are correctly set forth.

10             It is correct that I don't define the robbery in

11   connection with the racketeering activity with any

12   interstate commerce nexus because it doesn't apply.  What

13   we're talking about there is robbery under state law as one

14   of the predicates for racketeering.

15             We do define the interstate commerce aspect for

16   Count 29 because that's where it does apply.

17             I think I've adequately described obstruction of

18   justice and witness tampering as part of the racketeering

19   activity.

20             And finally, it is not appropriate to define the

21   concept of reasonable doubt at the outset.  If the jury

22   asks a question, we'll talk about appropriate language to

23   tell them, but the position in the Fourth Circuit is that

24   it's a term that is best not attempted to be defined unless

25   the jury expresses a question about it.

1         I hope I've mentioned everything that has been

2    brought up.

3         I think our jurors are here.  I guess we're

4    ready.

5              MR. GORMAN:  I have another matter.

6              THE COURT:  Um hum.

7              MR. GORMAN:  I wanted to renew my motions and

8    argue them briefly if I could.

9              THE COURT:  Um hum.

10              MR. GORMAN:  I move for a motion for judgment of

11   acquittal on all counts based upon the fact that the

12   prosecution has not proven them sufficiently, that it's a

13   little bit different situation now than it was at the end

14   of the prosecutor's case.

15         Specifically, I'd like to argue Counts 29 and 30.

16   In Count 29, there has to be some kind of nexus of

17   interstate commerce.  As far as the prostitute, the robbery

18   of the prostitute is concerned, of course my client was

19   never identified, but, more specifically, no one put a gun

20   to her head and said give me your money.  If they did

21   anything, they put a gun to her head or threatened her with

22   rape, and rape is not a predicate crime.  So as far as she

23   is concerned, there's no -- there's no robbery.

24         I mean there's a difference between robbery,

25   burglary and theft.  You could argue that maybe a burglary

14

occurred or a theft occurred, but certainly no robbery.

As far as perhaps coming up with the theory that this other person who testified was robbed, well, there's no -- there was no testimony about that person about interstate commerce, so there's no robbery there.

Now, I read -- I looked at this Manning case that the prosecution came forward with, and we'd suggest that it can be differentiated.  In that particular case, the person came over to someone who had just left the store and put a gun to his head.  Now, that's robbery.  And you can say that, well, that's robbery because he was coming -- the theory was he was coming out of the store and he worked for the store.

Well, in this particular case, no gun was put to this prostitute's head to commit robbery.  They -- they used force to commit the rape, and according to the prosecution's evidence, my client's participation was that he took some of the jewelry and then was caught with it. Well, that's burglary, or that's theft.  That's not -- that's not robbery.

And in order to make the robbery count, they would have had to have used some kind of force or threat to -- to steal this property.  The theory that they conspired to rob some unknown person before they came there, we would suggest, is inappropriate and not

1    sufficient.

2          They -- even on their testimony, what they

3    conspired to do was go to this house of prostitution and

4    commit a robbery.  Well, they did rob this, or supposedly,

5    this client, but what they did was they -- they didn't

6    commit a robbery on the person with the nexus, so we'd

7    suggest to the Court that their theory is insufficient.

8    There's not enough to go to the jury on on the robbery.  So

9    we'd ask the Court to dismiss that count.

10         And, of course, if the Court dismisses that

11   count, the Court would also have to dismiss Count 30

12   because that is based solely on the robbery.

13         So we'd ask the Court to consider that and

14   dismiss Count 1 because there's insufficient evidence and

15   Count 29 and 30 for the reasons that I've stated and for

16   all other reasons.

17         THE COURT:  Mr. Park.

18         MR. PARK:  Your Honor, we'll, I guess, rely on

19   our previous argument as to Count 1.  We believe that the

20   evidence has been sufficient as to the RICO conspiracy to,

21   at the very least, get it to the jury.  If the Court would

22   like to hear more argument on that, we're happy to go

23   through that.

24         In terms of Counts 29 and 30, we did supply the

25   Court with an additional case, and, for the record, it's

1    United States vs. Manning. It's a Fourth Circuit case out

2    of South Carolina from 2000.  It's Westlaw -- 2000 Westlaw

3    1468444.  That is one of the cases that we're relying on.

4    Obviously we had cited a couple cases to the Court last

5    week as well for the general propositions regarding

6    interstate commerce and the nexus that's required and the

7    minimal and potential or probable or actual effect on

8    interstate commerce that the Courts have deemed necessary

9    to uphold a conviction at the very least, we would submit,

10   to get it to the jury at a Rule 29 juncture.

11           Mr. Gorman's relying, I guess, on an argument

12   that, despite the fact that he seemed to concede that there

13   was an interstate nexus or some contact with interstate

14   commerce as to the prostitute, that because there was no

15   force used as to a robbery of her or no gun put to her head

16   in the -- at the actual time that jewelry was taken from

17   her, that doesn't constitute a robbery, and there's no

18   nexus to a robbery.

19           The rape itself is force.  The brandishing of a

20   gun in the apartment when they enter and when they start

21   tying up the doorman and then taking the victim prostitute

22   back to the back room is not only threat of force, but then

23   the actual use of force and restraint in the course of the

24   robbery.  And, again, the evidence showed that the

25   defendant Ramirez had on his person at the time of his

1    arrest the jewelry and property of the victim prostitute.

2            To go to the overall argument, I guess, that we

3    had articulated, perhaps not so artfully last week, but

4    hopefully a little more coherently in the letter we

5    submitted to the Court on Monday, in line with Manning and

6    the finding there that a robbery or -- rather, an attempted

7    robbery of an employee of a business, with the threat of

8    force or the use of force, where the ultimate target of the

9    conduct, the ultimate target of that robbery or the plan by

10   the defendants was the business assets is applicable here

11   in the sense that the testimony from the trial was that

12   these defendants or these individuals from MS-13 conspired

13   on a number of occasions to go and rob prostitution places,

14   to rape prostitutes there, but, again, on the issue of

15   robbery, to rob the places and to take the proceeds.

16            This was another in a series of events.  And,

17   again, I'm not -- we're not trying to bootstrap all those

18   seven or eight or whatever incidents just into this

19   particular instance, per se.  Even standing alone, I think

20   it would be sufficient.  But that, I think, sets the

21   context for what is happening here and the intent of the

22   defendant and the intent of his cohorts in going to that

23   prostitution place, in going after the assets of the

24   business.

25            The intent was not to go and try and just rob

1    individuals, individual targeted doormen or individual

2    targeted prostitutes there.  The intent was to get to the

3    assets of the business and, perhaps, the potential assets

4    of the business that might be found in the pockets of the

5    customers who either were there or were arriving there, as

6    was the case on November 14th of 2005.

7            And so when looked at in the framework of the

8    jury instructions and the case law where it talks about a

9    minimal requirement is -- a minimal effect is all that's

10   required, it could be a potential or probable effect on

11   interstate commerce.

12           In this case where you have the prostitute coming

13   from Virginia, testifying as such, talking about the fact

14   that she splits the proceeds with the owner or the doorman

15   of the brothel, and that was the case in this particular

16   instance in terms of how she testified and how the

17   arrangement was, that the taking of property, the taking of

18   the jewelry, the taking of the cell phone from the

19   prostitutes, the taking of the money and the cell phone

20   from the customer as well, who was there to partake of or

21   to try and buy the services of the prostitute, all fall

22   within the scope of this activity of the business.  And

23   then the attempted robbery -- well, actually, successful

24   robbery, to a certain extent, does fall within the scope of

25   that and does affect interstate commerce.

1          I would also note that it's not something where

2    the actions had been completed.  As was the case in the

3    earlier robbery that day with Travieso and the defendant,

4    they had robbed the place, they had raped the prostitute,

5    and then they had threatened to -- the doorman that if he

6    did not continue paying, that they would come back.  There

7    was an extortion demand.

8          Well, before that could happen in this particular

9    instance, obviously, the police arrived in the form of an

10   undercover detective at the door, but, nonetheless, it was

11   something where it was interrupted.

12         Looking at the language of the statute, I believe

13   under 1951 there are -- I'll grab the book in a second, but

14   they're talking about the use of force, the threat of force

15   or the threat or use of force in furtherance of this plan

16   or purpose to violate that particular section.  So under

17   1951, I think under all three of those prongs -- not

18   prongs, but I mean looking at the language, it falls within

19   the scope of that as charged in the indictment in terms of

20   the defendant being there, attempting to or actually

21   robbing the brothel there or using force or threatening

22   force in furtherance of that plan to violate this

23   particular statute.

24         So for those reasons, Your Honor, we ask that the

25   Court deny the Rule 29 motion, at least at this juncture,

1    and allow it to get to the jury, at the very least to

2    reserve judgment or reserve ruling on this particular

3    motion until after the jury has had a chance to consider

4    it, and if the Court so desires and has the same concerns,

5    we can revisit it after the jury's verdict.

6         Your Honor, may I just add one thing?  I did get

7    the book in front of me, and one other point that we did

8    not mention in the letter but that we think is relevant

9    also is the statute talks about whether or not there's

10   any -- in any way an obstruction or delaying or effect of

11   commerce or the movement of any article or commodity in

12   commerce, and at the risk of being crass about it, but I

13   think it does fall within the scope of the facts of this

14   case, in the prostitution business, the prostitute herself,

15   the female herself, is part of the business in terms of the

16   commodities or what is being used in the course of that

17   business.  It's vital, obviously, it's essential to that

18   business surviving and existing and continuing at that

19   location.

20        So, for example, with this individual who came

21   from Virginia, who's there to work as a prostitute, and I

22   think she testified she would work either just on the

23   weekends or sometimes during the week at times, but that

24   she came from Virginia via Greyhound bus and then taxi to

25   that particular location.  The robbery and the rape and

1    what transpired at that particular location on that day

2    would potentially affect her travel back to that location,

3    the existence of that -- or the continuation of that

4    particular business and the survival of that business, at

5    least vis-a-vis that particular individual, where she had

6    testified that she would arrange via cell phone with the

7    owners to arrange time and scheduling for her to be there.

8              MR. GORMAN:  May I be heard briefly in rebuttal?

9              THE COURT:  Sure.

10             MR. GORMAN:  The item about all these other

11   robberies, he's not charged in Count 29 with all these

12   other robberies.  He's only charged in the November 14th

13   robbery, so that's at this particular place.

14             As far as, I guess, the argument that she's a

15   prostitute and it affects interstate commerce, they've got

16   to prove that.  There's no evidence that some of these

17   other people came from somewhere else.  I don't think the

18   Court can assume that this customer who was mentioned --

19   that's the only one I think the Court could take into

20   consideration -- moved in interstate commerce because he

21   didn't testify to it, and there was no other evidence

22   brought in about interstate commerce other than her.  So if

23   she wasn't robbed, if she wasn't robbed, then the count

24   fails.  And if the count fails, Count 30 fails.

25             THE COURT:  I think the evidence is sufficient on

1   the interstate commerce aspect of Count 29 and, therefore,

2   Count 30.  There's evidence from which the jury could

3   conclude that this event in Wheaton on the date charged was

4   part of an overall attempt and intent to extort money from

5   people who ran prostitution houses.

6          The defense is focusing on the actual items taken

7   on this particular day, to the exclusion of the purpose and

8   intent.  The test is not quite so narrowly drawn for

9   sufficiency of the evidence purposes.

10          There's evidence that the woman involved in this

11  prostitution business at the time traveled from Virginia to

12  Maryland as part of her business activity, and I conclude

13  that the evidence is sufficient, viewed in the light most

14  favorable to the Government, to show that a successful or

15  completed robbery would have had an impact on interstate

16  commerce.

17          There was not only the testimony that the

18  customer whose money was actually taken was intending to

19  pay for the services on that occasion, there was also

20  testimony as to what impact or use the proceeds would have

21  gone to had the defendant and others not been interrupted

22  by the police on this occasion.

23          So I'll deny the motion for judgment of acquittal

24  on Counts 29 and 30.

25          Our jurors are here.  We'll bring them in.  I'll

1    instruct.  Will we need to take a brief break before --

2              MR. PARK:  Yes, just a few minutes, Your Honor,

3    just to set up and get the evidence.  We've got things, I

4    think, pretty much set up and have tested the audiovisual,

5    but we would need a few minutes, at least, to set up.

6              THE COURT:  And the discussion was that we will

7    have the Government's opening closing argument, we will

8    then take our lunch recess, and then we'll hear from

9    Mr. Gorman and then final rebuttal this afternoon.

10             MR. PARK:  Yes, Your Honor.  Thank you.

11             (Jury present.)

12             THE COURT:  Good morning.

13             THE JURY:  Good morning.

14             THE COURT:  As I indicated last week when we

15   recessed, today I'm going to begin by giving you the

16   instructions on the law.  After that, we will hear the

17   closing arguments from counsel.  That will take us through

18   a good part of the day into this afternoon, so I hope

19   you're rested and ready to listen.

20             At the outset, let me thank you for the attention

21   which you have paid to the lawyers and the witnesses in the

22   case and to all the evidence that has been introduced.  I

23   also want to thank you for your patience in enduring the

24   delays and hearings outside of your presence, which are

25   inevitable in any case.

1        My instructions to you are organized into three

2   parts.  The first part deals with criminal cases generally,

3   the second part relates to the law applicable to the

4   specific crimes charged in this case, and the third and

5   shortest section applies to the mechanics and procedure of

6   your deliberations.

7        If during the course of these instructions I

8   state any rule, direction or idea in varying ways, no

9   emphasis is intended by me, and none must be inferred by

10  you.  You are not to single out any certain sentence or

11  individual point or instruction and ignore the others.

12  Rather, you are to consider all of my instructions as a

13  whole, and you are to regard each instruction in the light

14  of all others.  You will have a copy of these instructions

15  for use during deliberations.

16        As you know, the functions of the judge and of

17  the jury in a case of this sort are quite different from

18  one another.  It is my duty as judge to instruct you as to

19  the law which applies to the case.  It is your duty to

20  decide the facts and, in deciding the facts, to comply with

21  the rules of law and apply them as I state them to you,

22  without regard to what you think the law is or should be.

23  In deciding the facts and issues of fact, you must decide

24  them without prejudice or bias or sympathy.

25        You are instructed that you are not to consider

1    whatever sentence may be given a defendant if you find a

2    defendant guilty since the matter of sentencing lies solely

3    within the province of the Court.

4         You and only you are the judges of the facts.  If

5    any expression of mine or anything I may or may not have

6    done or said would seem to indicate any opinion relating to

7    any factual matter, I instruct you to disregard it.

8         During their arguments, counsel may refer to some

9    of the evidence.  In determining the guilt or innocence of

10   a defendant, you may consider not only the evidence

11   referred to by counsel, but any which you may believe to be

12   material.  If any reference by counsel to matters of

13   evidence does not coincide with your own recollection, it

14   is your recollection which is to control during your

15   deliberations.

16        Some people have taken notes during trial.  As I

17   instructed you at the outset of the case, the notes will

18   not control when the jury is deliberating.  Each juror's

19   individual recollection is to be considered.

20        There are two types of evidence from which a jury

21   may properly find the facts of a case in determining

22   whether a defendant is guilty or not guilty of an offense.

23   One is direct evidence, such as the testimony of an

24   eyewitness.  The other is circumstantial evidence, the

25   proof of a chain of circumstances pointing to the existence

1   or nonexistence of a fact.

2          There is a simple example of circumstantial

3   evidence.  Assume that when you came into the courthouse

4   this morning, the sun was shining and it was a nice day.

5   Assume that the courtroom had windows but the blinds were

6   drawn and you could not look outside.  As you were sitting

7   here, someone walked in with an umbrella which was dripping

8   wet.  Somebody else then walked in with a raincoat which

9   was also dripping wet.

10          Now, you cannot look outside of the courtroom,

11   and you cannot see whether or not it is raining.  Thus, you

12   have no direct evidence of that fact, but, on the

13   combination of facts which I have asked you to assume, it

14   would be reasonable and logical for you to conclude that it

15   had been raining.

16          That is all there is to circumstantial evidence.

17   You infer on the basis of reason and experience and common

18   sense from an established fact the existence or the

19   nonexistence of some other fact.

20          Circumstantial evidence is of no less value than

21   direct evidence.  As a general rule, the law makes no

22   distinction between direct and circumstantial evidence but

23   simply requires that before convicting a defendant, the

24   jury be satisfied of the defendant's guilt beyond a

25   reasonable doubt from all the evidence in the case.

1          You are to consider only the evidence in the

2     case, but in your consideration of the evidence, you are

3     not limited to the bald statements of the witnesses.  On

4     the contrary, you are permitted to draw from facts which

5     you find have been proved such reasonable inferences as

6     seem justified in the light of your own experience.

7          An inference is not a suspicion or a guess.  It

8     is a reasoned, logical decision to conclude that a disputed

9     fact exists on the basis of another fact which you know

10    exists.

11         There are times when different inferences may be

12    drawn from facts, whether proved by direct or

13    circumstantial evidence.  The Government asks you to draw

14    one set of inferences, while the defense asks you to draw

15    another.  It is for you and you alone to decide what

16    inferences you will draw.

17         The statements and arguments of counsel and

18    questions which they ask containing assertions of fact are

19    not evidence and should not be considered as evidence

20    unless made as a stipulation.

21         Let me emphasize that a lawyer's question is not

22    evidence.  At times, a lawyer may have incorporated into a

23    question a statement which assumed certain facts to be true

24    and asked the witness if the statement was true.  If the

25    witness denied the truth of the statement and if there is

no evidence proving that the assumed fact is true, then you may not consider the fact to be true simply because it was contained in the lawyer's question.

On the other hand, a witness's answer is evidence, and if a witness agrees with a statement made by counsel, you may consider that as evidence.

At times throughout the trial, I have been called upon to pass on the admissibility of certain offered evidence.  You should not be concerned with my rulings or the reasons for them.  Whether evidence which has been offered is admissible or is not admissible is purely a question of law, and from a ruling on such a question, you are not to draw any inference.

In admitting evidence to which an objection has been made, the Court does not determine what weight should be given to such evidence.  You must not guess what the answer might have been to any question to which an objection was sustained, and you must not speculate as to the reason the question was asked or the reason for the objection.  Every party has the right to object to any evidence and to obtain from the Court its legal opinion as to whether such evidence is admissible and, if admissible, for what purposes and to what extent.  You are not to infer that any objection to evidence had any other purpose.

Any evidence as to which an objection was

1  sustained by the Court and any evidence which I have

2  ordered stricken must be entirely disregarded.

3  Furthermore, exhibits which have been marked for

4  identification but not received may not be considered by

5  you as evidence.  Only those exhibits received may be

6  considered as evidence.

7          This is a criminal case.  There are certain rules

8  which apply to criminal cases generally, to which I will

9  now refer.

10         A charging document, such as an indictment, is

11  simply a formal method of accusing a defendant of a crime.

12  It is not evidence of any kind against an accused and does

13  not create any presumption or permit any inference of

14  guilt.  A defendant's plea of not guilty puts in issue

15  every material allegation of fact contained in the charge,

16  and, further, the plea of not guilty serves as a continuing

17  denial by the defendant of the evidence offered against him

18  by the prosecution.

19         Another rule applicable to criminal cases is that

20  a defendant is entitled to the presumption of innocence.

21  Thus, a defendant, though accused, begins a trial with a

22  clean slate, that is to say with no evidence against him.

23  This presumption attends a defendant throughout the trial,

24  and the burden of overcoming this presumption rests upon

25  the Government, which must establish a defendant's guilt by

evidence beyond a reasonable doubt with respect to every essential element of the charge.  From the beginning of the trial to the end, the Government has the burden of establishing beyond a reasonable doubt every fact essential to the conviction of a defendant.  A defendant has no burden to sustain and has no duty to prove that he did not commit the alleged crime.

The defendant did not testify in this case. Under our Constitution, a defendant has no obligation to testify or to present any other evidence because it is the prosecution's burden to prove a defendant guilty beyond a reasonable doubt.  That burden remains with the prosecution throughout the entire trial and never shifts to a defendant.  You may not attach any significance to the fact that the defendant did not testify.  No adverse inference against him may be drawn by you because he did not take the witness stand.  You may not consider this against the defendant in any way in your deliberations in the jury room.

A reasonable doubt may arise not only from the evidence produced but also from a lack of evidence.  Since the burden is upon the prosecution to prove an accused guilty beyond a reasonable doubt of every essential element of the crime charged, a defendant has the right to rely upon failure of the prosecution to establish such proof.  A

1    defendant may also rely upon evidence brought out on

2    cross-examination of witnesses for the prosecution.

3            If you view the evidence as reasonably permitting

4    either of two conclusions, one of innocence, the other of

5    guilt, you should, of course, adopt the conclusion of

6    innocence.

7            You are the sole judges of whether a witness

8    should be believed.  In making this decision, you may apply

9    your own common sense and everyday experiences.

10           In determining whether a witness should be

11   believed, you should carefully judge all the testimony and

12   evidence, the circumstances under which each witness has

13   testified and every matter in evidence which tends to

14   indicate whether the witness is worthy of belief.  Consider

15   each witness's intelligence, motive and state of mind and

16   his or her demeanor and manner while on the stand.

17   Consider also any relation each witness may bear to either

18   side of the case, whether a witness has demonstrated any

19   bias, prejudice or hostility toward a defendant, the manner

20   in which each witness might be affected by the verdict and

21   the extent to which, if at all, each witness is either

22   supported or contradicted by other evidence.

23           You have heard evidence from some witnesses that

24   they discussed the facts of the case and their testimony

25   with the attorneys before testifying in court.  Although

you may consider that fact when you evaluate a witness's testimony, you should also know that attorneys are permitted to consult with witnesses in advance of their testimony.

Inconsistency or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause you to discredit such testimony.  Two or more persons witnessing an incident may see or hear it differently, and innocent misrecollection, like failure of recollection, is not an uncommon experience.  In weighing the effect of a discrepancy, always ask yourself whether it pertains to a matter of importance or an unimportant detail and whether the discrepancy results from innocent error or intentional falsehood.

A witness may be discredited or impeached not only by contradictory evidence but also by evidence that at other times the witness has made statements which are inconsistent with his or her present testimony.  You have heard evidence that one or more of the witnesses made statements on an earlier occasion which counsel may argue are inconsistent with a witness's trial testimony. Evidence of any prior inconsistent statement was placed before you for the purpose of helping you decide whether to believe the trial evidence of any witness who contradicted

1  himself or herself.  If you find that the witness made

2  another statement that conflicts with the evidence

3  presented at trial, you may consider that fact in deciding

4  how much of the trial testimony, if any, to believe.

5  In making this determination, you may consider

6  whether the witness purposely made a false statement or

7  whether it was an innocent mistake, whether the

8  inconsistency concerns an important fact or whether it had

9  to do with a small detail, whether the witness had an

10  explanation for the inconsistency and whether that

11  explanation appealed to your common sense.

12  If you find that a witness has testified

13  willfully and falsely with regard to any matter at trial,

14  you may choose to reject any part or all of said witness's

15  testimony.

16  You have heard from witnesses who testified that

17  they were actually involved in criminal conduct charged in

18  the indictment and some who pled guilty to charges arising

19  out of some of the same facts as in this case.  You are to

20  draw no conclusions or inferences of any kind about the

21  guilt of the defendant on trial from the fact that any

22  prosecution witness pled guilty to similar charges.  The

23  witness's decisions to plead guilty were personal decisions

24  about their own guilt.  Those decisions may not be used by

25  you in any way as evidence against or unfavorable to the

1   defendant on trial here.

2          The Government is permitted to use accomplice

3   testimony and to enter into agreements with witnesses, to

4   bring the witness's cooperation to the attention of the

5   sentencing court and/or to consider seeking a reduction in

6   the sentencing range for that witness.  The testimony of an

7   accomplice may be enough, in itself, for conviction if the

8   jury finds that the testimony establishes guilt beyond a

9   reasonable doubt.  However, the testimony of an accomplice

10  or a cooperating witness is of such a nature that it must

11  be scrutinized with great care and viewed with particular

12  caution when you decide how much of that testimony to

13  believe.  You should ask yourselves whether the witness

14  would benefit more by lying or by telling the truth.  Was

15  this testimony made up in any way because the witness

16  believed or hoped that he or she would somehow receive

17  favorable treatment by testifying falsely, or did he or she

18  believe that his or her interests would be best served by

19  testifying truthfully?

20         If you believe that the witness was motivated by

21  hopes of personal gain, was the motivation one which would

22  cause the witness to lie, or was it one which would cause

23  the witness to tell the truth?  Did this motivation color

24  the witness's testimony?

25         You have also heard the testimony of law

enforcement officials.  The fact that a witness may be

employed by the federal, state or local government as a law

enforcement official does not mean that his or her

testimony is necessarily deserving of more or less

consideration or greater or lesser weight than that of any

other witness.  At the same time, it is quite legitimate

for defense counsel to try to attack the credibility of a

law enforcement witness.

During the trial you have heard testimony of

witnesses and may hear argument by counsel that the

Government did not utilize specific investigative

techniques, such as fingerprinting certain items or

conducting other forensic examinations.  You may consider

these facts in deciding whether the Government has met its

burden of proof because, as I told you, you should look at

all of the evidence or lack of evidence in deciding whether

the defendant is guilty.  However, you are also instructed

that there is no legal requirement that the Government use

any specific investigative techniques to prove its case.

Moreover, the law does not require the prosecution to call

as witnesses all persons who may have been present at any

time or place involved in the case or who may appear to

have some knowledge of the matters at issue in this trial,

nor does the law require the prosecution to produce as

exhibits all papers and things mentioned in the evidence.

1        You have also heard testimony in this case

2   regarding various law enforcement actions, such as

3   approaching people and asking questions, stopping,

4   arresting and searching people and searching locations and

5   vehicles pursuant to search warrants.  There is no issue

6   before you concerning the legal basis for any of these

7   actions.  It is up to you to decide what significance, if

8   any, the evidence presented has in this case as you decide

9   whether the Government has proven beyond a reasonable doubt

10  the charges as I will explain in a minute.

11       The evidence in this case also includes newspaper

12  clippings.  The articles are not to be regarded as evidence

13  that the events as stated in the articles actually

14  occurred.  That is, they cannot be considered for the truth

15  of any statement contained in the article.  Rather, the

16  newspaper clippings may only be considered for the fact

17  that the articles exist and were found in certain

18  locations.  For that reason, some of the contents of the

19  articles have been masked.

20       Some of the newspaper articles are in Spanish,

21  and other items received in evidence contain Spanish as

22  well.  For any exhibit not in English, you are not to try

23  to translate it or otherwise make any assumption about the

24  meaning of any words.  You may, however, rely on any

25  English translation provided orally or in writing here in

1    court.

2           One item of evidence is a videotape, and you have

3    received a typed document containing interpretations of the

4    audio on the recording along with some description of the

5    visual images.  Normally, such a transcript would be given

6    to you as an aid or guide to assist you in listening to or

7    viewing a recording.  However, in this instance, where

8    conversations were held in Spanish or visual images

9    contained the Spanish language, the transcript which was

10   produced by a translator was admitted as evidence.  With

11   respect to the portions of the video and audio that are in

12   Spanish, the transcript is the primary evidence for your

13   consideration.  As to the other parts of the video, your

14   own observations are to control, and the transcript is to

15   be used only as an aid in viewing the video.

16          Certain persons who were referred to as experts

17   were permitted to express opinions about matters that are

18   in issue.  A witness may be permitted to testify as to an

19   opinion on those matters about which the witness has

20   special knowledge, skill, experience and training.  Such

21   testimony is presented to you on the theory that someone

22   who is experienced in the field can assist you in

23   understanding the evidence or in reaching an independent

24   decision on the facts.  In weighing this testimony, you may

25   consider the witness's qualifications, opinions, reasons

1   for testifying, as well as all of the other considerations

2   that ordinarily apply when you are deciding whether or not

3   to believe a witness's testimony.  You may give this

4   testimony whatever weight, if any, you find it deserves in

5   light of all the evidence in this case.  You should not,

6   however, accept this witness's testimony merely because the

7   witness was permitted to express an opinion, nor should you

8   substitute it for your own reason, judgment and common

9   sense.  The determination of the facts in this case rest

10  solely with you.

11          In sum, you should look at all of the evidence in

12  deciding what credence and what weight, if any, you will

13  want to give to the testimony of any witness.

14          There is a type of evidence that is subject to

15  certain limitations.  You may recall that I have admitted

16  into evidence against the defendant the acts and statements

17  of other people who are not on trial because the Government

18  contends that these acts and statements were committed by a

19  person who was a coconspirator of the defendant on trial.

20  The reason for allowing this evidence to be received

21  against the defendant has to do with the nature of the

22  crime of conspiracy.

23          A conspiracy is often referred to as a

24  partnership in crime.  Thus, as in other types of

25  partnerships, when people enter into a conspiracy to

1    accomplish an unlawful end, each and every member becomes

2    an agent for the other conspirators in carrying out the

3    conspiracy.  Accordingly, the reasonably foreseeable acts,

4    declarations and statements and omissions of any member of

5    the conspiracy, which are done in furtherance of the common

6    purpose of the conspiracy, are deemed under law to be the

7    acts of all of the members, and all of the members are

8    responsible for such acts, declarations, statements and

9    omissions.

10          If you find beyond a reasonable doubt that the

11   defendant was a member of the conspiracy charged in the

12   indictment, then any acts done or statements made in

13   furtherance of the conspiracy by a person also found by you

14   to have been a member of that conspiracy may be considered

15   against the defendant.  This is so even if such acts were

16   done and statements were made in the defendant's absence

17   and without his knowledge.

18          However, before you may consider the statements

19   or acts of a coconspirator in deciding the issue of the

20   defendant's guilt, you must first determine that the acts

21   and statements were made during the existence and in

22   furtherance of the unlawful scheme.  If the acts were done

23   or the statements made by someone whom you do not find to

24   have been a member of the conspiracy, or if they were not

25   done or said in furtherance of the conspiracy, they may not

1    be considered against the defendant.

2              The fact that one party called more witnesses and

3    introduced more evidence than the other does not mean that

4    you should necessarily find the facts in favor of the side

5    offering more witnesses.  You do not have to accept the

6    testimony of any witness simply because the witness has not

7    been contradicted or impeached if you find the witness not

8    to be credible.

9              You also have to decide which witnesses to

10   believe and which facts are true.  To do this, you must

11   look at all the evidence, drawing upon your own common

12   sense and personal experience.  There is nothing peculiarly

13   different in the way a jury should consider the evidence in

14   a criminal case from that in which all reasonable persons

15   treat any question depending upon evidence presented to

16   them.  You are expected to use your good sense, consider

17   the evidence in the case for only those purposes for which

18   it has been admitted and give it a reasonable and fair

19   construction in light of your common knowledge of the

20   natural tendencies and inclinations of human beings.

21             You must consider and decide this case fairly,

22   calmly and impartially.  The fact that the prosecution is

23   brought in the name of the United States of America

24   entitles the prosecution to no greater consideration than

25   that accorded to any other party to a litigation.  By the

1   same token, it is entitled to no less consideration.

2          All parties stand equal before the law and are

3   entitled to the same treatment under the law.  You should

4   not be prejudiced for or against any person because of that

5   person's race, color, gender, religion, political or social

6   views, wealth or poverty, nor should you allow emotion or

7   moral judgments to enter your deliberations.

8          Part two, substantive instructions.  We will next

9   consider the crimes with which the defendant is charged.

10  The indictment contains three counts that relate to the

11  defendant on trial before you.  You must, as a matter of

12  the law, consider each count of the indictment and the

13  defendant's involvement in that count separately, and you

14  must return a separate verdict for each count.

15         You are about to be asked to decide whether or

16  not the Government has proven beyond a reasonable doubt the

17  guilt of the defendant.  You are not being asked whether

18  any other person has been proven guilty.  Your verdict

19  should be based solely upon the evidence or lack of

20  evidence as to this defendant in accordance with my

21  instructions and without regard to whether the guilt of

22  other people has or has not been proven.  You are not to

23  draw any inference, favorable or unfavorable, towards the

24  Government or the defendant on trial from the fact that

25  certain persons were not named as defendants in the

1    indictment.  The circumstances that these persons were not

2    indicted must play no part in your deliberations.

3           Whether a person should be named as a

4    coconspirator or indicted as a defendant is a matter within

5    the sole discretion of the United States Attorney and the

6    Grand Jury.  Therefore, you may not consider it in any way

7    in reaching your verdict as to the defendant on trial.

8           While we are on the subject of the indictment, I

9    should draw your attention to the fact that the indictment

10   charges that the specific acts and offenses occurred on or

11   about certain dates.  The proof need not establish with any

12   certainty the exact dates of the specific acts or offenses.

13   It is sufficient if the evidence in this case establishes

14   that the offenses were committed on dates reasonably near

15   the dates alleged in the indictment.  The law only requires

16   a substantial similarity between the dates alleged in the

17   indictment and the dates established by testimony or

18   exhibits.

19          It has been said that a crime consists of two

20   principle parts, a criminal intent and a criminal act.  Let

21   me talk for a moment about criminal intent.

22          Generally, intent to do something means someone

23   knows what he is doing and does it on purpose or willfully.

24   For each of the crimes charged in this case, the Government

25   must show beyond a reasonable doubt that with regard to the

1  criminal act charged, the defendant knowingly and willfully

2  specifically sought to do the illegal act charged.

3      I will now read for you definitions of the terms

4  knowingly and willfully.  A person acts knowingly if he

5  acts intentionally and voluntarily and not because of

6  ignorance, mistake, accident or carelessness.  Whether a

7  defendant acted knowingly may be proven by the defendant's

8  conduct and by all of the facts and circumstances

9  surrounding the case.  Willfully means to act knowingly and

10 purposely, with an intent to do something the law forbids,

11 that is to say with a bad purpose, to disobey or to

12 disregard the law.  The defendant's conduct was not willful

13 if it was due to negligence, inadvertence or mistake.

14     Knowledge, willfulness and intent involve the

15 state of a person's mind.  It has often been said to juries

16 that the state of one's mind is a fact as much as the state

17 of his digestion.  Accordingly, this is a fact you are

18 called upon to decide.  Medical science has not yet devised

19 an instrument which can record what was in one's mind in

20 the distant past.  Rarely is direct proof available to

21 establish the state of one's mind.  This may be inferred

22 from what he says or does, his words, his actions and his

23 conduct as of the time of the occurrence of certain events.

24 The intent with which an act is done is often more clearly

25 and conclusively shown by the act itself, or by a series of

1    acts, than by words or explanations of the act uttered long

2    after its occurrence.  Accordingly, intent, willfulness and

3    knowledge are usually established by surrounding facts and

4    circumstances as of the time the acts in question occurred

5    or the events took place and the reasonable inferences to

6    be drawn from them.

7           Count 1.  Count 1 of the indictment reads as

8    follows:  The racketeering conspiracy.  Beginning on a date

9    unknown to the Grand Jury, but at least as of in or about

10   2001 and continuing through in or about March 2007, in the

11   District of Maryland and elsewhere, the defendant, Victor

12   Ramirez, being a person employed by and associated with

13   MS-13, an enterprise engaged in and the activities of which

14   affected interstate and foreign commerce, together with

15   others known and unknown to the Grand Jury, did knowingly

16   and intentionally conspire to conduct and participate

17   directly and indirectly in the conduct of the affairs of

18   the enterprise through a pattern of racketeering activity

19   as defined in sections 1961(1) and (5) of Title 18, United

20   States Code, including racketeering activity for which the

21   maximum penalty includes life imprisonment, which pattern

22   of racketeering activity consisted of multiple acts

23   involving intentional and premeditated murder in violation

24   of Maryland Code, Criminal Law, Section 2-201, attempted

25   intentional and premeditated murder in violation of

Maryland Code, Criminal Law, Section 2-205, murder and

attempted murder in violation of Maryland Code, Criminal

Law, Section 2-204 and 2-206, robbery in violation of

Maryland Code, Criminal Law, Sections 3-402 and 3-403, and

the common law of Maryland, punishable pursuant to Maryland

Code, Criminal Law, Sections 1-201 and 1-202, and multiple

acts indictable under 18 United States Code, Sections 1503,

obstruction of justice, and 1512, witness tampering.

        The defendant is charged with violating Title 18,

United States Code, Section 1962(d), which is a portion of

the Racketeer Influenced and Corrupt Organizations Act.

That section reads as follows:  It shall be unlawful for

any person to conspire to violate any of the provisions of

Subsection A, B or C of the RICO Act.

        Section 1962(c) of the RICO Act provides that it

shall be unlawful for any person employed by or associated

with any enterprise engaged in or the activities of which

affect interstate or foreign commerce to conduct or

participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering

activity or collection of unlawful debt.

        The word racketeering has certain implications in

our society.  Use of that term in this statute and in this

courtroom should not be regarded as having anything to do

with your determination of whether the guilt of this

defendant has been proven.  The term is only a term used by

Congress to describe the statute.

In order to satisfy its burden of proof as to

Count 1, the Government must prove the following four

elements beyond a reasonable doubt:  First, that an

enterprise existed as charged in the indictment; second,

that the enterprise affected interstate or foreign

commerce; third, that the defendant was associated with or

employed by the enterprise; and, fourth, that the defendant

knowingly and willfully became a member of the conspiracy.

The conspiracy charged in the indictment is to

participate in the conduct of the affairs of the enterprise

and that the enterprise engaged in a pattern of

racketeering activity.

The first element that the Government must prove

beyond a reasonable doubt is that an enterprise existed as

charged in the indictment.  An enterprise is a group of

people who have associated together for a common purpose of

engaging in a course of conduct over a period of time.

This group of people, in addition to having a common

purpose, must have an ongoing organization, either formal

or informal, and it must have personnel who function as a

continuing unit.  This group of people does not have to be

a legally cognizable entity, such as a partnership or a

corporation.  This group may be organized for a legitimate

1    and lawful purpose, or it may be organized for an unlawful

2    purpose.

3              The Government has charged that the enterprise in

4    this case is La Mara Salvatrucha, or MS-13, including its

5    leadership, members and associates, and that the common

6    purposes include, A, preserving and protecting the power,

7    territory and profits of the enterprise through the use of

8    intimidation, violence, including assaults and murder, and

9    threats of violence; B, promoting and enhancing the

10   enterprise and its members' and associates' activities; C,

11   keeping victims and potential victims in fear of the

12   enterprise and in fear of its members and associates

13   through violence and threats of violence; D, providing

14   financial support and information to the gang and gang

15   members, including those who were incarcerated for

16   committing acts of violence or other offenses; and, E,

17   providing assistance to other gang members who committed

18   crimes for and on behalf of the gang in order to hinder,

19   obstruct and prevent law enforcement officers from

20   identifying the offender, apprehending the offender and

21   trying and punishing the offender.

22             If you find that the Government has proven that

23   there was a group of people characterized by, one, a common

24   purpose, two, an ongoing formal or informal organization

25   and, three, by personnel who function as a continuing unit,

1  then you may find that an enterprise existed.

2          If you find that this enterprise existed, you

3  must also determine whether this enterprise continued in an

4  essentially unchanged form during substantially the entire

5  period charged in the indictment.  This does not mean that

6  everyone involved has to be the same, but the core of the

7  enterprise has to be the same throughout.

8          The second element that the Government must prove

9  beyond a reasonable doubt is that the enterprise was

10  engaged in or had an effect upon interstate or foreign

11  commerce.  Interstate commerce includes the movement of

12  goods, services, money and individuals between states or

13  between states and the District of Columbia or a U.S.

14  territory or possession or between the United States and a

15  foreign state or nation.  The Government must prove that

16  the enterprise engaged in interstate or foreign commerce or

17  that its activities affected interstate or foreign commerce

18  in any way, no matter how minimal.  It does not have to

19  prove that the racketeering activity affected interstate or

20  foreign commerce, although proof that racketeering acts did

21  affect interstate or foreign commerce is sufficient to

22  satisfy this element.

23          It is not necessary to prove that the acts of any

24  particular defendant affected interstate or foreign

25  commerce as long as the acts of the enterprise had such

effect.

Additionally, the Government is not required to prove that any defendant knew he was affecting interstate or foreign commerce.  Even a mere potential or probable effect on interstate commerce is sufficient to satisfy this requirement.

Finally, there is no requirement that the activity affecting interstate commerce be legal.

The third element that the Government must prove beyond a reasonable doubt is that the defendant was associated with the enterprise.  It is not required that the defendant be associated with the enterprise for the entire time that the enterprise existed.  It is required, however, that the Government prove beyond a reasonable doubt that at some time during the period indicated in the indictment, the defendant himself was associated with the enterprise.

A person cannot be associated with an enterprise if he does not know of the enterprise's existence or the nature of its activities.  Thus, in order to prove this element, the Government must prove beyond a reasonable doubt that the defendant was connected to the enterprise in some meaningful way and that he knew of the existence of the enterprise and of the general nature of its activities.

The fourth element that the Government must prove

beyond a reasonable doubt is that the defendant knowingly

and willfully became a member of the conspiracy.  A

conspiracy is a kind of criminal partnership, a combination

or agreement of two or more persons to join together to

accomplish some unlawful purpose.

In order to prove a conspiratorial agreement, the

Government must establish that at least two or more persons

entered the unlawful agreement charged in the indictment,

that is, an agreement to conduct and participate in the

conduct of the affairs of the enterprise through a pattern

of racketeering activity, and that the defendant knowingly

and willfully became a member of the conspiracy.

You need not find that the alleged members of the

conspiracy met together and entered into any express or

formal agreement.  Similarly, you need not find that the

alleged conspirators stated in words or writing what the

scheme was, its object or purpose or every precise detail

of the scheme or the means by which its object or purpose

was to be accomplished.  What the Government must prove is

that there was a mutual understanding, either spoken or

unspoken, between two or more people to cooperate with each

other to accomplish an unlawful act.

The focus of this element is on the defendant's

agreement to participate in the objective of the

enterprise, to engage in a pattern of racketeering

activity, and not on the defendant's agreement to commit

individual criminal acts.  The Government must prove that

the defendant participated in some manner, however slight,

in the overall objective of the conspiracy and that the

conspiracy itself involved or would have involved the

commission of two racketeering acts.

The extent of a defendant's participation has no

bearing on the defendant's guilt.  A conspirator's

liability is not measured by the extent or duration of his

participation.  Indeed, each member may perform separate

and distinct acts and may perform them at different times.

Some conspirators play major roles, while others play minor

parts.  An equal role is not what the law requires.

The term racketeering activity as charged in the

indictment means, A, murder and attempted murder in

violation of Maryland law, B, robbery in violation of

Maryland law, and/or, C, obstruction of justice or witness

tampering in violation of federal law.  I will define those

crimes a little later.

The crime of rape is not included in the

definition of racketeering activity.

The phrase "pattern of racketeering activity"

requires at least two acts of racketeering activity that

are related to the enterprise and to each other and that

pose a threat of continued criminal activity.  It is not

sufficient for the Government to prove only that two of the

racketeering acts were committed or intended to be

committed.  A series of disconnected acts does not

constitute a pattern, and a series of disconnected crimes

does not constitute a pattern of racketeering activity, nor

do they amount to or pose a threat of continued

racketeering activity.

          To prove that the acts of racketeering are

related, the Government must prove that the acts had the

same or similar purposes, results, participants, victims or

methods of commission or that they are otherwise

interrelated by distinguishing characteristics and are not

isolated events.

          To prove that the racketeering acts pose a threat

of continued racketeering activity, the Government must

establish that the acts are part of a long-term association

that exists for criminal purposes.

          The Government is not required to prove that the

defendant personally committed two such acts, although you

may conclude that the defendant agreed to participate in

the conduct of the enterprise from proof that he agreed to

commit or actually committed such acts.

          You are further instructed that the Government is

not required to prove that the defendant knew the others or

that they agreed with each other to violate the law.

1    Indeed, the focus of this count is on the defendant's own

2    agreement to join or remain in the conspiracy charged.

3          Nor is the Government required to prove that the

4    defendant agreed with another to commit two racketeering

5    acts.  What is important is that the Government prove that

6    the defendant knowingly adopted the goal of furthering or

7    facilitating the criminal endeavor or, in other words, the

8    defendant knew generally about the pattern of racketeering

9    activity and agreed to facilitate the racketeering scheme

10   in some manner and not that the defendant himself committed

11   the crimes encompassing the pattern of racketeering

12   activity.

13         The Government is not required to prove that each

14   coconspirator explicitly agreed with every other

15   coconspirator to conduct and participate in the conduct of

16   the affairs of the enterprise through a pattern of

17   racketeering activity or knew all of his fellow

18   conspirators or was aware of all of the details of the

19   conspiracy.  Rather, to establish sufficient knowledge, it

20   is only required that the defendant know the general nature

21   and common purpose of the conspiracy and that the

22   conspiracy extends beyond his individual role.

23         Moreover, the elements of a RICO conspiracy, such

24   as the conspiratorial agreement, the defendant's knowledge

25   of it and the defendant's participation in the conspiracy,

1    may be inferred from circumstantial evidence.  I want to

2    caution you, however, that a defendant's mere presence at

3    the scene of the alleged crime does not by itself make him

4    a member of the conspiracy.  Similarly, mere association

5    with one or more members of the conspiracy does not

6    automatically make a defendant a member.  A person may know

7    or be friendly with a criminal without being a criminal

8    himself.  Mere similarity of conduct or the fact that they

9    may have assembled together and discussed common aims and

10   interests does not necessarily establish proof of the

11   existence of a conspiracy.

12           I also want to caution you that mere knowledge or

13   acquiescence, without participation in the unlawful plan,

14   is not sufficient.  Moreover, the fact that the acts of a

15   defendant without knowledge merely happened to further the

16   purposes or objectives of the conspiracy does not make the

17   defendant a member.  More is required under the law.

18           What is necessary is that the defendant must have

19   participated with knowledge of at least some of the

20   purposes or objectives of the conspiracy and with the

21   intention of aiding in the accomplishment of those unlawful

22   ends.

23           In sum, before you may find the conspiracy

24   element of Count 1, the Government must have proven beyond

25   a reasonable doubt that the defendant, with an

1    understanding of the unlawful character of the conspiracy,

2    must have intentionally engaged, advised or assisted in it

3    for the purpose of furthering the illegal undertaking.  He

4    thereby became a knowing and willing participant in the

5    unlawful agreement, that is to say a conspirator.

6              It is for you to determine whether the

7    racketeering acts alleged in the indictment were proven to

8    be intended as part of the conspiracy.

9              Murder.  First degree murder is the intentional

10   killing of another person with willfulness, deliberation

11   and premeditation.  Willful means that the person actually

12   intended to kill the victim.  Deliberate means that the

13   person was conscious of the intent to kill.  Premeditated

14   means that the person thought about the killing and that

15   there was enough time before the killing, though it may

16   only have been brief, for the assailant to consider the

17   decision whether or not to kill and enough time to weigh

18   the reasons for and against the choice.  The premeditated

19   intent to kill must be formed before the killing.

20             Second degree murder is the killing of another

21   person with either the intent to kill or the intent to

22   inflict such serious bodily harm that death would be the

23   likely result.  Second degree murder does not require

24   premeditation or deliberation.

25             Attempted murder is a substantial step, beyond

1    mere preparation, toward the commission of murder in the

2    first or second degree.  In order to prove attempt, the

3    Government must show that the assailant had the apparent

4    ability at that time to commit the crime of murder and the

5    requisite intent.

6          Robbery.  Under Maryland law, robbery is the

7    taking and carrying away of property from another by force

8    or threat of force, with the intent to permanently deprive

9    the victim of the property.  Property means anything of

10   value.

11         Obstruction of justice.  The federal obstruction

12   of justice statute is codified at 18 United States Code,

13   Section 1503.  It provides that whoever, one, corruptly or

14   by threats or force endeavors to influence, intimidate or

15   impede any grand or petit juror or officer in or of any

16   court of the United States or, two, corruptly or by threats

17   or force influences, obstructs or impedes or endeavors to

18   influence, obstruct or impede the due administration of

19   justice is guilty of a crime.  This law is aimed at a

20   variety of means by which the orderly and due process of

21   the administration of justice may be impeded, thwarted or

22   corrupted.  The due administration of justice includes, but

23   is not limited to, a Grand Jury proceeding or

24   investigation.

25         The sweep of the statute extends to any corrupt

endeavor or effort to interfere with a juror's function in
the discharge of his duties.

The key word in the statute is endeavor.  As used
in the statute, endeavor means any effort or any act,
however contrived, to obstruct, impede or interfere with
the Grand Jury or trial proceeding.  It is the endeavor
which is the gist of the crime.

Success of the endeavor is not an element of the
crime.  Any effort, whether successful or not, that is made
for the purpose of corrupting, obstructing or impeding the
proceeding is condemned.  The word corruptly as used in the
statute means simply having the improper motive or purpose
of obstructing justice.

Witness tampering.  Section 1512 of Title 18 of
the United States Code requires two elements.  First, the
conduct must involve the use of physical force or the
threat of physical force against another or attempt to do
so or intimidation, threats or attempt to do so.

Second, the conduct must be done with the intent
to cause another to withhold testimony from an official
proceeding or hinder, delay or prevent the communication to
a law enforcement officer of the United States any
information relating to the commission or possible
commission of a federal offense.  The law does not require
that the federal proceeding be pending at the time of the

use of force or threat or that the individual know whether

any proceeding is federal or local as long as the

proceeding itself was reasonably foreseeable and the intent

of the force or threat was to obstruct the proceeding and

the actions were likely to affect such a proceeding.

In order to convict the defendant of the RICO

conspiracy offense charged in Count 1, all 12 of you must

agree as to which type or types of predicate racketeering

activity were intended as part of the conspiracy the

defendant joined.  For example, at least two acts of murder

or robbery or obstruction of justice or one of each or any

combination thereof.

On the verdict sheet, you will first be asked

whether you find the defendant guilty or not guilty of the

charge in Count 1.  If you find the defendant guilty, you

will be asked to specify what type or types of racketeering

activity you find to have been the objectives of the

conspiracy he joined.  You will be asked separately about

first degree murder, second degree murder, attempted

murder, robbery, obstruction of justice and witness

tampering.

Count 29.  In Count 29, the defendant is charged

with violating Title 18, United States Code, Section 1951

by interfering with interstate commerce by robbery.

Section 1951 reads as follows:  Whoever in any

way or degree obstructs, delays or affects commerce or the

movement of any article or commodity in commerce by

robbery, or attempts or conspires to do so, or commits or

threatens physical violence to any person or property in

furtherance of a plan or purpose to do anything in

violation of this section, is guilty of a crime.

Specifically, the indictment reads as follows:

Count 29.  On or about November 14, 2005, in the District

of Maryland, the defendant, Victor Ramirez, together with

others known and unknown to the Grand Jury, attempted to

and did unlawfully obstruct, delay and affect commerce and

the movement of articles and commodities in such commerce

by robbery in that the defendant did unlawfully take and

obtain United States currency and personal property from

individuals present at 2302 Blueridge Avenue, Apartment

Number 5, Wheaton, Maryland, in the presence of those

individuals, against their will, by means of actual and

threatened force, violence and fear of immediate injury to

their persons, and committed and threatened physical

violence to those individuals in furtherance of a plan and

purpose to commit the robbery.

In order to prove a violation of Section 1951,

the Government must establish beyond a reasonable doubt

each one of the following three elements of the offense:

First, that the defendant knowingly obtained or took the

1   personal property of another or from the presence of

2   another; second, that the defendant took this property

3   against the victim's will by actual or threatened force,

4   violence or fear of injury, whether immediately or in the

5   future; third, that as a result of the defendant's actions,

6   interstate commerce or an item moving in interstate

7   commerce was delayed, obstructed or affected in any way or

8   degree.

9        The first element that the Government must prove

10   beyond a reasonable doubt is that the defendant knowingly

11   obtained or took the personal property of another or from

12   the presence of another.  The term property includes money

13   and other tangible and intangible things of value.

14        The second element the Government must prove

15   beyond a reasonable doubt is that the defendant unlawfully

16   took this property against the victim's will, by actual or

17   threatened force, violence or fear of injury, whether

18   immediately or in the future.

19        In considering whether the defendant used or

20   threatened to use force, violence or fear, you should give

21   those words their common and ordinary meaning and

22   understand them as you normally would.  The violence does

23   not have to be directed at the person whose property was

24   taken.  The use or threat of force or violence might be

25   aimed at a third person or at causing economic rather than

physical injury.  A threat may be made verbally or by a

physical gesture.  Whether a statement or physical gesture

by the defendant actually was a threat depends upon the

surrounding facts.

You must determine whether the defendant

knowingly and willfully threatened to use force, violence

or fear to unlawfully obtain the property.  Fear exists if

a victim experiences anxiety, concerns or worry over

expected personal harm or business loss or over financial

or job security.  The existence of fear must be determined

by the facts existing at the time of the defendant's

actions.

Your decision whether the defendant used or

threatened fear of injury involves a decision about the

victim's state of mind at the time of the defendant's

actions.  It is obviously impossible to ascertain or prove

directly a person's subjective feeling.  You cannot look

into a person's mind to see what his state of mind is or

was, but a careful consideration of the circumstances and

evidence should enable you to decide whether fear would

reasonably have been in the victim's state of -- excuse

me -- decide whether fear would reasonably have been the

victim's state of mind.

Looking at the situation and the actions of

people involved may help you determine what their state of

1  mind was.  You consider this kind of evidence, which I have

2  already described as circumstantial evidence, in deciding

3  whether property was obtained by the defendant through the

4  use or threat of fear.

5       You have also heard the testimony of a witness

6  describing his state of mind, that is, how he felt in

7  giving up the property.  This testimony was allowed so as

8  to help you in deciding whether the property was obtained

9  by fear.  You should consider this testimony for that

10  purpose only.

11       If you decide that the defendant obtained

12  another's property against his will by the use or threat of

13  force, violence or fear of injury, you must then decide

14  whether this action would affect interstate commerce in any

15  way or degree.  You must determine whether there is an

16  actual or potential effect on commerce between any two or

17  more states or between one state and the District of

18  Columbia or between a state and a U.S. territory or

19  possession or on commerce within one state that goes

20  through any place outside that state.

21       If you decide that there was any effect at all on

22  interstate commerce, then that is enough to satisfy this

23  element.  The effect can be minimal.  For example, if a

24  successful robbery of money would prevent the use of those

25  funds to purchase articles which travel through interstate

1   commerce, that would be a sufficient effect on interstate

2   commerce.  It would not be sufficient, however, to prove

3   this element if the defendant targeted only the personal

4   assets of the victim.  Instead, the Government must prove

5   that the defendant targeted business assets of the victim

6   which would have been used to purchase articles which

7   traveled through interstate commerce.

8          If you decide that interstate commerce would

9   potentially or probably be affected if the defendant had

10  successfully and fully completed his actions, then the

11  element of affecting interstate commerce is satisfied.  You

12  do not have to find that interstate commerce was actually

13  affected.  However, if the defendant has finished his

14  actions and done all he intended to do and you determine

15  that there has been no effect on interstate commerce, then

16  you cannot find the defendant guilty.

17         You do not have to decide whether the effect on

18  interstate commerce was harmful or beneficial to a

19  particular business or to commerce in general.  The

20  Government satisfies its burden of proving an effect on

21  interstate commerce if it proves beyond a reasonable doubt

22  any effect, whether it was harmful or not.

23         In addition, the defendant need not have intended

24  or anticipated an effect on interstate commerce.  You may

25  find that the effect is a natural consequence of the

 1   defendant's actions.  If you find that the defendant

 2   intended to take certain actions, that is, he did the acts

 3   charged in the indictment in order to obtain property, and

 4   you find those actions have either caused or would probably

 5   cause an effect on interstate commerce, then you may find

 6   the requirements of this element have been satisfied.

 7          Under the aiding and abetting statute, it is not

 8   necessary for the Government to show that a defendant

 9   himself physically committed the crime with which he is

10   charged in order for the Government to sustain its burden

11   of proof.  A person who aids or abets another to commit an

12   offense is just as guilty of that offense as if he

13   committed it himself.  Accordingly, you may find that the

14   defendant aided and abetted in the commission of an offense

15   if you find beyond a reasonable doubt that the Government

16   has proven that another person actually committed the

17   offense and that the defendant aided or abetted that person

18   in the commission of the offense.

19          As you can see, the first requirement is that you

20   find that another person has committed the crime of

21   violence.  Obviously no one can be convicted of aiding and

22   abetting the criminal acts of another if no crime was

23   committed by the other person in the first place.  But if

24   you do find that a crime was committed, then you must

25   consider whether the defendant aided or abetted the

1    commission of that crime.

2             In order to aid or abet another to commit a

3    crime, it is necessary that the defendant knowingly

4    associate himself in some way with the crime and that he

5    participate in the crime by doing some act to help make the

6    crime succeed.  To establish that a defendant knowingly

7    associated himself with the crime, the Government must

8    establish that the defendant knew of the criminal venture.

9    To establish that the defendant participated in the

10   commission of the crime, the Government must prove that the

11   defendant engaged in some affirmative conduct or overt act

12   for the specific purpose of bringing about that crime.

13            The mere presence where a crime is being

14   committed, even coupled with knowledge by the defendant

15   that a crime is being committed, or merely associating with

16   others who were committing a crime is not sufficient to

17   establish aiding and abetting.  One who has no knowledge

18   that a crime is being committed or is about to be committed

19   but inadvertently does something that aids in the

20   commission of that crime is not an aider and abettor.  An

21   aider and abettor must know that the crime is being

22   committed and act in a way which is intended to bring about

23   the success of the criminal venture.

24            To determine whether a defendant aided or abetted

25   the commission of the crime with which he is charged, ask

yourself these questions.  Did he participate in the crime

charged as something he wished to bring about?  Did he

knowingly associate himself with the criminal venture?  Did

he seek by his actions to make the criminal venture

succeed?  If he did, then the defendant is an aider and

abettor in the commission of the crime.  If not -- if, on

the other hand, your answer to any one of these questions

is no, then the defendant is not an aider and abettor.

Count 30.  Count 30 charges the crime of using a

firearm to commit or carrying a firearm during the

commission of or possessing a firearm in furtherance of a

crime of violence.  The indictment reads as follows:  Count

30.  On or about November 14, 2005, in the District of

Maryland, the defendant, Victor Ramirez, did knowingly use

and carry a firearm during and in relation to and possess a

firearm in furtherance of a crime of violence for which he

may be prosecuted in a court of the United States, to wit,

attempting to and unlawfully obstructing, delaying and

affecting commerce and the movement of articles and

commodities in such commerce by robbery as set forth in

Count 29 of the indictment which is incorporated here.

The relevant statute on this subject is 18 United

States Code, Section 924(c), which provides any person who

during and in relation to any crime of violence for which

the person may be prosecuted in a court of the United

States uses or carries a firearm or who, in furtherance of

any such crime, possesses a firearm shall be guilty of a

crime.  Under this count, the defendant is charged with

using, carrying or possessing a firearm during or in

furtherance of the commission of the crime of violence

referenced in the previous count, or with aiding and

abetting another person to do so.

          If upon all of the evidence you find that the

Government has failed to prove Count 29 beyond a reasonable

doubt, then you will proceed no further as to Count 30.

Count 30 is to be considered only if you first find the

defendant guilty of the crime of violence charged.

          In reaching your verdict on Count 30, you may

consider the evidence of Count 29 only for the purpose of

determining whether the elements of Count 30 have been

satisfied as to the defendant.  The Government must prove

each of the following elements beyond a reasonable doubt to

sustain its burden of proving the defendant guilty:  First,

that the defendant committed or aided and abetted the

commission of a crime of violence for which he may be

prosecuted in a court of the United States; and, second,

either that the defendant knowingly used or carried a

firearm during and in relation to the commission of, or

knowingly possessed a firearm in furtherance of the crime

charged in the referenced count, or that he aided and

1    abetted another person to do so.

2            The first element the Government must prove

3    beyond a reasonable doubt is that the defendant committed

4    or aided and abetted the commission of a crime of violence

5    for which he might be prosecuted in a court of the United

6    States.  The defendant is charged in Count 29 of the

7    indictment with interference with interstate commerce

8    through robbery.  I instruct you that this is a crime of

9    violence.  However, it is for you to determine that the

10   Government has proven beyond a reasonable doubt that the

11   defendant committed that crime.

12           The second element the Government must prove

13   beyond a reasonable doubt is that the defendant knowingly

14   used or carried a firearm during and in relation to or that

15   the defendant knowingly possessed a firearm in furtherance

16   of the commission of the crime charged in the referenced

17   count or that he aided and abetted another person to do so.

18           A firearm is any weapon which will or is designed

19   to or may be readily converted to expel a projectile by the

20   action of an explosive.  Use of a firearm means proof

21   beyond a reasonable doubt of active employment of the

22   firearm by a person during and in relation to the crime,

23   the commission of the crime of violence.  This does not

24   mean that the person must actually fire or attempt to fire

25   the weapon, although those would obviously constitute use

of the weapon.  Brandishing, displaying or even referring

to the weapon so that others present knew that the person

had the firearm available if needed all constitute use of

the firearm.  However, the mere possession of a firearm at

or near the site of the crime without active employment as

I have just described it is not sufficient to constitute a

use of the firearm.

Carrying a firearm means proof beyond a

reasonable doubt that the person had the weapon within his

control in such a way that it furthered the commission of

the crime of violence or was an integral part of the

commission of the crime.  A person did not necessarily have

to hold the firearm physically, that is, have actual

possession of it on his person.  If you find that the

person had dominion and control over the place where the

firearm was located and had the power and intention to

exercise control over the firearm in such a way that it

furthered the commission of the crime of violence, you may

find that the Government has proven that the person carried

the weapon.  It is not sufficient to prove carrying if all

the Government has proven is that the firearm was

transported in a vehicle in which the person was riding.

There must be proof that the person knew of the weapon's

presence and had the power and intention to exercise

control of the weapon so that it was available for his use

1    in the commission of the crime if the need arose.

2              Possession of a firearm in furtherance of the

3    crime means proof beyond a reasonable doubt that the person

4    had possession of the firearm and that such possession was

5    in furtherance of that crime.  Possession means that the

6    person either had physical possession of the firearm on his

7    person or that he had dominion and control over the place

8    where the firearm was located and had the power and

9    intention to exercise control over the firearm.

10             Possession may be sole or joint.  If one person

11   alone possesses something, that is sole possession.

12   However, it is possible that more than one person may have

13   the power and intention to exercise control over the

14   firearm.  This is called joint possession.

15             If you find the defendant had such power and

16   intention, then he possessed the firearm even if he

17   possessed it jointly with another.  Possession cannot be

18   found solely because the defendant associated with another

19   person who did possess the firearm or solely because he was

20   near to the firearm or solely because he knew that the

21   firearm was present.  These factors may be considered by

22   you, however, in connection with all of the evidence in

23   making your decision whether the firearm -- whether the

24   defendant possessed the firearm.

25             To possess a firearm in furtherance of the crime

1    means that the firearm helped forward, advance or promote

2    the commission of the crime.  The mere possession of the

3    firearm at the scene of the crime is not sufficient under

4    this definition.  The firearm must have played some part in

5    furthering the crime in order for this element to be

6    satisfied.

7          To satisfy this element, you must also find that

8    the person carried or used the firearm knowingly.  This

9    means that he carried the firearm purposely and voluntarily

10   and not by accident or mistake.  It also means that he knew

11   that the weapon was a firearm as we commonly use the word.

12   However, the Government is not required to prove that the

13   person knew that he was breaking the law.

14         I will give you the final section of the

15   instructions, those pertaining to the mechanics and

16   procedure of your deliberations, after we have heard

17   closing arguments from counsel.

18         But, counsel, would you please come forward to

19   let me know if I have neglected to give any substantive

20   instructions.

21         (Counsel approached the bench.)

22         MR. PARK:  Nothing from the Government.

23   Obviously the Court caught that one, I think, typo on Count

24   30 where it's they're instead of he.  I know the Court --

25         THE COURT:  There were several times --

1          MR. PARK:  Right.

2          THE COURT:  -- when I corrected the plural to the

3    singular.

4          MR. PARK:  Other than that, nothing substantive

5    that the Government saw.

6          MR. GORMAN:  I'd like to reiterate all the

7    objections I made prior to giving the instructions, but

8    specifically there's nothing in the instructions that say

9    that they have to be unanimous about the particular murder

10   or robbery, and I think that that prevents a unanimous

11   verdict.

12         For instance, a few could be -- could decide that

13   he's involved in one murder, a few could decide that it's

14   another, and they decide, well, he must have done one

15   murder.  The same could be over the robberies or the

16   obstructions of justice.

17         So I think that you should give an instruction to

18   say that -- define the two predicate acts, you have to be

19   unanimous on the two predicate acts, and I don't think

20   that's part of the instructions.

21         MR. PARK:  The Government would oppose that

22   instruction.  Obviously the Court has already instructed

23   that the defendant himself need not have committed any two

24   predicate acts; it's just that two predicate acts,

25   racketeering acts would have been committed or were

1    committed by members of the conspiracy.  I don't think that

2    there's a need to specify specific murders, specific

3    robberies.  It's just that the jury has to unanimously find

4    whether or not murder -- first degree murder, second degree

5    murder, attempted murder were actual objects of the

6    conspiracy, but not that specific acts were committed by

7    the defendant.

8           MR. GORMAN:  I'm not arguing specific acts by the

9    defendant.  I'm arguing that they have to decide that --

10   unanimously that an act was committed by the conspiracy,

11   and I don't think that's very clear from these

12   instructions.

13          THE COURT:  I don't think that they do have to

14   find that an act was actually committed.  Conspiracy is the

15   inchoate crime of agreeing to participate.  In this case,

16   it's agreeing to participate in the activities of a

17   racketeering enterprise and that the racketeering

18   enterprise, in order to prove that, that there was a

19   pattern of two or more connected activities.  They don't

20   have to have been carried out and the defendant does not

21   have to have agreed to specific crimes, just that the

22   enterprise would commit first degree murder.

23          The reason I'm asking this question is because

24   unless they say first degree murder, the maximum penalty

25   would not have been life in prison.  I do agree that they

1    must be unanimous on what type or types, and I have told

2    them that, but I don't think they have to find that the

3    evidence -- they don't have to be unanimous on which piece

4    of evidence they use to find the existence of the element,

5    and that's what you're asking me to tell them.  So if I'm

6    wrong --

7              MR. GORMAN:  I'm not exactly asking you to tell

8    them that.  My argument goes to the fact that the

9    conspiracy, if they find that -- let's say ten of them said

10   that they decided that they conspired to do this one act

11   and two of them think no, that wasn't it and then a

12   different percentage decided on the different acts or the

13   different robberies, there's no unanimous decision on what

14   the conspiracy came up with or what the conspiracy decided.

15             THE COURT:  Well, I understand what you're

16   saying, but I don't think -- I think that's asking me to

17   tell them that they must rely on the same evidence to find

18   beyond a reasonable doubt an element of the offense, and I

19   don't think that's required.

20             I also don't think on the evidence before this

21   jury that there's, frankly, that much way to split it,

22   particularly not with the robberies, but also not with what

23   the Government -- I mean, frankly, some of the murders, as

24   you pointed out, predated his travel to Maryland, and

25   that's really not the focus.  It's the focus about whether

1    he joined a conspiracy to participate in this enterprise

2    knowing and intending to facilitate the objectives of

3    committing racketeering acts.

4              So I -- I'm not going to change the instruction.

5    The exception is understood.

6              MR. GORMAN:  May I ask one other thing?  I intend

7    to argue that.  Is the Court going to prevent me from

8    arguing that position?

9              THE COURT:  What?

10             MR. GORMAN:  About they have to decide on which

11   acts he did.

12             THE COURT:  No, they don't.  I've told them that.

13   They don't have to decide whether he personally

14   participated.

15             MR. GORMAN:  Well, I understand the Court's not

16   going to give that instruction.  Is the Court also saying

17   that I can't argue that point?

18             THE COURT:  I'm not sure I understand how you

19   wish to argue it.  You can argue that the evidence doesn't

20   show that he agreed to participate in an enterprise that

21   was engaged in murder, but I'm not sure I understand

22   exactly --

23             MR. GORMAN:  All right.  Well, I guess I'll

24   see --

25             THE COURT:  We'll see what we do.

1            Okay.  We'll take a break?

2            (Counsel returned to the trial tables.)

3            THE COURT:  Okay.  Members of the jury, we're

4    going to take a brief recess now in order for the attorneys

5    to set up and to begin the closing arguments.  Remember,

6    it's not time to talk about this case among yourselves or

7    even really to think about it, even though you've now heard

8    the jury instructions, so we'll just take, I hope, about a

9    ten-minute recess to get set up, and we'll then hear

10   closing arguments.

11           (Recess.)

12           THE COURT:  Be seated, please.

13           Are we ready?

14           Bring in the jury, please.

15           (Jury present.)

16           THE COURT:  Please be seated.

17           We're ready now to hear the first of the closing

18   arguments.  Mr. Jaffe.

19           MR. JAFFE:  Yes, Your Honor.

20           May it please the Court, counsel, members of the

21   jury, good morning.  We've heard them called slang or gang

22   slang, terms like chavalas, jumping in, 13s, pegadas or

23   hits, green lights, and over the course of this trial,

24   we've learned that they're part of a language all their

25   own, a language of rules, a language of control, a language

 1    of violence, the language of MS-13.

 2          We've also seen and heard throughout the course

 3    of this trial that MS-13 doesn't just use the language of

 4    violence.  They use violence.  And what makes MS-13 so

 5    dangerous is that it is structured, disciplined, leader

 6    driven, rule-based violence.  It is organized violence.

 7          We've also learned during the course of this

 8    trial that the man right in the middle of that screen

 9    there, the defendant, came from an MS-13-controlled prison

10    in El Salvador to the United States, to Maryland, to this

11    community, to make sure that the gang followed the rules

12    and was as violent as possible.  And after the deaths, the

13    murders of Jose Cerda, Eduardo Trujillo, Alejandro

14    Rubi-Martinez, the attempted murder of Richard Paredes, the

15    rape of Patricia Velez and others, the robberies, the

16    extortions, we saw the defendant came very close to

17    completing and succeeding in that mission.

18          Now, the picture up there on your screens right

19    there is part of that story.  This is a still shot taken

20    from that video, Otis 1.  That is that videotape that was

21    found in Maryland during one of those search warrants at a

22    gang member's home.  The tape was found in Maryland, but we

23    learned it was filmed in El Salvador, in that prison and in

24    the surrounding community.

25          And in that video, we saw the leaders of MS-13,

 1    Cisco and Trece, standing shoulder to shoulder with this

 2    man sitting with us in this building, in this room today,

 3    the defendant, Victor Ramirez, Mousy, standing with him

 4    before they sent him up here on his mission.

 5            Another part of the story is this exhibit right

 6    here, Ramirez 2.  Same guy, the defendant, Victor Ramirez,

 7    Mousy, November 14, 2005, after he had just been caught

 8    red-handed participating in a robbery and rape in an

 9    apartment on Blueridge Avenue in Wheaton, with three other

10    young MS-13 guys, doing a gun point robbery and rape.  And,

11    of course, the defendant had all the stolen property on him

12    at the time that he was caught by the police.

13            He's in El Salvador with the other MS members

14    giving the shout out to Maryland, and then he's in Maryland

15    showing the other MS-ers how it's done.

16            Now, you may hear a lot from me today, you're

17    going to undoubtedly hear a lot from defense, and Mr. Park

18    will have a chance to rebut some of what the defense says,

19    but I submit that these two images, kind of bookmarks, if

20    you will, in the defendant's participation and association

21    with MS-13, and they are undeniable, irrefutable evidence,

22    I'd submit, of the defendant's guilt in this case beyond a

23    reasonable doubt, and they're pictures, images that speak

24    volumes, and they can't be cross-examined or reasonably

25    spun away, explained away.  They help define and explain

1    who the defendant is, what the defendant joined, what he

2    was a part of and what he participated in.  He participated

3    in and was a member of MS-13.

4         Now, of course, there's a lot more evidence in

5    this case than just these two images, and there's no way

6    that in this closing today I can go over every single piece

7    of evidence and explain its significance.  So what I'm

8    going to do for the course of the closing today is I'm

9    going to just go over some of what the judge told you just

10   now and what is it the Government has to prove to you

11   beyond a reasonable doubt, what are the charges and what

12   are the pieces of each charge, the elements of each charge.

13        And while doing that, I will give you some

14   samples and examples from the testimony and from the

15   exhibits that show how we've proven each of those elements

16   of each crime beyond a reasonable doubt.

17        Now, the indictment, you heard, consists of three

18   charges related to the defendant, but I'd submit to you

19   they really fall under two sort of different categories.

20   They're two different types of charges.

21        There's the gang charge, if you will, this RICO

22   conspiracy charge that I have on the poster that's listed

23   on the screen.  It's the racketeering conspiracy.  It

24   relates to the defendant's knowing and willful

25   participation in MS-13.

1          The two other charges that you've heard described

2     to you by the judge today relate to that one incident where

3     the defendant was caught red-handed on November 14th, 2005

4     in that apartment being used as a brothel on Blueridge

5     Avenue in Wheaton, the robbery charge and the firearms

6     charge.  That's sort of -- those two second charges are

7     like a second group or topic of the charges here.

8          Now, let me talk about the first charge, the

9     racketeering conspiracy charge, or the RICO charge as we're

10     going to refer to it.  Now, what is it that we have to

11     prove there?  And the judge has given it to you in the

12     instructions, and, of course, as she mentioned, you'll have

13     a copy of the written instructions with you as you go back

14     and deliberate.  And I guess this is a good time to just

15     remind you, of course, the judge is the judge of the law,

16     and what she says the law is is the law.  So as I'm going

17     through my closing today and explaining things, if for some

18     reason I say something different than the judge as to what

19     the law is, ignore what I say.  Please follow what the

20     judge said and says about the law.

21          But I submit to you that the judge has lined out

22     basically four elements the Government has to prove for

23     this first count.  The enterprise existed, the enterprise

24     affected interstate or foreign commerce, the defendant was

25     associated with the enterprise, the defendant was a

1   knowing, willing member of the racketeering conspiracy.

2           One thing you might notice flat out in the

3   beginning is half the elements don't even have the word

4   defendant in them.  Right?  Only these bottom two do.  I

5   want to mention that because that's how the evidence came

6   in, so the evidence tracked those charges during the course

7   of the trial.

8           We put on evidence about what MS-13 is, the

9   enterprise and how it existed, and sometimes testimony

10  about interstate commerce as well, that may not involve the

11  defendant specifically but involves MS-13.  That's because

12  the law requires it.

13          But, of course, you also heard a lot of evidence

14  during the course of this trial about the defendant, about

15  the defendant's participation and association with MS-13

16  and even what the defendant did with MS-13.  We'll get to

17  that.

18          Let's talk about this first element.  The

19  enterprise existed.  Is MS-13 an enterprise?  Did it exist?

20  What do we have to show?  The judge gave you those

21  instructions, too.  One thing we have to show is that MS-13

22  had some type of ongoing organization, formal or informal.

23  It had to have a common purpose and some sort of continuity

24  of its structure.  There had to be a core to the

25  enterprise.

1           Well, did we show those things?  Let's go through

2     them one by one.

3           Was there a structure to MS-13?  Yeah, we heard a

4     lot about it.  The very first witness, Frank Flores, the

5     detective from L.A., the expert on MS-13, through the very

6     last witness, Juan Diaz, the police officer from El

7     Salvador working on MS-13, they both said the same thing.

8     The cooperating witnesses, the gang members and the

9     physical evidence said it again and again.  There's three

10    levels of MS-13.  There's three levels to the structure of

11    MS-13.  There's the clique structure at the most basic

12    bottom level, the local level.  The cliques work together

13    on a regional basis.  They coordinate together.  They have

14    meetings together, and that's that middle level.  Top

15    level, there's some international direction and leadership,

16    people from El Salvador or sometimes from L.A. giving

17    instructions to individual cliques.

18          Well, fine.  That's what they said.  What's the

19    proof?  Well, let's talk about the cliques.  What did we

20    learn about the cliques?  The cliques, we've learned from

21    all these witnesses, have a structure themselves.  Right?

22    They've got leaders, first word and second word.  They have

23    rules, rules like we have enemies, the chavalas, the

24    informants.  They have a jumping-in procedure.  You get

25    initiated in this gang, you have to go through a jumping-in

procedure.  You have to be beaten for 13 seconds.  It's a
rule.  It's a formal process.

Other rules, we heard a lot about them, not just
from the experts, from the gang members themselves.  Can't
use the number eight.  Can't use the number 18.  Can't wear
red.  Our numbers are 13.  Our colors are blue and white
and black.  You must attend meetings.  You must pay dues.
The dues are used for guns or to support members of the
gang who are in jail.  You cannot inform against the gang.
You cannot betray the gang to law enforcement.  And you
must attack the rival gang members, the chavalas, where you
find them.  Kill them if you can.

We heard those rules over and over again during
the course of this trial.  It's because MS-13 has rules.
It's part of its basic structure and its organization.

And what if you violate the rules?  Well, like
any organization, there are punishments for violating the
rules.  You get the 13, the 13-second beating.  If you
really violate the rules, you get the double beating, the
26.  And if you violate one of those cardinal rules, like
don't betray the gang, you can get greenlighted, marked for
death.

Now, what was the evidence of that?  Again, our
experts.  Frank Flores, the detective from L.A. at the
beginning of the case, Juan Diaz, the police officer from

 1    El Salvador at the end of the case, told us about those

 2    rules and how they apply to MS-13.  They are MS-13's rules.

 3         The gang members themselves, the cooperating

 4    witnesses, Wilbur Garcia, Scorpion, Juan Carlos Dominguez,

 5    Sombra, Jovet Medina, Travieso, all knew the rules.  All

 6    were jumped in through the initiation process, went to the

 7    meetings, paid their dues, the money, participated in 13s

 8    and disciplines, either as one of the beaters or one of the

 9    people receiving the beatings.

10         But they said some other things about MS-13's

11    structure as well that I wonder if you noticed.  I think

12    all of them at some points in time said something about

13    this, that the meetings were pretty formal.  They occurred

14    regularly.  They started a pretty similar way, get in a

15    circle, throw the gang signs and shout La Mara Salvatrucha.

16         What else did they say about what goes on in

17    these meetings?  I'd submit to you it's kind of striking.

18    The first word would speak, and everybody else in that 25

19    or 30, however many, other people there were silent.  They

20    raised their hand to speak.  They only spoke when they got

21    permission from the first word to speak.  It's a small

22    thing, but I'd submit to you it's kind of striking.

23         You heard a lot of cross-examination about -- and

24    argument even from the defense lawyer about how bad the

25    cooperators are, that they're gang members who committed

1    violence, and that's certainly true.  And they had limited

2    levels of education, their English ability may not be

3    great, and yet in the gang, in the clique, they're raising

4    their hand for permission to speak.  They're speaking only

5    when they had permission.  They're showing up when they're

6    supposed to show up.  They're paying their dues.  It's

7    just -- it's a small thing, but it just sort of underscores

8    what the gang is about, discipline and control from within

9    the gang and without.

10           Well, what else is there to back up that, in

11   fact, there is some structure and organization to MS-13,

12   that they do have meetings, they do pay dues, stuff like

13   that?  Well, we heard from other witnesses.  I mean the

14   police intercepted some of these meetings.  Remember that

15   testimony?  Well, what was that testimony?

16           We heard that in January of 2004, Sergeant Murphy

17   from the Park Police stumbled upon a Teclas meeting, an

18   MS-13 TLS meeting, taking place at a park in Beltsville.

19   The meeting was just beginning to start up, and the police

20   swoop in.  They stop everybody.  They take photographs of

21   the gang members.  They actually see some gang dues books

22   and things like that.  Witnesses say there are meetings.

23   The police see one.

24           And there's another one, too, about a month or so

25   later.  Excuse me.  I think the witness was Corporal

1    Thurston.  I think he said he like literally fell into the

2    middle of the meeting I think was the testimony.  He

3    stumbled down the snowy hill and landed on his back in the

4    middle of that circle where they're doing the meeting.

5    There you go.  The police, again, other witnesses backing

6    up the witnesses we've heard from, saying yes, these

7    meetings take place.  They exist.  MS-13 meets.

8            And what else is there in terms of evidence that

9    shows that there's an organization, a structure to this

10   gang, to MS-13?  Well, dues sheet.  This is Beltsville 16,

11   one of those documents taken during that time when the

12   police, Sergeant Murphy, intercepted this gang meeting

13   taking place.  They actually write down who's attending and

14   whether or not they're paying dues.  This is from a January

15   2004 meeting.

16           And, again, as I said at the outset, these are

17   samples of some of the evidence that's contained in what's

18   been presented at trial, but other examples, too.  Just one

19   other.  This is 14th Avenue 68, a dues list from a

20   different clique.  Again, they're organized.  There's a

21   structure.  They're paying dues.  They're attending

22   meetings.

23           Now, a lot of letters came into evidence during

24   the course of the trial.  Here are some samples that relate

25   to whether or not there's a structure and organization to

1    this gang.  Cronin 9, the first word, Homeboy, writing to

2    the clique after he had been arrested.  What does he say?

3    Well, I still have first, first word, but well, case you've

4    always had the -- you've always had the opportunity to

5    choose the homie you see fit to control the clique.

6    Stomper, that's the second word, is toughing it out, that

7    is, he's the first word now, but you have a right to allow

8    him to be the first word 'cause he stood strong for the

9    neighborhood, or you can have somebody else be the first

10   word after that.

11          Again, the cliques have individual leadership, a

12   first word, second word, designed so that the first word

13   gets arrested, the second word takes over and becomes the

14   first word.  There's an organization to MS-13.

15          What else?  Another sample, Cronin 20A, just from

16   Homeboy to one of the gang members.  Hey, I heard you're

17   not showing up at the meetings.  Does MS hold regular

18   meetings?  Is there an organization?  Yes.  It's in

19   writing.

20          20D, another letter from Homeboy to another gang

21   member.  Hey, always show up at the meetings and be alert

22   with the cash.  We have gang meetings.  We have dues.  Go

23   to the meetings.  Pay the dues.  It's the rules.

24          Once again, it's physical evidence that backs up

25   the witnesses and says yes, MS has cliques.   There are

1    rules, including attending meetings and paying dues.

2             And, again, what happens if you violate the

3    rules?  What happens if you break one of the rules of

4    MS-13?  There is structured discipline.  You agree and

5    submit to this.  This is -- this guy is getting beaten, is

6    a member of the gang and agreeing yes, I break a rule, beat

7    me for 13 seconds.  It's part of the structure and

8    organization of this gang.  It is enforced discipline,

9    enforced rules.  The clique structure is part of the

10   structure and organization of MS-13.

11            What's the second level that we've heard

12   described to us about MS-13 and the structure of MS-13?

13   Well, not only are there individual cliques, but the

14   cliques work together.  They're all part of MS-13.  And

15   they work at the regional level together.  They have

16   general meetings.

17            How do we know that?  What's the evidence of

18   that?

19            Well, Frank Flores, the expert at the beginning

20   of the case, Juan Diaz, the expert at the end of the case,

21   said that.  What else?  The cooperating witnesses, the gang

22   members who testified, all talked about that.

23            Examples.  Wilbur Garcia, Scorpion, the first guy

24   who testified, said, hey, early on, we had general meetings

25   where everybody could attend, and there was one in

1    Virginia.  We all were going down there, but the police

2    broke it up.

3           Sombra, Juan Carlos Dominguez, the second guy,

4    what did he say?  Yes, there are general meetings.  Only

5    the first words would attend after the first few ones got

6    intercepted by the police, so the leaders of the cliques

7    would attend these meetings.  They'd tell us what would

8    happen.

9           And, in fact, when the defendant here came up

10    from El Salvador to Maryland, he attended some of those

11    general meetings with the first word of our clique,

12    Strayboy, and, in fact, we were told afterwards from

13    Strayboy and Mousy that when he addressed the general

14    meeting, Mousy did, he instituted this program, the

15    programa, the making sure, like they do in El Salvador,

16    that the cliques divide up the brothels and rob and extort

17    them.

18           What did the last cooperating witness, Jovet

19    Medina, Travieso, say about whether or not there were

20    general meetings?  Yes, I was a really new guy, I didn't

21    know everything, I'm learning the gang, but they make me --

22    they being Strayboy and the defendant Mousy -- they make me

23    drive them to a general meeting.  So yes, the cliques work

24    together in these general meetings.

25           What other evidence is there to back up these

1    witnesses and what they said about this level of the

2    structure of MS-13?  There's a Police Officer Garza who

3    testified.  I don't know if you remember him because he was

4    way back at the beginning, probably right after Frank

5    Flores testified.  He was an officer from Virginia, a gang

6    officer, who actually traveled to that Virginia park that

7    day and said he intercepted MS members from all over the

8    place, Virginia, Maryland, D.C.  They're all getting over

9    there.  They're all meeting.  He intercepts them and takes

10   down their personal information and sees them that day.

11   And might very well be the very meeting that Wilbur Garcia,

12   Scorpion, was talking about, the one at Bull Run in

13   Virginia.

14          So a witness, a police witness, saying you know

15   what?  Different cliques all together, I intercepted them.

16          But more than that, think about the violence we

17   heard about in this case.  We heard a lot about different

18   acts of violence and specific acts of violence.  If you

19   think back to how the evidence came in, you realize that

20   lots of times it was more than one MS-13 clique doing the

21   violence at the same time.  Right?  What am I talking

22   about?

23          Example.  There's -- you heard a lot about the

24   incident, the murders that took place on Quintana Street in

25   Riverdale, the double murders.  Jose Cerda and Eduardo

1  Trujillo get shot in the head and killed.  Richard Paredes

2  gets shot in the knee.  Who did that?  We'll talk more

3  about it later, but we heard Strayboy, Mousy, from the

4  Teclas clique, and in Juan Carlos Dominguez's, Sombra's,

5  car, as well, is a guy named Estraño from a different

6  clique, PVLS.  And as Sombra's driving his Toyota Celica,

7  there's a car in front of him from another clique from

8  Virginia who's joining in on this as well.  Multiple

9  cliques working together to commit violence.

10        Another example.  About two weeks later,

11  Alejandro Rubi-Martinez is shot and killed in front of his

12  father.  Remember that testimony?  What did we learn about

13  that?  It was orchestrated and organized by Strayboy and

14  Mousy from the Teclas clique, but they had two people go

15  and do the shooting, one from the Teclas clique, one from

16  the LPS or Langley Park Salvatruchas clique.  Multiple

17  cliques working together.

18        Or Jovet Medina, when he testified, talked about

19  he was a driver for a guy named Ski and Player when they

20  grabbed a guy with an 18th Street tattoo in the MS

21  territory, in the Four Stops.  They put him in the car,

22  they drove him up to Howard County and then they brutally

23  killed him.  They popped his eye out and they almost

24  decapitated him.  Again, Medina from the Teclas clique, Ski

25  and Player from a different MS-13 clique.  Multiple cliques

1    working together.

2           And there are more examples.  In what the

3    cooperators said they did in their own criminal acts as

4    part of the enterprise, they did more often than not with

5    other cliques, like that horrible gang rape at a skipping

6    party was multiple cliques, Teclas and the LPS clique.

7    Some of the assaults they participated in were Teclas and

8    the Sailors cliques.

9           But not only that, but we saw physical evidence

10   of the cliques, sure, shouting out to the world, we're all

11   part of MS-13.  We all work together.  These are from the

12   Sprint series of graffiti pictures, Sprint 2, Sprint 11.

13   Take a look at that.  Has the big MS3C in the middle, but

14   that's the SLSW on one side and the LPS on the other.  Two

15   different cliques on one graffiti.  They work together.

16   They're part of the same gang.

17          The same structure after it's repainted and

18   tagged again has even more cliques on there.  PVLS and LPS,

19   SLSW, they're telling the world we're all one gang.  We

20   work together regionally.  We work together in multiple

21   cliques.

22          Even in their own graffiti -- I'm sorry.

23   Another -- Laurel 2, another example of the cliques

24   advertising to the world they work together.

25          And even in their own graffiti, 14th Avenue 1, in

1    their doodles, they're even writing down, even in their own

2    notebooks, that they're all part of the same gang.  All the

3    cliques working together.  There it is.

4            In phone books, 14th Avenue 83, MS-13 members

5    have the telephone numbers of MS guys from various cliques.

6    An LPS member, a Teclas member, on the next page an HLS

7    member.  They're all part of the same gang.

8            Now, there are a lot of letters that came into

9    evidence, and I can't put them all and discuss them all

10   with you now.  Letters from one guy in jail saying, hey,

11   I'm here with members of several different cliques, send us

12   all money, or let's all work together, things like that.  I

13   think one letter probably sums it up pretty well.  Otis 9.

14   Where he says, look, like I tell him, the MS hood always.

15   I don't pay attention to the clique because what unites us

16   are the two big letters, MS.  Pretty much says it all.

17           Now, during some of the cross-examinations of

18   some of the witnesses, we heard the defense ask people, you

19   know, you're in Maryland.  You don't know what's going on

20   in Arizona or New Hampshire or Nevada or Nashville,

21   Tennessee, right?  I can't say I fully appreciate or

22   understand all of where he was going with that, but to the

23   extent he's suggesting that it has any relevance to this

24   discussion, I submit it doesn't for a couple reasons.

25           First of all, there's nothing in the judge's

1   instructions that says every clique and any member in every

2   clique has to know everybody else and know what they're

3   doing.  In fact, if you look at your instructions, I think

4   you'll see the opposite.  Conspirators don't have to know

5   all the other coconspirators or what exactly they're doing.

6          Second, another thing I think we've learned over

7   the course of this trial is that some of those places, the

8   guys in Maryland did have contacts with.  Arizona, the guy

9   Player, Mafioso, Lil Man, those guys came up from Arizona

10  and were hanging out with the Teclas clique and talking to

11  them.  Nashville, Tennessee, Ski was down there.

12         How about other countries?  El Salvador.  Cisco

13  and Trece keeping in contact with them, and the defendant

14  right there showing up in Maryland to give instructions.

15         But also, I mean seriously, I don't -- I submit

16  any big organization, formal, informal, any large one,

17  can't possibly fit some sort of definition where everybody

18  has to know what everybody else is doing.  It doesn't make

19  any sense.

20         Let me use an example that's been used before

21  during the course of this trial.  McDonald's.  Right?  Big

22  organization.  Franchises independently owned and operated,

23  all part of McDonald's.  I'd submit to you that a

24  McDonald's in Reno, Nevada probably does not have a clue

25  who's working the night shift in Concord, New Hampshire.

1    They probably don't even know who's on the night shift or

2    how many burgers they sold that day or even where there's

3    one in Concord, New Hampshire or if there's one in Concord,

4    New Hampshire.  But I bet you if you ask somebody at a

5    McDonald's in Reno what's the color of the uniforms of

6    McDonald's in New Hampshire, they probably have a good

7    guess.  They probably also know what's on the menu.

8            Same thing, I'd submit, as with MS-13.  May not

9    know where all the cliques are in the United States or who

10   they are or exactly how many people they've killed on a

11   particular day, but I bet you if you ask an MS member, and

12   they were asked, you know, what's the colors in another

13   state of MS, they'd say MS is blue and white and black.

14   Come on.

15           And if you asked them what was on the menu for an

16   MS clique, you know, what do they do, mata, viola,

17   controla.  Murder, rape, control.  Violence, because that's

18   what is at the core of MS-13.

19           But that's the regional level we've been talking

20   about.  What about this other last level, international

21   direction?  Do cliques get direction or instruction

22   internationally?  Did we see that during the course of this

23   trial?  Of course.  There's a lot of evidence about

24   international direction.  I mean there's an exhibit in a

25   way sitting right here in court, the defendant.

1          But what do the experts say, first of all?  They

2    said yes, you know, there are leaders incarcerated in El

3    Salvador.  They give instructions on the outside.

4          The cooperating witnesses all said, look, we were

5    all at meetings.  They all said at times we were at

6    meetings where I was there, we got on the phone, on the

7    speaker phone, and Cisco and Trece checked in with us and

8    told us what was up and told us we had to stay sharp and

9    things like that.

10          Is there anything backing up these witnesses?  Is

11    there anything in the physical evidence that backs up all

12    of this?  Yes.  Phone books, right?  If they're actually

13    speaking with someone named Cisco and Trece from El

14    Salvador, you'd think we'd see their name and telephone

15    number show up in some of these search warrants.  12th

16    Avenue 1, there it is.  Trece with that 011-503 precursor

17    phone number.  Otis 1K, Chalena, a guy who actually shows

18    up in the video as well, and another number for Trece.

19    Right?  It shows up in the phone books.

20          It shows up in the letters.  I'm going to show

21    you one letter in particular because -- oh, I'm sorry.  I

22    forgot one.  This is 8320 14th Avenue 14.  It's a passport.

23    What does that have to do with anything?

24          Remember the testimony of -- I think it was

25    Wilbur Garcia, Scorpion, and Juan Carlos Dominguez, Sombra.

In talking about instructions from El Salvador and contacts with El Salvador, what did they say?  Among other things, they said, you know what?  Our leader, first word, Strayboy went down to El Salvador to meet up with the MS guys there, and, you know, they even were planning on doing a hit together, and they talked about what was going on.  That happened on the, I don't know, beginning of February of '05, give or take.

Was there anything backing that up?  This is Strayboy's passport taken from his apartment in a search warrant, and you can see on the screen it's been stamped indicating he took a trip to El Salvador around the time that the cooperator said he did.  It just sort of, again, backs up this international connection and backs up what the witnesses are saying.

Letters.  This is Cronin 49.  It's lengthy.  I'm going to actually quote up a big part of this.  The first part of this, actually, I just quoted because it has something to do with one of the other topics we already discussed, about the structure.  This is Homeboy, the first word, who's now in jail, writing to his second command, who's not yet in jail.  And what is he saying?

Hey, you know, I'm here inside.  I don't know when I'm going to get out, but I'll be on alert.  Hope you know how to use your intelligence and control things on the

1    outside.  For now you're automatically the first dude.

2              Again, the structure of the cliques in the

3    organization.  It's like vice president becoming president

4    in a way, you know.  He's now the first word.  Right?

5              Check it, homie.  You know the problem you have,

6    so grab another homie as your second who will hustle for

7    you so he'll keep you informed about what's up.

8              Again, the structure.  You're now the first word

9    automatically, according to the rules of MS-13, according

10   to our structure and organization.  You need to have a

11   second word to keep it going.

12             Now, what about this international instruction?

13   It's very blatant and very clear in this letter.

14             Remember that we have to report to El Salvador.

15   Check it out, homie.  My old lady has the number of the

16   homie who's in the pen and has the word in the clique down

17   there in El Salvador.  Check this.  What's up, yo.  Call

18   him and tell him your tag.  Tell him that you're the one

19   who runs the clique.  I'm locked up.  Act tough.  He's

20   going to talk very tough, and tell him we're like 25 guys

21   but we're all crazy.

22             Right?  There it is right in the letter.  We

23   report to El Salvador.  We get instructions from El

24   Salvador.  Check in with him.

25             And in case that wasn't enough, there's more in

1  this letter.

2           Tell them -- this is, again, Stomper, call up MS

3  in El Salvador in the penitentiary there and tell them that

4  since we got no help from El Salvador for the clique to

5  run, we've gotten more solid.

6           Again, we're getting instructions from El

7  Salvador.

8           And, but, well, the most important thing for you

9  is to talk to Cisco, who has the big word there in the --

10 in El Salvador of the clique.  Cronin 49.  It couldn't

11 really get any more blatant than that and any more clear.

12 The witnesses were all telling us the truth.

13          There's directions from El Salvador.  Maryland

14 was getting instructions from El Salvador, and here it is

15 laid out in a letter.

16          Now, is there really a Cisco and Trece?  Are they

17 in El Salvador?  Well, the Otis Street video made it really

18 clear.

19          I'm going to play a portion of the video now, the

20 portion from the transcript.  You don't have to get them

21 out.  I'm going to give you the page number so you can go

22 and sort of check what I'm talking about later and see I'm

23 accurate, but this is really -- this is toward the

24 beginning.  Page 4 and 5 and 7 and 8 of the transcript.

25 Just show you Cisco and Trece introducing themselves, and

1    then soon thereafter, Mousy, the defendant himself, right

2    with them, introducing himself and the shout out to

3    Maryland.

4              (Videotape being played.)

5              MR. JAFFE:   Cisco.   Trece.   There they are in El

6    Salvador in a video being sent to Maryland.   And then --

7              (Videotape being played.)

8              MR. JAFFE:   -- the defendant.   The homeboys in

9    Maryland.   Right out there on the tape, this is going to

10   Maryland.   There is instruction and communication from El

11   Salvador to Maryland, just as the witnesses said, just as

12   the experts said.   There is that top level of structure and

13   organization to MS-13.

14             The defense a couple times in cross-examination

15   were asking the witnesses, well, how do you know you're

16   talking to Cisco and Trece?   How do you know you're talking

17   to El Salvador?   Could be some trick played on you.

18             I hope you can see from the testimony of the

19   witnesses, from the fact that Cisco and Trece's name and

20   number are showing up in the phone books, from the fact

21   that Cronin 49, the letter, specifically orders the leader,

22   you must call Cisco in El Salvador to get instructions, and

23   the video makes it clear that that argument of the defense,

24   or cross-examination, I'd submit, is totally without merit.

25   The evidence is overwhelming that there was international

1    instruction and direction coming from El Salvador.

2            So okay.  That's the ongoing organization and

3    structure of MS-13 as we've seen and heard and that the

4    evidence and physical evidence has shown us.  What are the

5    common purpose or purposes of MS-13?  Do they exist?  Well,

6    yeah.  One of them is pretty clear, preserving the power

7    and territory of the gang through violence.  I say one of

8    them's pretty clear because this is, I submit to you, at

9    the very heart, at the very core of what MS-13 is all

10   about, is violence.  That's what our experts, Frank Flores

11   and Juan Diaz, said about MS-13, is what the cooperating

12   witnesses told them and what they lived.  What it's all

13   about is attacking rivals, attacking chavalas, killing them

14   if you can.  Every one of the cooperating witnesses not

15   only talked about it, but they did it.  That's why they're

16   in jail.

17           And we've heard specific acts of violence that

18   just bring this home, that MS is about violence and they

19   celebrate violence.  Like, again, the murder of Alejandro

20   Rubi-Martinez, the man who was killed in front of his

21   father.  I mean what did we hear?  Not just only that it

22   happened, but as these guys, the gang members, are shooting

23   and committing this killing, what are they doing?  They're

24   yelling out Salvatrucha, or Mara Salvatrucha, whatever it

25   was.  Celebrating the gang in the act of committing murder.

1    It's what MS is all about.

2              The Blue -- the robbery and the rape at the

3    brothel in Blueridge, I mean it wasn't just a robbery.  It

4    was a brutal, violent act, a brutal and vicious rape, not

5    only the rape against Patricia Velez, but the way they

6    attacked the people in the apartment just is excessive

7    violence.  It's all about what MS is about.

8              Or grabbing a guy who's standing in the MS

9    territory, yanking him off the street because he's got an

10   18 tattoo -- this is Juarez-Sanchez -- and then brutally

11   torturing and killing him in Howard County.

12             Remember what Ski said to Jovet Medina after he

13   and the other guy just do that horrible thing in the woods?

14   He says, that's what you do to chavalas.  That's what MS-13

15   does.  That's what they're all about.  This is what they

16   do.  This is really their core purpose.

17             Or the murder of Noel Gudiel.  I don't know if

18   you remember that one.  That one was from April of 2003.

19   The leader of the clique, Homeboy, shoots the rival gang

20   member in the head?  Remember how we learned about that?

21   The cooperating witness said they had a meeting, and

22   Homeboy's upset, not because he did the murder but because

23   another MS clique is taking credit for it.  Taking credit

24   for it.  It's shocking.  But it's what MS is all about, and

25   it's their purpose.  It is at their core.

1        And I mean you see we've got this display at the

2   table.  The knives, the machetes, the guns, the bullets,

3   every single one of these just speaks to this, that this is

4   what they're about.  This is at their core as one of the

5   main purposes, is violence, violence to preserve their

6   power, their control, their territory.  And, of course, we

7   saw this in all the accumulated evidence and letters and

8   things like that.

9        Examples, Cronin 20A, I think that is -- Cronin

10  20B, excuse me.  20B.  Right there in black and white.

11  Mara Salvatrucha, viola, mata, controla.  We had that

12  defined for us several times over.  Murder, rape, control.

13  That's what MS is all about.

14       Cronin 4.  Tell me about all the homies outside

15  are doing, how they're doing and how the Teclas territory

16  is doing.  They view themselves as having their territory

17  that they control through intimidation and through

18  violence.

19       14th Avenue 81.  Gee, I'd like to be out there

20  right now with all the homeboys fucking up the puta

21  chavalas.  Don't let the fucking pigs fuck with you.

22  Remember every homeboy's got a mission.  We die for the

23  hood.  It's what MS is all about.

24       Even in the Otis Street video.  This is a -- I

25  think I just put the transcript up here.  Page 76 and 77.

1    This is that part of the video where they go into the guy's

2    house who's got that contraption on his leg because he's

3    injured.  Remember that?  What do they say?  This is the

4    dumb ass.  This is the little homie that, yeah, look,

5    homie, he got messed up, man, you know, in a hit, and we

6    put a little red box around the Spanish for hit, pegada.

7    We know what that is from the witnesses, the experts, the

8    interpreters.  Pegada, a mission, shooting and attacking

9    rival gang members.

10          And we see it repeated on page 77.  Here we are.

11   Check it out, homeboy.  The homeboy who was shot, man, a

12   hit, a pegada.  It's what MS is all about.  This is one of

13   their purposes, violence for the sake of violence, for

14   power, for control.

15          What's another thing that they do?  They promote

16   and enhance the gang's activities.  They keep the victims

17   in fear of the gang.  A number of ways they did this, but

18   there's one I really want to talk about.  They do it

19   through graffiti.

20          This is McCormick 21.  Right?  What does it say

21   on there?  Welcome Langley Park -- welcome to Langley Park

22   MS-13.  Why is this important?  Well, I submit to you it's

23   particularly important.  It's particularly frightening.  It

24   shows their control of territory.  It shows their control

25   of a neighborhood.  It shows and advertises their power.

1          And make no mistake, members of the jury, this

2     picture here, this graffiti, is a threat, and it is a

3     threat of the most vicious order.  Why?  Why is that?

4     Because of where this is.  It's in Langley Park.  But more

5     specifically, the building that it's on, do you remember

6     the testimony of the building that this is on?  That's an

7     elementary school.  That's an elementary school.  Can you

8     imagine?  Can you imagine being the parent having to take

9     your five year old or your six year old or seven year old

10    to that every day?  Are you going to mess with MS-13?  Are

11    you going to tell the police anything about the gang?  Who

12    controls your neighborhood?  Who controls the neighborhood?

13    Who could put this on an elementary school?  MS-13.

14         And then you think of this and then think of all

15    the different exhibits we saw -- we showed you about

16    graffiti all over the place, on walls, on stores and what

17    have you.  And you heard about MS graffiti all over the

18    place and in cars and stuff like that, and people standing

19    on the corners and flashing the signs and the 13 jerseys

20    and the shoes and all that, so you see what this gang does.

21    It displays and advertises who they are and what they are

22    to the world, and they do it for a reason.  It's not just

23    for fun.  It's for a purpose.  To intimidate, to control,

24    to say to the world we are here, we are everywhere, we

25    control, we are the worldwide MS-13, don't mess with us.

1  And nothing, I submit, speaks louder than what we're seeing

2  on that screen right there on an elementary school.

3        But there are other purposes as well.  They

4  provide financial support and information to people who are

5  in jail for members of the gang.  What are we talking about

6  here?  Well, we heard a lot about this from the experts, as

7  well as the gang members.  We pay dues as members of MS-13,

8  and part of the reason we pay dues is to buy guns, of

9  course, but also to send off to people who are in jail.

10  Wilbur Garcia, Scorpion, Juan Carlos Dominguez, Sombra,

11  Jovet Medina, Travieso, said this.  And there are tons of

12  letters that talk about send me -- I'm in jail, send me

13  money, or thanks for money.

14        Some samples.  This is Cronin 41.  Please send

15  jail money.  Right?  Send me bread.  Money orders.  And

16  same two guys talking in Cronin 48.  Hey, I received your

17  letter and the dough.  Thanks.  Right?  Sending money to

18  gang members.

19        And this is Chapman 4.  We see this in lots of

20  places.  Pages and pages in all these different search

21  warrants of names with inmate numbers and jail addresses.

22  The Upper Marlboro address we saw lots of places and other

23  jail addresses.  They are keeping and collecting and

24  collating tons of gang members' names and places you can

25  mail letters and information to.  There's lots of jail

1    letters in evidence.  They keep in contact with jail

2    members.  They support them.

3            What about other types of communication we saw?

4    Well, we saw newspaper articles show up in search warrants.

5    Like this one, Cronin 39B.  What's significant about this?

6    Sure underscores that the gang does keep in communication

7    with each other.  This is taken from a place in Virginia, a

8    gang member's house in Virginia, but it is a newspaper

9    article -- and the translation's attached to the exhibit if

10   you want to take a look at it -- from El Salvador talking

11   about what's going on with the gang in El Salvador.  Just

12   another example of the gang keeping mementos of what's

13   going on with the gang, keeping in touch with what's going

14   on with the gang.

15           If you want to talk about that, Beltsville 13

16   is -- Blueridge, excuse me, Blueridge 13 is another one of

17   those examples.  What's that?  It's a newspaper article.

18   Where'd it come from?  It came from the wallet of one of

19   the four guys who was arrested in that apartment on

20   Blueridge, Wheaton, when they were caught red-handed during

21   that rape and robbery.  It wasn't the defendant.  It was

22   one of the other MS guys.

23           What is it about?  It's a newspaper article about

24   the Noel Gudiel homicide from 2003.  This guy didn't do it.

25   He's just a member of the gang.  But it's a way they keep

1    mementos and they keep information about the gang and what

2    it's all about.

3          But there's more evidence.  The Otis Street video

4    has some evidence of this support of the gang members as

5    well.  I'm going to show you a section from page 68 of the

6    transcript at one hour 08 minutes on the time clock for the

7    video when they're talking about a guy collecting money

8    from all the gang members to send to the guys in jail.

9          (Videotape being played.)

10          MR. JAFFE:  They're collecting cash -- collecting

11    cash for the guys locked up in prison in El Salvador.  And

12    one of the things you'll see about that clip -- I turned it

13    off because it was going off and on, but when they're

14    talking about we're collecting cash for all the guys who

15    are locked up in El Salvador, they also say they're

16    collecting cash for guys from multiple cliques or a mess of

17    cliques, just evidence that goes back to one of the points

18    I was making early on about the structure of MS.  The

19    cliques work together sometimes.  They coordinate together.

20    You even see it in El Salvador on that video.

21          Now, I have next another purpose, providing

22    assistance to gang members in trouble with the police and

23    obstructing justice.  What's that all about?  Where do we

24    see that?  Do members of the gang try and mess with or and

25    obstruct with justice by intimidating witnesses, by

1    tampering with witnesses, by trying to get witnesses not to

2    cooperate with the Government?  That's a purpose of MS-13.

3    Where have we seen that?  The term green light, right?

4    Every one of these witnesses testified they've got a green

5    light on them, or they expect they would because of the

6    rules of MS.  If you cooperate with the police, if you

7    cooperate with justice, you are marked for death.  It's

8    part of what MS-13 is.  It's just a part of what they are.

9            What else?  We actually saw in some of the

10   letters this discussion of witnesses in court.  This is a

11   letter, Chapman 9.  We've highlighted the portion here.

12           Hey, do you know a Jessica Sanchez that goes to

13   Blair with you all?  'Cause she's testifying and is a

14   witness against me and LM, whatever that is, and shit.

15   Just asking if you all know her.

16           All right.  By itself, that letter, oh, maybe it

17   doesn't mean that they're going to do anything to the

18   witness.  Right?  But they're identifying the witness.  But

19   from the same search warrant, same handwriting basically,

20   same people talking, look at Chapman 13.  Oh, don't --

21   don't be so hot about talking about witnesses and shit you

22   all do out there, shhh, don't -- don't write me about that

23   stuff about witnesses.  Just do what you all got to do for

24   us.

25           Put those two letters together and you see what

1   they're talking about.  Don't write to me about what you're

2   going to do to Jessica Sanchez or other witnesses.  Just do

3   what you got to do for us.  Keep it quiet.

4          There's another letter that talks about this

5   obstruction of justice point.  This is 14th Avenue 17.

6   Hey, homeboy, I need you to go to court for me and say the

7   following.  Right?  And then there's this long fact pattern

8   about the Nancy Diaz homicide we've heard a little bit

9   about.  Wasn't one of the main homicides we talked about in

10  this trial but heard a little bit of reference to it.

11         What's going on in this letter?  Guys, I'm locked

12  up.  Please go to court and tell the following story for

13  me, that I had nothing to do with this murder.

14         Obstructing justice.  It's part of what they do.

15  It's just part of what they do.  That's a discussion of

16  purposes.

17         So there's an ongoing organization.  They have

18  some common purposes.  At their core, violence, but there's

19  other purposes, like intimidation, fear, displaying to the

20  world who they are, supporting people in jail and

21  greenlighting witnesses.

22         But is there a continuity of structure?  Is there

23  a core to this enterprise?  I made some reference to it

24  already, but let me go through it now.  I'm going to just

25  discuss some of the things the judge told us about

continuity and core of the enterprise.  Substantially the
same structure or form of the core throughout the time
period of the indictment is what we have to show.  It does
not mean that everyone involved has to be the same, just
that the core of the enterprise has to be the same
throughout.

Well, did we see that with regards to MS-13?
Sure.  Continuity of structure.  There's individual cliques
that are all part of MS-13.  The communication and
coordination between and among cliques going up through
years, in 2003 throughout 2005, the time period of the
indictment.  Meetings and dues and leadership, we saw from
all different time periods and discussed just part of what
the gang was all about.  And the rules.  Not much change in
the rules that we heard of at all throughout.  And.

The succession that's in place.  Talk about
continuity.  There's a first word and a second word.  Jail,
murder are not going to stop this gang.  The cliques are
organized so that if the leader is incapacitated,
somebody's there to take his place.  The understanding
among the cliques is that if the first word or second word
is out, not doing their job, they could put somebody new in
their place.  It is organized.  It is structured.  It is
designed for continuity.

Is there a core to this enterprise?  Yes.  As I

1    said at the -- throughout this so far, at the very core of

2    MS-13 is this violence, is this power and turf.  Kill the

3    chavalas.  Intimidate others.  Support the homeboys.

4    Violence.  Murder.  Attempted murder.  Robbery.  Rape.

5    Intimidation.  Mata, viola, controla.  It is at the core of

6    what MS-13 is all about.  Murder, rape and control.

7              And, of course, the tools of the trade.  It

8    speaks volumes for what the core is all about.  Every

9    knife, every machete, every gun, every bullet speaks to

10   that.

11             When you put it together, the organization, the

12   common purpose or purposes in this case, the continuity and

13   core of MS-13, you have Mara Salvatrucha, a criminal

14   enterprise, the first element of Count 1.

15             Now, does this enterprise engage in a pattern of

16   racketeering activity?  Murder, attempted murder, robbery,

17   obstruction, witness tampering?  Yes.  Right?  They have

18   to -- the MS-13 enterprise itself, not in Maryland, not a

19   couple guys, but MS, have they engaged in two acts of

20   racketeering related to the enterprise?  And there's a

21   threat of continuing activity?  Certainly we saw that in

22   this case.  Right?  We heard about five murders:  Noel

23   Gudiel, Anbar Juarez-Sanchez, Jose Cerda, Eduardo Trujillo,

24   and Anbar Rubi-Martinez.  And the robberies, the robbery at

25   Blueridge and all the other ones they talked about that the

1    cooperators did or that they all did at various points and

2    times.

3            The attempted murder of Richard Paredes.  The

4    violence related to obstruction, witness tampering, the

5    greenlighting process we heard all about.  And the gang,

6    its members, its leaders protecting turf, attacking

7    chavalas.

8            We only have to show two.  We don't have to -- we

9    only have to say that the enterprise engaged in at least

10   two.  They engaged in five, more, countless, I'd submit.

11           Let's talk about the second element.  Was there

12   some effect on interstate commerce?  And, members of the

13   jury, the key point here, I'd submit, is that only a

14   minimal effect or potential effect, even, on interstate

15   commerce is required.  Under that low threshold, I submit

16   we've shown it beyond a reasonable doubt.

17           Examples, the cost of cleaning up the graffiti.

18   One of the last witnesses, Sonia Portela, the manager of

19   all these different apartment buildings in the neighborhood

20   where the Teclas clique thrived and controlled.  It caused

21   all kinds of interstate commerce to clean the stuff up.

22   Calling Needham, Massachusetts and cut the check and send

23   it out here and the purchase order and all that.

24           And, of course, the apartment buildings

25   themselves had federal funding, had people coming from all

1    over the country to live.  Interstate commerce affected

2    just by tagging up the buildings.

3         The firearms and ammunition that the gang

4    purchases with their gang dues, none of it was manufactured

5    within Maryland.  It all traveled here at some point to get

6    itself purchased eventually by the gang.  It's an effect on

7    interstate commerce.

8         Interstate travel, international travel.  We saw

9    that.  The Bull Run meeting that happened in Virginia.  The

10   Otis Street video itself must have come from El Salvador.

11   It traveled across foreign and state borders.  The

12   defendant himself traveled in foreign and state borders.

13   Even the Blueridge brothel robbery, Patricia Velez herself

14   came from out of state, making that whole brothel and

15   enterprise itself an interstate business.

16        And, of course, their use of phones, use of the

17   mail, tons of letters.  There are some internet exhibits.

18   They keep tabs of themselves on the internet.  We even saw

19   Western Unions.  So really this is, I submit, very easily

20   proven beyond a reasonable doubt.

21        So it comes down to this, members of the jury.

22   Did the defendant associate with MS-13, the third one?  Did

23   the defendant conspire with other MS members to commit

24   racketeering acts?

25        Let's talk about association.  Right?  The

1    Government must prove the defendant was connected in some

2    way, some meaningful way, to MS and that he knew generally

3    of the existence of the enterprise and its activities.

4         Was he connected in some way?  There he is in

5    Quezaltepeque prison throwing the gang signs and his gang

6    tats, his tattoos, prominently displayed.  What do we know

7    about him?  A long-time member of MS-13.  Jumped in in El

8    Salvador.  Traveled to the U.S. at the direction of the MS

9    leaders in prison.  Schooled the Teclas clique in Maryland

10   and enforced the rules, participated in clique and general

11   meetings and directly involved in violence.

12        This guy wasn't connected to MS.  He was a member

13   of MS.  He is a full-blooded, initiated, top of the line,

14   he is in MS.  This is easily met.  Right?

15        Let's go through it a little bit more.  Tattoos.

16   That's Ramirez 2 and Ramirez 3.  He's tattooed.  You can't

17   have tattoos unless you're a member.

18        Look at this.

19        (Videotape being played.)

20        MR. JAFFE:  Just off the right shoulder of the

21   guy in blue, who is that?  The defendant throwing the claw.

22   What was that guy saying?  This is at page 20 to 21 of the

23   transcript, the 25:28 mark of the video.  Hey, these are

24   homeboys, real homeboys from the Teclas clique.  They're

25   locked up here in Quezaltepeque.  Right?  A hundred percent

1    Mara Salvatrucha, major gang bangers, and there's a mess of

2    homeboys here, including Mousy, the defendant, throwing the

3    signs.  Is he connected in some way?  Does he have some

4    clue of what this is about?  It's right there.  Yeah.

5          And, of course, there he is on the left, right

6    after he's caught red-handed, participating with three

7    other MS members -- there's one of the guys he's

8    participating with tatted up -- in this robbery at

9    Blueridge and at this rape at Blueridge.  Is he a member?

10   Oh yes.

11         Think of it another way.  If somehow the

12   defendant wasn't a member, I'd submit to you none of these

13   exhibits I just showed you would have existed.  He showed

14   up in Quezaltepeque throwing the gang signs and tatted up

15   and he wasn't a member, I submit to you that those big bad

16   leaders from MS standing right next to him would have taken

17   care of him right then and there.  The rule is only MS guys

18   have those tats.  Only MS guys throw those signs.

19         And there's no way he'd be showing up in the

20   middle of participating with three other MS guys in a

21   robbery if he wasn't a member and had some idea of what was

22   going on.

23         So I'd submit this one, defendant was associated

24   with the enterprise in some way, this is very easily met.

25   He was a member of this enterprise.

1    So what's it come down to?  Number four.  Was the

2    defendant a knowing, willing member of the racketeering

3    conspiracy, RICO conspiracy?  Some key points that we want

4    to highlight that the judge mentioned in her instructions.

5    What's conspiracy?  Meaning agreement.  Unspoken,

6    unwritten, informal.  Right?  Some manner of participation,

7    however slight, is sufficient.  It doesn't matter your

8    level of participation.  Right?  The role you play is not

9    what's important here.  It doesn't require an equal role.

10    What other stuff?  You don't need to know the

11    other coconspirators.

12    What other stuff?  You only need to know the

13    general nature of its activities and its common purpose.

14    The duration of your participation does not matter.  The

15    conspiracy doesn't even need to be successful.

16    So what -- you boil that down, that you're a

17    member, associate, you have some knowledge, some intent

18    that the other members of all over of MS would commit two

19    or more predicate offenses or racketeering activity as part

20    of the racketeering activity.  Right?

21    The defendant does not have to commit any act

22    himself.  He does not have to personally agree to the

23    commission of any actual act.  So the defendant does not

24    have to commit the acts himself.  What is it that the

25    evidence has shown about whether or not the defendant

1    conspired, agreed to participate in the general nature of

2    this activity, this racketeering activity?  Because that's

3    what this boils down to.  What can we show or what have we

4    shown that the defendant agreed to participate in the

5    general nature of this activity?

6              Well, first off, the witnesses.  What did Wilbur

7    Garcia, Scorpion, say?  He says, hey, this guy Mousy, I

8    don't know him until I was in jail.  Then this guy starts

9    talking about MS and hits and what the MS does and even

10   says he did a hit in Riverdale where Sombra was driving.

11   Is the defendant aware of the general nature of what this

12   gang is all about?  Yes.

13             But of course there's more.  Juan Carlos

14   Dominguez, Sombra, what does he say?  Hey, this guy Mousy

15   comes up from El Salvador.  He shows up at meetings.  He

16   says he's here to make sure we follow the rules of MS and

17   to school and train the younger guys.  He's there when

18   Cisco and Trece call.  He's there when we're discussing

19   pegadas, hits, and 13s and green lights and all that stuff.

20   He's there and part of these meetings.

21             Is he participating in the meetings, and is he

22   aware of the general nature of the racketeering activity?

23   Yes.

24             Jovet Medina, Travieso, what does he say?  Mousy

25   helped jump me into the gang.  He was counting.  When I'm

1    getting beaten into this gang, he's there counting.

2           What else?  He told me the rules of MS, Mousy

3    did, the defendant.  And what else?  He went to the

4    meetings.  He hung out at the Four Stops with us.  He threw

5    the signs.  He even did four or five robberies with me with

6    other MS guys.

7           Is the defendant aware of the general nature of

8    the racketeering activity?  Yes.

9           What else?  He's jumped in, the defendant.  We

10   know what that means.  I think one witness said it's called

11   like being blooded in.  You know the gang is about violence

12   if to get into the gang you have to get -- agree to get

13   beaten up for 13 seconds.  He is a jumped-in, initiated

14   member.

15          He's in jail in Quezaltepeque with the TLS

16   leaders.  And it's not just that he's in jail.  You look

17   through that transcript, it's all over the place in the

18   transcript, kill the chavalas, kill the levas, kill these

19   guys, eliminate them, control.  Every other word seems to

20   be something like that.

21          Is the defendant aware of the general nature of

22   the racketeering activity?  That's all we got to show.  Oh,

23   yes.

24          What else?  He introduced and organized this

25   programa, general -- in the general meeting in Maryland.

1    Is he aware of what MS is about if he goes to a general

2    meeting, gets the Maryland cliques together and says, okay,

3    divvy up those brothels, 'cause like we do it in El

4    Salvador, you're going to rob and extort these folks.  And,

5    of course, he's caught red-handed doing one with three

6    young MS members.  Is he aware of the general nature and

7    activities?  Yes.  Yes, he is.  That evidence shows it.

8          You can stop right there.  I submit you could

9    find him guilty of Count 1 based on all that evidence.

10    It's done.  But, of course, there's more evidence because

11    he -- the law says we don't have to show that he committed

12    any act himself, but we know from the course of this trial

13    that he did.  He did.

14          Let's talk about the Quintana, Riverdale double

15    homicide.  What do we know happened there?  Juan Carlos

16    Dominguez, Sombra, says, I'm the driver for that.  Before

17    we go, we're all at a meeting.  Mousy's there with us.  We

18    decide we're going to do a hit.  Somebody picks the target

19    out for us.  We get in two cars, the guys from Virginia in

20    one car, me in my silver Toyota Celica.  I got Mousy and

21    Strayboy and this guy Estraño from the PVLS clique.  We

22    drive out there.  We go around a couple times.  We park up

23    the block.  Strayboy and Mousy leave my car with guns.

24    There's gunshots.  They come back.  We leave.  The

25    defendant participated in this double homicide.

1           What else?  The guy who survived that shooting,

2    the attempted murder victim, Richard Paredes.  He says, you

3    know what?  I'm there on the street, and yeah, these two

4    cars are circling around looking at us.  The second one is

5    a silver Toyota Celica.  They're loaded down with Hispanic

6    males.  I think four or five in each car, he said.  They

7    park up the block.  Some guys come towards us.  One of them

8    starts firing.  I get hit.  My buddy, Eduardo Trujillo is

9    murdered.  I get under a truck and I don't see what happens

10   after that.

11          And yes, Trujillo and Cerda were gang members,

12   and another gang, VL, Vatos Locos, was just down the

13   street.

14          What does another witness say, Scorpion, Wilbur

15   Garcia?  I'm in jail.  I don't know anything about this.

16   But we're there in the common area one day in jail, me and

17   Mousy.  The TV is blaring on out there in the background.

18   When the word Riverdale comes up, he says, hey, you know

19   what?  I know that place.  MS does hits there.  In fact, I

20   did a hit there.  Sombra was the driver.  The defendant

21   participated directly in this murder.  Is he aware of the

22   general nature of MS activities?  Of course.

23          There's some more evidence of the defendant's

24   guilt and defendant's participation in Quintana Street.

25   I'll talk a little bit about it later.

1          The 14th Avenue murder.  That is the murder of

2     Alejandro Rubi-Martinez.  What do we know about that?  Juan

3     Carlos Dominguez says, hey, you know what?  There was a

4     meeting right near that parking lot.  They said there's

5     some rival gang member there.  Mousy and Strayboy

6     orchestrate it.  They assign two guys to go and do the

7     shooting, and it's done.

8          Jovet Medina says, you know what?  I was there

9     before the meeting.  I'm there with Mousy.  He says there's

10    a rival gang member there.  He tells me to drive him to his

11    apartment.  He gets his gun.  We come back.  There's a

12    meeting with all the guys.  Strayboy and Mousy pick two

13    guys to do the shooting.  They go and do it, and I'm the

14    getaway driver.

15         The victim's father, what does he say?  Again,

16    while I'm there with my son, these guys come up and yell

17    Salvatrucha and begin firing.  And they yell again as they

18    leave.

19         The defendant helped orchestrate this crime.  Is

20    he aware of the general nature and participating in the

21    general nature of the gang's activities?  Absolutely.

22         And, of course, there's this.  Talk about direct

23    participation in crimes, he's caught red-handed in the

24    middle of participating with three other MS guys in this

25    rape and robbery.  And it's a gunpoint rape or robbery.

1   Blueridge 41, this gun?

2           And not only did the witnesses, Juan Carlos

3   Dominguez, Jovet Medina, say yes, this defendant was part

4   of this plan, part of this participation in this robbery,

5   he had this gun at points, the victim, Patricia Velez,

6   says, you know what -- she says it herself on the stand or

7   through the nurse -- four guys attacked me.  Three are

8   physically brutally raping me, and there's a fourth guy

9   watching, and there's a gun pointed at my head.  And yes,

10  that's my property that ends up in the defendant's pocket.

11          And, of course, the cops all say, you know what?

12  We're there to arrest somebody else.  The door opens up and

13  it's the defendant who's the one who's trying to attack the

14  female detective.  He's caught red-handed.

15          What about that other evidence for all of these

16  crimes?  Right?  This gun?  What is that other evidence

17  that shows the witnesses are telling us the truth, that

18  shows us the defendant not only had general knowledge but

19  directly participated?  Susan Lee.  Remember her?  Who was

20  she?  She was the expert with the firearms and tool

21  evidence who reviews the striations and the markings on the

22  guns and the bullets.  What did she say?

23          She compared the bullet that Carol Allan, the

24  medical examiner, took out of the body of Jose Cerda and

25  said it was fired from this gun.  This gun, found with the

1    defendant and the three others in that robbery and rape at

2    Blueridge.

3         Why is that significant?  Because from all the

4    evidence in the case, we know that there's only two things,

5    there are only two things that are inside that Blueridge

6    apartment and standing on the street as Jose Cerda and

7    Eduardo Trujillo are getting shot in the head, this gun and

8    Victor Ramirez, the defendant.  It's powerful evidence, I'd

9    submit, members of the jury.

10        The defendant had general knowledge of MS-13

11   activities?  Yes.  The evidence even goes so far as to say

12   he had direct participation.

13        That's not all Susan Lee said.  She said --

14   remember about the Quintana Street double murder?  Two guns

15   were used, this gun, which killed Jose Cerda, and a

16   different gun was used to kill Eduardo Trujillo.  The gun

17   was never recovered.

18        What do we know about that second gun at the

19   Quintana Street homicide?  According to Susan Lee, that is

20   the gun that was used to kill Alejandro Rubi-Martinez.  Why

21   is that significant?  Why does that help us get even a

22   clearer understanding of the defendant's general knowledge

23   of MS-13?  Well, because from all the evidence and the

24   witnesses' testimony, we know that those two murders had

25   something else in common in addition to the fact that the

1   same gun was used.  And what is that?  Both homicides, the

2   Quintana Street and Alejandro Rubi-Martinez, were

3   orchestrated and plotted and directed by the same two

4   people, Strayboy and Victor Ramirez, the defendant.

5           Again, the Government has to show the defendant

6   agreed to participate in the general nature of the

7   racketeering activity.  We've shown that through the

8   testimony of the witnesses, the Otis Street video, his

9   tattoos, his attendance at meetings, his getting caught at

10  Blueridge, but we've shown much more than that.  The

11  evidence is pretty clear, I submit, members of the jury,

12  the defendant had direct participation in these crimes.

13          The defendant is an MS gang member.  He's a RICO

14  coconspirator.  He is guilty of Count 1.

15          And there are those bookmarks to his

16  participation right there that makes it pretty clear, I'd

17  submit, members of the jury.

18          One last thing about Count 1 is this verdict

19  sheet.  The judge made some reference to it.  We're going

20  to -- the verdict sheet asked you not only whether or not

21  the defendant is guilty -- and we submit, based on the

22  evidence, he is guilty beyond a reasonable doubt -- but it

23  asks you to check off the objectives of the conspiracy.  We

24  just want to make sure it's clear it's not what the

25  defendant personally committed.  What you are asked to

1    check off are what are the objects of the conspiracy.  That

2    is, what were some of the goals of the conspiracy, not what

3    particular, specific acts it committed or were successfully

4    committed, but what was this gang part of and what was it

5    trying to do.  This sort of goes back to what its core was.

6              We submit to you this gang tried to commit and

7    actually did commit and was -- an objective of it was

8    murder and attempted murder, first degree, second degree

9    murder, and the five, six murders we've heard about make

10   that crystal clear.  Attempted murder as well.

11             Robbery, again, the police catch one in progress

12   in Blueridge, but we heard testimony that this was part of

13   a program of robberies and extortions.  It's what the gang

14   is all about.  Based on the evidence, we ask you to check

15   off robbery as well.

16             Obstruction of justice, witness tampering, it's

17   why there's a term green light.  It's -- the green light

18   was designed to answer these checkmarks.  We ask you to

19   check those off as well.  Check them all off, I ask you --

20   we ask you, members of the jury, based on the evidence,

21   because that's what the evidence supports.

22             Now, Counts 29 and 30, these are these two counts

23   that relate to the Blueridge robbery.  I'm not going to be

24   anywhere near as long in discussing these to you because I

25   submit these are short in terms of the amount of elements

1    we have to discuss, and we've already discussed the facts

2    very clearly.

3            Let me talk about the robbery count.  The judge

4    gave you these three elements.  Let me just read them off

5    and talk about them briefly.  Defendant knowingly obtained

6    or took personal property or from the presence of another.

7    Defendant took this property against the victim's will by

8    actual or threatened force or violence.  Result of

9    defendant's actions, interstate commerce was affected,

10   delayed, obstructed in any way or degree.  Have we shown

11   this?  Yes.

12           And when you're considering this count, we ask

13   you to keep the aiding and abetting language in your mind

14   as well, but what do we know?  Did the defendant obtain or

15   take personal property?  It's on him.  When he's caught by

16   the police, it's on him.  That's very clearly, very clearly

17   proven, I'd submit, members of the jury.

18           What else do we know?  Was the property taken

19   that day through the use of actual or threatened force?

20   Well, they didn't ask permission to take it.  Remember,

21   this is a robbery team.  The defendant, Jovet Medina, that

22   guy Snairoon and the guy Estraño from TLS, they go in

23   there.  There's a gun.  They tie the people up.  They

24   brutally, brutally rape Patricia Velez.  It's for a

25   purpose.  It's not a purpose to just say hi.  It's not a

1    purpose to just find out what the weather's like.  The

2    purpose is to take the property.  And the defendant himself

3    and/or with the others made sure that that property was

4    going to be surrendered, and they used force and the threat

5    of force to do it.  That's why they say things like to

6    Santos Mejia, the john who was there to engage in the act

7    of prostitution with the prostitute, yo, they took my money

8    and they said they'd kill me if I didn't comply.  Right?

9              This is very easily proven.  This is a gunpoint

10   robbery.  This was a violent act.  The violence was part of

11   the robbery.

12             What's this last thing about interstate commerce,

13   the one up there on your screen?  Did it affect interstate

14   commerce in any way, shape or form?  Yes.  How do you think

15   about this?  Well, members of the jury, in considering

16   this, you have to look at what this business was, and it's

17   an unfortunate thing to discuss but, I mean, this was a

18   brothel.  This was a business engaged in basically

19   trafficking in a human being.  The commerce that it was

20   engaged in was in the commerce of Patricia Velez.  She

21   was -- to put it bluntly, she was the interstate commerce

22   in this case.  She was the good that was being sold by this

23   brothel.  And that's certainly how the defendant and his

24   cohorts treated her and certainly how the people who

25   employed her treated her, and that's why this is an

interstate robbery.  It's because this was an interstate

business.  Patricia Velez testified, I would come up from

Virginia to go to this brothel to work as a prostitute, and

that is what she did that day.

Now, did the defendant and the others know that

they were robbing what happened to be an interstate brothel

rather than non-interstate?  There's no evidence they did.

The law says it doesn't matter.  They don't have to intend

to affect interstate commerce.  It just had to have

happened.  And they did.

How did they do it?  They brutalized her and

terrorized her.  They terrorized the potential customers of

Patricia Velez.  Not good for business.  They took money

from the customers, money that was going to go to the

business.  Affected interstate commerce.  That's what that

is, and that's all that is.

Let me talk briefly about the last count, Count

30, use and carrying of a firearm.  This has only got two

elements, and, again, I think, based on the evidence in

this case, Detective Cobo, Detective Mason, Detective

Grims, Police Officer Green, plus Juan Carlos Dominguez and

Jovet Medina, Patricia Velez, Santos Mejia, all those

witnesses, the fact the defendant's got the property on him

and the gun itself is recovered, this is straightforward.

It's got two elements.  The first element the

1    judge explained to you -- it's got a lot of words to it,

2    but it is that you find the defendant guilty of Count 29.

3    That's what this first element is.  If you find the

4    defendant guilty of Count 29, then the first almost is

5    satisfied.  If he's not guilty, then you don't consider

6    this count at all.

7         But I'd submit, based on everything we discussed,

8    based on the evidence in this case, the first element is

9    met because the defendant and the others committed this

10   violent robbery.

11        So what about the second element?  Did the

12   defendant knowingly use or carry the firearm during and in

13   relation to the commission of the crime or possess the

14   firearm in furtherance of the crime?  Or did he aid and

15   abet the others?  The answer to that, I think, is yes, to

16   all of it.

17        What do we know?  The witnesses say, Sombra and

18   Travieso, the defendant held this gun from time to time

19   while we were in there, and this was a gunpoint robbery.

20   The purpose of the gun being at the robbery was to use it

21   in the robbery.  It wasn't a necklace or a chain or

22   something we just had for fun.  This was an instrument of

23   the robbery.  Its purpose in being carried and brandished

24   was to use it in a robbery.

25        Now, not only that, but, again, this was a team,

1    a team of four guys.  They were all part of the robbery.

2    Some were tying people up, some were taking property, some

3    were raping, and the gun was part of all of that at points

4    in time.  What does that mean?  That the aiding and

5    abetting language applies to all of this.

6           A person who aids and abets is just as guilty as

7    if he committed it himself.  He associated himself with the

8    crime.  He was a full participant in the crime.  He's got

9    the stolen property on him, and the witnesses say he was a

10   full participant, so he is responsible for the gun.

11          Of course, he also carried it himself, but even

12   if you weren't sure, he's certainly an aider and abettor

13   and certainly guilty of this count.

14          And as we would submit the evidence has shown,

15   he's guilty of this count and the robbery count and the

16   RICO conspiracy count based on all the evidence in this

17   case.

18          And, in fact, in these past several weeks,

19   members of the jury, we've seen and heard what MS-13 is all

20   about.  Not just in the Blueridge robbery and the rape that

21   we've -- I'm discussing at the end today, but in everything

22   that we've seen and heard the defendant do and even MS do

23   before that.  Murder, rape and control.  Mata, viola,

24   controla.

25          And even before the defendant got here, we saw

1    MS-13 putting that motto into practice, putting it into

2    practice because members of the gang, in the name of the

3    gang, committed murder killing Noel Gudiel.  They committed

4    murder killing Anbar Juarez-Sanchez.  Committing rape, like

5    that vicious rape at the skipping party that we heard Juan

6    Carlos, Sombra, participate in with all those other MS

7    members.  And we've seen how Victor Ramirez, when he came

8    here to make the gang stronger, to make the gang obey the

9    rules to the letter and introduce the program, made the

10   gang so much more violent in those eight to ten weeks he

11   was here.  We see that in the trail of bodies he left

12   behind, in the murder of Jose Cerda, in the murder of

13   Eduardo Trujillo, in the vicious murder of Anbar

14   Rubi-Martinez in front of his own father, in the way

15   Richard Paredes was wounded, in the way they raped Patricia

16   Velez, in the robbery at that brothel and all the other

17   rapes and robberies that we heard the defendant and the

18   others were doing as part of this program.

19          All of these acts that MS committed and the

20   defendant even committed sometimes with MS were horrible,

21   but I'd submit there's something also unconscionable that

22   the defendant, Victor Ramirez, Mousy, did is that he came

23   to this country, and he came here, not for a better life,

24   not looking for new opportunities, but to complete his

25   mission, to murder, to rape, to control, and worst of all,

1    to train young people here in this community to do the very

2    same thing, I mean to school them up is what we heard.

3    Young people who are being tempted by gangs, have a chance

4    to turn from these choices, who instead get subjected to

5    the defendant, to Victor Ramirez, to Mousy, to that

6    poisonous MS-13 organization, to his destructive way of

7    life, to this way of life.

8              (Videotape being played.)

9              MR. JAFFE:  Members of the jury, based on all the

10   evidence you've seen and heard in the course of the past

11   three or four weeks, based on the law the judge has given

12   to you, based on the interest of justice, on behalf of the

13   United States, we ask you to return the only just verdict

14   supported by the evidence and the law, and that is a

15   verdict of guilty on each and every count with which the

16   defendant is charged.  Thank you.

17             THE COURT:  Okay.  Thank you, Mr. Jaffe.

18             Members of the jury, we're going to take our

19   lunch recess before we hear from Mr. Gorman and then

20   Mr. Park.  I can't emphasize too heavily it's not time to

21   talk about the case.  There are some very, very important

22   aspects of the closings that remain for this afternoon.

23             We'll resume in an hour, at quarter of 2.  We'll

24   see everybody then.  Take our recess.

25             (Luncheon recess.)

1          THE COURT:  Mr. Gorman, are we ready?

2          MR. GORMAN:  Yes.

3          THE COURT:  Bring in the jury, please.

4          (Jury present.)

5          THE COURT:  Please be seated.

6          We're ready to resume with the closing arguments.

7     We'll next hear from Mr. Gorman.

8          MR. GORMAN:  Thank you, Your Honor.

9          Good afternoon.  On behalf of Mr. Ramirez, I want

10    to thank you for your time and attention.  Of course, this

11    case is very important to him.  It deeply affects his life.

12         The reason I only get to speak with you once is

13    because the prosecution has the burden of proof to try to

14    prove the case beyond a reasonable doubt.  I'm not going to

15    have an opportunity to talk to you again, so you may want

16    to consider how I would answer their rebuttal arguments

17    because this is going to be my one and only chance to talk

18    to you.

19         The prosecution claims that there is an

20    international enterprise, conspiracy, racketeering that's

21    going around, going all over the world almost, I mean,

22    United States, Mexico, El Salvador, and they're claiming

23    that Mr. Ramirez was part of this conspiracy and

24    racketeering enterprise.

25         Well, from all the evidence they put on, you know

1    that in order to join MS-13, you have to be initiated or

2    jumped in.  Absolutely no evidence that Mr. Ramirez was

3    ever initiated or jumped in.

4            They've shown you a video and suggest to you that

5    Mr. Ramirez was a member when he was in El Salvador, was a

6    member when he came to the United States.  They suggest to

7    you that because he was in jail, that he must be a member

8    because he was shown with other MS-13 people and he had

9    MS-13 on his stomach.

10           I ask you, are there other reasons why people

11   associate with each other in jail other than being members

12   of the gang, protection or other reasons?  Is there reasons

13   why people come from El Salvador to the United States other

14   than to promote the activities of a gang?

15           Now, as you look at this table here, and you've

16   seen it for a couple weeks, I don't see Spider here, I

17   don't see Casper here --

18           MR. PARK:  Objection.

19           MR. GORMAN:  -- I don't see Gumbo here --

20           MR. PARK:  Objection, Your Honor.

21           THE COURT:  Okay.  Come up here for a minute,

22   please.

23           (Counsel approached the bench.)

24           THE COURT:  What is that going to?

25           MR. GORMAN:  To say that MS-13's not on trial,

1    that he is.  That was my next comment.

2              THE COURT:  That's all you're doing, not that

3    they weren't charged.

4              MR. GORMAN:  Right.

5              MR. PARK:  That's fine, Your Honor.

6              THE COURT:  Okay.  Go ahead.

7              (Counsel returned to the trial tables.)

8              MR. GORMAN:  I don't see Mickey Mouse here, and,

9    of course, I don't see MS-13 here.  That's because only

10   Victor Ramirez is on trial here, not MS-13.

11             So when you come to your verdict, don't try

12   MS-13.  Try and make a decision about Victor Ramirez.

13             Their theory is that he's part of this conspiracy

14   and somehow El Salvador is part of this conspiracy.  Can

15   you imagine if -- I mean it's the United States against

16   Victor Ramirez.  Can you imagine if a couple of members of

17   Hell's Angels went to El Salvador two years ago, sold

18   drugs, they got arrested.  A year later somebody else from

19   El Salvador from Hell's Angels came in.  No proof against

20   them.  Part of Hell's Angels, you're in our country, you're

21   guilty.

22             And this organization, this enterprise, you know,

23   there are a lot of other enterprises around in this country

24   now and before.  Years ago, there was the Students for a

25   Democratic Society, and they were on a, lot of college

1    campuses, and some of them did illegal acts.  There were

2    bombs that went off.  Other things.  Do you think everybody

3    on every campus was guilty?

4              How about the Ku Klux Klan years and years ago?

5    Some of them did terrible things.  Hung people.  Crosses.

6    But not all of them did that.  Are they all guilty?

7              The Black Panthers.  Black Panthers, some of them

8    did violence, but some of them were just part of a

9    political movement.  Are they all guilty because they knew

10   or should have known what the people who use guns were?

11             How about the Nazis?  A lot of them did terrible

12   things, concentration camps, but some of them were just

13   soldiers, and they are not -- they cannot be held

14   responsible for what the other people did.

15             They didn't prove a case against Victor Ramirez.

16   They tried to show you a lot of evidence against MS-13.

17             And we've been here for a number of weeks.  You

18   may ask yourself why, why are they putting on 90 percent of

19   this evidence that has nothing to do with Victor Ramirez?

20             Let me give you another example of their theory

21   about MS-13, according to them.  Some kid, 16 years old,

22   gets punched in in Nevada.  Doesn't know anybody except the

23   people in Nevada.  He knows all the rules and everything.

24   Half an hour later, somebody in MS-13 in New York hijacks

25   and commits an armed robbery of some produce truck that's

1    coming from Connecticut to Ohio.  Interstate commerce.

2    Robbery.  Doesn't know him.  One act.

3           Half an hour after that, somebody in Mexico

4    threatens a witnesses, saying if you testify, I'm going to

5    break your legs.  Act Number 2.

6           So an hour after this guy's punched in, he's

7    guilty of two acts of this conspiracy.  He's guilty.

8    That's their theory.

9           You heard a lot of or saw a lot of different

10   kinds of evidence in this case, and we'd suggest to you

11   that the evidence is insufficient.  It's not that they were

12   trying to prove a criminal enterprise.  Their theory is if

13   they can throw enough things up against the wall and pin

14   them against the wall, that you are going to find

15   Mr. Ramirez guilty.

16          Scary tattoos, graffiti, doesn't stick.  Letters

17   to and from people, don't mention Mr. Ramirez, put this up

18   against the wall, doesn't stick.

19          How about this video and those scary MS-13 shirts

20   and the fake guns that have nothing to do with Mr. Ramirez?

21   Let's put that into evidence.  That doesn't stick.

22          How about the fake guns and the guns and the

23   bullets that cannot be attributed to Mr. Ramirez?  That

24   doesn't stick either.

25          Most of this stuff has nothing to do with

1        Mr. Ramirez, but supposedly because he is part of this

2        organization, he is guilty.

3                I'm not going to touch on all the evidence that

4        was brought out, and as you know, we didn't put on any

5        evidence.  We suggest to you there wasn't a need for any

6        evidence because they didn't prove the case.  But I'm just

7        going to go over a couple little tidbits.

8                One of their cooperators, and I'll get to them a

9        little bit later, said that on this November 14th robbery,

10       they had a meeting on November 20th.  How could they have a

11       meeting on November 20th if the robbery occurred on

12       November 14th?

13               Another cooperator said that these murders

14       happened on October 18th, yet in the autopsy report, the

15       autopsy report shows that the murder was October 22nd and

16       the autopsy occurred October 23rd.  Doesn't make sense.

17               We're in Federal Court, and there are special

18       rules in Federal Court.  It's not State Court.  Different

19       rules apply.  In order for you to find Mr. Ramirez guilty

20       of the first count, this enterprise and racketeering,

21       you're going to have to decide beyond a reasonable doubt

22       that somehow he was involved in murder, second degree

23       murder, attempted murder --

24               MR. PARK:  Objection, Your Honor.

25               THE COURT:  Okay.  Let me hear the rest of this.

1    Go ahead.

2                MR. GORMAN:   -- obstruction of justice, tampering

3    or robbery.  He is not charged with rape.  He could have

4    committed 50 rapes.  You can't find him guilty of anything

5    because of this alleged rape.

6                And you know something?  Really, that's the only

7    evidence they have against him.  And let's look at that

8    evidence in and of itself for a moment, if we could.

9                In order to find him guilty, not only do you have

10   to find that he committed robbery but that it affected

11   interstate commerce.  So how did they prove that?  Well,

12   they put a prostitute on, and their theory on this

13   interstate commerce bit is that she came from Virginia.

14   The other person they put on, this customer, he didn't say

15   he came from any other state.  So even if you believe that

16   a robbery occurred with him, that doesn't prove the case

17   because there's no showing of interstate -- interstate

18   movement.

19               Let's talk about this robbery for a moment, if we

20   could, and the difference between different events and

21   different acts.  Here's a piece of licorice.  Go into a

22   7-Eleven, take the licorice, nobody's looking, put it in

23   your pocket, that's theft.  Someone breaks into a house,

24   sees the licorice, takes it, burglary.  Go into the house,

25   someone has the licorice, you say give me the licorice or

1    I'm going to beat you up, going to shoot you, that's

2    robbery.

3         Now, what is the evidence concerning this

4    prostitute?  Well, number one, for the prostitute and this

5    customer, none of them, neither of them identified anyone.

6    They didn't identify any of the alleged four people, and

7    they certainly didn't identify Mr. Ramirez.

8         What else did the prostitute say?  Well, they

9    didn't take anything from her, I mean any items.

10   Supposedly Mr. Ramirez had some items in his pocket when he

11   was arrested, and I'll get to that in a minute, but they

12   didn't say -- no one said to her, give me this licorice, or

13   give me the money, or give me the jewelry, I'm threatening

14   you, I'm going to shoot you, I'm going to beat you up.

15   Now, they may have done that with the rape, but he's not

16   charged with that, so there was no proof of robbery, none,

17   on her.  And if there's no proof of robbery, there can't be

18   a Count 30.  There can't be having this gun in interstate

19   commerce because that is predicated on the robbery.

20        So you have a situation in which the first man,

21   who, of course, didn't identify Mr. Ramirez or anybody

22   else, didn't go in interstate commerce.  You have the

23   prostitute, didn't identify anyone, said that she went from

24   Virginia to Maryland for interstate commerce, but she

25   wasn't robbed.  Even if you believe that he took this from

1    the drawer or someplace in the apartment, there's no

2    testimony that he took it from her, so there's no proof.

3         Well, you say to yourself, well, you know, it

4    sounds like he did something bad, I've got to convict him.

5    That's not what your duty is.  Your duty is if they've

6    proven the case beyond a reasonable doubt, and they

7    haven't.

8         And even the testimony about the police officers

9    that came in, it doesn't really make a lot of sense, does

10   it?  If you remember, there were five police officers.

11   This is the -- this is the way -- well, there were six

12   police officers, and this is the way they said it happened.

13   I'm going to put these little items on here because I'm

14   sure you're probably bored with my presentation already, so

15   I'll put these on here.

16        Here's the female police officer.  Remember?  And

17   here are the three guys.  One, two, three.  Of course, this

18   is the way they said it happened.  I'm going to put

19   Mr. Ramirez, or supposedly the person who was Mr. Ramirez,

20   right here at the door.  Okay?

21        Remember what she said?  Hey, I put my hands in.

22   They tried to grab it.  Of course, that's not an offense

23   right there, a predicate offense.  She moved away, and here

24   they come.  How many?  Five.  He's right at the door.

25   Remember?  The first man comes in.  Come on -- oh, he lost

his head.  First man comes in, second -- and Mr. Ramirez is right at the door.  Second man comes in, and supposedly one of them put this guy right -- one of them, right against the door.  Two other guys come in, boom.  They're rushing in.  The fourth guy comes in, and somehow, even though Mr. Ramirez is standing at the door, it's not until the fifth guy, Mr. Green, he's the one that tackles him and allegedly gets these items from his pocket.

Now, do you believe these were the prostitute's items?  Do you think she knows?  Could there have been somebody else in the house?

And how is it that the fifth officer that comes in or the sixth officer involved is the one who supposedly tackles Mr. Ramirez?  Was he one of the robbers?  Were there other people in the apartment?  Did other people get there somehow?  You don't know.

And how about the gun?  You know something?  You heard a lot of witnesses.  A lot.  A lot of police officers and experts.  And supposedly some time, according to their evidence, Mr. Ramirez had a gun, or they did a test of DNA on the prostitute.  Well, there were no results, were there?  They didn't give you anything that says his fingerprints is on the gun, his DNA is on the gun.  Nothing.

We suggest to you there was no robbery.  He

1    didn't have the gun.  They didn't prove that element of the

2    case.

3           Now, you heard a lot of high-tech stuff and saw a

4    lot of high-tech stuff, a lot of videos, a lot of pictures,

5    a lot of high-tech stuff like an autopsy.  You saw

6    autopsies of people who were killed that had nothing to do

7    with Mr. Ramirez.  That was the high-tech stuff.  It's the

8    last one.  Let's see if it sticks.  Doesn't stick.

9           But let's look at some low-tech stuff.  Defense

10   is more of a low-tech organization than the three

11   prosecutors and two law enforcement officers over there, so

12   we'll go over to some low tech as to whether or not

13   Mr. Ramirez did anything.  And let's look at their

14   evidence.

15          Let's look at all the police officers who saw or

16   brought in evidence to show that Mr. Ramirez did something

17   wrong.  Okay?  Because there were a lot, weren't there?

18   Let's write that number down because there must have been

19   20 police officers.  How many saw him do something?  Saw

20   him go to a meeting, saw him plan anything, saw him commit

21   a robbery?  And putting your hands in the door is not a

22   robbery and having jewelry in your pocket is not a robbery.

23   How many saw him?  Let's write down that number right here.

24          How many independent witnesses saw Mr. Ramirez

25   plan anything or do anything?  I mean you saw some, the

prostitute, the guy who said he got robbed, the man whose

son got killed, heard a number -- saw a number of them.

How many of them saw Mr. Ramirez in any way connected with

MS-13?

How about the scientific evidence?  Because,

after all, they put on a lot of stuff, and they had a lot

of experts.  They had a lot of experts on this and what the

MS-13 gang is and the autopsies, and they brought them in

from El Salvador and from all over.  They brought, you

know, a lot of guys in, a lot of women, you know, a lot of

women to say this happened and that happened.  Well, how

many of them associated Mr. Ramirez with any planning or

any act?

How about correspondence?  Because, after all,

you saw just a few minutes ago all these letters about this

and that and this and that and, you know, homies and, you

know, protect everybody.  How many of those letters went to

Mr. Ramirez or from Mr. Ramirez?  Another zero.

How about payment of dues?  And I don't mean some

list that had a couple of names of Mousy on it.  I mean

something where it says $20, $10, $30 that he supposedly

paid.  How many people, police officers or written papers

showed him paying dues?  Another zero.

How about this communication with El Salvador?

You know, somebody -- there was a cooperator who said,

1    well, we called El Salvador, he got on the phone and this

2    and that.  How many people said they knew this Trece or

3    Cisco, who saw the number dialed and knew -- and could

4    identify the person as somebody from El Salvador?

5              All right.  I'm running out of space.

6              What I'm trying to point out to you is that with

7    all of this evidence that was thrown up against there,

8    thrown over here, put on this board, there's something that

9    the defense would ask you to consider.  There is

10   insufficient proof of proving Mr. Ramirez guilty without

11   you believing the testimony of the three cooperators, the

12   video in El Salvador, the stomach tattoo, the test -- the

13   autopsies.  The only three people that link him to MS-13,

14   to where they prove the case, is these three conspirators

15   because they're the ones that say he was at the murder,

16   they're the ones that say he was involved in the robbery,

17   he was involved in the planning.

18             Let me say this one more time because the defense

19   believes it's very important.  Without these three, if you

20   don't believe these three -- and I want you to just take

21   your time when you go back to the jury room.  Just think

22   about all the different evidence that was thrown at you and

23   think about, you know, if I don't believe these three guys,

24   if I don't believe them, do they have a case?  Did they

25   make their case?  We'd suggest to you that they have not.

1          And who are these three people?  Well, they are

2     confessed murderers, robbers, rapists, extortionists, liars

3     and betrayers, people who are interested in themselves,

4     their own gain, their own lives.

5          Let's look at the first guy, Wilbur Martinez,

6     Scorpion.  His testimony, we'd suggest, is just totally

7     unbelievable.  Here's a guy, never knew Mr. Ramirez, never

8     saw him, never associated him with MS-13, didn't know him

9     from Adam, and according to him, for some unknown reason,

10    when people might have been snitching and talking to police

11    officers and talking to prosecutors, Victor Ramirez came up

12    to him and admitted doing the crime.  In jail.  He just did

13    it.  No reason.  Just to show off, supposedly.

14         And how is his testimony corroborated?  The guy

15    who admitted to murder, how is this murderer's testimony

16    corroborated?  Did somebody else hear it at the jail?  Is

17    there a wire?  Is there a telephone?  As a matter of fact,

18    is there any telephone records at all submitted to you

19    showing that Mr. Ramirez was somehow involved?

20         You heard about all these search warrants.  Was

21    there any search warrant attributed to Mr. Ramirez,

22    anything shown in where he lived that he was somehow a

23    member of this gang?  So what you have is this -- a

24    confessed murderer --

25         MR. PARK:  Objection.

1          MR. GORMAN:  -- who never --

2          MR. PARK:  Objection.

3          THE COURT:  The jury's recollection of the

4     witness's testimony will prevail.

5          MR. GORMAN:  -- who never met Mr. Ramirez, for

6     some unknown reason Mr. Ramirez made an admission to him

7     while they were in jail.  Any records showing they were

8     ever in jail together?  Anything to corroborate this guy's

9     testimony?  Nothing.  This guy who said, oh, MS-13 forever.

10    Nothing.

11         How about Convict Number 2?  Juan Dominguez,

12    Sombra.  What a guy.

13         Now, you're going to have three of these plea

14    agreements for you to look at.  They're into evidence.

15         Now, this guy is really something, huh?  He

16    admits to two first degrees murders, attempted murder,

17    armed robbery, but how about the pièce de résistance for

18    this guy to show you what a great guy he is, a guy that

19    should be believed beyond a reasonable doubt, someone you

20    should believe in order to convict Mr. Ramirez?  What does

21    this guy do?

22         Well, he gets a high school girl, brings her to a

23    party knowing that she's going to be raped by many men.

24    Not only is she going to be raped by many men, but he's

25    going to rape her, and he does rape her, and they all rape

1   her.

2         Is this the kind of guy that you're going to

3   believe about anything?  This guy is out for himself, he's

4   no good, he's a liar and he shouldn't be believed.

5         Let's go to the last guy.  Jovet Medina -- I

6   think I need my glasses for this guy.  But anyway, like

7   some of the other people, he came here illegally, stayed

8   illegally and admitted to a number of murders.  Now, he

9   couldn't really say which one he knew was going to be a

10   murder, but he think he probably knew some of them were

11   murders and maybe just didn't know if the others were.  You

12   know the one where a guy's eye got torn out before they

13   even showed Mr. Ramirez came into this country?  A bunch of

14   murders.

15         And how about the armed robberies?  Well, I don't

16   know.  There were so many, I don't know.  There's a lot of

17   them.  I don't know.  Sometimes I raped somebody, sometimes

18   I didn't.

19         But what else do we know about this great guy,

20   the one who really had the most evidence against

21   Mr. Ramirez?  Well, he came in to talk to the prosecutors,

22   and he talked to them a few times, and then he admitted I'm

23   lying.  I'm not telling you the truth, Prosecutors.  I'm

24   not telling you the truth.

25         So what changes his mind, this great citizen?

1    What changes his mind?  He goes back to the jail, and he

2    doesn't talk to members of his gang.  He talks to some

3    unknown people at the jail.

4           Now, supposedly this must -- isn't this

5    potentially a big deal?  I mean here he is, he's lying,

6    he's a murderer, he's a robber, and some unknown people

7    say, hey, you know something?  You should tell the truth.

8    Well, these people that told him that, you figure you'd

9    know -- he'd know their names, wouldn't you?  Well, I don't

10   know who they are.

11          That's the person that you're going to believe, a

12   guy -- a killer, a guy that lied to the prosecutors, a guy

13   that committed robberies, rapes?

14          Now, why would these people testify?  Well, let's

15   see.  At least one of them testified, and then you're going

16   to see the plea agreements, that in the beginning they were

17   at Level 43.  And, of course, they don't have to get these

18   sentences, but 43 can carry -- and as you heard -- up to

19   life in jail.  Life.

20          Well, let's see if they go down the path.  They

21   admit they did something wrong, they get a couple of

22   points.  The prosecutor said, well, they pled early.  He

23   got another point.  Couple of them said they were minor

24   participants, minor participants.  Hey, that's another two

25   points.  And then because you told the truth, or you said

1    something about somebody else, you get another four points.

2    And according to one of them, that puts him down to 34 --

3    actually, one way or another, they all get down to 34.

4           Nine points doesn't seem like a lot, but remember

5    what he said about the bottom of 34, between life and 34?

6    That's 12 years and 7 months.  Let me move on to page 2.

7    Okay?  Life, 12 years and 7 months, and these guys were,

8    what?  In a cage.  Well, here they are.  They're all locked

9    up, about to testify.  They did testify, trying to get a

10   deal.  Let's make a deal.  Monty Hall.  All right?

11          Now, say they're all 20 or 25, and let's say they

12   live to 75.  And there's no saying that they're going to

13   get life.  Let's say they live to 75, and let's say they

14   get 12 years or 15 years.  Okay?  So if they're 25 and live

15   to 75, that's 50 years.  All right?  They're looking at 50

16   years if they get the maximum.  Fifty.

17          And let's say instead of 12, let's say they

18   get -- because they're so good, they get not 12 years.  Say

19   they get 15.  That means they save themselves 35 years in

20   jail.  Thirty-five years.

21          Not necessarily what they're going to say, but

22   they're going to say -- and they said, well, you know

23   something?  We're not lying.  We're telling the truth

24   because the prosecutor said we got to tell the truth.  And

25   don't forget, there's three prosecutors here working on the

1  case, two law enforcement officers here working on the

2  case, and we've got to tell the truth.

3          Well, what's the truth?  I mean you're going to

4  decide what the truth is and whether he did it or not, but

5  do you think any of the prosecutors were there when these

6  murders were done or planned?  Do you think any of the law

7  enforcement officers were there when these murders were

8  planned?  The truth is what they tell them.  That's what

9  the truth is.  The truth is they want to do the least

10 amount of time they can.  They don't care what they say.

11 They don't care what they do.  You saw what they did.  They

12 killed, they robbed, they raped, they lied, they betrayed

13 their friends.  Do you think they care about perjury?  Do

14 you?  They don't care about perjury.  They care about

15 themselves.  They'd sell anybody down the river to get a

16 better deal.  Is there any question in your mind that

17 that's correct?

18         These are the guys that you would have to believe

19 that involved Mr. Ramirez in this because if you don't

20 believe them, there's no proof about his involvement in

21 MS-13, about what he supposedly did, about what he

22 supposedly planned.

23         Now, you're going to get a verdict sheet, and I'm

24 going to -- and you're going to do what you want on this

25 verdict, but there are a lot of things for you to consider.

1   For instance, what murder, what robbery.  Be unanimous.  If

2   you're going to come to a decision about something that

3   Mr. Ramirez did, be unanimous.  Don't say, well -- I mean

4   you can do what you want -- he must have done something.

5   He must have done some robbery.  He must have been involved

6   in some planning of a murder.  Which one?  I don't know.

7   But, you know, he's got -- how are we going to let him go?

8   How are we going to let this guy go because he's in that

9   video, he looks scary, he's got that stupid tattoo on his

10  stomach, so he must be guilty.  That is not what you're

11  here to do.

12          What you're here to do is to listen to the

13  evidence and decide if there's proof.  You're not deciding

14  this case against MS-13, although most of the evidence was

15  against MS-13.  There's a living, breathing man sitting

16  right there.  He is the one that's on trial, not MS-13.  If

17  the prosecution has the proof, convict, but they don't.

18  You have to make a determination that they proved the case

19  beyond a reasonable doubt, that they proved each and every

20  element, and they haven't.  They put on a ton of evidence

21  against MS-13 and a miniscule and insufficient amount of

22  evidence against Victor Ramirez.

23          Rebuttal argument might be, hey, he was part of

24  the thing.  Whatever they did, he's responsible for.

25          They haven't proved the case.  They put on a lot

1    of evidence against MS-13, no sufficient evidence against

2    Mr. Ramirez.

3              I'd ask you to follow your duty or do your duty,

4    forget this big tattoo, forget the graffiti, forget all the

5    stuff that has nothing to do with Mr. Ramirez, and come

6    back with a just verdict on each and every count, and that

7    is not guilty.  Thank you.

8              THE COURT:  Thank you, Mr. Gorman.

9              Are you ready or should we take a brief -- to set

10   up?

11             MR. PARK:  Just a five-minute break?

12             THE COURT:  Five minute?  Okay.

13             MR. PARK:  Thank you, Your Honor.

14             THE COURT:  Okay.  Why don't we take -- probably

15   end up ten, but we'll take a very brief recess and come

16   back and hear the final closing argument from Mr. Park.

17             (Recess.)

18             THE COURT:  Please be seated.

19             Ready, Mr. Park?

20             (Jury present.)

21             THE COURT:  Please be seated.

22             Okay.  We're now ready to hear the final closing

23   argument.  Mr. Park.

24             MR. PARK:  Thank you, Your Honor.  May it please

25   the Court, counsel.

1           Good afternoon, ladies and gentlemen.  This is

2    the last you'll from us, and I'm sure you're very pleased

3    to finally be nearing the end.

4           Let me start by trying to make a couple things

5    clear.  You will not see in the jury instructions that you

6    take back with you where it has the language of the

7    indictment.  You will not see MS-13 listed as a defendant.

8    That's correct.  You will not see Victor Ramirez charged

9    with murder.  That is correct.  That's not what we've

10   charged him with.

11          If you remember from the opening statements and

12   from Mr. Jaffe's closing arguments, he is charged in Count

13   1 with conspiring, conspiring to somehow assist or aid or

14   further the racketeering conspiracy.  He doesn't even have

15   to be a member of MS-13 to be guilty of that count.  He is

16   charged with conspiring with the enterprise, with MS-13,

17   the enterprise.

18          In Counts 29 and 30, he is then charged also with

19   being present and participating in the robbery of a brothel

20   that affected interstate commerce and having a gun in the

21   process of that.  That's what he's charged with.  Please do

22   not be confused.  Please don't be confused by what I say,

23   what Mr. Jaffe says, and certainly what Mr. Gorman says

24   about what the counts say.  It's here in the jury

25   instructions.  You can look at it.  We invite you to look

1    at it, to look at it very carefully to see what he's

2    charged with and what the Government has to prove in order

3    to find him guilty.  We invite you to do that.  That is

4    your job, that's your duty, and that's what you've been

5    sworn as jurors to do.

6            What I also ask you not to do, though, is to be

7    confused when witnesses are attacked, facts are misstated,

8    testimony is misstated and the law is misstated.  The point

9    of this trial has been to seek the truth, and that is your

10   job as the finders of the facts.  You are the judges of the

11   facts.  That's in the instructions, that's what the judge

12   has told you, and then, again, that is your duty.

13           So please, dispense of the gimmicks, dispense of

14   the props, dispense of all the different theatrics.  Look

15   at the facts, look at the law and make your determination

16   based on those and those only.

17           It's not a matter of who's high tech or who's low

18   tech.  It's not a matter of who's got the props and the

19   Lego figures or who's got the drawings, who's got the

20   PowerPoints.  Throw that all away.

21           Recall the testimony of the witnesses.  Look at

22   the evidence that you have back there with you.  Look at

23   the jury instructions and the law and make your

24   determination.  We are confident that once you do that, you

25   will find that Victor Ramirez is, in fact, guilty of all

1    the counts for which he is charged.

2            To argue that MS-13 has nothing to do with Victor

3    Ramirez or Victor Ramirez has nothing to do with MS-13 is

4    ridiculous.  Plain and simple.

5            The reason why the Government put on all the

6    evidence about MS-13 is because we have to.  That is part

7    of our burden of proof.  We have to establish to you beyond

8    a reasonable doubt that there was an enterprise, that it

9    had a common purpose, that it was organized, that it had a

10   continuity of structure and personnel.  That's what we have

11   to do.  We have done it.  We have proven it through the

12   search warrant evidence, through the documents that you've

13   seen, through the graffiti, through the testimony of the

14   witnesses, whether they be the expert witnesses on the

15   front end and the back end or the cooperating witnesses or

16   the civilian witnesses, like Sonia Portela talking about

17   her neighborhood and about the graffiti in her neighborhood

18   and the way that MS-13 terrorized the residents in her

19   apartment buildings.  That's what we are establishing.

20           When we talk about Noel Gudiel being murdered in

21   2003, we're not putting that on to say that Mousy was there

22   with a gun in hand firing the shot into the guy's head, but

23   we are putting that on to show that murder is part and

24   parcel, integrated with what MS-13 is all about.  That is

25   the reason for that evidence.

1        When Mr. Gorman stands up here and says the

2   evidence -- 90 percent of the evidence is about MS-13 and

3   has nothing to do with Victor Ramirez, all this evidence,

4   he throws it up against the wall, throws it up into the

5   air, it doesn't stick to Mr. Ramirez, when you have a

6   tattoo of Mara Salvatrucha on your stomach, that sticks.

7        To somehow claim, oh, this is worthless, this

8   doesn't mean a thing, what do you think was in

9   Mr. Ramirez's mind as he's getting the letters Mara

10  Salvatrucha tattooed one by one across his chest?  What do

11  you think is in his mind as he's flashing hand signs into a

12  video camera among other MS-13 members in El Salvador in a

13  prison who are all yelling about killing chavalas?  What do

14  you think is in his mind as he's with other MS-13 members

15  in an apartment in Wheaton where they're raping a woman and

16  robbing the people after having tied them up?  Is he

17  thinking, I need to be with these guys for protection, I

18  should get out of the gang, I should really not be with

19  these guys?  Is that what he's thinking?  No.

20       One of the clearest instructions and one of the

21  most important instructions in this set of instructions

22  that you'll get back with you, ladies and gentlemen, is to

23  use your common sense.  Okay?

24       Again, gimmicks, props, PowerPoints, you know,

25  all the legal language, throw it aside if you need to, but

1    look at the facts, listen to the testimony, recall the

2    testimony, look at the law and use your common sense.

3            Was this individual over here, was he somehow

4    associated with MS-13 and was he a member of the

5    conspiracy?  He doesn't, again, have to be a member of the

6    gang.  It could be a gang member's mom who helps out by,

7    you know, giving money to the gang or buying a gun for

8    them.  It could be a sister who houses an MS-13 member

9    who's hiding from the law.  But in this case, with this

10   man, he's a member of MS-13 as well, and a member of the

11   conspiracy that helped to keep it going.  That's what we

12   presented, and that is what he's guilty of.

13           Now, ladies and gentlemen, Mr. Gorman was asking

14   how many law enforcement folks came in here and talked

15   about, well, they saw, you know, Victor Ramirez, Mousy,

16   shooting somebody?  How many witnesses came in here who saw

17   him raping somebody?  How many witnesses saw this or that

18   aside from the cooperators?  Well, that's still back in

19   Count 1.

20           How many of us here in the room during the

21   presentation of the trial evidence saw Mousy on the screen

22   in the video saying, I'm Mousy from Mara Salvatrucha?  How

23   many of you saw him flashing the hand signs, standing side

24   by side with his fellow TLS members, with Trece and Cisco?

25   How many of you saw the picture of his tattoo when he's

1   arrested and also in the video in El Salvador?  How many of

2   you saw the picture of him sitting there after he's been

3   arrested where he's caught, again, red-handed in that

4   apartment on Blueridge Avenue in Wheaton?  That's the

5   evidence here.

6           And, again, please don't be distracted by the

7   fact that we're trying to somehow draw circles around or

8   talk about who saw what or this or that.  Five law

9   enforcement officers walk into -- barge into an apartment

10  in Wheaton on November 14th of 2005.  Three people are tied

11  up.  One person is in the back room naked, having just been

12  brutally raped.  None of those folks are Mousy.  Mousy's

13  standing there at the door trying to grab the undercover

14  detective.  That's what they saw.  Five people saw that,

15  five detectives.

16          And to now somehow say, oh, that didn't really

17  happen or you can't believe the cooperators or law

18  enforcement doesn't know what was happening back there, you

19  know what happened back there.

20          Again, set aside what Travieso -- what Jovet

21  Medina said.  Set that aside.  Set aside what Juan

22  Dominguez said.  Set that aside.  When you're looking at

23  the evidence, you can set all that aside and still find

24  Victor Ramirez guilty of Count 1, the conspiracy, and you

25  can, quite frankly, find him guilty of Counts 29 and 30

1    based solely on the testimony of the officers and the

2    testimony of Patricia Velez and the testimony of Santos

3    Mejia.  You do not need the testimony of Jovet Medina, Juan

4    Dominguez or Wilbur Garcia to find the defendant guilty of

5    those charges because if you believe the officers as to

6    what they saw there, the people they saw tied up, if you

7    believe Patricia Velez in terms of, you know, the people

8    being in there and a gun being used and her being raped and

9    robbed, if you believe Santos Mejia that his money was

10   taken, that his cell phone was taken, that he was tied up

11   by his shoelaces and thrown onto the ground, if you believe

12   the law enforcement officers who seized evidence from Otis

13   Street and seized the video, if you believe the law

14   enforcement officers who took the picture of this tattoo,

15   if you believe the law enforcement officers who found all

16   the evidence that leads us to the fact that this enterprise

17   existed, that is sufficient for you, ladies and gentlemen,

18   to find the defendant guilty of those charges.

19           Now, to get to these individuals, the, I guess,

20   quote, unquote, cooperators, the defendants who pled guilty

21   and are now cooperating, let's kind of go through what they

22   said.  And I think what's telling is you heard a lot of

23   names being used, a lot of names -- name calling in terms

24   of these guys are rapists -- let's see, rapists, murderers,

25   extortionists, no good, liars, a lot of names thrown around

1    but not too much discussion about what they actually said.

2    Not too much discussion about what was inconsistent about

3    what they've said.  Not too much discussion about what was

4    false about what they said.  A lot of discussion about, oh,

5    they have a lot to lose.  They're going to go from life to

6    12 years.

7             By the way, please look in the plea agreements.

8    Right?  They're -- this is not being hidden from you.  They

9    are part of the evidence that is being put back into the

10   jury room with you to take a look at, at your leisure.

11   Please look and see if you find anywhere the number 12

12   years and 12 and a half years or 70 years, 50 years,

13   whatever numbers Mr. Gorman had on that chart there.  If

14   you find it here, let me know.

15            What you will find is that the maximum penalty

16   for what they've pled guilty to is life.  What you will

17   find is that the person who makes the final decision about

18   their sentence is the judge.  Not me, not him, not him, not

19   them.  The judge.

20            What you also will find as you review the

21   evidence is that there's corroboration, and this is

22   something that I hope I said, I think I said in the

23   beginning when we first started opening statements.  These

24   are not choirboys.  These are not folks who you want to

25   take home with you.  These are not folks who you will like

1    or like now after having heard their testimony on what they

2    did.  These are not model citizens.  We're not going around

3    saying, oh, these are great guys, these are wonderful guys,

4    please believe them because of their character, because

5    they've been Boy Scouts.  No.  They are part of this

6    overall body of evidence that you need to take a look at.

7          And again, even -- we've already talked about the

8    fact that even without them, you can find Mr. Ramirez

9    guilty, but put them into the equation and see how they fit

10   or don't fit with the other evidence.  We would submit to

11   you that they do fit together.

12         When you have Sombra, for example, Juan

13   Dominguez, talking about driving to Quintana Street in

14   Riverdale and driving his Celica and Richard Paredes saying

15   yeah, I saw the silver Celica, and Mousy himself saying,

16   through Scorpion, oh, yeah, we drove there in Sombra's car,

17   I drove in Sombra's car, they all fit together.

18         When Sombra talks about the gun being used and

19   Strayboy taking the shells out -- or, rather, the casings

20   out and giving it to him and him burying them, that fits

21   with Agent James going and finding the casings where he

22   said he buried them.

23         When you have Travieso, Jovet Medina, talking

24   about 14th Avenue and the ways in which Mousy was there

25   orchestrating and getting the gun for the murder of

1   Alejandro Rubi-Martinez, that correspond and correlates

2   with what Sombra was saying, what Juan Dominguez was

3   saying, as it does with the firearms evidence and the

4   evidence about the bullets and how they all linked up.

5           If these individuals were so willing to and so

6   eager to lie in order to benefit themselves, don't you

7   think they'd do a little bit of a better job of it?  You've

8   got Scorpion locked up, who's saying, oh, yeah, I didn't

9   know Mousy.  I didn't know him at all.  The only thing I

10  knew about Mousy was Strayboy told me in a phone call that

11  they were going to try and get Mousy and Snoopy up here,

12  get some money to them, but I've never met him.  And when I

13  do meet him, he's in jail, and he mentions Riverdale, or we

14  hear on the news, and he says something about a pegada and

15  about driving there.  Scorpion could have thrown in, but he

16  didn't, oh, yeah, and Mousy said he's the one who pulled

17  the trigger.  Oh, yeah, but Mousy's the one who said he

18  ordered the hit.  And Mousy told me he's been a member of

19  MS-13 for this long and that long and he's done this and

20  that.  He could have blown the door wide open.

21          So could Sombra.  He could have said, yeah, Mousy

22  was -- he was talking about this and that and he was the

23  one who ordered us to go to Quintana Street.  He's the one

24  who was there ordering everything that happened at 14th

25  Avenue.

1          Same with Jovet Medina.  Mousy was the one who

2     ordered everything, and he's the one -- he's the top dog.

3     He's the leader, and he's the one that everybody turned to.

4          But no.  They testified to the best of their

5     recollection.  That's your -- you're judge.  You're the

6     judge of that.  But ask yourselves -- and it's in the

7     instructions -- if there are inconsistencies.  If, for

8     example, in the plea agreement it says for Jovet Medina

9     that's October 18th, 2005 as opposed to October 23rd, 2005,

10    ask yourself what does, first of all, the jury instructions

11    say about dates and whether it's on or about a certain date

12    and whether or not you need to hold that against somebody.

13    And then also ask yourselves, is that something where he's

14    trying to mislead the jury?  Is that something where he's

15    trying to mislead the Court or somehow pull the wool over

16    our eyes that we convict an innocent man?

17         Ask yourselves whether or not there are things

18    that corroborate these individuals, these witnesses, and

19    ask yourselves how does it match up with the testimony of

20    the other individuals.  Because it does match up with the

21    testimony of law enforcement.  It does match up with the

22    testimony of the quote, unquote, civilian witnesses, the

23    non-defendant, non-law enforcement folks.

24         And when you do that, you'll see that there is an

25    interlocking web of evidence.  And in order for the defense

1  to credibly argue, to credibly argue that you have to

2  ignore and discredit everything the cooperators have to

3  say, you have to ignore and discredit everything the law

4  enforcement folks have to say and everything the civilian

5  witnesses have to say, everything that's shown in the

6  physical evidence, everything that's shown in the documents

7  and the search warrants because they are interwoven.

8          And, again, going back to what we talked about in

9  opening statements and in closing, we're not asking you to

10  look at these particular individuals, Medina, Dominguez and

11  Garcia, in a vacuum and solely look at those individuals

12  and their testimony and say, okay, based on this, is that

13  what I can base my verdict on, or our verdict on?  No.

14          Again, there is an invitation to you that is your

15  duty to look at and examine all the evidence in its

16  totality, how they interrelate with each other, and that's

17  the important thing.

18          I do want to touch on, while we're on the subject

19  of witnesses and the credibility, I guess some of the -- I

20  call them civilian witnesses, but people who aren't law

21  enforcement and people who aren't the defendants or

22  cooperating defendants.

23          Mr. Gorman mentioned it in his closing.  He also

24  mentioned during some of the questions, asking people

25  essentially are you getting favors from the Government?

1    Any promises?  Are you here legally?  What does that have

2    to -- what does a person's legal status have to do with

3    whether or not they're telling the truth and their

4    credibility?  At least in the eyes of you, the jury, when

5    you're looking at the testimony of the Roberto

6    Rubi-Hernandez, the guy whose son was shot and murdered in

7    front of his face, what does the fact that he may or may

8    not be here lawfully or not have to do with whether or not

9    you determine whether or not he's telling the truth

10   vis-a-vis all the other evidence and all the testimony of

11   the other witnesses?  What does that have to do with it?

12   It's a way to try and divert your attention from the truth,

13   and you shouldn't tolerate it.  I ask you not to tolerate

14   it.

15          DNA evidence and fingerprint evidence, another

16   red herring.  Do we need DNA evidence and fingerprint

17   evidence to establish that Mousy, Victor Ramirez, was in

18   that apartment at the time the woman was raped and the guys

19   were robbed and tied up?  No.  We have five officers who

20   said, I saw the guy there.  You don't need DNA evidence or

21   fingerprint evidence to establish that.  Do you need DNA or

22   fingerprint evidence to establish that Mousy was in this

23   video flashing signs and saying he's Mousy from MS-13?  No.

24   Do you need DNA evidence or fingerprint evidence to go

25   through the transcript and hear what he was saying and how

1   he was celebrating MS-13 and what the gang's all about?

2   No.

3           On the topic of -- and, again, the rape and the

4   robbery that happened at Blueridge -- and, again, we're

5   spending a lot of time talking about that particular

6   instance because I think the enterprise has been

7   established.  Quite frankly, I don't think that there's any

8   credible argument that Mousy was not a member of MS-13 and

9   wasn't a part of it or that he didn't know what it was

10  about.

11          But what really, I think, is important to look at

12  is this argument that on Counts 29 and 30 a robbery did not

13  take place because it was theft or it was burglary and not

14  robbery because there wasn't force?

15          Imagine you're in an apartment.  Somebody walks

16  in and points a gun at you or at the people in the

17  apartment.  You're in there.  People are getting tied up.

18  Imagine that you're there and a gun's being pointed at you

19  and then while you're being brutally raped by three men, a

20  gun's being pointed at your head and your property is taken

21  in the process.  Is force not used during that process?  Is

22  force not used to get that property from you or the threat

23  of force?

24          And look at the instructions again.  It's not

25  just force.  It's threat of force.

1       So is a loaded gun being pointed at your head

2  while you're being raped not the threat of force or the use

3  of force?

4       And the idea that these are -- these BB guns or

5  the other things, the ammunition, are just things, again,

6  that are thrown up against the wall and they have no

7  bearing whatsoever, do you know whether or not this is real

8  or not?  If I were to point this at you at night or point

9  this at you after I barged into your apartment, if I were

10  to point this at you while I'm taking things from you, do

11  you think that you'd be able to establish, oh, that's a BB

12  gun.  I'm not going to pay attention to this guy.  He's

13  not -- just because he's flashing MS-13 signs or saying

14  Mara Salvatrucha and he's got four or five other guys with

15  him and pointing a gun that I'm not sure if it's a BB gun

16  or not, that, oh, yeah, well, no, that's not really, you

17  know, something that bears on MS-13.  I don't really have

18  to worry about it.  I'm just going to walk away from these

19  guys that are pointing this thing at my head.  It's all

20  about the intimidation.  It's all about MS-13.  It's all

21  about controlling the territory and the turf and making

22  people so afraid of the gang that they will be controlled

23  by the gang.

24       So when you put graffiti on the wall of an

25  elementary school saying welcome to Langley Park, MS-13,

1    when you write letters saying fuck the police, fuck the

2    chavalas and all those -- the hideous language that you see

3    in the letters, that's all part and parcel of this effort

4    to control, to use the violence and the threat of violence

5    to keep people in check, to make sure they don't cross you,

6    make sure they don't really dare go against the gang.

7         Ladies and gentlemen, I want to kind of end up,

8    again, with what the law is to make sure we're clear on

9    this.  Let me put a couple things on the screen real quick.

10        You saw this slide earlier when Mr. Jaffe was

11   speaking to you.  On Count 1, when we're talking about

12   MS-13 and whether or not Mousy was a member of the

13   conspiracy -- you will see the instructions.  This is just

14   kind of a quote or a paraphrasing, but you can look at the

15   instructions yourselves and read through them.  All we need

16   to prove is that the defendant was connected in some

17   meaningful way and that he knew the existence of the

18   enterprise and the general nature of the activities.  We do

19   not need to establish, we do not need to establish that he

20   himself committed these acts.

21        In order to find the defendant guilty of Count 1,

22   you don't need to find that he was there with a gun in his

23   hand at Quintana Avenue or Quintana Street, although we

24   believe the evidence does show that.  You don't have to

25   find that the defendant himself was there giving the gun to

1    one of the shooters at 14th Avenue when Alejandro

2    Rubi-Martinez was shot, although we believe the evidence

3    shows that.  We don't even have to show that the defendant

4    himself was there when the rape occurred and the robbery

5    occurred at Blueridge Avenue, although we believe the

6    evidence does establish that.  You don't have to find that

7    he himself committed those acts.

8            So when you're looking at the verdict sheet and

9    you see different things listed, you'll see first degree

10   murder, second degree murder, attempted murder, robbery,

11   obstruction of justice, witness tampering, please don't be

12   confused.  In order to check those things off, you do not

13   need to find that the defendant himself committed those

14   acts or that they even occurred.  All you need to find is

15   that the defendant himself conspired with a member of the

16   enterprise and the conspiracy and that the enterprise,

17   MS-13, had as its objectives, that they talked about doing

18   this, that they wanted to do this, that it was their goal,

19   the common purpose, the plan, they wanted to murder, they

20   wanted to attempt murder, they wanted to commit robbery,

21   they wanted to obstruct justice, they wanted to tamper with

22   witnesses, and, in fact, they did, and the evidence does

23   show that, but you do not need to find that he himself did

24   it.

25           And that's a very important point because I know

that were a lot of things that were thrown at you during

the instructions, and, you know, Your Honor did the best

she could to try and spice it up, but it's a long set of

instructions, and you'll have to go back and look through

this.  And you'll see the verdict sheet.

But once you get through this and once you talk

about the evidence, it will be very clear to you that the

defendant himself was a long-time active leader in MS-13.

He tattooed MS -- or Mara Salvatrucha across his belly for

a reason.  It's because he celebrated it, he belonged to

it, he knew exactly what it was about.

As Mr. Jaffe said, he was sent here on a mission.

People like Jovet Medina, Travieso, the younger guy who

testified later in the trial about being there when the

guy's eye was almost popped out and the awful murder that

happened in Howard County and about how he was there when

the rape and robbery happened -- actually, how he

accompanied Mousy on a number of robberies, people like

that, that's exactly the type of person that Mousy was

after, that he was sent up here to school.  That's exactly

the type of person.  That's exactly the types of acts that

he engaged in and was -- that MS-13 was all about and

celebrated down in El Salvador, and when they brought the

rules up here to the United States to enforce them, that's

exactly what they did.

1          In the short time that he was here -- and make no

2   mistake about it.  We're not saying that Mousy was here in

3   the United States when Noel Gudiel was shot.  We're not

4   saying that Mousy was here when Anbar Juarez-Sanchez was

5   killed in Howard County or here for the gang rape of the

6   two young girls in May of '03, but he was here for Quintana

7   Street in Riverdale when two people were murdered and one

8   was shot.  He was here for 14th Avenue when a boy was shot

9   in front of his father.  He was here when they were raping

10  and robbing at Blueridge in Wheaton.  MS-13 is what he's

11  all about.

12          You see, again, the bookends that Mr. Jaffe

13  talked about.  From beginning to end, you saw the story.

14  You saw him in El Salvador.  You saw the leaders.  You

15  heard the leaders.  You heard about MS-13 and the rules and

16  the culture, the violence, the motto of mata, viola,

17  controla.  You saw the evidence of the enterprise.  You

18  saw -- you learned what it was all about.  And then you saw

19  Mousy come up here, and you heard about him being in

20  contact with the people in El Salvador.  You heard about

21  the violence.  You heard about the murders.  You heard

22  about the rapes.  And then you see him here, still a member

23  of MS-13, still a leader, and a person who must be held

24  accountable for his actions.  He must be held accountable

25  for his leadership, not only for what he did, but for what

1    he was a part of and what he knew he was a part of, and the

2    fact that he helped to keep this going.  He helped to lead

3    it, he helped to recruit, he helped to school.

4         We ask you to hold him accountable.  We ask you

5    to look at all the evidence and look at the instructions,

6    read the instructions carefully, consider it carefully and

7    to do your duty, to find the truth, to find justice and to

8    find Mr. Victor Ramirez, or Mousy, guilty of each and every

9    count.

10        Thank you, ladies and gentlemen.

11        THE COURT:  Thank you, Mr. Park.

12        Members of the jury, it's now time for me to give

13   you the third part of the instructions, those relating to

14   the mechanics and procedure of your deliberations.  When

15   you retire to the jury room, you will select one of

16   yourselves to act as your foreperson.  The foreperson will

17   be your spokesperson here in court.

18        After you have completed the verdict form, please

19   advise the Court by sending a note through the bailiff that

20   you have reached a verdict.  When I receive that note, I

21   shall have you return to the -- with your verdict to the

22   courtroom.

23        The courtroom deputy clerk will then, after

24   taking roll call, take your verdict.  She will ask if you

25   have agreed on your verdict.  You will say, we have.  She

1   will ask, who will speak for you, and you will reply, our

2   foreperson.  The clerk will then ask your foreperson to

3   give your verdict as to guilty or not guilty of the crimes

4   charged.

5        If it becomes necessary during your deliberations

6   to communicate with the Court, you may send a note by the

7   bailiff, signed by your foreperson or by one or more

8   members of the jury.  No member of the jury should ever

9   attempt to communicate with the Court by any means other

10   then a signed writing, and the Court will never communicate

11   with any member of the jury on any subject touching the

12   merits of the case otherwise than in writing or orally here

13   in open court.

14        You will note from the oath about to be taken by

15   the bailiff that he or she, too, as well as all other

16   persons, is forbidden to communicate in any way or manner

17   with any members of the jury on any subject touching the

18   merits of the case.

19        Bear in mind also that you are never to reveal to

20   any person, not even to the Court, how the jury stands,

21   numerically or otherwise, on the question of the guilt or

22   innocence of the accused or any other aspect of your

23   verdict until after you have reached a unanimous verdict.

24        The verdict must represent the considered

25   judgment of each juror.  In order to return a verdict of

1    guilty or not guilty, it is necessary that each juror agree

2    thereto.   Your verdict must be unanimous.

3         It is your duty as jurors to consult with one

4    another and to deliberate with a view to reaching an

5    agreement if you can do so without violence to individual

6    judgment.  Each of you must decide the case for yourself,

7    but do so only after an impartial consideration of the

8    evidence in the case with your fellow jurors.

9         In the course of your deliberations, do not

10   hesitate to re-examine your own views and change your

11   opinion if convinced it is erroneous, but do not surrender

12   your honest conviction as to the weight or effect of

13   evidence solely because of the opinion of your fellow

14   jurors or for the mere purpose of returning a verdict.

15        Remember at all times you are not partisans, you

16   are judges, judges of the facts.

17        Will the bailiff please come forward to be sworn.

18        (The oath was administered.)

19        THE CLERK:  Please state your name for the record

20   and spell your last name.

21        CSO ROBINSON:  Gary Robinson, R-O-B-I-N-S-O-N.

22        THE CLERK:  Thank you.

23        THE COURT:  Okay.I need to address Jurors 188,

24   198 and 211.  The other 12 jurors are going to begin in

25   just a few moments the deliberations and at this phase it's

1    less likely, but not impossible, that your services will be

2    needed to join with them.  You've been here, as you know,

3    in case something prevented the first 12 from continuing

4    their participation.  We never know what might interfere

5    with a juror's ability to do that, so we need to have

6    people available in case that happens.

7              As I said, it is still possible that you can be

8    called upon to participate again, so I'll ask that you not

9    talk about the case, even among yourselves, and certainly

10   not with anyone else until the case is entirely completed.

11             I see a little bit of relief, a little bit of

12   disappointment, I'm sure, is going through your brains at

13   the moment.  It most logically is a combination of them.

14             I'm going to thank you, though, in case I don't

15   see you again in connection with this case, for your jury

16   service.

17             I'm going to ask the bailiff to take you back

18   into the jury room so that you can retrieve any personal

19   belongings of your own.  If you'll just leave your folders

20   here in the courtroom, Ms. Derro will keep track of them in

21   case you are needed to return, but with the Court's thanks,

22   the alternates are excused at this time from the courtroom.

23   Thank you.

24             (Alternates excused.)

25             THE COURT:  Okay.  Members of the jury, we're

1    going to give them just a couple of minutes to get their

2    belongings and make their way out and then you will retire

3    to the jury room to begin your deliberations.  Take your

4    folders and any notes that you may have taken with you.

5    Give us a few moments to make sure we have all of the

6    exhibits together, along with the jury instructions.

7            Let me advise you that we will not be sending

8    back any -- or not all of the weapons and that kind of

9    exhibit.  If you think something has been received in

10   evidence that you don't get, send out a note and I'll

11   either let you know that it's something that wasn't

12   received in evidence, but if it is something that we

13   haven't sent back, we'll make arrangements for you to be

14   able to see it.

15           One of the exhibits is that -- they've been

16   calling it a video.  I believe it is on DVD, and we will

17   have a DVD player available.  I don't know if it's already

18   back there, but send out a note if you want to have the

19   ability to watch that DVD.

20           Counsel, is there anything else before the jurors

21   retire to begin their deliberations?

22           MR. PARK:  Not from the Government, Your Honor.

23           THE COURT:  Anything, Mr. Gorman?

24           MR. GORMAN:  No, Your Honor.

25           THE COURT:  All right.  Then, members of the

1    jury, you may now retire to the jury room to begin your

2    deliberations.

3              (The jury left the courtroom to commence its

4    deliberations at 3:20 p.m.)

5              THE COURT:  Please be seated.

6              Counsel, you'll need to wait and talk with Ms.

7    Derro to go over the exhibits so that you can verify that

8    the right ones are, indeed, there and going back.

9              In about an hour and a half, if we haven't heard

10   anything from the jury, I'll send in a note telling them

11   that they can go home for the evening and return tomorrow,

12   and we'll let you know what they say.  I assume you agree

13   that they can be released through the jury room without

14   coming back into court, is that right?

15             MR. PARK:  Yes, Your Honor.

16             MR. GORMAN:  Yes.

17             THE COURT:  Okay?  All right.  Then --

18             MR. GORMAN:  One other matter.  I just want to

19   make sure.  I think we spoke -- what does the Court want me

20   to do about my availability, let's say for today --

21             THE COURT:  Okay.  Today I request that you stay

22   in case we get a question.  We'll let you know when the

23   jury goes home for the evening.  It would be my expectation

24   that they won't return a verdict this afternoon.

25             Do you have any other court appearances tomorrow

1   or how far away are you at your office?

2              MR. GORMAN:  I have something at 10:30, not

3   exactly in court, but somewhere else.  My office, depending

4   on the time of the day, is somewhere between a half an hour

5   and 45 minutes, depending on the rush hour and stuff.

6              THE COURT:  Okay.  As long as we can reach you by

7   cell phone, I don't think you would need to come here

8   tomorrow after your 10 or 10:30 meeting.  As it gets later

9   in the day, we probably need to talk and decide because

10  what I don't want to have happen is for the jury to came

11  in, say, at 4:30 or 5:00 and say they have a verdict but

12  then we not be able to have you get here for too long a

13  time.

14             So let's wait and see what kinds of questions we

15  get, if we get any inkling from the jury how they're doing.

16  But in the morning, certainly, as long as we have a number

17  where we can reach you, that will be fine.

18             All right.  Ms. Derro is back.  She'd appreciate

19  your help getting the exhibits ready for the jury.

20             We'll await the call of the jury.

21             (Proceedings adjourned.)

22

23                   COURT REPORTER'S CERTIFICATE

24                              -oOo-

25             I certify that the foregoing is a correct

transcript from the record of proceedings in the above

matter.


Date:

                                        /s/ _____

                                        Sharon O'Neill