```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MARYLAND
 2                         SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA      .
                                   .
 4        vs.                      .  DKC-05-0393
                                   .
 5   VICTOR RAMIREZ                .  GREENBELT, MARYLAND
     DEFENDANT                     .
 6                                 .  FEBRUARY 9, 2009

 7

 8                TRANSCRIPT OF SENTENCING HEARING
             BEFORE THE HONORABLE DEBORAH K. CHASANOW,
 9                  UNITED STATES DISTRICT JUDGE

10

11   A P P E A R A N C E S:

12   FOR THE GOVERNMENT:          CHAN PARK, ESQ.
                                  DAVID JAFFE, ESQ.
13                                ROB HUR, ESQ.
                                  ASSISTANT U.S. ATTORNEYS
14

15   FOR THE DEFENDANT:          WARREN E. GORMAN, ESQ.

16

17

18

     Court Reporter:            Sharon O'Neill, RMR
19                              Official Court Reporter
                                United States District Court
20                              6500 Cherrywood Lane - RM 200
                                Greenbelt, Maryland 20770
21                              301-344-3227

22

23

24

25
```

1          THE COURT:  Good morning.

2          VOICES:  Good morning, Your Honor.

3          THE COURT:  Please be seated.

4          Mr. Jaffe.

5          MR. JAFFE:  Calling the case of United States of

6   America vs. Victor Ramirez, Criminal Number DKC 05-0393.

7   David Jaffe, Chan Park and Robert Hur for the Government.

8   Sitting with us at counsel table is Special Agent Mark

9   James of the Federal Bureau of Investigation.

10         This matter is on the Court's calendar for

11  sentencing today.  Good morning.

12         THE COURT:  Mr. Gorman.

13         MR. GORMAN:  Warren Gorman for Mr. Ramirez.  I

14  apologize for getting the time and date wrong, Your Honor,

15  and being late.

16         THE COURT:  Okay.  Thank you for rearranging

17  things to be here.  Given that mix-up, let me know if we're

18  ready to proceed on everything.

19         MR. GORMAN:  I'd like to approach the bench on

20  one issue -- on an issue, Your Honor.

21         THE COURT:  Okay.  Come on up.

22         (Counsel approached the bench.)

23         MR. PARK:  Just want to let you know that there

24  are two of the victims -- there are two individuals who may

25  be speaking as members of some of the victims' families.

1    They have right now earpieces so they can listen to the

2    interpreters.  I don't know if the interpreters are

3    actually translating or not.  It looks like they've

4    actually taken it out.  I just want to --

5              THE COURT:  I have no idea what we're -- right

6    now there is no simultaneous --

7              MR. PARK:  I know, but if there's something that

8    was sensitive.

9              THE COURT:  No, I'm incorrect.  Mr. Wesley is

10   interpreting.

11             Could you ask the victims' families to cease

12   listening, please.

13             All right.  Go ahead, Mr. Gorman.

14             MR. GORMAN:  Your Honor, I'd like part, if not

15   all, of the sentencing to be under seal.  I want to bring

16   up certain issues concerning Mr. Ramirez' conferences with

17   the United States Attorney's Office, which we contend are

18   cooperation, and we'd suggest that, based on the history of

19   the organization, that this would put him at great risk, so

20   we'd like all, if not all, then at least a portion of the

21   sentencing to be under seal so he's not subjected to that

22   risk.

23             MR. JAFFE:  Your Honor, we don't think it's a

24   basis to seal the entire proceedings.  Public proceeding,

25   we have victims' families here, and I don't see anything

1    about this -- what's it going to be, a contested issue

2    about any so-called cooperation which the Government claims

3    did not exist, that that is a basis to seal the entire

4    proceedings beginning to end.

5         To the extent that the defense is going to be

6    making this argument in any event, I would understand that

7    the Court may want to construct some way to protect him

8    just to avoid any appearance that -- from any outsider that

9    Mr. Ramirez is somehow -- was somehow cooperating with the

10   Government, though the Government's position is he never

11   was, but I'm not sure if sealing the courtroom is the

12   solution to that, although I apologize, Your Honor, I don't

13   have anything off the top of my head that would be an

14   appropriate and limited way to accomplish that task while

15   protecting the right to a public proceeding.

16        THE COURT:  As I alluded to, because -- well,

17   there may be lots of reasons we don't complete everything

18   today.  I would like to get started and see what other

19   issues and what other information -- because there are

20   guideline issues and a lot of things that we need to talk

21   about.

22        I did not receive any sentencing memo on behalf

23   of Mr. Ramirez.  I do have the exceptions that were

24   originally taken, and I have received some letters.  I

25   assume there was no memo?

1              MR. GORMAN:  No.

2              THE COURT:  It may be that, depending on the

3      extent of what you want to tell me, it may be more

4      appropriate to have you brief it and so the Government can

5      proffer its situation and then we can decide.

6      Alternatively, we can come to the bench when you want to

7      talk about that.

8              I am reluctant -- obviously you're not even

9      asking me to seal the entire proceeding, so I'm not going

10     to do that.  If we can do it by coming to the bench, I'd

11     prefer doing it that way rather than asking people to

12     leave.  These folks have a specific and special interest to

13     being here.

14             So it's not a perfect solution, but I think

15     that's the way we'll try to proceed.

16             I agree that it's appropriate not to make full

17     public disclosure of what Mr. Ramirez wants me to know

18     about what he might have told the Government, whether it's

19     in cooperation or not.  The letters that I've received on

20     his behalf indicate that they are already fearful that

21     there has been some notice of some cooperation, true or

22     not, so I understand it's already out there in some

23     fashion.

24             But let's begin, and I just leave it to counsel

25     to alert me and come to the bench, and we'll discuss it at

1   that time to decide whether I ask people to leave or

2   whether we can do it at the bench or whether we defer it to

3   another time.  Thank you.

4              (Counsel returned to the trial tables.)

5              THE COURT:  All right.  The presentence report

6   that I have was sent to me with a cover memo dated

7   January 21st, although it does not say that it was revised,

8   and the date on it says it was prepared December 22nd.  But

9   that's the version that I have.

10             In addition, I received some -- separately,

11  victim impact statements.  They do have another defendant's

12  name on the front, but they apply to this case.

13             In addition, I received a packet of letters on

14  behalf of the defendant from counsel with a translation

15  into English.  I have a copy of the January 9th letter sent

16  by Mr. Gorman to the Probation Office.

17             That's all I have in writing.  Is that everything

18  I'm supposed to have?

19             MR. JAFFE:  Yes from the Government, Your Honor.

20             THE COURT:  And do you have all of that?

21             MR. JAFFE:  We have all those items, Your Honor.

22  Our presentence report, the copy we have, does have an

23  addendum at the end which lists objections by the defendant

24  and the responses by the Probation Office.  I don't know if

25  the Court has that.

1          THE COURT:  Mine does, too --

2          MR. JAFFE:  Okay.

3          THE COURT:  -- so I did receive that version.

4          Mr. Gorman, have you had a full opportunity to

5     review the revised presentence report with Mr. Ramirez?

6          MR. GORMAN:  Yes.

7          THE COURT:  And are there -- well, I know there

8     are some guideline issues, but are there any factual

9     questions?

10          MR. GORMAN:  No.

11          THE COURT:  All right.  I have one.  It says date

12     of arrest, March 1st, 2006.  Elsewhere, I am aware that the

13     defendant was actually arrested November 14th, 2005, but I

14     don't see a state arrest in the history section on criminal

15     history, so who can tell me what the correct information

16     is?

17          MR. JAFFE:  Your Honor, the defendant was taken

18     into state custody most certainly November 14th of 2005.

19     As to when he was transferred to federal custody, if I --

20     Court's indulgence.

21          THE COURT:  Okay.  But there never -- he has

22     not -- this sentence should date from November 14th, 2005.

23     He's been continually in custody of someone since that

24     date?

25          MR. JAFFE:  Yes, Your Honor.  Absolutely.

1    THE COURT:  All right.  Ms. Garner, I'm not sure

2 why that gap is or -- is it under related cases?  Did I

3 miss it?

4    MR. JAFFE:  Paragraph 5.

5    PROBATION OFFICER:  Paragraph 5.

6    THE COURT:  Paragraph 5?  Okay.  There it is.

7    Well, the face sheet should show state custody

8 November 14th, 2005, charges dismissed in favor of federal

9 prosecution, so it needs to make sure that this sentence

10 starts from that original arrest.  Okay?  Good.  Thank you.

11    The guideline issues, as I understand it, the

12 defense objects to any guideline raising above 43?  Is that

13 the way I understand it?

14    MR. GORMAN:  Yes.

15    THE COURT:  Okay.  I guess the enhancements that

16 I see here for each of the offenses are based upon -- oh,

17 I'm sorry.  I forgot to have the interpreters sworn in.

18    Thank you, Ms. Derro.

19    (Interpreters sworn.)

20    THE COURT:  There are guideline enhancements for

21 role in the offense for each of the -- well, for many of

22 them, based upon the general role the defendant had in

23 MS-13 rather than specific aspects of each of the

24 underlying offenses.  And I had been, in this case, not

25 adopting that approach but, rather, focusing on role in the

1   underlying conduct, so it's going to moot out the defense

2   argument with regard to Groups 1 -- 1, 2, 3, and perhaps

3   some of the others if -- unless the Government has a

4   different argument it wants to make.

5            MR. JAFFE:  Court's indulgence.

6            THE COURT:  Um hum.

7            MR. JAFFE:  Your Honor, the Government does

8   concur with the Court's reasoning on that.

9            THE COURT:  Paragraph 33, we're going to delete

10  so that Group 1 will have an Adjusted Offense Level 43.

11  Group 2, we're going to delete paragraph 39, with the same

12  result.  Group 3, we delete paragraph 45, again resulting

13  in a 43.

14           Group 4 is assault with intent to murder, and,

15  again, I think paragraph 51 is not appropriate, so that for

16  Group 4, we end up with a 35.

17           Group 5, paragraph 59 added a 2.  I don't know if

18  the Government agrees so much on that one.  It really is

19  not going to matter, I don't think, in guideline

20  ultimately, but --

21           MR. JAFFE:  Your Honor, I must apologize.

22  Conferring right now and listening to the Court, when we

23  concurred with the Court's reasoning, we were concurring

24  with the Court's reasoning that -- for the basis listed for

25  the role adjustment.  We understood the Court's position

 1    that that is not a factual basis to support the role

 2    adjustment.

 3         What there was some confusion at this table was

 4    whether the Court wanted to hear factual arguments to

 5    support the role adjustment on an alternate basis --

 6         THE COURT:  Do you contend that there is for the

 7    murders as opposed to, perhaps, for the robbery?

 8         MR. JAFFE:  We do believe, Your Honor, that

 9    there's a factual basis to support a role enhancement for

10    the murders and are prepared to argue the factual reasons

11    when the Court is ready to hear that.

12         THE COURT:  All right.  Then I do need to start

13    hearing some of that.  I just do not think that general

14    role in the gang is appropriate when the guidelines tell us

15    to focus on the underlying conduct in terms of assessment.

16         MR. JAFFE:  Indeed, and that was my mistake, Your

17    Honor, in responding to the Court's colloquy right now.

18         With respect to counts -- withdrawn.

19         With respect to Groups 1 and 2, the murders of

20    Mr. Cerda and Mr. Trujillo, and -- first, and that involves

21    what we've been, on the Government's side, referring to as

22    the Quintana Street double homicides of October of 2005,

23    the Government would submit there is a factual basis to

24    support a role enhancement for the defendant with respect

25    to those murders.

1     As the Court will recall, there was testimony

2  from cooperating witnesses that this murder was preceded in

3  time, earlier the same day, I believe, with a meeting of

4  the TLS clique, and the meeting was called and presided

5  over by this defendant, along with Mr. Eris

6  Marchante-Rivas, who is known as Struayboy.  And I believe

7  the testimony was, was that this defendant, along with

8  Struayboy, announced that this mission would take place,

9  and they gathered some MS-13 members from another clique

10  and distributed some firearms and selected some drivers to

11  go and do this crime, one of the drivers being the

12  individual known as Sombra, and that they drove to the

13  location to go do this murder, and the defendant actually

14  is one of the people who left.

15     And focusing on a role enhancement for these

16  crimes, the Government would draw the Court's attention to

17  that testimony that showed that the defendant not only

18  called the meeting on this date but called the meeting and

19  directed the discussion about how and why to do these

20  murders and picked people to do -- and helped pick people

21  to do things like the driving and who would join them, and

22  then the defendant actually went to the scene with the

23  group and went actually out of the car to where the murders

24  took place.

25     The Government would submit that the defendant's

1  words and actions that day demonstrated more than a mere

2  participant.  He was more of a leadership role, and that is

3  beyond the fact that he happened to be the first word and

4  was -- held that position by title.  He was acting on that

5  title that day as described by the cooperating witnesses

6  who testified about that incident.

7        So that is the extent of the Government's

8  argument for Groups 1 and 2, and I believe I'm leaving out

9  the other violent act, Group 4, which deals with that same

10  incident, the injuring or the wounding of Mr. Paredes.

11        And for -- if I could move on to the Group 3,

12  which involves the victim Rubi-Martinez, I think there are

13  some additional facts there, beyond the defendant's mere

14  title, that showed that he had a leadership role.

15        If Your Honor will recall, the testimony of

16  Mr. Medina, one of the cooperating witnesses, as well as

17  Mr. Dominguez, Sombra, was that the defendant, of course,

18  held the TLS leadership role on this date, but I think it

19  was Mr. Medina said that the defendant was at the scene

20  long before the shooting happened and communicated to

21  Mr. Medina that he had seen some chavalas in the location.

22  He wanted them dead, and he wanted Medina to drive him to

23  go retrieve guns to do this murder.

24        Testimony from Medina and Dominguez also was that

25  after the gun was retrieved, there was a meeting of the TLS

1    clique a short distance away from where the murder

2    ultimately happened.  During that meeting, this defendant

3    along, again, with, I believe, Marchante-Rivas, selected

4    one of the two people who would be the shooters for this

5    crime.  And as we know, Ramirez provided the weapon that

6    was going to be used for this crime.

7          And Ramirez, since he knew where the victims

8    were, pointed out where the victims would be.  And then

9    once the defendant -- the shooters went out to commit the

10   crime, the defendant was present when the other people were

11   selected to go pick them up and take them away.

12         So, again, the defendant didn't just have the

13   title of leadership role for the murder of

14   Mr. Rubi-Martinez, but he actually also not only provided

15   weapons but took part in the planning and selection process

16   as to who would commit the crime.

17         So the Government would submit that there is a

18   factual basis to support the role enhancement for Group 3.

19         And I think, Your Honor, that those arguments

20   take us up to the armed robbery of November 14th, 2005, and

21   I wasn't sure at this point whether the Court wanted

22   additional factual argument of that, so I'll --

23         THE COURT:  Right.  Paragraph 59 -- why don't we

24   hear everything?  Let me see.  Paragraph 59 suggests a

25   two-level upward adjustment in that one.

1            MR. JAFFE:  Your Honor, the Government believes,

2    especially given that the defendant's mere title is not

3    sufficient for a full enhancement, that the two-level

4    enhancement's appropriate simply because the cooperator

5    testimony that was presented to the Court, as well as the

6    witness testimony, I think established the defendant did

7    have a type of supervisory role.  But unlike with the

8    murders, I don't think the testimony came out as clearly

9    that the defendant was orchestrating everything and making

10    the types of selections and planning and choices in this

11    robbery as in the murders.  That I believe, instead, the

12    testimony was a number of people were making suggestions

13    and doing things.  Some were taking orders and more than

14    one, maybe, were giving directions.

15            So the Government would believe that while the

16    defendant certainly had a supervisory role, an enhanced

17    role, given the testimony for the robbery, that testimony

18    didn't rise to the same level of overall control that we

19    saw in the murders.

20            THE COURT:  That would apply, your argument, to

21    Group 5, 6, 7 --

22            MR. JAFFE:  And 8 as well.

23            THE COURT:  Mr. Gorman.

24            MR. GORMAN:  Your Honor, it's our position that

25    there was no leadership role in any of these incidents,

that he was there but that he was not the trigger man.  He

didn't tell anyone who to kill.  He didn't even know the

people who were murdered.  That he had just been in the

country for a short period of time and that he was part of

the group, but he was not in a leadership position in any

of these incidents.

As far as the murders are concerned, he didn't

tell anyone who to kill.  He didn't point out the persons

that -- who should be killed.  There was no testimony that

he was the one that actually pulled the trigger in any of

these incidents.

So based on that, we'd suggest to the Court that

he was not in a leadership position in any of the murders.

As far as the robbery is concerned, there's no

testimony that he ever had the gun within the premises,

that he was not the one who did anything to the woman

inside the premises.  He didn't have any sexual contact

with her.  He never -- if I remember correctly, there's no

testimony he ever pulled a gun within the premises, and for

those reasons, we'd suggest to the Court that, although the

jury certainly convicted him of these, that the Court

should not put an enhanced penalty on him in a leadership

capacity in any of these incidents.

THE COURT:  Government want to identify for me by

name, if you can, who the five or more were, or are you

1  contending this was otherwise extensive?  I mean I can

2  name -- the first step in deciding if there's to be a

3  four-level is was this -- each of these offenses, not MS-13

4  generally, involve five or more participants?

5           On October 9th, we have the defendant.  We have

6  Marchante-Rivas.  We have Juan Dominguez.  Who else do I --

7  did we hear evidence?  I mean I'm pretty sure there were

8  more than --

9           MR. JAFFE:  Yes.

10          THE COURT:  -- five on that occasion.

11          MR. JAFFE:  The people were -- and we can even

12  narrow it down, Your Honor, to who actually was traveling

13  to the scene, putting aside the meeting.

14          Your Honor mentioned Mr. Marchante-Rivas.

15  Mr. Dominguez.  The person known as Estraño from the PVLS

16  clique.  Mr. Ramirez himself.  That's four right there.

17  And then he mentioned more than one individual from an

18  MS-13 clique in Virginia who was in the first car.  If Your

19  Honor will recall the testimony, there were two automobiles

20  who had both -- and even our -- Mr. Parades said both were

21  full of people, four or five per car.

22          We know one of those cars, again, was

23  Marchante-Rivas, Ramirez, Dominguez, Estraño, PVLS, and

24  then there were multiple individuals.  And I don't know if

25  we had from the testimony an exact number as to how many

1   from the MS-13 clique in Virginia, but clearly more than

2   one.  So that's a minimum of five and more likely six,

3   seven or eight, if you -- given -- plus or minus on the

4   Virginia MS-13 members.

5           So those are just of the group that traveled on

6   October 9th.

7           THE COURT:  What about the next date?

8           MR. JAFFE:  For Mr. Rubi-Martinez, we have

9   Mr. Marchante-Rivas, the defendant, Victor Ramirez,

10  Mr. Medina and Mr. Dominguez.  That's four.

11          Then there were the two shooters, the person

12  known as Vampy and the person known as Estraño from the TLS

13  clique, so there's six right there.  And then I think -- I

14  think I'll just stop right there.  There's six, at least,

15  and I'd have to go back and look to see if there were more

16  than six.

17          THE COURT:  Do you want to be heard on that,

18  Mr. Gorman?

19          MR. GORMAN:  Our position hasn't changed, Your

20  Honor, that the evidence is still insufficient.

21          THE COURT:  I'm going to reserve on this until I

22  can have my trial notes brought in so I can review some of

23  it.  I was not aware I was going to be facing this

24  particular factual question.

25          Ultimately, I think, first of all, Mr. Gorman's

1    objection is not well taken.  While ultimately, if the

2    number for offense level is over 43, we consider it to be a

3    43, but that does not mean that enhancements bringing an

4    offense level at some point over 43 cannot be considered.

5    In my looking at it, though, ahead of time, I had not

6    realized that the Government would be pressing these

7    enhancements based upon the facts relating to each event.

8    I'm going to take another look.

9         But even if we only had 43s on each of the first

10   three groups, we would still end up at a 43 after all of

11   the offenses that underlie Count 1 were taken into account.

12   I will finish this before we finish the proceeding, but we

13   don't need to wait because ultimately we will have an

14   offense -- for Groups 1 through 8, we will have an offense

15   level of 43, criminal history category of 1, and then Group

16   9 is a mandatory consecutive sentence.

17        So for guideline purposes, I think we can proceed

18   without me making that final decision as to whether I will

19   enhance any of the counts for role adjustments.  Because

20   even if we drop everything out, we still end up with a 47,

21   as far as I can tell.

22        Does the Government have any presentation to

23   make?

24        MR. JAFFE:  Your Honor, the Government does have

25   comments, and we've noted at the bench there are some

1    individuals here in court today who wish to make

2    statements.

3              THE COURT:  Well, then let's proceed with that.

4              MR. JAFFE:  Okay.  Your Honor, the Government

5    would submit that under the 3553 factors, under the

6    guidelines and in the interest of justice, that a life

7    sentence is the appropriate sentence in this case.

8              I'd first, Your Honor, direct the Court to some

9    of the incidents that we just talked about in doing the

10   guideline analysis, submit that the defendant's actual

11   participation in the incidents that the Court heard a great

12   deal of testimony about during trial by themselves support

13   a life sentence in this case, and the incidents I'm

14   focusing on, Your Honor, are the murders and the wounding

15   that took place on October 9th of 2005, the murder on 14th

16   Avenue of Mr. Rubi-Martinez that the Court heard testimony

17   about that occurred a few weeks later, in October of 2005,

18   as well as the rape and robbery that occurred in the

19   apartment in Blueridge on November 14th, 2005.  The

20   Government would submit that these acts, especially when

21   taken together, support the life sentence.

22             First, the October 9th incident.  I'm calling it

23   the incident, but what it was was the defendant's

24   participation in a brutal, wanton act of murder which

25   resulted in two murders and a third individual being shot

1    in the leg, and it was even more than that.  This was

2    premeditated.  Your Honor heard the testimony that the

3    defendant and others met and discussed and planned doing a

4    hit of chavalas, of rival gang members, and then went out

5    armed, in two automobiles, to case the scene, as it were,

6    to go to where they were directed, where they believed the

7    chavalas would be, and drove around in a circle, around the

8    blocks, to check their targets before they parked out of

9    the way and then could walk up to their victims and fire.

10        Was the defendant a triggerman?  The evidence did

11   not support any such finding, mainly because there wasn't

12   anybody on the scene who could make an identification.

13   Rather, the testimony was the defendant was one of the

14   individuals armed with a weapon, who left the car with the

15   gun.  Gunshots were fired, and we know from a victim on the

16   scene that, in fact, people fired at least one gun, and the

17   ballistics showed two guns, and the defendant and others

18   came back, and the defendant was one of the people with a

19   gun on the way back.

20        The defendant clearly had the intent to murder,

21   and the evidence proved that beyond any doubt.

22        And, again, it wasn't just that these two young

23   men were killed and another was injured.  This was so

24   reckless and so wanton.  Gunshots were firing everywhere.

25   I don't know if Your Honor remembered from some of the

1    forensics that a bullet went into a house.  Bullets were

2    flying everywhere.  This was very much a situation where

3    not only these two individuals were killed, but others

4    could have been killed.  People in their homes could have

5    been killed.  And it was really amazing that only two

6    people were killed given the nature of the defendant's and

7    the other's actions in this incident, in what happened

8    October 9th.

9         I mean the defendant, I submit, Your Honor, in

10   his planning and his role, in his participation in this

11   crime and how senseless and unprovoked it was and how

12   brutal it was, that it supports a life sentence.

13        And then, Your Honor, you factor in what happened

14   a few weeks later in the Four Stops area in Langley Park.

15   I've already alluded to some of what the trial evidence

16   showed, that the defendant tells Mr. Medina to go with him

17   to go get a gun to kill some chavalas who he thought were

18   dealing drugs or otherwise in MS-13 territory and that the

19   defendant presided over a meeting and helped run a meeting

20   where two people were chosen to go and execute these

21   alleged chavalas, not even knowing for sure whether or not

22   they were gang members, and that that's exactly what

23   happened.  And as a result of the defendant's getting a gun

24   and participating in the planning and the targeting and all

25   of that to lead up to this murder, in fact, this person

1    Vampy and this person Estraño went up and shot

2    Mr. Rubi-Martinez in the chest in front of his own father,

3    and the man practically died in his father's arms.  It was

4    just an absolutely, again, random, heinous crime in a

5    public location where others quite easily could have been

6    shot or killed as well.

7         And it was done why?  Because the defendant was a

8    member of MS-13, because he thought there might have been

9    rival gang members in the territory.  It was this same

10   brutal senselessness, the senseless violence perpetrated by

11   this gang and orchestrated and perpetrated by this

12   defendant that the Government would submit more than

13   justifies a life sentence taken by itself or connected with

14   the October 9th crime.

15        And then, Your Honor, we'd ask you to then factor

16   into that what occurred on November 14th, 2005 in that

17   apartment in Blueridge where the defendant and the four

18   others targeted this brothel for one of their program, la

19   programa robberies.  And if Your Honor will recall the

20   testimony, especially of Mr. Medina, that this wasn't the

21   first such crime that the defendant either planned and/or

22   participated in and that, in fact, the defendant had

23   participated in these robberies of brothels in the past as

24   part of the program.  That, in fact, the defendant had

25   actually participated in the rapes of prostitutes prior to

this incident and this robbery and rape of November 14th,

2005.  And that a firearm was present for this and was used

and was brandished and the defendant at times during his

time in the apartment brandished and possessed that weapon.

But the testimony was it wasn't just a robbery

and rape, if such a thing could be said, just a robbery or

rape.  I mean this was violent.  People who were in the

apartment were tied up with their own shoelaces and

threatened with death if they looked up at the people who

were robbing them or resisted in any way.  And the woman

who was in the back, who was working at the brothel that

day, also testified about how vicious her assaulters were.

She didn't know the identities of which people were

assaulting her, but of the four people in the apartment,

she was quite clear that each had a role.  Three raped and

sodomized her repeatedly and one watched.

And was the defendant part of that group that

assaulted her?  Most certainly.  Not only was the aiding

and abetting legal language more than sufficient to prove

that, but factually, and just as a common sense way, it's

clear the defendant was a full, knowing, active and

enthusiastic participant in every aspect of this crime

because the defendant was found to possess, not only the

property of some of the male victims in the front of the

apartment, but he had some of the female victim's property

1  on him as well.  I'd submit, Your Honor, without question

2  this defendant was a wholehearted, enthusiastic participant

3  in every aspect of this vicious and violent act that

4  occurred on November 14th, 2005.  Again, another act with a

5  weapon, an act of violence and an act of violation.

6          And you factor that in with the crimes in Langley

7  Park, the murder of Rubi-Martinez and the murders of

8  Mr. Trujillo, Mr. Cerda and the assault on Mr. Parades on

9  October 9th, I'd submit that this very short period of time

10 the defendant was in the country and participating very

11 actively in all these acts of violence more than supports a

12 life sentence in this case.

13          But there is even more, I'd submit, Your Honor,

14 what the defendant did, what he said, who he was, all the

15 factors that Your Honor is told to consider in 3553 that

16 support a life sentence, and that is the defendant's

17 overall role in MS-13, his overall role in TLS, while not

18 sufficient to support a role adjustment under the

19 guidelines, I'd submit, is something that the Government

20 would ask you to consider in formulating a sentence under

21 the 3553 factors.

22          And here, the testimony, the evidence, especially

23 the Otis Street video, speak volumes of who the defendant

24 is, the nature of the defendant, the nature of his overall

25 conduct in Count 1 and in his role in this enterprise.

1          The defendant was a member jumped into MS-13 in

2     El Salvador, a full-blooded, enthusiastic participant in

3     the culture, in the goals and the objects of MS-13 and the

4     MS-13 racketeering conspiracy.  It was seen time and again

5     in the video, the defendant flashing signs, elbow to

6     elbow with these leaders, like Trece and Cisco, and the

7     others that were seen in the video.  When -- also throwing

8     signs and shoulder to shoulder with these individuals when

9     people are yelling out death and murder and kill the

10    chavalas and all the other words and phrases that were

11    shouted out and recorded and memorialized on the Otis

12    Street video.

13          And to the extent that there could be any

14    possible argument that somehow any aspect of that video was

15    unclear or nebulous in any way, it was corroborated by the

16    words of cooperating witnesses who saw this man in action

17    when he came to the United States, and that is people like

18    Medina and Dominguez, and even Wilbur Martinez, who

19    testified about how the defendant reveled and glorified the

20    violence of MS-13.

21          And not only that, but the role that he took

22    within the clique here in Maryland, that he took a

23    leadership role, that he took a role as a father and a

24    teacher, if you will, to the newer members.  That Medina

25    learned the rules of MS-13 from Ramirez.  It was either

1    Medina or Dominguez who said that Ramirez took the role of

2    schooling, I think was the word, others in the rules and

3    the language, the culture of MS-13, the tattoos, the

4    colors, the signs, all of those things.

5            And I'd submit all of that is particularly

6    significant given the testimony, given the evidence that

7    showed that the defendant came to the United States,

8    contrary to what we see in some of the defendant's

9    submissions, not to better himself, not to escape something

10   but, on orders of the MS-13 leadership, to bring the most

11   violent and most intense form, if you will, Your Honor, of

12   what TLS and MS-13 were about in El Salvador to the United

13   States, to Maryland, to this community.  That's what the

14   testimony was, that's what the defendant did, and that's

15   what the evidence showed time and again throughout the

16   course of this trial.

17           The defendant came here to be a member of MS-13,

18   to be a leader of the TLS clique and to make sure the TLS

19   clique of MS-13 lived up to the rules of MS-13, to attack

20   chavalas, to kill them when you can and to show the colors

21   and to represent and to control the territory.  That was

22   his mission.

23           And on October 9th of 2005, at The Four Stops in

24   Langley Park a few weeks later, at the Blueridge apartment

25   and at the other incidents that the cooperators alluded to

1    and made reference to and described for us over the course

2    of this trial, the defendant did just that time and time

3    again.  He brought Trece and Cisco and all of those people

4    from MS-13 in El Salvador incarcerated in that prison, and

5    he brought them in spirit and in word and deed into this

6    clique in Maryland, into this community in Maryland, and

7    most ruinously into the lives of the victims we've been

8    talking about here today.

9         And the Government would submit based on all the

10    evidence that's been supported and been presented to this

11    Court and to the jury here over the course of this trial

12    and been demonstrated in the Probation Office's presentence

13    report, that everything here, based on the evidence and the

14    interest of justice and the law support a life sentence in

15    this case, and the Government would ask you to impose that

16    sentence.

17         THE COURT:  Are there people who would like to be

18    heard in addition to the written statements I've received?

19         MR. PARK:  Your Honor, if I might.

20         THE COURT:  Um hum.

21         MR. PARK:  Your Honor, we'll probably need an

22    interpreter's assistance.

23         THE COURT:  Um hum.

24         EDDIE TRUJILLLO'S MOTHER:  (Through interpreter)

25    I'm Eddie Trujillo's mother, and what I want to talk about

1    is how this has, in part, affected me.  I cannot tell it

2    all.  Very often I go by the place where he has been

3    killed, and when it's time when there's warm weather, I

4    think that he's lying there and that he cannot get up.  And

5    when it is cold weather, I think that he's lying there and

6    that he cannot get up either.

7             And sometimes when it's dark, I go by there and I

8    think that he might be there lying down, and there's

9    nothing I can do for him.  It seems that I'm thinking of

10   him all the time, but in those particular instances I think

11   of him even more.

12            And what has been said here about the murders,

13   what has affected me the most has been when they took the

14   eye of the young man.  This is something I cannot forget,

15   and I would think that maybe if I talk about it, I can get

16   over it.

17            I don't know if this can be done here, but I

18   would love for you to see pictures of my son.  If that is

19   allowed, I would do so.  If not, that's all I have to say.

20   Thank you.

21            THE COURT:  Has the Government seen any of these

22   pictures?

23            MR. JAFFE:  No, Your Honor.

24            THE COURT:  If you have them and show them to

25   Mr. Park, he might be able to help me decide if this is

1    something that is appropriate for me to see at this time.

2           MR. PARK:  Your Honor, I have had a chance to

3    take a look at these very briefly.  They do appear to be

4    just family photos, and I think they might be appropriate.

5    I'll show them to Mr. Gorman first.

6           THE COURT:  Certainly show them to Mr. Gorman.

7           MR. PARK:  If I might assist, I'll put them up on

8    the ...

9           MR. GORMAN:  Your Honor, at least some of these

10   are not of the victim.  I don't know what kind of relevance

11   they're going to have.

12          THE COURT:  Well, all right.  Let's --

13          EDDIE TRUJILLLO'S MOTHER:  They're family only.

14          MR. PARK:  I believe ...

15          EDDIE TRUJILLLO'S MOTHER:  This is my son

16   (indicating on photograph).

17          This is the card that he sent on my birthday.

18          This is my birthday.

19          This is the graduation of his sister.

20          THE COURT:  Um hum.

21          EDDIE TRUJILLLO'S MOTHER:  This is also.

22          That is his little girl.

23          Thank you.

24          THE COURT:  Thank you.

25          MR. PARK:  Your Honor, I believe there's one

1    other individual who wanted to speak, Mr. Rubi-Martinez.

2              MR. RUBI-MARTINEZ:  (Through interpreter) I am

3    the father of Roberto Alejandro.  I feel very bad.  Since

4    that happened, my life has changed.  Because he was a

5    person, he was the biggest one, and we never had any

6    problems here.  I don't know why this happened.  It has

7    affected all my family.  His younger brother has been

8    affected a lot.

9              Well, I think -- well, that's all I can say.  I

10   don't have any -- yes, that's all.  Thank you.

11             THE COURT:  Thank you.

12             MR. PARK:  Your Honor, I apologize to be

13   ping-ponging back and forth between myself and Mr. Jaffe.

14   I just want to flag -- that's, I think, all we have in

15   terms of presenting witnesses and argument.  I did want to

16   flag something for the Court in terms of guidelines

17   calculations.  I don't think it affects the ultimate

18   calculations, but on the counts related to the robberies,

19   the armed robberies, I think there was a calculation in

20   there adding five levels for brandishing of a firearm.  I

21   think, given the 924(c) conviction, that enhancement

22   actually would not necessarily be applicable in this

23   particular instance.

24             It doesn't affect, I think, the overall

25   calculations because regardless of whether or not there's

1  five levels or not added, it's still going to be nine

2  levels or more or less than the highest level, but I did

3  want to flag that for the Court in terms of, I think, what

4  would be the correct calculation of the guidelines.

5          THE COURT:  Ms. Garner, I know it's short notice.

6  Do you agree that it should drop out there?

7          PROBATION OFFICER:  Yes, Your Honor.

8          THE COURT:  Before I turn to Mr. Gorman and the

9  defendant, let me try to resolve some of the ultimate

10  guideline issues here.

11          I have had a chance to review my notes and

12  refresh my recollection a little bit more about the

13  specifics of the evidence concerning Mr. Ramirez's role.  I

14  do credit the testimony that I heard concerning the purpose

15  for Mr. Ramirez being in this area and his general role in

16  the meetings for the brief period he was here.

17          The guidelines have a bit of a sliding scale in

18  terms of role, and I'm going to conclude that, with regard

19  to the murders and the wounding on October 9th, as well as

20  the murder on October 23rd, that the defendant did have an

21  aggravating role, but not at the four-level -- four-point

22  level.  The -- and some of these remarks may be more

23  general than specific.

24          This overall activity of course, was people who

25  adhere to the general credo of MS-13, the decisions to go

1   after chavalas being one of the basic tenants of the

2   overall gang, so all of them involved were adherence to

3   that particular goal.

4            The Government's position and the evidence showed

5   that Mr. Ramirez came here to assist in enhancing, perhaps,

6   the adherence to the rules, but he was not the kingpin, as

7   we say.  He was more an agent of those who might have been

8   more in a leadership role.

9            And when you ask people to remember back and

10  testify about events that happened in the distant past, it

11  may not be as precise as the Government might think in

12  terms of who exactly said what under what circumstance, and

13  while I conclude that there were five or more participants

14  in each of these events, I'm going to conclude that the

15  defendant was more a manager or supervisor rather than the

16  full organizer or leader in this.

17           There were at least two people who were giving

18  more direction, and the defendant was one of those.  He was

19  not the only one, however, and I find that the testimony,

20  for instance, from Mr. Dominguez with regard to one and

21  Mr. Medina with regard to the other falls a little short of

22  the specifics that the Government believes.

23           So we'll add three for the roles in Counts 1 --

24  Group, rather, 1, 2, 3, 4 -- and 4.

25           With regard to the robbery, which is Groups 5, 6,

1    7 and 8, I do find that the two level is appropriate.  The

2    defendant, I think, from the evidence, was not merely one

3    of the crowd but was leading the activity, both in terms of

4    having suggested it and having participated in it before

5    and having directed the others on that particular occasion.

6              So let me see.  Group 1, we have 46.  Group 2 is

7    46.  Group 3 is 46.  Group 4 is 38.  Group 5, 28?  Is that

8    right?  Let me see here.  28.  Group 6 is a 24.  Group 7,

9    24.  Group 8, 24.

10             That means we have one unit for Group 1, one unit

11   for Group 2, one unit for Group 3, a half unit for Group 4,

12   zero units for Groups 5, 6, 7 and 8, so we end up, I

13   believe, at a 50, which, of course, is then considered 43,

14   as I said before.  But I think that's where we are.

15             And then Group 9, I've not heard any question

16   about it.  There -- ten years mandatory minimum is the

17   guideline.

18             Okay.  Mr. Gorman.

19             MR. JAFFE:  Your Honor, with that last point,

20   Count 9, the 924(c), it's our recollection, referred back

21   to the brandishing of the firearm at the Blueridge

22   incident.

23             THE COURT:  Right.

24             MR. JAFFE:  So the brandishing carries the

25   seven-year sentence.

1          THE COURT:  Seven years?

2          MR. JAFFE:  Yes.

3          THE COURT:  Oh, rather than the use of it during

4    any of the murders.  You're right.  Absolutely.

5          MR. JAFFE:  Wasn't discharged.

6          THE COURT:  Right.  Okay.  Mr. Gorman.

7          MR. GORMAN:  Can we approach the bench again?

8          THE COURT:  Um hum.

9          (Counsel approached the bench.)

10          MR. GORMAN:  Your Honor, it looks like there's

11   only four people in the courtroom that are not court

12   personnel.  I'd ask the Court to consider sealing my

13   argument at this point and asking them to be removed from

14   the -- leave the courtroom until the time the Court

15   actually does the sentencing, or else I have to do my whole

16   argument up here, which I prefer not to do.

17          MR. JAFFE:  The Government doesn't quite

18   understand.  The Government believes that the Court's

19   solution of just having -- segmenting the argument so that

20   any portion dealing with proffers could be done up here and

21   the remainder done in public court was a fair resolution to

22   this issue, and the Government asks that the Court impose

23   that.

24          MR. GORMAN:  My whole argument's going to be on

25   this issue, more or less touching on it, so I don't -- I

1  don't see the great disservice of asking these four people

2  to leave the courtroom so I can do my argument.

3          THE COURT:  The person on the left-hand side, I

4  was told ahead of time, is someone who is learning to do

5  interpretation and not -- that's the one on the left.

6          MR. GORMAN:  So it's three people.

7          THE COURT:  The others are the parents of the

8  two -- two of the victims and another family member?

9          MR. JAFFE:  Yes, Your Honor, the sister of a

10  victim, people uniquely interested in what's going on in

11  these proceedings.

12          THE COURT:  None of whom are at all affiliated

13  with MS-13.  If the fear is that MS-13 is going to learn of

14  his perspective, I mean that certainly does not obtain.  I

15  don't -- there's one thing to seal a -- to ask people to

16  leave a public event.  It's another thing for me to direct

17  Ms. O'Neill not to release this transcript to anybody.

18          MR. GORMAN:  They have a motive of revenge

19  against my client.  There are close relatives that were

20  killed.  They could use this information in a way that

21  could harm him once he's incarcerated.  You know, it seems

22  to me that the defense ability to present an argument at

23  sentencing far outweighs their ability to hear what I have

24  to say.

25          THE COURT:  Tell me what it is that you think he

1    did.  Proffer to me.  Tell me now.  You're not going to

2    present evidence, I assume.  It's going to be your --

3              MR. GORMAN:  No, it's going to be -- I mean do

4    you want me to do my whole argument here?

5              THE COURT:  No, I want you to tell me factually

6    what you believe the defendant did that you want me to know

7    about so I can have some idea.

8              MR. GORMAN:  My argument is going to go to the

9    four proffer sessions, at least four proffer sessions, that

10   the defendant had with the Government, his cooperation with

11   the prosecution --

12             THE COURT:  Tell me what the -- tell me about it.

13             MR. GORMAN:  On four separate occasions, he had

14   at least, I'd say, about two-hour proffers with the

15   prosecution in the hope of getting a plea arrangement.  He

16   was questioned.  On all of these occasions, there was at

17   least one or two prosecutors here.  A number of law

18   enforcement officials were present.

19             He explained to them his role in the -- in MS-13.

20   They asked him a number of questions on each and every

21   occasion.  On each and every occasion, he cooperated.  They

22   thought enough of his cooperation that they brought him

23   back a second time and a third time and a fourth time.

24             He was scheduled -- or he was going to cooperate

25   including, but not limited to, testifying in court, like

some of these other witnesses did who testified in front of him, testified in his trial.

During the course of this, his family in El Salvador received death threats.  There was a publication made, I guess like a newsletter, suggesting that he was a cooperator.  That we brought this to the attention of the prosecution.

My client weighed these factors and decided that he couldn't testify because he thought that not only would he be killed but, more importantly to him, that his whole family in El Salvador would be killed.  So he wasn't -- he felt at that point he wasn't in a position to be a cooperating witness.  At that point in time, the plea negotiations fell apart because he wasn't willing to be a witness.

And we'd suggest that that's a level of acceptance of responsibility.  It's a level of cooperation. I think when the Court takes into consideration what the sentence should be in comparison to what -- the sentence some of the cooperators will receive, that he deserves -- that the Court should consider a sentence less than the life sentence requested by the prosecution.

These other people who were actually the triggermen, who admitted doing multiple robberies, rapes, killings, are they going to get life in prison?  Because --

1    is there going to be a difference in his sentence of 30

2    years because they spent two or three hours up here and he

3    didn't because he thought his family was going to be killed

4    in El Salvador?  That's the nature of my argument.

5         MR. JAFFE:  Your Honor, a couple things.  First,

6    one of the reasons, the main reason why the defendant was

7    not cooperating, from the Government's perspective, is

8    because the defendant was not truthful about many aspects

9    of what he was purporting to be telling us at points in

10   time.

11        Indeed, while counsel presents to us -- to the

12   Court four proffer sessions as if they were a linear

13   progression of providing more information, the reality was

14   it was a back and forth of telling some lies, then

15   suggesting he's come to see the light and wants to speak to

16   us again, and then telling some half-truths and not wanting

17   to talk to us and then coming back and saying this time

18   it's for real.  And perhaps the Government should be

19   faulted for riding the merry-go-round as long as they did,

20   but we did and gave him every opportunity to come forward

21   and be truthful, and he was not.

22        A case in point would be something as basic as

23   why was Mr. Ramirez in the United States?  Time and again

24   we heard stories about he was running from the police,

25   running from MS-13, running for his life, starting a new

1    life.  The Government ran that to ground and proved it, to

2    the point we had witnesses available, that it was

3    completely false.

4           Counsel has made reference and the letters make

5    reference to publications identifying Mr. Ramirez as a

6    cooperator.  While counsel says he presented that to us,

7    what he presented was Mr. Ramirez saying that was so.

8    We've never seen and never found any such article or

9    writing or announcements that Ramirez was cooperating in

10   any Spanish publication or anywhere else.

11          Mr. Ramirez is a failed -- somebody who failed at

12   trying to cooperate.  He presented the Government

13   ultimately with nothing it could use against anybody and

14   did not use against anybody, and, therefore, he really, the

15   Government submits, should receive no benefit from coming

16   into the Government's conference rooms and telling some

17   things that probably were true and some things that were

18   quite clearly false.

19          And the Government, therefore, would submit there

20   should be no benefit to that, especially given the

21   defendant's conduct overall in the MS-13 enterprise.

22          The life sentence, if you compare him to people

23   who had his role, the Government would submit that a life

24   sentence is appropriate.

25          MR. GORMAN:  You know, I remember the testimony

1    of some of the cooperators.  They admitted lying to the

2    prosecution.  They admitted changing their stories.

3         THE COURT:  Mr. Gorman, I think -- here's where I

4    think I am on this.  I understand that the defendant has

5    spoken to the Government.  They have brought him back

6    several times, and that, undoubtedly, can be perceived as

7    attempting to cooperate.  But if you want me to be able to

8    go beyond that and conclude that he either has accepted

9    responsibility, either technically or under 3553E, or that

10   it was his decision not to continue the cooperation, we're

11   going to need to hear evidence.

12        I have conflicting proffers as to the substance

13   and the validity of what was said.  What is uncontroverted

14   is that there were discussions.  He came in on four

15   occasions.  The Government acknowledges that he did talk

16   about MS-13 but is not willing to concede that what he told

17   them was true in sufficient measure.  So I am not at --

18   unless there's agreement as to what happened, I'm not in a

19   position from proffers of counsel to resolve that.

20        But if you and Mr. Ramirez wish an opportunity to

21   present more than proffer, that is, if he wants to testify

22   or if you want to call Government agents as witnesses or in

23   some other fashion give me more specifics about what you

24   think he did say that constitutes an acknowledgment of his

25   own responsibility or a true attempt to cooperate, I'll

1  give you that opportunity, but I can't make any such

2  conclusion based upon proffers.

3          MR. GORMAN:  Then I'm going to need more time

4  than today, and I would ask that it be put off.

5          THE COURT:  I don't disagree.  I don't disagree

6  at all.  I had a feeling, you know, from all of this that

7  we might not complete today for a lot of reasons, but if

8  you want to try to do that and take some time, I agree

9  because --

10          MR. GORMAN:  Would the Court put that under seal?

11          THE COURT:  I'm sorry?

12          MR. GORMAN:  Would the Court allow that hearing

13  to be under seal?

14          THE COURT:  Let me see.  Yes.  I mean I may well,

15  or I may conclude that some of that testimony should not be

16  made public, but let me see.  I don't know exactly what

17  you're going to decide to do.

18          It's an important aspect, I understand that, but

19  the Government is taking a very different view of what they

20  heard, and I can't -- I don't know -- I don't want you to

21  misunderstand me.  I'm not sure how in the future I may be

22  able to resolve some of these factual disputes, but I'm

23  willing to listen.  If you think that their

24  characterization of it is unfair, then I'll see what I can

25  do.

1              MR. GORMAN:  May I have a moment with my client?

2              THE COURT:  Absolutely.

3              (Pause.)

4              MR. GORMAN:  Thank you, Your Honor.  We'd ask

5     that the matter be continued.

6              THE COURT:  Both because of the late start and

7     the matters that I've just talked about with counsel, we

8     will not be able to complete the proceedings today.  I

9     think -- do you have any idea, Mr. Gorman, how much time

10    you would want to prepare for the continuation?

11             MR. GORMAN:  Because I need to get an interpreter

12    lined up and have a few sessions with my client, I'd ask

13    for about 60 days.

14             THE COURT:  Okay.  What I'm going to suggest then

15    is, instead of actually setting a date, that I have a

16    telephone call with counsel in a week or so, and we

17    will discuss it and figure out --

18             MR. GORMAN:  Can I have a little more time than a

19    week because I'm having trouble getting an interpreter

20    because of one reason or another, and I might --

21             THE COURT:  What I meant was that we could

22    then -- okay --

23             MR. GORMAN:  Oh, I see.

24             THE COURT:  -- do it -- just schedule it at that

25    point, not -- because we don't really know -- just to

1    regroup.  But let's see.  Today's the 9th.

2            Friday, February 20th, is actually going to give

3    you almost ten days, at 9 for a telephone call?

4            MR. GORMAN:  That's fine with me, Your Honor.

5            MR. JAFFE:  Your Honor, if we could do any time

6    later that day?

7            THE COURT:  Certainly.  Are you available at,

8    say, noon, Mr. Gorman?  Noon?  Is that better?

9            MR. JAFFE:  Yes, Your Honor.

10           THE COURT:  Okay.  Then I'll have a telephone

11   call with counsel at noon on the 20th of February, and we

12   will discuss scheduling the completion of this and set a

13   schedule for any submissions that the parties might want to

14   make.

15           I gather, Mr. Gorman, from the nature of our

16   discussion that you would like to reserve on all of your

17   remarks pending that, is that right?

18           MR. GORMAN:  I would, Your Honor.

19           THE COURT:  Okay.  Then that's what we'll do.

20   We'll recess now, and we will schedule the completion of

21   the sentencing proceeding a little bit later.

22           Thank you.

23           (Proceedings adjourned.)

24

25

COURT REPORTER'S CERTIFICATE

-oOo-

I certify that the foregoing is a correct transcript from the record of proceedings in the above matter.

Date:

/s/

Sharon O'Neill